```
 1                IN THE UNITED STATES DISTRICT COURT

 2                         DISTRICT OF KANSAS

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                         Plaintiff,)  District Court
                                      )  Case No. 07-10223
 6   vs.                              )
                                      )
 7   TODD GEHRINGER,                  )
                                      )
 8                         Defendant,)
                                      )
 9   _____

10

11

12                  TRANSCRIPT OF MOTION HEARING

13

14          On the 22nd day of January, 2008, came on to be
     heard Motion Hearing in the above-entitled and numbered cause
15   before the HONORABLE MONTI L. BELOT, Judge of the United
     States District Court for the District of Kansas, Sitting in
16   Wichita.

17

18

19

20

21   APPEARANCES

22          The Plaintiff appeared by and through Mr. Chris
     Oakley;
23
            The Defendant appeared by and through Mr. Steve
24   Gradert.

25
```

CINDY L. SCHWEMMER, UNITED STATES COURT REPORTER
Wichita, Kansas  (316) 269-6363

1                    (Beginning at 2:20 p.m. January 22, 2008,
2                    the following proceedings were had.)
3          THE COURT:  This is United States against Todd R
4     Gehringer.  Case number 07-10223.  Chris Oakley appears for
5     the Government.
6          Are you Todd Gehringer?
7          DEFENDANT MR. GEHRINGER:  Yes, sir, I am
8          THE COURT:  All right.  The Defendant appears with
9     Steve Gradert.  We're here today on an appeal from a detention
10    order filed January 11, 2008.  No, the order was filed --
11    well, actually there was a -- apparently there was a first
12    order and then there was a motion to reconsider filed and
13    Judge Bostwick denied that order, that motion, on December 19.
14    Correct, Mr. Gradert?
15         MR. GRADERT:  That's correct, Your Honor.
16         THE COURT:  All right.  Well, I've read the motion.
17    Mr. Gehringer has written a letter to me.  I will be glad to
18    hear anything that he would like to say here today through you
19    or his witnesses.  Or he can testify.  What do you want to do?
20         MR. GRADERT:  Well, Your Honor, I planned to proceed
21    just by way of proffer.  I'm going to make a proposal to the
22    Court and then Mr. Gehringer wanted to briefly be heard by the
23    Court.  I do have a number of people here in support of
24    Mr. Gehringer.  All friends.  One is a potential employer who
25    was at the motion for reconsideration.  And just to give you a

1   little procedural background.  When we had the first detention
2   hearing Mr. Gehringer really didn't have a job to go to, Your
3   Honor, and we were making a proposal that he be released but
4   we didn't really have a very good plan.  And, of course, what
5   happened when we took it back to Judge Bostwick on our oral
6   motion for reconsideration, we had learned that Todd was
7   potentially employable by Larry Cook Construction Company and
8   a Mr. Steve Templeton, who's present here on the second row.
9   What he would be doing -- and we're still making that proposal
10  to the Court.  My client, Your Honor, has done a lot of
11  construction type work, framing, stucko and tile work.  In
12  fact, two of the men that are here today learned their craft
13  with regard to this tile work from my client Mr. Gehringer and
14  they're here in support of him.  They're not currently working
15  in that particular field, and they wouldn't be working with
16  the Defendant or Mr. Templeton, but they're here in support.
17  They say that everything they know they learned from my
18  client, and apparently he is very good at what he does when
19  he's doing it and, unfortunately, he hasn't been doing it for
20  a while.  As the Court knows, if you've reviewed the pretrial
21  order, he's been doing some other things and, of course, some
22  of the things he's been doing have been getting him into the
23  mess that he's in here in this case.
24           One of the things, Your Honor, is it's pretty clear
25  from his own admissions to the pretrial officer, and the

1    evidence in this case I suspect will reveal that he has a
2    pretty bad drug addition to the drug methamphetamine.  And I
3    think that's primarily the reason that he's in this mess that
4    he's in related to all of these various charges.  We believe
5    that he needs to have those issues addressed and one of the
6    things that we would propose, Your Honor, is for the Court to
7    consider placing him into drug treatment.  Now, Mr. Gehringer
8    would like to get out and go to work; and one of the reasons
9    for that, Your Honor, is because he wants to support those
10   that he loves around him.  And one of those is his girlfriend
11   Dana Elwell, who couldn't be here today but has been at the
12   previous hearings.  The -- it's my position that he may very
13   well be able to function well enough with outpatient treatment
14   and some mental health counseling.  And I think both of those
15   would be in order in his case.  I know that while he's been in
16   the Butler County jail, I think that one of the things that
17   prompted his letter to the Court was a little bit of
18   depression from his situation there in the county jail.  And
19   he even asked, as I understand it, to see somebody in their
20   mental health department or somebody from mental health and I
21   don't know if he's been able to get any counseling or any
22   treatment in that regard since he's been incarcerated.  But
23   that's something I think would be appropriate since he's asked
24   for it.
25              Certainly, Your Honor, if the Court felt that the

1    only reasonable condition of his release that would reasonably
2    assure the safety of the community and reasonably assure that
3    he is not a flight risk may very well be an inpatient
4    treatment program.  And I note that the pretrial report has
5    indicated that back when he was on some -- I think it was some
6    kind of a courtesy supervision out of Oklahoma for a
7    misdemeanor drug offense a number of years ago, Phil Messer,
8    our U.S. probation officer who used to be here, had supervised
9    Mr. Gehringer and had Mr. Gehringer in the inpatient treatment
10   program over at Options.  But I talked to Mr. Gehringer about
11   it and he had indicated that it really wasn't a complete
12   inpatient treatment program.  He successfully completed it and
13   was discharged.  But he told me that it was apparently at the
14   end of the fiscal year and we were out of money and they had
15   to get him out of the program a little before they would have
16   liked to have gotten him out.  And so he really only had a two
17   week program.  And, frankly, my experience and I know the
18   Court's commented on this before, these short term drug
19   inpatient drug treatment programs don't always do the trick,
20   especially with a drug like methamphetamine which is so highly
21   addictive.  So certainly that's an option that my client is
22   willing to work toward.  And then, of course, the Court could
23   review his situation upon successful completion of the
24   inpatient program over there.  If he successfully completes
25   the inpatient program at Options, Your Honor, there is a

1  reintegration program where he could live over there and he
2  could work while he's still living around and working in
3  therapy and with people who are in a similar situation with
4  regard to drug addiction and that would be I think productive
5  for Todd and it would also enable us to work a little closer
6  together in preparation of his case.
7       So those are the primary options, Your Honor, that
8  I'm proposing the Court for the Court's consideration.  And as
9  I indicated before, Todd's always had a lot of support at the
10 hearings that I've had in front of Judge Bostwick.  He has it
11 again here today.  I think people want to help him and help
12 him handle this case in the proper manner.  And I'd ask the
13 Court to consider those options.
14      THE COURT:  Well, what you haven't told me here is
15 why -- what's wrong with Judge Bostwick's order.  I mean, what
16 has changed since he -- you've been before him twice.  Judge
17 Bostwick is very reasonable.  What is there about his orders
18 that would make me modify them?
19      MR. GRADERT:  Actually, Your Honor, the only thing
20 that I would suggest that's somewhat different now than it was
21 when we appeared in front of Judge Bostwick, and that has now
22 been back in December, December 19th of 2007, is that I would
23 suggest that the Defendant, and as he appears here today, he
24 appears to be far better, in a far better state of mind than
25 he was on those early occasions.  I would have to say that he

1   was in a severe state of detoxification at the time of those
2   hearings.  I would imagine that that was fairly apparent to
3   Judge Bostwick.  And I think he's just in a far better frame
4   of mind, Your Honor, to be ready to do the things that I'm
5   asking this Court to consider allowing him to do.  Other than
6   that, Your Honor, there are not any real significant changes
7   in what my proposals are for this Court's consideration.  I
8   explained to my client that this is a de novo review process
9   but I know that this court generally isn't going to second
10  guess the decisions of the magistrate judge absent some change
11  in circumstances.  So that's the one that I would probably
12  offer as the best, Your Honor.  And that's the fact that I
13  think he's more ready.  And he can address the Court himself
14  with regard to what he's currently feeling, I think, in terms
15  of where his head is and the ability to abide by the
16  conditions that the court would impose.  I do know that Judge
17  Bostwick had some concerns, and this Court probably has some
18  concerns, with the issues of there's been a number of cases
19  particularly recently involving the incidents that are the
20  subject of our indictment in this case where there was fleeing
21  and eluding involved and I know that those raise caution flags
22  for courts with regard to whether an individual is going to
23  appear or not.  It's my understanding, Your Honor, that
24  Mr. Gehringer has had a couple of occasions where law
25  enforcement has been a little rough with him when they have

1   apprehended him.  In fact, he has told me that they have a
2   tape recording, and some of the people who are present here
3   have heard this tape recording, of an officer, a Wichita
4   police officer, basically telling him he was gonna make a
5   personal project out of him which my client perceived to be
6   somewhat threatening.  And he gets scared when he gets himself
7   in these situations and doesn't want the police to shoot him
8   or beat him up; and, unfortunately, he makes the wrong choice,
9   I think, by running because that just aggravates or
10  exacerbates the situation.  But I wanted the Court to be aware
11  of the fact that that's really his only reason for doing that;
12  and if ordered to appear, he will appear.  He does have a case
13  pending over in Sedgwick County District Court and he was on
14  bond in that case as I understand it.  He has been on bond
15  numerous times before and I believe his bondsman would be more
16  than glad to continue to stay on that bond and probably
17  wouldn't have bonded him if he thought that Todd was a true
18  flight risk.  So I'd like for the Court to take that into
19  consideration as well.  And I didn't have that information
20  when I was before Judge Bostwick either, Your Honor.
21            THE COURT:  Who's the bondsman?
22            DEFENDANT MR. GEHRINGER:  Larry Matthews.  Your
23  Honor, I'm a self-motivated person naturally when I'm not on
24  drugs.  I'm not on drugs now.  When I was being supervised by
25  Mr. Phil Messer, he gave me a choice to go to inpatient

1   treatment.  At the end of the financial fiscal year, it was
2   like December 19th or something like that, or 21st, I went
3   into the inpatient treatment and it lasted for two weeks until
4   the end of the year and at that time I, I came out and I did
5   very good.  I was real good.  I mean, I grossed $80,000 that
6   year.  $50,000 the next year.  And that's how I was able to
7   employ these two gentlemen over here in the trade, ceramic,
8   tile, marble and granite.  The hallways in here on your floor,
9   that's the type of work I do.  My very first job being foreman
10  was St. Francis hospital, used to be a revolving door, but I
11  think it's a walk-through door now, where all that marble and
12  tile is on a 30 degree angle and goes all the way to the
13  parking garage.  That was -- that's the type of profession I'm
14  in.  Very high skilled hard labor.  I'm self-motivated.  I've
15  taught a lot of people how to set tile and taught them self-
16  motivation and I feel that the treatment that I received in
17  2001 in Options, is motivated me for the next two years.  I
18  was in there for only two weeks.  And I had the opportunity to
19  walk out of that facility.  It's not locked down.  You have --
20  you can walk in and out of that place.  And I had the
21  opportunity to walk out at any given time that I felt like I
22  decided I was going to quit or not proceed or whatever that
23  I'd, you know, thought that I was better than that.  But I'm
24  not.  I'm not.  I need help.  I'm asking for help.  But I'm
25  also asking to be released on an OR bond so I can help defend

1   myself.  I feel that Alcoholics Anonymous and Addicts
2   Anonymous is not an adequate class.  I think there needs to be
3   a new system started called Addicts Among Us, because it's the
4   highest -- I mean, society -- two years ago, or last summer,
5   there was an ad in the newspaper for police trying to get
6   drugs legalized.  It was -- it was highly publicized on the
7   front page of the Wichita paper itself.  I feel that given the
8   chance, the opportunity, and enough help and education, that I
9   could probably -- I would like to start a new program called
10  Addicts Among Us.  And I've had friends that I've talked to
11  before my situation as to now and they said that they would
12  follow me, that they would attend a class such as that instead
13  of anonymous.  You need to quit sweeping up under a rug and
14  deal with this problem outright because there's lot of
15  professionals and people in, you know, that are addicts that
16  have not, you know, that need help, too.  And they ain't gonna
17  go to an anonymous place, you know.  I mean, I feel that --
18  Friday I turned 43 and I figure that's half my life if I live
19  to be 86.  And I'm ready to turn around.  I need the help.  I
20  want the help.  I want to help other people, too, but I can't
21  do it from inside the jail.  I, I'm a serious professional.
22  When I go to work, I take my job very seriously.  I don't do
23  drugs when I'm at work.  And I'm very high skilled labor.  I'm
24  not afraid to work.  I enjoy working.  I have two daughters,
25  20 years old and 22 years old.  I just became a grandfather

```
 1    December 8th.  And my younger daughter, my 20 year old, she's
 2    due in March or April, I believe.  And they've watched me go
 3    downhill and I want them to be able -- to show them that I can
 4    turn around and set a better example by turning around and
 5    climbing back up that hill instead of going downhill and going
 6    to prison.  Which isn't going to do them no good or me no good
 7    or anybody else in this world no good when I can set an
 8    example for a lot of people if I'm given the chance.  And my
 9    woman now, my girlfriend now, we have a 18 month old baby.  I
10    don't know and I don't care who the father is.  I knew that
11    when we got together she was pregnant.  I've took that
12    responsibility upon myself and I am that child's father
13    regardless if I am biologically or not.  And she is now
14    pregnant.  I find out that she became pregnant the last night
15    that we spent together.  She's seven weeks pregnant.  And I
16    wish to be able to support them.  I am a very good father.
17    And I ask -- I do have the courage to change the things I can
18    change.  I don't have -- I can't change the things in the
19    past.  I do know that.  I have the wisdom to know the
20    difference.  And you, sir, you have the wisdom to know and
21    have, have the means to give me that chance to show that I
22    can, I can change.  And I ask you and I beg you to please give
23    me that chance to show you and the court and the community.
24    Because I think I can help the community with the addicts
25    among us because I have only one way to go.  If I -- if you
```

1    deny my bond, I know where I'm going.  I'm not going anywhere.
2    If you, if you give me the chance to show or try to change,
3    then I only got one way to go and that's up.  Please give me
4    that opportunity.  I mean, if anything, put me in inpatient
5    treatment facility to where I can -- I have that choice to
6    walk out, like Mr. Phill Messer said years ago.  And if I walk
7    out them doors without completing it then that means I don't
8    want help, I don't think I need help and that I'm better than
9    all this.  And I know I'm not.  I need help.  I want help and
10   I'm asking you and pleading with you, please give me that
11   chance.  Thank you, Your Honor.
12             THE COURT:  You desire to present any other
13   evidence, Mr. Gradert?
14             MR. GRADERT:  I do not, Your Honor.  Thank you.
15             THE COURT:  What's the Government's position on this
16   matter?
17             MR. OAKLEY:  Your Honor, the Government still feels
18   that detention is appropriate.  As the Court inquired of
19   defense counsel whether or not anything has changed, it
20   appears that defense counsel cites the fact that the Defendant
21   is now clean.  The Government would suggest that that's due to
22   the fact that he's been detained.  And the fact that he is now
23   clean supports detention more than it does release because
24   it's clear from the Defendant's recent history what he does
25   when he is out on the street.  He has a history of possessing

|   |   |
|---|---|
| 1 | drugs, of possessing firearms.  He has a history when law |
| 2 | enforcement stops him of fleeing.  Defense counsel seems to |
| 3 | argue that the reason for the Defendant fleeing is because he |
| 4 | has concerns about the Wichita Police Department.  Well, Your |
| 5 | Honor, in this case that is indicted.  The, the Defendant fled |
| 6 | on the incident that occurred February 2nd, 2007.  That was a |
| 7 | highway patrol trooper.  Looking at the presentence report, he |
| 8 | has allegations of flee and eluding where it's a Sedgwick |
| 9 | County Sheriff's officer.  Appears to be a Haysville police |
| 10 | department.  Your Honor, on December 2nd, 2007, when ATF |
| 11 | executed a warrant and attempted to arrest the Defendant, he |
| 12 | fled from them.  So certainly the Defendant has a history of |
| 13 | running from law enforcement. |
| 14 | Not only does that demonstrate his unwillingness to |
| 15 | cooperate with the authority; but it also shows that he is a |
| 16 | danger to society when he is in possession and using illegal |
| 17 | drugs.  He has firearms.  He's leading law enforcement on not |
| 18 | only foot chases but also chases involving motor vehicles. |
| 19 | Your Honor, defense counsel mentioned the fact that the |
| 20 | Defendant was on bond from Sedgwick County.  Well, that cuts |
| 21 | both ways because it appears he committed many of those |
| 22 | offenses while he was on bond.  He has demonstrated his |
| 23 | unwillingness or inability to comply with bond.  I'm sure not |
| 24 | committing new offenses and not using illegal drugs was a |
| 25 | condition of the Sedgwick County bond.  He couldn't comply |

1    with those.  Those are very serious charges.  This is not an
2    isolated incident.  He has shown through his conduct that he
3    is a danger to the community and through his conduct he is
4    also a flight risk.
5             THE COURT:  One of the factors that I have to
6    consider is the weight of the evidence.  Now, I'm also keeping
7    in mind, of course, that the Defendant is presumed innocent.
8    But I don't know anything about this case.  What's the -- give
9    me give a quick synopsis of the Government's evidence in this
10   case.
11            MR. OAKLEY:  Judge, there's multiple incidents,
12   starting with the most recent, which is the December, December
13   3rd, 2007.  Right now he is charged with possession of those
14   firearms.  He led ATF to the location of those firearms.  He
15   admitted to ATF that he's an ad addict.  They also found a
16   quantity of methamphetamine that has been submitted to the
17   lab.  I don't have the lab results back; but at the time of
18   this indictment, that wasn't charged because we didn't have
19   the lab results.  The other incidents -- there was another
20   incident where he had contact with ATF.  I believe that was
21   early of 2007, maybe around January.  They went and talked to
22   him.  They found firearms in his house.  Again, he admitted
23   that he is an addict and that those were his firearms.  So the
24   Government's position, as I mentioned the February 2nd
25   incident, I believe that's just the misdemeanor possession of

1   meth; but, that was a chase with the Kansas highway patrol.
2   Started out with a vehicle chase.  The Defendant gets out of
3   the vehicle, the Defendant tries to run across the little
4   Arkansas River, which was somewhat iced over, but he ends up
5   falling through.  They find the methamphetamine in his pocket
6   at the jail.
7              THE COURT:  All right.
8              MR. GRADERT:  Judge, if I could, I just wanted to
9   let the Court know.
10             THE COURT:  Briefly.
11             MR. GRADERT:  It will be very brief.
12             THE COURT:  I've heard enough, I think.
13             MR. GRADERT:  Your Honor, the very first incident
14  that the Defendant is charged in, it's my understanding that
15  ATF went to him to talk with him about information they had
16  about someone who had, I think, has maybe been in this court
17  or at least in the federal court trying to sell or give guns
18  to Mr. Gehringer.  Mr. Gehringer was candid with them about
19  that.  Gave them permission to search.  They found those
20  items.  He's been cooperative with them, I think, when he has
21  dealt with the Bureau of Alcohol Tobacco and Firearms agents.
22  And I just wanted the Court to be aware of that.  That he, he
23  has run from law enforcement when they've been in pursuit of
24  him; but he hasn't run when they've confronted him and he's
25  actually known who he's dealing with.

1     THE COURT:  Is there supposed to be some difference
2  that I'm to see in that type of conduct?
3     MR. GRADERT:  Your Honor, I'm always looking for a
4  silver lining.
5     THE COURT:  You're wasting your breath on that,
6  Mr. Gradert.  There's no difference.  Matter of fact, it's
7  worse to run from an officer who's pursuing you in a car
8  because you may get in an accident and kill someone.
9     MR. GRADERT:  It's poor judgment on his part, Your
10 Honor, and --
11    THE COURT:  This Defendant has a lifetime of poor
12 judgment.  I'm considering the factors set forth in 18 U.S.C.
13 Section 3142(g).  The nature and circumstances of the offense
14 charged.  Involves both a controlled substance and a firearm.
15 One of the most serious offenses that I deal with here is
16 possession of firearms by felons.  There is no reason in the
17 world for a felon to have firearms.  Much less numerous
18 firearms.
19    MR. GRADERT:  Your Honor, he is not a convicted
20 felon.
21    THE COURT:  Well, all right.  Then he's a drug user
22 and has firearms.  The weight of the evidence, I'm satisfied
23 with that.  This Defendant, he can argue all day about what a
24 great man he is, but he isn't.  The clear -- and I'm sure
25 Judge Bostwick took this into consideration.  I know Judge

1   Bostwick took this into consideration.  This man has had
2   nothing but contact with law enforcement authorities since,
3   according to this, 1992; and none of these are -- I don't hear
4   any evidence that any of these instances is erroneous.  He was
5   here apparently in 2001.  Failed to report for UA's on
6   numerous numerous occasions.  Submitted positive drug tests on
7   numerous occasions.  As far as I'm concerned, these drug
8   treatment programs are failures.  There's nothing here,
9   Mr. Gehringer, that would even make me in my wildest dreams
10  release you on bond.  You are a danger to the community.
11  There is no circumstance that I can see.  You all have wasted
12  my time today to bring this here.  He's remanded.  You either
13  get this case ready for trial, Mr. Gradert, or plea.  Take him
14  out.  We've got a jury here.
15          MR. GRADERT:  We have a schedule from the Court.
16  Thank you, Your Honor.
17                  (Adjourned at 2:45 p.m.)

Case 6:07-cr-10223-MLB   Document 17   Filed 03/03/08   Page 18 of 18

18

```
 1
 2                    C E R T I F I C A T E
 3
 4           I, Cindy L. Schwemmer, United States Court
 5   Reporter in and for the District of Kansas, do hereby
 6   certify:
 7           That the above and foregoing proceedings were
 8   taken by me at said time and place in stenotype;
 9           That thereafter said proceedings were
10   transcribed under my direction and supervision by means
11   of computer-aided transcription, and that the above
12   and foregoing constitutes a full, true and correct
13   transcript of said proceedings;
14           That I am a disinterested person to the said
15   action.
16           IN WITNESS WHEREOF, I hereto set my hand on
17   this the 3rd day of March, 2008.
18
19
20
21                              s/ Cindy L. Schwemmer
22                                 Cindy L. Schwemmer
23                              United States Court Reporter
24
25
```

CINDY L. SCHWEMMER, UNITED STATES COURT REPORTER
Wichita, Kansas  (316) 269-6363