**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
| ) | |
| Plaintiff,      ) | **CIVIL ACTION** |
| ) | |
| v.                           ) | No. 07-10223-01-MLB |
| ) | |
| TODD R. GEHRINGER,            ) | |
| ) | |
| Defendant.      ) | |
| _____) | |

**MEMORANDUM AND ORDER**

Defendant Todd R. Gehringer has been charged in a superceding indictment with various firearm and controlled substance offenses. (Doc. 28.)  This matter currently comes before the court on Gehringer's pretrial motions:

1.    Gehringer's "appeal from denial of motion for reconsideration of detention order" (Doc. 13);

2.    Gehringer's "motion to produce transcript of hearing on defendant's appeal of the detention order" (Doc. 14);

3.    Gehringer's motion to suppress statements (Doc. 18) and memorandum in support (Doc. 19), and the government's response (Doc. 38);

4.    Gehringer's motion to suppress evidence from alleged consensual searches (Doc. 20) and memorandum in support (Doc. 21), and the government's response (Doc. 33);

5.    Gehringer's motion to dismiss indictment due to pre-indictment delay (Doc. 22) and memorandum in support (Doc. 23), and the government's response (Doc. 29);

6.    Gehringer's motion to suppress evidence, including the derivative evidence and statements seized following defendant's arrest on December 19, 2006 (Doc. 24) and memorandum in support (Doc. 25), and the government's response (Doc. 31); and

7.    Gehringer's motion for severance (Doc. 26) and

memorandum in support (Doc. 27), and the government's response (Doc. 30).

The court held a motions hearing on April 28, 2008, at which several of the above motions were addressed.  The court will analyze each motion in turn.

**I.  ANALYSIS**

**1.  Defendant's appeal from denial of his motion for reconsideration of the court's detention order.**

Gehringer's "appeal from denial of motion for reconsideration of detention order" (Doc. 13) was the subject of a hearing on January 22, 2008 (See Docket Entry 122).  At that hearing, the court orally denied defendant's motion, stating that it had considered "the factors set forth in 18 U.S.C. Section 3142(g)" and that: "This man has had nothing but contact with law enforcement authorities since, according to this, 1992; and none of these are -- I don't hear any evidence that any of these instances is erroneous.  He was here apparently in 2001. Failed to report for UA's on numerous numerous occasions.  Submitted positive drug tests on numerous occasions.  As far as I'm concerned, these drug treatment programs are failures.  There's nothing here, Mr. Gehringer, that would even make me in my wildest dreams release you on bond.  You are a danger to the community.  There is no circumstance that I can see. . . . He's remanded."

Gehringer's motion for reconsideration of detention (Doc. 13) has therefore been denied.

**2.  Defendant's motion to produce a transcript of the court's hearing on his appeal of the court's detention order.**

Gehringer filed his "motion to produce transcript of hearing on defendant's appeal of the detention order" (Doc. 14), seeking the

-2-

transcript from the January 22, 2008 hearing on his "appeal from denial of motion for reconsideration of detention order" (Doc. 13). In the motion, Gehringer's counsel stated: "The purpose of this request is that defendant has requested that counsel file a motion for recusal based on what the defendant perceived to be a violation of due process because of judicial bias or an appearance of bias." No motion for recusal has been filed.

The transcript from the January 22, 2008 hearing was filed in the docket on March 3, 2008 (Doc. 17). Defendant's motion (Doc. 14) has been resolved, and is therefore denied as moot.

**3. Defendant's motion to suppress statements.**

Gehringer moves to suppress the statements he made in connection with his arrests on February 2, 2007 and December 3, 2007. (Doc. 18.) At the suppression hearing, Kansas Highway Patrol Trooper Andrew Waller testified regarding the February 2, 2007 incident. While driving northbound on Interstate 235, Waller ran the license plate of the pickup driving in front of him. The plate came up as stolen and Waller initiated his lights, indicating to the driver to pull over. The driver of the pickup did not stop, leading Waller on a ten minute chase, covering four to five miles. A portion of the chase was over main roads, which were dry and clean, but other portions were over snow-packed and icy side city streets. The driver of the pickup drove well for the conditions, and did not seem to be driving as if he was under the influence of drugs or alcohol.

While the pickup was still moving, the driver of the pickup jumped out of the vehicle and ran toward the nearby river. While running, the driver of the pickup threw something to the ground.

-3-

Waller later went back to pick up the item that had been thrown, and identified it as a scale. The driver of the pickup then began to cross the frozen river, but slipped, fell, and became submerged from the chest down. At the suppression hearing, Waller identified the man as Gehringer. Waller talked Gehringer out of the river and took Gehringer into custody. Gehringer was arrested for fleeing and eluding, having a stolen license plate, and for not having vehicle insurance. After Gehringer came out of the river, he and Waller walked approximately forty yards back to Waller's patrol car. Gehringer was therefore outside and wet for four to five minutes. Waller does not know the temperature of the river water, but remembers that it was very cold outside.

Waller placed Gehringer into handcuffs and wrapped a blanket around him. The EMS arrived. Gehringer cooperated with them, but ultimately refused treatment. After the EMS finished evaluating Gehringer, he was placed in the front passenger seat of Waller's patrol car. Waller read Gehringer his <u>Miranda</u> rights and Gehringer stated that he understood them. Waller asked Gehringer if he wanted to talk to him, and Gehringer responded by stating "what about?" Waller replied by asking why Gehringer did not stop for him.

Waller and Gehringer then had a five to ten minute conversation. Waller did not threaten Gehringer. Waller did have his uniform on, which included a firearm, but he never had his firearm out. Based on his training in alcohol and drug intoxication, Waller felt that during their conversation, Gehringer understood the questions that were asked. Gehringer did not smell like alcohol and he did not seem like he had been using drugs. Gehringer did not use slurred speech and

-4-

told Waller that he was not currently under the influence of alcohol or drugs.  Gehringer told Waller that he did not stop because he did not want to go to jail and because he was driving with a revoked license.  He also told Waller that he was drug addict, in response to Waller's question regarding why he threw the scale.  Throughout their conversation, Waller and Gehringer were sitting in Waller's patrol car, with the heat on, and Gehringer told Waller he was warming up.

ATF Agents Stephen Gravatt and Kevin Bradford testified regarding the December 3, 2007 incident.  Their testimony was that Bradford identified himself to Gehringer on the street outside a grocery store.  Upon Bradford's identification, Gehringer ran. Gravatt chased Gehringer by foot for a block and a half through a residential area.  Gehringer jumped two fences during the foot chase, and Gravatt caught Gehringer as Gehringer was attempting to go over a third fence.  Gravatt took Gehringer into custody and Bradford then transported Gehringer to the ATF offices where Gravatt and Bradford interviewed Gehringer.

During the interview, Gravatt and Bradford were in plain clothes, and although they were carrying their firearms, neither agent's firearm was visible to Gehringer.  Bradford, with Gravatt present, read Gehringer his <u>Miranda</u> rights.  Gehringer agreed to waive those rights and then Gehringer and Bradford signed a written waiver. Bradford had Gehringer initial next to each of his rights so Bradford could make sure Gehringer understood the waiver.  Gehringer was in the interview room for several hours, and was interrogated on and off during that time, the agents asking questions for thirty to forty-five minutes at a time.  The agents took at least two breaks and got

-5-

Gehringer a sandwich midway through the interrogation.  Gehringer also took a restroom/drink break.  The agents never threatened Gehringer.

Gravatt testified that Gehringer seemed to understand his <u>Miranda</u> rights, answered questions appropriately, and did not appear to be under the influence of alcohol or drugs.  The agents told Gehringer they would stop the interview if Gehringer wanted a lawyer, but Gehringer never explicitly stated he wanted a lawyer, and when Bradford asked Gehringer if he wanted to continue to talk, Gehringer never gave a definitive answer and continued to answer questions.

Over the course of the interview, Gehringer gave the agents written permission to search the vehicles in his driveway and his storage unit.  Gehringer told the agents he was a methamphetamine addict and that he had guns in his house and in a duffel bag in his storage unit.  Gehringer gave the agents specific instructions regarding how to keep a low profile during the search of the storage unit, and gave the agents the code and key for entry into the unit.

Gehringer told Gravatt that he had not used drugs that day, and that he had last used drugs the night before.[1]  Based on Gravatt's experience with methamphetamine users, Gravatt did not believe Gehringer was on methamphetamine at the time of the interrogation, because Gehringer was not paranoid or fidgety and was calm.  Gehringer did, however, lay his head down a few times during the interrogation period.  Based on his experience, Bradford also did not believe Gehringer was under the influence of drugs or alcohol because Gehringer was not nervous, sweating, or excessively tired.  Rather,

---

[1]  The interrogation occurred during the day, from approximately 11:30 a.m. to 2:30 or 3:00 p.m.

-6-

Bradford testified that Gehringer was articulate, cordial, responsive, and polite during the interrogation.

Gravatt explained that although Gehringer was detained, he was not formally arrested at the time of the interrogation. Gravatt never told Gehringer that if Gehringer talked to the agents he would not be charged and never promised Gehringer anything to induce Gehringer to talk. Bradford testified that he was initially interested in developing Gehringer as an informant, but also stated that he never told Gehringer he would not be charged.

Gehringer also testified regarding the December 3, 2007 statements. Gehringer said he was told he was not under arrest and that he would not be charged with anything. He also said that the agents told him they did not care about anything but some stolen firearms they were looking for, and that if they found anything else during their searches, Gehringer would not be charged.

Gehringer told the court that he is a drug addict and that he threw a quarter ounce of methamphetamine while he was being chased by Gravatt because he wanted to get the drugs out of his possession. At the time Gehringer ran from Gravatt, he assumed it was the police he was running from. Gehringer also testified that during the interrogation he was not thinking clearly because he was still using, but that he was "coherent to an extent" and that he was "fully clear" that the agents just wanted to know about the stolen guns. Gehringer admitted that he had a very good memory of the December 3, 2007 interview, that he had not used drugs that day, that he understood the questions that were asked, and that he was treated "fairly" during the interview.

Gehringer argues that his statements on both occasions were not voluntary because in February and December 2007 he was under the influence of some intoxicating substance, and in February he was suffering from extreme cold. (Doc. 19 at 3.) The government, in its response, notes that the superceding indictment drops any federal charges related to the February 2007 arrest, but states that it intends to "present evidence from this incident to establish [that] the defendant is a user of a controlled substance." (Doc. 38 at 1.)

For a statement from a defendant to be admissible at trial, it must have been voluntarily given. United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002) ("Waiver of one's Fifth Amendment privilege against self-incrimination requires that the individual "voluntarily, knowingly and intelligently" waive his constitutional privilege." (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966))). Within this standard are two "distinct requirements":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Morris, 287 F.3d at 988 (quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).

"A determination of voluntariness is based on the totality of the circumstances." United States v. Nguyen, 155 F.3d 1219, 1222 (10th Cir. 1998). Courts examine many factors when determining voluntariness, including: "the characteristics of the suspect, such

as his age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the interrogation, and the use or threat of physical force." Id.  The effect of intoxication on these requirements has been addressed by the Tenth Circuit.  In United States v. Curtis, 344 F.3d 1057, 1066 (10th Cir. 1998), the Tenth Circuit affirmed the lower court's denial of a motion to suppress based on intoxication because both the videotape of the defendant's statement and the testimony from the officer who had arrested the defendant showed that the defendant's statement was knowingly and voluntarily given.

The court finds that Gehringer's statements given in connection with his arrests on February 2, 2007 and December 3, 2007 were voluntary and are admissible.  In both February and December 2007, the credible testimony of the law enforcement officials was that Gehringer did not appear intoxicated.  Regarding the February 2007 incident, Waller explained that, once apprehended, Gehringer was cooperative, understood the questions asked of him, did not smell like alcohol or seem like he was high on drugs, and did not have slurred speech. Waller concluded, based on his training, Gehringer did not appear to be under the influence of drugs or alcohol.  Waller also testified that Gehringer told him he was not currently high or under the influence.  In addition, Gehringer was of sufficient age to understand the questions asked of him, he was read his Miranda rights and stated that he understood them, and was questioned by Waller for only five to ten minutes before being transported.  Waller did not threaten Gehringer or use physical force against Gehringer.

-9-

It is significant that Gehringer was not questioned by Waller until <u>after</u> the EMS had evaluated Gehringer. Gehringer was wrapped with a blanket upon reaching Waller's patrol car. Then, Gehringer was placed inside the heated patrol car for questioning. Gehringer told Waller at the time of questioning that he was warming up. Waller's credible testimony shows that Gehringer was not suffering from extreme cold.

Turning to the December 2007 incident, Gravatt and Bradford testified that Gehringer did not appear under the influence of alcohol or drugs, that he answered all questions appropriately, and that Gehringer did not exhibit the characteristic side effects of methamphetamine of paranoia and fidgeting, but was calm and still. During the interrogation, Gehringer was articulate, cordial, responsive, and polite. When Gehringer gave consent for law enforcement officers to search his storage unit, he was able to give very specific instructions on how it should be carried out and where the officers should look. While Gehringer was being interrogated, the agents were in their plain clothes, with firearms concealed. They never threatened Gehringer. Bradford read Gehringer his <u>Miranda</u> rights and Gehringer initialed next to each one that he understood it. The interrogation lasted only approximately three hours, with questioning lasting only approximately thirty to forty-five minutes at a time, and with at least two breaks.

Even Gehringer admits that he was not actively under the influence of drugs at the time he gave the statements, simply arguing that because he is a drug addict, he does not think clearly. Gehringer also testified, however, that he was coherent "to an

extent," and that he was "fully clear" about the agents' alleged stated purpose for the interrogation.  Gehringer also testified that he had a very good memory of the December 3, 2007 interview, that he had not used drugs that day, that he understood the questions that were asked, and that he was treated "fairly" during the interview.

The court finds that Gehringer comprehended the situation he was in and freely made the choice to waive his <u>Miranda</u> rights and talk to Waller in February 2007 and Gravatt and Bradford in December 2007. Gehringer's motion to suppress these statements (Doc. 18) is denied.

**4.  Defendant's motion to suppress evidence from alleged consensual searches.**

Gehringer moves to suppress "all evidence seized as a result of the alleged consent searches that were conducted on February 26, 2007 and December 3, 2007." (Doc. 20 at 1.)  The facts established through the suppression hearing show that ATF Agent Mike Jones encountered Gehringer on February 26, 2007 at Gehringer's residence.  Gehringer's house was under surveillance by Jones because Gehringer was the subject of an investigation at that time.  Jones saw Gehringer in the front yard of his home, so Jones walked up to Gehringer, introduced himself, and told Gehringer he was looking for two stolen guns.  At the time, Jones was wearing plain clothes.

Gehringer told Jones he did not have the two stolen guns.  Jones asked Gehringer if he minded whether Jones looked through Gehringer's house, and Gehringer responded that he did not want agents looking through his house.  Jones then continued to talk to Gehringer and Gehringer eventually stated that he had guns but not the guns Jones was looking for.  Jones asked if he could go in Gehringer's house to

look at the guns to make sure, and Gehringer responded that he could. Gehringer told Jones specifically where to look for the guns.

Jones told Gehringer that he knew Gehringer had already informed other law enforcement officers about his drug addiction. Gehringer acknowledged that he is an addict and that he had used drugs earlier that day. Jones explained to Gehringer his status as a drug user made his possession of firearms illegal. Jones asked Gehringer if he wanted to surrender any other guns or any narcotics. Gehringer allowed Jones into his house and told Jones exactly where to look for ten to twelve additional guns. Gehringer signed a written abandonment of these guns to Jones. Gehringer did not sign a written consent to search his home however, because Jones did not have a form with him.

In addition to Jones, two other agents were present at Gehringer's home. All three agents were in plain clothes, but were armed, although the agents' firearms were hidden under their clothes. Jones testified that the agents never made promises or threats to Gehringer and never told Gehringer that there would be consequences if Gehringer refused to consent to a search. Jones stated that the agents just told Gehringer what they already knew and that being cooperative would be helpful to him. Gehringer never appeared to be under the influence of drugs and always gave appropriate responses to questions.

Gehringer testified regarding the February 26, 2007 search. Gehringer said that the agents told him that they did not care about any drugs they might find or whether Gehringer was an addict, and that Gehringer would not be charged with anything related to drugs if he showed the agents his guns. Gehringer explained that he would not

-12-

have let the agents search his house if they would not have told him this, and that he did not know he did not have to let the agents search his home.  Gehringer also stated, however, that he knew the agents did not have a search warrant, and that the agents were searching his house because he gave them consent.  Gehringer testified that because he was not arrested that day, he thought he had not done anything wrong.

The facts regarding the alleged consent to search Gehringer's storage unit on December 3, 2007 are laid out in the section immediately above.

Defendant argues that "his mental condition and capacity to consent was (sic) impaired by his regular usage of controlled substances" and that "the only reason he gave consent to search these areas was that he was promised by agents of the ATF that if he gave consent, he would not be prosecuted and that they were just attempting to recover items that they believed had been stolen from burglaries." (Doc. 21 at 2.)  The government responds that Gehringer gave unequivocal consent without law enforcement officer coercion.  (Doc. 33 at 3.)

The searches at issue were conducted without a warrant.  "A warrantless search of a suspect's premises is, per se, unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent.  Consent is valid, if voluntarily provided, and is not the product of duress or coercion, either express or implied." United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992) (internal citations omitted); see also United States v. Sawyer, 441 F.3d 890,

894 (10th Cir. 2006). "[W]hether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined by the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

"In determining whether a consent to search is voluntary, a court should consider, *inter alia*, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances. An officer's request for consent to search does not taint an otherwise consensual encounter as long as the police do not convey a message that compliance with their request is required." United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994) (internal quotation omitted). Evidence obtained by a consent-based search is admissible only if the government (1) produces clear and positive testimony that the consent was unequivocal, specific, and freely given, and (2) proves that the consent was given without duress or coercion, express or implied. United States v. Guerrero, 472 F.3d 785, 789 (10th Cir. 2007); United States v. Glover, 104 F.3d 1570, 1584 (10th Cir. 1997). A "knock and talk" is a consensual encounter and does not require reasonable suspicion. United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006).

Regarding the February 26, 2007 search, the record explicitly shows that Gehringer gave affirmative verbal consent for Jones to search his house for guns, and when those guns were located, Gehringer continued to give consent to the agents to look for additional

-14-

contraband.  Gehringer went so far as to tell the agents specifically where to look for each set of guns he possessed.  At the time of this incident, Jones and the other agents involved were in plain clothes with no visible weapons.  Jones testified that he never made promises to Gehringer, threatened Gehringer, or told Gehringer there would be consequences to non-cooperation.  The record also shows that at the time Gehringer gave consent, Gehringer did not appear under influence and always appropriate responses to questions.  Gehringer even filled out a written abandonment form for the guns.

Gehringer claims Jones told him he would not be prosecuted as a result of anything the agents found during their search, but this is not credible testimony because Gehringer admits the agents explained to him that it was a violation of federal law to be an admitted drug addict in possession of firearms.  It is incredible to believe that a federal agent would have explained the circumstances that cause violations of a federal law and then promise not to enforce that law, despite having Gehringer abandon his guns to Jones.  In addition, Gehringer knew the agents were searching his home without a warrant and that they were searching because he gave them permission to do so. Regardless, when viewing the totality of the circumstances, all the other factors point to Gehringer's consent being voluntarily given.

Regarding the December 3, 2007 consent search of Gehringer's storage unit, the record also shows that Gehringer's consent was unequivocal (he singed a written consent form), and that it was voluntarily given.  Gehringer's testimony that he was "tricked" into giving consent through promises that he would not be charged is not credible and Gravatt and Bradford's testimony that they made no

-15-

threats or promises to Gehringer is credible.  Gravatt and Bradford's behavior was not coercive.  They were dressed in plain clothes.  They did not employ aggressive interrogation techniques.  Rather, they questioned Gehringer for only thirty to forty-five minutes at a time, took at least two breaks, and fed Gehringer.  Gehringer was lucid and answering questions appropriately throughout the interrogation.

The record is clear that Gehringer's consent on both occasions was unequivocal and freely given, and that it was not given under duress or coercion.  Gehringer's motion to suppress evidence found as a result of these consent searches (Doc. 20) is denied.

## 5.  Defendant's motion to dismiss the indictment due to pre-indictment delay.

Gehringer moves the court for an order "dismissing the Indictment in this case due to pre-indictment delay." (Doc. 22 at 1.)  Gehringer argues that the alleged delay in filing the indictment in this case was "an intentional device to gain a tactical advantage." (Doc. 23 at 1.)  Gehringer contends he has been prejudiced by the alleged delay and that the law enforcement officers' behavior was misleading. (Doc. 23 at 2-3.)

The superceding indictment in this case charges twelve counts, stemming from five separate incidents.  Defendant offers no factual support for his motion, and the government recounts the incidents as follows:

### October 10, 2006

Wichita Police Officer Chad Cooper conducted a traffic stop of a motor vehicle driven by the defendant, Todd Gehringer.  A female, Ricki Starks, was the only passenger in the vehicle.  Officer Cooper saw the defendant get out of the vehicle prior to Officer Cooper approaching the vehicle.  Officer Cooper asked the defendant if there were

any drugs in the vehicle, to which the defendant replied,
"I don't think so." When asked what he meant, the
defendant said that he had used drugs earlier. Officer
Cooper found a meth pipe and lighter beside a tree the
defendant was standing next to after he got out of the car.
A search of the car yielded approximately 24.764 grams of
methamphetamine in a zipper pouch under the driver's seat.

**December 19, 2006**

     Two Wichita Police officers, Jeffrey McVay and Jeremy
Wolfram were standing outside a business at 610 North West
Street when they observed a pickup truck driven by the
defendant back into a pole in the parking lot of the
Homeland grocery store at 640 West Street. Upon contacting
the defendant, officers learned that the defendant's
drivers license was suspended and observed that the
defendant's eyes appeared glazed over and that he was
unsteady and had poor balance. Officer McVay conducted
field sobriety testing on the defendant to determine
whether he was too intoxicated to drive. The defendant
refused the Officer McVay's request to take a blood test,
saying that he is an addict and would be dirty because he
used the day before. Ultimately the defendant was arrested
for driving under the influence and driving while
suspended. Officers searched the defendant's truck
incident to the his arrest and found a glove sitting on the
bench seat of the truck. Inside the glove was a Cobra .32
caliber handgun. Next to the glove and gun was a zippered
bag. Inside of the zippered bag were 10.75 grams of
marijuana, approximately 42 grams of methamphetamine and
numerous plastic baggies.

**February 26, 2007**

     ATF agents were investigating a burglary that occurred
in July, 2006. Agents went to the defendant's house and
contacted him while he was in the driveway. Agents asked
the defendant whether he knew the location of firearms that
were taken during the burglary. The defendant said that
someone had offered to sell one of the stolen guns but the
defendant refused, saying he knew the gun was stolen.
Agents asked the defendant about his drug usage, and the
defendant repeatedly claimed to be an addict. Agents asked
the defendant if they could search his house to make sure
he did not have the stolen guns. The defendant refused,
but said that he would let the agents look at his firearms
to make sure they were not the ones that were stolen.

     The defendant showed the agents three firearms. He
again admitted to using drugs, and showed the agents some
marijuana and pills he had hidden in his kitchen. He then
took agents up to his attic and showed them three more long

guns and a case with five handguns.

**May 25, 2007**

Wichita Police executed a search warrant at the defendant's house that he shared with his girlfriend and her child. During the search officers found three long guns, 34.72 grams of marijuana and .17 grams of methamphetamine.

**December 3, 2007**

ATF agents executed a federal search warrant at the defendant's home. ATF agents Steve Gravatt, who was conducting surveillance on the residence, saw the defendant walking from a Braum's restaurant near the residence. Agent Gravatt approached the defendant as he walked to a fence near the back of the residence. After Agent Gravatt identified himself as a law enforcement officer, the defendant ran. As Agent Gravatt chased the defendant, he saw the defendant acting as if he were reaching for something at the front his body. Agent Gravatt eventually caught the defendant. A search of the area where Agent Gravatt saw the defendant reaching for something yielded four small baggies of methamphetamine and some marijuana.

After his arrest, the defendant was read his Miranda rights and agreed to speak with Agent Gravatt. The defendant said he had used methamphetamine the night before. He said the reason he ran was because he wanted to get rid of the drugs that he had on his person. Agent Gravatt asked the defendant how much drugs he had thrown, and the defendant said about a quarter of an ounce of methamphetamine and a small bag of marijuana.

During the interview the defendant signed a consent form to search a storage unit that he had rented. During the search of both the residence and storage unit, officers found several firearms.

(Doc. 29 at 1-4.)

Even if an indictment is filed within the statute of limitations, due process rights under the Fifth Amendment can be violated if pre-indictment delay "caused substantial prejudice" to a defendant's rights to a fair trial or if pre-indictment delay "was an intentional device to gain tactical advantage" over a defendant. <u>United States v. Marion</u>, 404 U.S. 307, 324 (1971). But, "proof of prejudice is

-18-

generally a necessary but not sufficient element of a due process claim, and . . . the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." United States v. Lovasco, 431 U.S. 783, 790 (1977).

"When seeking dismissal of an indictment based on pre-indictment delay, a defendant must establish the government intentionally delayed for tactical reasons and the delay caused him actual prejudice. Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice." United States v. Wood, 207 F.3d 1222, 1234-35 (10th Cir. 2000) (internal citations and quotations omitted). Gehringer argues that he was prejudiced because he was not arrested or formally charged until after the alleged completion of five separate offenses. (Doc. 23.) The government responds that Gehringer cannot allege prejudice based on his own intentional conduct. (Doc. 29.)

The law is clear that a prosecutor is not required to file charges as soon as he or she has gathered enough evidence to establish a case. Lovasco, 431 U.S. at 791-92. The government asserts that the one year delay between the first charged incident and the time the indictment was filed was necessary (and, therefore, not "intentional delay") because the case agent was preparing the case and each time he was able to proceed, Gehringer was involved in a new incident with law enforcement officers, thereby requiring more investigation and preparation. This is a credible justification. Gehringer was involved in five incidents with law enforcement officers between December 2006 and December 2007. Gehringer has not shown "intentional

-19-

delay" by the government.

In addition, Gehringer has not shown "actual prejudice."  The prejudice alleged comes from Gehringer's own actions, not those of the government or the law enforcement officers.  Gehringer's alleged involvement in the five separate incidents was done on his own accord. A defendant cannot show "actual prejudice" when the allegation of prejudice does not even stem from the government's conduct.

Gehringer has shown neither unreasonable delay or prejudice stemming therefrom.  His motion to dismiss due to pre-indictment delay (Doc. 22) is denied.

**6.   Defendant's motion to suppress evidence seized following his arrest on December 19, 2006.**

Gehringer next moves to suppress "all evidence including statements made by the defendant in connection with his unlawful, warrantless arrest on December 19, 2006, by officers of the Wichita Police Department."  (Doc. 24 at 1.)  Gehringer argues that no probable cause existed to arrest him, therefore making all evidence obtained as a result of a search incident to the arrest the "fruit of the poisonous tree."  (Doc. 25 at 3.)

The facts established through the suppression hearing show that on December 19, 2006, near midnight, Wichita Police Department Officer Jeffrey McVay was in a parking lot responding to an audible alarm at an army recruiting station at a strip mall.  There were only about a dozen vehicles in the lot at the time, and the grocery store which was the main building for the lot was not open.

While there, McVay witnessed a pickup enter the lot and strike the sign for the grocery store.  McVay saw the pickup pull in, because

the pickup was loud; in addition, it had been raining, and McVay heard the tires screech on the wet road.  McVay testified that there was an approximately two stall-length distance between himself and the pickup as the pickup first drove by, and that there were no other vehicles driving in the parking lot at the time.  McVay saw that there only one person in the pickup, and that the person was a male with long black hair.  McVay was approximately 30 yards away from the sign, but the parking lot of the strip mall was lit up very well.  In addition, Gehringer stuck his head out of the pickup to see what he had hit.  McVay identified Gehringer as the driver of the pickup.

McVay watched Gehringer park, exit the pickup, and begin to walk up to the grocery store.  No one else was outside in the parking lot.  McVay drove his patrol car over to Gehringer.  McVay's backup, Jeramy Wolfram, contacted Gehringer while McVay called in the stop.  Wolfram also testified that it was Gehringer who drove the pickup, and although the distance was more than thirty yards distance between himself and the sign, the lot was very well lit and that he believed it was Gehringer driving the pickup  because there was no one else in the lot.

While McVay spoke to Gehringer, he noticed that Gehringer had muscular ticks and was swaying and losing his balance.  McVay's training made him believe that Gehringer was under the influence os either alcohol or drugs.  Gehringer's eyes were glazed over.  When asked if he had been drinking alcohol or using drugs, Gehringer responded no.

McVay asked Gehringer to complete a field sobriety test.  McVay conducted three different field sobriety tests and Gehringer failed

them.  Gehringer was swaying and had to use his arms for balance. McVay's backup asked Gehringer if he had a driver's license and Gehringer responded that he did not have one.  Gehringer was then taken into custody so that the officers could continue their driving under the influence investigation.  McVay asked Gehringer if he could perform a blood test (because McVay wanted to check for the presence of drug usage), but Gehringer refused and counteroffered a breath test.  Gehringer was arrested.  McVay read Gehringer his <u>Miranda</u> rights, and Gehringer did not talk thereafter.  Gehringer's pickup was searched after his arrest and the officers found a handgun and drugs. Both McVay and Wolfram testified that the weather was cold at the time of the incident.

Gehringer testified regarding the December 19, 2006 incident. Gehringer stated that he was walking down the street with an empty propane bottle on each shoulder, that it was cold outside, and that he accepted a ride from someone he did not know.  Gehringer related that he got out of the passenger side of the pickup at the stop sign, before the accident, and went to the door of the grocery store to get propane.

Gehringer admits that he told the officers that he had no license, but denies that he was driving. Gehringer claimed that McVay saw the driver, but neither McVay nor Wolfram did anything to go after this other person. Gehringer stated that the pickup is not registered to him.  Upon cross-examination, it was revealed that Gehringer had left the two propane tanks in the back of the pickup, and had left his cellular phone and cigarettes on the dash of the pickup.  Gehringer agreed that the parking lot is well lit.

A warrantless arrest must be supported by probable cause to arrest. United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir. 2004); United States v. Edwards, 242 F.3d 928, 933 (10th Cir. 2001). Probable cause to arrest exists when "the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. Although it is not necessary that the officer possess knowledge of facts sufficient to establish guilt, mere suspicion is insufficient to establish probable cause. Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer." Edwards, 242 F.3d at 934 (internal quotations and alterations omitted).

Probable cause to arrest exists only when the facts and circumstances within law enforcement officers' knowledge, of which they have reasonably trustworthy information, are sufficient to warrant a reasonable officer to believe that an offense has been or is being committed. Although probable cause does not require facts sufficient for a finding of guilt, it does require more than mere suspicion. United States v. Patten, 183 F.3d 1190, 1195 (10th Cir. 1999) ("To determine if probable cause for a warrantless arrest exists, we ask whether at the time of the arrest, the facts and circumstances within the arresting officer's knowledge were sufficient to justify a prudent officer in believing the defendant was engaged in illegal activity.").

"Probable cause is measured against an objective standard. The subjective belief of an individual officer as to whether there was

-23-

probable cause for making an arrest is not dispositive.  Thus, the primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." <u>Valenzuela</u>, 365 F.3d at 896-97 (internal citations omitted); <u>see also</u> <u>United States v. Asmudio-Carrillo</u>, 499 F.3d 1206, 1209 (10th Cir. 2007) ("Probable cause is measured against an objective standard of reasonableness and may rest on the collective knowledge of all officers involved in an investigation rather than solely on the knowledge of the officer who made the arrest.").

The government alleges probable cause to arrest based on a violation of Kansas Statutes.  Section 8-1567 of Kansas code regarding traffic offenses states:

> (a) No person shall operate or attempt to operate any vehicle within this state while:
>
> . . .
>
> (4) under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle;

K.S.A. § 8-1567.  In addition, section 8-262(a)(1) prohibits driving "a motor vehicle on any highway of this state at a time when such person's privilege so to do is canceled, suspended or revoked."

Probable cause to arrest in this instance is clear.  McVay and Wolfram, who are both credible witnesses, saw Gehringer drive from a public roadway into a well-lit, private parking lot and strike a sign with his pickup.  McVay then saw Gehringer stick his head out the window, park, and walk toward a grocery store. When McVay and Wolfram approached Gehringer, he was visibly under the influence of drugs or

-24-

alcohol; he was swaying, his eyes were glassed over, and he had difficulty keeping his balance.  Gehringer then failed the field sobriety tests he was given, which gave the officers probable cause to believe Gehringer was under the influence.  In addition, Gehringer admitted that his driver's license had been revoked.

Gehringer's testimony that he was not the driver of the pickup is not credible.  The record is clear that Gehringer's propane tanks, cigarettes, and cellular phone were recovered from the pickup.  In addition, McVay and Wolfram's credible testimony was that no one else was present in the parking lot.

A reasonable officer would have believed probable cause existed to arrest Gehringer for driving under the influence.  Gehringer's motion to suppress statements and evidence stemming from this arrest is denied.

**7.  Defendant's motion for severance.**

Finally, Gehringer moves for severance of the counts in the superceding indictment alleged to have occurred on December 19, 2006. (Docs. 26, 27 at 3.) Gehringer contends that because he intends to testify as to those counts, but not as to the other counts on which he is indicted, that he would be prejudiced by a wholesale trial of the counts against him.  (Doc. 27 at 3.)

Rule 8(a) of the Federal Rules of Criminal Procedure states:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

It is a defendant's "heavy burden of showing real prejudice from

joinder." <u>United States v. Muniz</u>, 1 F.3d 1018, 1023 (10 th Cir. 1993). "Rule 8 is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system." <u>United States v. Janus Industries</u>, 48 F.3d 1548, 1557 (10th Cir. 1995) (internal quotation omitted).

Gehringer argues that the charges against him are "very different." (Doc. 27 at 4.) However, all the counts charged in the superceding indictment involve either the use, possession, or distribution of narcotics. Some of these counts also include the use of firearms, but the central "drug" theme is present in every one of the charged counts. (Doc. 28.) Joinder of these counts is clearly appropriate under Rule 8; they are of the same or similar character, and they are indicative of a common scheme of drug use.

Regardless of Rule 8(a), however, a court may also, under Rule 14, "order the separate trials of counts if it appears that a defendant is prejudiced by a joinder of offenses. In deciding on a motion for severance, the district court has a duty to weigh the prejudice resulting from a single trial of counts against the expense and inconvenience of separate trials." <u>Janus Industries</u>, 48 F.3d at 1557 (internal quotations and alterations omitted). The Tenth Circuit has stated that when a defendant argues prejudice based on a willingness to testify on some counts but not on others, "no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other." <u>United States v. Martin</u>, 18 F.3d 1515, 1518-19 (10th Cir. 1994). In <u>United States v. Bruce</u>, the Tenth Circuit stated:

In <u>Valentine</u>, 706 F.2d at 291, we discussed what a defendant who wishes to remain silent on some counts and testify on others must do before he is entitled to severance under Rule 14:

> '[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information-regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other-to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying.'

934 F.2d 1114, 1120 (10th Cir. 1991) (quoting <u>United States v. Valentine</u>, 706 F.2d 282, 291 (10th Cir. 1983)).

Gehringer proffers that the testimony he would give concerns the driving under the influence arrest on December 19, 2006, and is "that he was not the driver of the vehicle for which he was arrested allegedly for operating under the influence, and from which items of contraband were found in a search incident to that arrest." (Doc. 27 at 3.) Gehringer then argues that if he testifies as to this incident, "he would likely place himself in a position for which he would have to testify about his use of controlled substances," which he argues would incriminate him as to other counts. (Doc. 27 at 4.) The government responds that even if the court were to grant a severance, because of the nature of the charges against Gehringer, the court would ultimately have five identical trials because the government has to prove Gehringer is an addict and to prove this, the government intends to offer evidence of Gehringer's alleged prior

-27-

admissions of addiction to methamphetamine.  (Doc. 30 at 5-6.)

The court does not believe that severance of the charges in the superceding indictment is necessary.  Gehringer proffers that he would testify that he was not the driver of the pickup the night of December 19, 2006.  The court has heard Gehringer's version of the events and cannot imagine how he believes a jury would find his version to be credible.  In any event, his limited proffer does not place Gehringer in a position in which he would have to testify about controlled substances, unless Gehringer placed himself in that position.  Simply testifying that he was not the person identified as driving the pickup does not equate to testimony concerning whether Gehringer is a drug addict.  Therefore, Gehringer would suffer no undue prejudice from the court's denial of his motion for severance, and certainly no prejudice that offsets the heavy burden to the court of having to conduct separate trials.

Gehringer's motion for severance (Doc. 26) is denied.

## II.  CONCLUSION

Gehringer's pretrial motions (Docs. 13, 14, 18, 20, 22, 24, 26) are DENIED for the reasons stated more fully herein.

IT IS SO ORDERED.

Dated this   14th   day of May, 2008, at Wichita, Kansas.

s/Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE