```
 1              (Opening Statements NOT

 2                  Transcribed.)

 3          THE COURT:  Call your first witness.

 4          MR. OAKLEY:  United States calls Officer Chad

 5  Cooper.
```

**CHAD COOPER**

```
 6
```

```
 7  Having been first duly sworn to tell the truth, the

 8  whole truth and nothing but the truth, testified as

 9  follows on:
```

**DIRECT EXAMINATION**

```
10
```

```
11  BY MR. OAKLEY:

12  Q   Sir, would you please state your name?

13  A   Chad Cooper.

14  Q   And how are you employed?

15  A   I'm a police officer with the Wichita Police

16  Department.

17  Q   How long have you been a police officer with the

18  Wichita Police Department?

19  A   Be ten years next month.

20  Q   What is your current assignment with Wichita Police

21  Department?

22  A   I'm a canine handler assigned to SCAT south.

23  Q   Could you explain for the jury what it is that as a

24  canine handler that you typically do on a workday?

25  A   Typical workday is drug interdiction either on the
```

1    highway or in the city assisting the other SCAT members

2    of our team with car stops and/or search warrants,

3    whatever comes up that day.

4    Q    How long have you been a drug dog handler?

5    A    Three years.

6    Q    And what type of training have you had as it relates

7    to your job as a police officer?

8    A    Obviously, went through the academy for I believe it

9    was six months.  Since then I've had the canine school

10   which was 22 weeks of canine handling training.  I've

11   gone through several conferences in reference to drug

12   interdiction.  One for commercial vehicles; one for

13   passenger vehicles.  Been to a conference ElPaso, Texas,

14   in reference to drug interdiction.  And we train weekly

15   with our canines.

16   Q    Your training as it specifically relates to drugs

17   and to drug interdiction, have you had any training as

18   it relates to the difference between drug usage and drug

19   distribution?

20            MR. GRADERT:  I'm going to object.  Lack of

21   foundation.

22            THE COURT:  He's only asking whether -- it

23   just calls for a yes or no.  He can answer yes or no.

24   A    Yes.

25            THE COURT:  Now lay a foundation if you can.

 1          MR. OAKLEY:  Okay.

 2     Q    (By Mr. Oakley) And at this training, have they

 3     told you things to look at to try and distinguish the

 4     difference between someone who is simply possessing

 5     drugs for their own use and someone who is possessing

 6     drugs to sell?

 7     A    Yes.

 8     Q    And what, based upon your training, what types of

 9     things do you typically look at in determining whether

10     or not someone's possessing drugs for their own use or

11     possessing drugs to sell?

12     A    The way the drugs are packaged; any signs of scales

13     to weigh the drugs out; currency; drug ledgers, anything

14     of that nature.

15     Q    All right.  Let me talk about some of that in more

16     detail.  You said packaging.  What do you mean?  What

17     does packaging have to do with the differences?

18     A    Majority of the time you see the users will have one

19     package.  Not very many people go and buy several

20     different packages for personal use.  When you see

21     individuals with several different packages weighed out,

22     they're usually for resale.  They package 'em before

23     they transport 'em, that way they know how much product

24     is in one package before selling it to somebody else.

25     Q    You said scales, what does scales have to do with

1   the difference between a drug user and a drug

2   distributor?

3   A    Majority of the times the drug users will have a

4   scale to weigh out their package to keep the drug

5   purchaser from wondering if he's gettin' shorted on his

6   amount.  If they ask for a certain amount of drugs, they

7   can have a scale to where they'll weigh it out and the

8   buyer knows that that's what he's gettin'.

9   Q    You said the drug user has the scale?

10  A    No, the drug seller.

11  Q    So typically it's the drug distributor that has the

12  scale?

13  A    Yes.

14  Q    And you also mentioned something about currency.

15  Can you explain that?

16  A    Well, with drug sales comes a large amount of

17  currency.  Usually in my past experience users will have

18  a small amount of currency because they're only buying a

19  small amount of drugs.  The sellers will have a large

20  amount of currency because they're selling to several

21  different people.

22  Q    Is the illegal drug distribution usually a cash

23  business or can people use credit cards, checks, those

24  sorts of things?

25  A    It's either cash or stolen goods.

```
 1    Q    Is there anything about the weight of the drugs that
 2    based upon your training and experience would help you
 3    in determining whether or not someone possesses for
 4    their use or to sell?
 5    A    Again, on a user only, it's going to be a smaller
 6    amount.  It depends on the level of the seller.  The
 7    drugs are usually weighed out into equal amounts, say,
 8    if he has three or four or seven or eight packages of
 9    drugs, they're usually pretty close to the same amount
10    of weight per package.
11    Q    Let me talk to you now about a specific incident.  I
12    want to talk to you about October 10th, 2006.  Were you
13    working on that date?
14    A    Yes, I was.
15    Q    And on that date did you receive a report of a
16    stolen vehicle?
17    A    Yes.
18    Q    And approximately what time was it when you received
19    that report?
20    A    It was approximately 2 in the morning, 2 a.m. in the
21    morning.
22    Q    2 a.m.  What shift were you working on that day?
23    A    SCAT works kind of a swing shift from 5 at night
24    until 3 in the morning.
25    Q    So this was later in your shift?
```

1    A    Yes.

2    Q    At some point after receiving this report of a

3    stolen vehicle did you see another vehicle that you

4    thought might be the stolen one?

5    A    Yes.

6    Q    Now, did it turn out that that was the stolen

7    vehicle?

8    A    No, it was not.

9    Q    But when you saw this vehicle, what made you think

10   that it might have been the one that was stolen?

11   A    At the time that the call came out, the call was a

12   vehicle that had just been stolen at the Quik Trip

13   located at Pawnee -- I'm sorry -- Broadway and Mt.

14   Vernon.  The call or the dispatch advised that the car

15   was last seen eastbound on Mt. Vernon.  At that time I

16   was at Hydraulic street, which is maybe a mile and a

17   half, two miles east of Broadway.  So I started towards

18   Mt. Vernon.  I was at the intersection of Hydraulic and

19   Southeast Boulevard when I saw a white vehicle traveling

20   higher -- faster than I thought was normal, eastbound on

21   Mt. Vernon.  The stolen car report was supposed to be a

22   white Chevy Suburban.  I was approximately quarter of a

23   mile or a little bit further away from the intersection.

24   All I saw was a white vehicle traveling at what I

25   thought was higher speed than normal eastbound on Mt.

1    Vernon.

2    Q    And so after you see this white vehicle, what did

3    you do?

4    A    Due to the fact that it was eastbound on Mt. Vernon

5    going through the Southeast Boulevard or K-15

6    intersection, I continued southbound on Hydraulic which

7    meets up to Mt. Vernon maybe two blocks east of K-15

8    hoping that I could intercept the vehicle and find out

9    if it was a stolen vehicle or not.

10   Q    And were you able to intercept the vehicle?

11   A    When I got up to the intersection of Hydraulic and

12   Mt. Vernon, the vehicle didn't come further east.   I

13   assumed that it had either turned off north or south

14   prior to getting to Hydraulic.

15   Q    So did you try and find that vehicle?

16   A    Yes, I did.   I went westbound on Mt. Vernon and I

17   looked down the -- there's only one side street between

18   K-15 or Southeast Boulevard and Hydraulic, that's

19   Greenwood.   I went up to Greenwood, looked south, looked

20   back to the north and I saw the taillights of it going

21   northbound.

22   Q    Heading northbound?

23   A    Yes.

24   Q    So did you turn northbound and follow it?

25   A    Yes.

1    Q    Okay.  Did you ever catch up with the vehicle?

2    A    Yeah.  The vehicle went northbound on Greenwood and

3    then turned westbound on Skinner.  As it turned, was

4    making its turn westbound on Skinner, I was turning

5    northbound onto Greenwood.  At that time I noticed the

6    vehicle accelerated rapidly after making the turn.  I

7    also accelerated rapidly to try to catch up to the

8    vehicle.

9    Q    When you tell me the vehicle accelerated after

10   making the turn, did that cause you any concern?

11   A    Made me believed that they were -- had noticed me

12   and they were trying to get away from me.

13   Q    And so you sped up your patrol car?

14   A    Yes.

15   Q    Now, were you in a marked patrol unit?

16   A    Yes.

17   Q    Did you -- at this point did you turn on your

18   emergency lights or siren or anything like that?

19   A    Not at that point, no.

20   Q    After the vehicle turned and you sped up to catch

21   it, can you explain to the jury what the vehicle did?

22   A    As the vehicle went westbound on Skinner, as I

23   turned from northbound Greenwood to westbound Skinner, I

24   noticed that it turned back northbound on Lulu.  At that

25   time it didn't use its turn signal so I sped up to

1    initiate a traffic stop.  As I turned from westbound

2    Skinner to northbound Lulu, I noticed the vehicle was

3    parked on the east curb lane and there was a white male

4    wearing a black leather coat getting out of the driver's

5    side and began walking up around the front of the

6    vehicle into the yard into the residence on the east

7    side of the house that he was parked in front of.

8    Q    So you actually saw this person get out of the

9    driver's side of that vehicle?

10   A    Yes.

11   Q    Did you pull up to where that other vehicle was

12   parked?

13   A    Yes.  I pulled up along the driver's side of the

14   vehicle and initiated my emergency equipment, my

15   overhead lights.  At that time the driver had gone out

16   of my view on the other side of his truck into the front

17   yard of the house.  At that time a female exited the

18   rear or the passenger side of the vehicle and came

19   walking around to my car.  At that time I asked her

20   where the driver went.  She pointed up to the yard and

21   said he's over there.

22   Q    What type of vehicle was this?  Once you got it

23   stopped, were you able to tell what kind of vehicle you

24   had been following?

25   A    It was a white Chevy pickup.

28

1    Q    So it was a pickup?

2    A    Yes.

3    Q    So it wasn't a stolen SUV?

4    A    No.

5    Q    After the passenger pointed up to the front yard,

6    did you look that direction?

7    A    Yes.

8    Q    And did you see anyone up there?

9    A    I saw the male that I noticed get out of the vehicle

10   was standing in the yard by a tree on the other side of

11   the tree from me.

12   Q    That was the same person that you saw get out of the

13   vehicle?

14   A    Yes.

15   Q    Do you see that person in the courtroom here today?

16   A    Yes.

17   Q    And could you please identify that person by where

18   he is seated and describe what he is wearing?

19   A    Sitting at the table here with the brown shirt on

20   and brown tie.

21        MR. OAKLEY:  Your Honor, I'd ask the record

22   reflect the witness has identified the Defendant.

23        THE COURT:  It will.

24   BY MR. OAKLEY:

25   Q    This entire incident, it occurred in Wichita?

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

1    A    Yes.

2    Q    When you turned and you saw the Defendant standing

3    up by the tree, what did you do?

4    A    At that time asked him to come over to me.

5    Q    And did he comply?

6    A    He did, yes.

7    Q    And when the Defendant walked up to you, what did

8    you observe?  What did you notice about him?

9    A    He appeared to be very nervous.  I could see he was

10   breathing hard like he had just got done runnin',

11   joggin'.  He was sweatin', and he continued lookin' left

12   to right as if -- which made me at that time think that

13   he was getting ready to run on me or flee on foot.

14   Q    Did he flee?

15   A    No.

16   Q    In your job as a police officer, you've stopped

17   people for traffic infractions and that sort of thing?

18   A    Daily, yes.

19   Q    And are people -- do you have contact with people

20   that are nervous whenever they have contact with a law

21   enforcement officer?

22   A    Everybody exhibits a little bit of nervousness when

23   stopped by the police.  I've had several individuals

24   that I've stopped in the ten years I've been on the

25   police department that exhibit extreme nervousness or

1    more than what I've had on the normal car stop for a

2    minor traffic violation.

3    Q    And would you consider this to be more than what's

4    normal?

5    A    Yes.

6    Q    Did you ask the Defendant about why you were so

7    nervous?

8    A    Yeah.  Asked him why are you so nervous and he said

9    he was driving on a suspended driver's license.

10    Q    That's a crime?

11    A    Yes.

12    Q    What did you say when he said that he was driving on

13    a suspended driver's answer?

14    A    At that time, due to his level of nervousness -- I

15    was by myself.  I knew I had a back-up unit coming so I

16    didn't want to make him more nervous or give him a

17    reason to fight or flee from me.  I advised him I wasn't

18    going to worry about his driving on suspended at that

19    time.

20    Q    That's a traffic violation?

21    A    Yes, misdemeanor.

22    Q    Is that normally prosecuted through the city court?

23    A    Yes.

24    Q    After you told the Defendant you weren't going to

25    worry about that violation, did his nerves seem to

1    decrease?

2    A    No.  After he said that -- after I told him that,

3    usually if that's what they were nervous about, their

4    nervousness would subside, they would become more calm.

5    He continued to look left and right as if he was gettin'

6    ready to run on me again.

7    Q    Where was the female that was passenger?  Where was

8    she at when you were having contact with the Defendant?

9    A    At that time, due to the fact of his nervousness and

10   uncertainty what was going to happen, I had told her to

11   go sit in front of the vehicle on the curb.

12   Q    So she went back into that pickup truck?

13   A    No.

14   Q    After you told the Defendant you weren't going to

15   worry about the driving while suspended, did you have

16   further conversation with him?

17   A    Yeah.  I -- due to the nervousness not subsiding

18   over the misdemeanor violation and after I told him I

19   wasn't gonna worry about his driving on suspended, his

20   nervousness didn't go down, I asked him if he had any

21   drugs on him.

22   Q    What did the Defendant say?

23   A    He said he didn't think so.

24   Q    That cause you any concern?  That answer?

25   A    Yeah.

1    Q    Why?

2    A    A person that doesn't have any drugs on 'em would

3    say, no, you know, and pretty matter of fact.  An

4    individual that says he doesn't think he has any drugs

5    on him makes me believe that he does.

6    Q    Okay.  Did you ask him to clarify what he meant when

7    he said he didn't think he had drugs?

8    A    Yeah.  I repeated what do you mean you don't think

9    you have any drugs on you.  And he said that he did

10   earlier.

11   Q    What did you do then?

12   A    I asked him what happened to the drugs he had

13   earlier, that he had with him earlier, and he said that

14   he used 'em.  At that time, knowing that he was under

15   the influence or possibly under the influence of drugs,

16   I had him place his hands on the front of my patrol

17   vehicle to pat him down for weapons.

18   Q    At the point when the Defendant told you he had used

19   drugs earlier, was he under arrest?

20   A    Not at that time.

21   Q    When he made that statement, was he in handcuffs?

22   A    No.

23   Q    Did you have your service revolver or your service

24   weapon with you?

25   A    Yes.

1    Q    Did you pull it on him at any point?

2    A    No.

3    Q    You said that you told the Defendant to put his

4    hands on the car and you were going to pat him down?

5    A    Yes.

6    Q    Did you pat him down?

7    A    Yes.

8    Q    Did you find anything on him?

9    A    At that time I just patted him down for weapons.  I

10   didn't feel any handguns or large knives that I would be

11   concerned of.

12   Q    At this point you're not -- all that you're looking

13   for is weapons?

14   A    Yes.

15   Q    After you patted him down, what did you do?

16   A    I waited I believe it was a couple minutes.  My back

17   up officers arrived, and once they arrived, I had them

18   stand by him and I went over to the tree that he was

19   standing at.  I did so because the way he got out of the

20   car and went over there, the way he was standing on the

21   other side of the tree from the vehicle and my vehicle,

22   it looked suspicious to me.  I went over there and I

23   located on the ground just on the other side of the tree

24   where he was standing of what I thought to be at that

25   point a meth pipe and a lighter.

34

1    Q    Okay.  The pipe and the lighter were laying on the

2    ground?

3    A    Yes.

4    Q    And where were they at in relation to where you had

5    seen the Defendant standing by the tree?

6    A    Right there where he was standing.

7    Q    What time was this?

8    A    Approximately -- the car stop was at 2:03 in the

9    morning is what dispatch logged.

10   Q    What was the weather like then?

11   A    It was sprinkling and it had been raining earlier in

12   the day, earlier that evening.

13   Q    Did you notice anything about the pipe or the

14   lighter that led you to believe that it hadn't been

15   there very long?

16   A    Yeah.  They were dry.

17   Q    The pipe and the lighter were dry?

18   A    Yes.

19   Q    At this point what did you do?

20   A    I walked back over to the front of my patrol vehicle

21   and I placed the Defendant in custody by securing his

22   hands behind his back with handcuffs.

23   Q    Okay.  And after you did this and place handcuffs on

24   him, did you search him any further?

25   A    Yes, I did.

35

1    Q    And when you searched him, what did you find?

2    A    At that time I went into all of his pockets incident

3    to an arrest.  In his coat pocket I found a large amount

4    of money.  Also in his pants pocket was also a wad of

5    money.

6    Q    Do you know how much money there was total on the

7    Defendant when you searched him on October 10th?

8    A    After we got back to the station, all-and-all -- we

9    counted it and it was $4,812.

10   Q    And you found that in two locations on the

11   Defendant?

12   A    Yes.

13   Q    You said his coat pocket?

14   A    Coat pocket and front pants pocket.

15   Q    Do you remember anything about the denominations of

16   this $4800?

17   A    There was several $100 bills, several 50s, several

18   20s, some tens, fives and I believe a couple ones.

19   Q    You said that when you got back to the police

20   station that it was counted?

21   A    Yes.

22   Q    That's when you determined how much there was?

23   A    Yes.

24   Q    And at that point would the denominations of the

25   bills have been written down?

1    A    Yes.

2    Q    Would that be placed on the Wichita Police

3    Department departmental receipt, property receipt?

4    A    Yes.

5    Q    Do you recall as you're testifying how many $20

6    bills there were?

7    A    I'd have to look at the receipt.

8    Q    Would looking at the receipt help you refresh your

9    recollection?

10   A    Yes.

11           MR. OAKLEY:  Your Honor, may I approach.

12           THE COURT:  Yes, sir.

13   A    There was 97 $20 bills.

14   Q    (By Mr. Oakley)  What was the breakdown of the

15   other denominations?

16   A    13 $100 bills; ten $10 bills; three $5 bills,

17   three -- I'm sorry, 29 $50 bills and 7 $1 bills.

18   Q    After you arrested the Defendant and searched the

19   Defendant, did you search the white pickup truck that he

20   was in?

21   A    Yes.

22   Q    What did you find in that pickup truck?

23   A    Underneath the driver's seat was a black cloth

24   zipper pouch and in that zipper pouch were several --

25   four baggies of crystal substance I recognized as

37

1    methamphetamine.  There was a digital scale and several

2    empty clear plastic baggies.

3    Q   I'm going to hand you the evidence.  I'm going to

4    hand you a pair of scissors, too, and ask that you open

5    the evidence if you would.

6                    (Witness complies with request.)

7    Q   Is that the evidence that you obtained either by the

8    tree or from the Defendant's truck on October 10th?

9    A   Yes.  It's all in here, yes.

10   Q   Do you see the pipe that you found by the tree?

11   A   Yes.

12   Q   And can I see that?  For the record, I've marked

13   this as Government Exhibit 104.  Do you recognize that?

14   A   Yes.

15   Q   What is that?

16   A   Appears to be a meth pipe.

17   Q   Is that the same pipe that you found by the tree on

18   October 10th?

19   A   Yes.

20            MR. OAKLEY:  Your Honor, at this time I'd move

21   to admit Government Exhibit 104.

22            MR. GRADERT:  No objection, Your Honor.

23            THE COURT:  It's received.

24   Q   You say that's a meth pipe.  Based upon your

25   training and experience, are you familiar with how

1    methamphetamine can be used?

2    A    Yes.

3    Q    Can it be used by smoking it?

4    A    Yes.

5    Q    Can it also be used by injecting it?

6    A    Yes.

7    Q    Let me talk to you about how people smoke

8    methamphetamine.  How would someone smoke

9    methamphetamine using a pipe like Government Exhibit

10   104?

11   A    They take the crystal meth, they drop it down into

12   the pipe and then they heat it up with a match or a

13   lighter or whatever and the smoke comes up through this

14   hole and they smoke it.  They inhale the smoke.

15   Q    Now, you said that underneath the driver's seat is

16   where you found the black bag that had the

17   methamphetamine?

18   A    Yes.

19   Q    Other than the Defendant and the female that was in

20   the passenger seat, was there anybody else in this

21   truck?

22   A    No.

23   Q    How far were you away when you saw the Defendant get

24   out of the truck?

25   A    From the corner of Skinner -- from the concern of

1    Skinner and Lulu to the residence where the vehicle

2    stopped was maybe two houses, two to three houses.

3    Q    You said that the passenger got out of this truck --

4    A    Yes.

5    Q    -- when the Defendant ran up to the tree.  You said

6    you didn't let her back in the truck?

7    A    No.

8    Q    Was she ever allowed back in the truck?

9    A    No.

10   Q    Did you ever see the female, Ms. Starks, around the

11   driver's seat of the pickup truck?

12   A    No.

13   Q    Do you see the four baggies of methamphetamine that

14   you found underneath that driver's seat?

15   A    Yes.

16   Q    May I see those please.

17                      (Witness complies with request.)

18   Q    (By Mr. Oakley) For the record, I'm handing you

19   these back.  I've marked these as Government Exhibits

20   101-A, 101-B, 101-C and 101-D.  Do you recognize those?

21   A    Yes.

22   Q    And what are those?

23   A    Clear plastic baggies containing meth, crystal meth.

24   Q    How do you know those are the same baggies of

25   methamphetamine that you found on October 10th?

1    A    They were sealed with my evidence tape and initialed

2    and then sent to the forensics lab.

3    Q    So whenever you collect something like that, you

4    mark it and initial it with your initials?

5    A    Yes.

6    Q    You said that there was a set of digital scales?

7    A    Yes.

8    Q    Do you see those?

9    A    Yes.

10   Q    May I see those.

11                   (Witness complies with request.)

12   BY MR. OAKLEY:

13   Q    For the record, I've marked these as Government

14   Exhibit 102.  Let me hand you that.  How do you know

15   that's the same set of digital scales that you found on

16   October 10th.

17   A    It was marked and submitted along with the bag and

18   the meth, the pills and everything was marked in one bag

19   to the send to the forensic lab.

20   Q    Where did you find the scales?

21   A    The scale was in the black zipper pouch.

22   Q    Is that the same pouch that had the meth?

23   A    Yes.

24           MR. OAKLEY:  Your Honor, at this time I'd move

25   to admit Government Exhibit 102.

41

```
 1              MR. GRADERT:  No objection, Your Honor.

 2              THE COURT:  102 is received.

 3   Q   Did you also find some empty baggies?

 4   A   Yes.

 5   Q   And where did you find those?

 6   A   They were also in the black zipper pouch.

 7   Q   May I see those?

 8                   (Witness complies with request.)

 9   Q    (By Mr. Oakley) I'm going to hand you what's been

10   marked collectively as Government Exhibit 105.  Do you

11   recognize those?

12   A   Yes.

13   Q   What are those?

14   A   The baggies that were located in the black zipper

15   pouch.

16   Q   Why did you collect these baggies?

17   A   It's common practice that if you have -- for lack of

18   a better word -- a kit like this, we don't separate

19   stuff out of it.  It all comes with us.

20   Q   Okay.  Based upon your training and experience, have

21   you seen small plastic baggies like that before?

22   A   Yes.

23   Q   When?

24   A   During making drug arrests.

25   Q   And how are they used?
```

1    A    To package drugs.

2    Q    Does it appear those bags have anything at all in

3    them?

4    A    It didn't appear so.

5                MR. OAKLEY:  Your Honor, at this time I'd move

6    to admit Government Exhibit 105.

7                MR. GRADERT:  No objection.

8                THE COURT:  105 is received.

9    Q    (By Mr. Oakley) Did you find any other bag that

10   caused you concern?

11   A    There was three other bags in the black zipper pouch

12   that appeared to be prescription medication.

13   Q    Were those in a prescription pill bottle?

14   A    No.

15   Q    How were they packaged?

16   A    In plastic bags also.

17               MR. OAKLEY:  May I see that.

18                         (Witness complies with request.)

19   BY MR. OAKLEY:

20   Q    Going to hand you what I've marked as Government

21   Exhibit 106, 107 and 108 and ask you are those the same

22   baggies with pills that you found on October 10th?

23   A    Yes.

24   Q    Let me talk to you about what happened after the

25   Defendant was arrested.  Was he booked into jail?

43

```
 1   A    Yes.
 2   Q    At some point during the booking process do you
 3   obtain I guess biographical information from the people
 4   that you arrest such as name, date of birth and that
 5   type of thing?
 6   A    Yes.
 7   Q    As part of that, do you ask the person that you've
 8   arrested if they're employed?
 9   A    Yes.
10   Q    I want to talk to you about your booking of the
11   Defendant.  Did you ask him those questions on October
12   10th?
13   A    Yes.
14   Q    Did you ask him specifically if he was employed?
15   A    Yes.
16   Q    And what did the Defendant say when you asked him if
17   he was employed?
18   A    He advised that he was unemployed.
19   Q    That he was not employed?
20   A    Yes.
21   Q    Finally, let me talk to you about this pickup truck
22   that you stopped.  Did it have a license tag?
23   A    Yes.
24   Q    And what was the license tag?
25   A    I'd have to -- do you mind if I refer to my notes?
```

44

1    Q    Would referring your notes help you refresh your
2    recollection?
3    A    Yes.
4    Q    Let me talk to you a little bit about this report.
5    When typically do you make your reports?
6    A    That night, the night that the incident happened.
7    Q    Is there something you type up yourself?
8    A    No.  The written portion of the report is done that
9    night prior to the end of our shift and turned in.  The
10   same report -- what was done due to the overtime issue,
11   was called in the very next day when I arrived at work.
12   Q    So the next day you called in the report?
13   A    Yes.  We call in to -- it's like a recording
14   machine, and then we have personnel in our records
15   department that types it out.  So you don't actually
16   type it yourself.  You just call in and state what
17   happened.
18   Q    It's called a dictaphone you're talking about?
19   A    The phone.
20   Q    Sometimes do you make mistakes or does the person
21   typing the report make mistakes?
22   A    Yes.
23   Q    In this case you said that you found four baggies of
24   methamphetamine.  Does your report contain a discrepancy
25   in the number of baggies?

```
 1    A    My taped report says three baggies of meth.  My
 2    written report, the evidence receipt that you fill out
 3    when you submit the drugs and you attach it with the
 4    drugs to go to the lab, says four baggies.
 5    Q    And there were four baggies that you found?
 6    A    Yes.
 7    Q    So where it says three baggies in the dictaphone
 8    report was simply a mistake?
 9    A    I'm not sure if I said it wrong or if it was
10    transposed wrong.  I'm not sure.
11    Q    There's no question there were four baggies?
12    A    Yes.
13    Q    Let me talk to you now about the license tag that
14    was on the truck when you stopped it.  And if you need
15    to look at your report to refresh your memory as far as
16    what license tag that was, go ahead.
17    A    The license place was William -- I'm sorry, W-Y-K
18    991.
19              MR. OAKLEY:  Your Honor, with the Court's
20    permission, may I may have this witness come down and
21    step to the paper?
22              THE COURT:  Yes, sir.
23    Q    Officer Cooper, if I can have you take that marker
24    and step over to the easel there, would you write down
25    the date that this incident occurred.
```

 1                    (Witness complies with request.)

 2    BY MR. OAKLEY:

 3    Q    And would you write down the Kansas license tag that

 4    was on the vehicle that you stopped that the Defendant

 5    was driving.

 6                         (Witness complies with request.)

 7    Q    Can I get you to draw a line below that and just put

 8    your initials by that so we know that you're the one

 9    that wrote it.

10                         (Witness complies with request.)

11         MR. OAKLEY:  Thank you.  Your Honor, I have no

12    further questions.

13         THE COURT:  Mr. Gradert.

14                    **CROSS EXAMINATION**

15    BY MR. GRADERT:

16    Q    Officer Cooper, you talked about being assigned to

17    SCAT.  What is SCAT?

18    A    SCAT is an enforcement part of community policing.

19    Q    Don't all police officers enforce the laws?

20    A    SCAT is -- yes, they do, yes.

21    Q    So what separates SCAT --

22    A    SCAT is responsible for following up on drug

23    complaints and gang complaints that come through

24    community policing officers.

25    Q    Okay.  So -- and does SCAT have its own line

1    supervisors and its like lieutenants and captains?

2    A    Its own sergeant and lieutenant.

3    Q    And is there a lot of communication between SCAT

4    officers about cases, things that are going on?

5    A    Yes.

6    Q    Prior to October 10, 2006, did you know Todd

7    Gehringer?

8    A    I had heard of the name, yes.

9    Q    You've testified here that you were looking for a

10   stolen vehicle; but you weren't just out to get

11   Mr. Gehringer that night, were you?

12   A    No, sir.

13   Q    Let's talk a little bit about drug interdiction.

14   Drug interdiction generally is where you try to get

15   somebody who's a transporter of drugs; is that correct?

16   A    Yes, sir.

17   Q    And a lot of times people transport large quantities

18   of drugs?

19   A    Yes.

20   Q    Okay.  And one of the reasons you have a canine is

21   so they can sniff out to see whether somebody is

22   transporting large quantities of drugs?

23   A    Yes.

24   Q    Okay.  I think you had indicated that -- something

25   about when an individual is asked, you know, do you have

48

1    drugs.  What did you say?  How did you say that they

2    respond?

3    A    Usually if an individual doesn't have drugs or

4    doesn't use drugs, doesn't do any drugs, they say no.

5    Q    They say no?

6    A    Yeah.

7    Q    Right.  But you've probably stopped individuals

8    and -- in fact, let me go through this with kind of the

9    standard procedure.  When you stop somebody in a traffic

10   stop who you suspect might have drugs is to ask them are

11   you carrying any drugs or guns or illegal stuff in your

12   car.  Right?

13   A    Yes.

14   Q    And how often do the people that have drugs in their

15   cars say yes?

16   A    Not very often.

17   Q    So could it be safe to say -- now, a lot of times

18   you find drugs even when they tell you they didn't have

19   them; correct?

20   A    Sure.

21   Q    Okay.  And you've been doing this for about ten

22   years now?  Is that what you said?

23   A    Yes.

24   Q    So you've talked a little bit about what you

25   typically see; but in ten years of experience I suspect

49

```
 1    you've seen a lot of different things happen.  Is that
 2    correct?
 3    A    Yes.
 4    Q    I mean, no two drug dealers do things exactly alike,
 5    do they?
 6    A    I wouldn't say exactly alike, no.
 7    Q    There's some similarities?
 8    A    Sure.
 9    Q    Okay.  And you testified about your expertise in
10    making determinations about what might constitute
11    possession with an intent to sell; correct?
12    A    Yes.
13    Q    And that's based on your training?
14    A    Correct.
15    Q    And so your training has been from police officers
16    who have told you this is what you should look for?
17    A    Police officers, attorneys, highway troopers, the
18    agents.
19    Q    And that's -- some of that's at the law enforcement
20    training academy, isn't it?
21    A    Here and other training opportunities that I've had
22    the chance to go to.
23    Q    Do they ever have drug addicts or drug dealers come
24    talk to you about it?
25    A    No, I don't think they have ever had.  I don't think
```

1    I've been involved in any training that's ever had

2    anyone --

3    Q    So you don't get training from drug counselors or

4    drug addicts or drug users about what is typical for

5    them; correct?

6    A    Correct.

7    Q    And you've never been a drug addict or drug user

8    yourself, have you?

9    A    No.

10    Q    Okay.  So you really wouldn't know, would you, how

11    much somebody that's a drug addict would do other than

12    what other law enforcement officers have told you, do

13    you?

14    A    Well, what other officers have told me and my

15    experience over the years of doing this; but, no.

16    Q    Would you agree with me that there are some people

17    who might use more drugs than others?

18    A    Sure.

19    Q    Would you also agree with me that a lot of the times

20    people in the drug business, whether selling or buying

21    drugs, do so in a fashion so that they won't get caught?

22    I mean, they don't do it out in the open, do they?

23    A    Yes.

24    Q    And one of the things that helps law enforcement

25    catch people is when they come out into the open

1    frequently, isn't it?  In other words, I mean, you might

2    catch somebody on a single incident transporting drugs,

3    but sometimes it takes numerous investigations to

4    finally end up getting your target.  Is that correct?

5    A    I'm sorry, I don't understand the question.

6    Q    Well, let's put it this way.  A lot of the times

7    when you -- you've heard of a controlled buy, haven't

8    you?

9    A    Yes.

10   Q    Have you ever participated in anything like that?

11   A    Yes.

12   Q    A controlled buy is when the police through an

13   informant or through an undercover police officer go and

14   by drugs or sell drugs themselves to somebody; is that

15   right?

16   A    Correct.

17   Q    And a lot of the times, would you agree with me,

18   that's done and there's no immediate arrest made?

19   A    There's no -- correct, they don't arrest 'em at that

20   point in time.

21   Q    One of the reasons they do that is because they're

22   hoping maybe they can catch them again doing it at

23   another place or get other quantities of drugs or find

24   their sources.  Is that correct?

25   A    The majority of the times why we do it is so we

1    don't burn our confidential informants; but I guess they

2    could be trying to do it that way also.

3    Q   And so it's -- at least you'd agree with me that

4    it's a risky proposition for somebody who's a drug user

5    to come out and buy drugs frequently?  Every time they

6    come out, they put themselves at risk, don't they?

7    A   Sure.

8    Q   Would it not be smarter for a drug dealer or --

9    excuse me -- for a drug user to buy perhaps a larger

10   quantity so that they don't have to come out and buy

11   drugs so often?

12   A   In my opinion?

13   Q   Yes.

14   A   No, it wouldn't be.

15   Q   It would be?

16   A   It would not be smarter.

17   Q   Okay.  Why not?

18   A   Well, if you get caught with a sixteenth of a

19   gram -- or sixteenth of an ounce, you're lookin' at less

20   time.  You get caught with four ounces, you're lookin'

21   at quite a bit of time.

22   Q   Do you think that drug users think about the

23   consequences of what's gonna happen to 'em if they get

24   caught?

25   A   I believe they do, yes, or they wouldn't run and

1   they wouldn't hide it so well.

2   Q   But it would be -- if they could, and if they could

3   get away with it, it's smarter to buy larger quantities,

4   wouldn't it?

5   A   That's a matter of opinion.

6   Q   At least to avoid detection?

7   A   Then again, I'm a canine handler.  I would rather

8   put my dog on a car with four ounces in it than a

9   sixteenth of a gram so -- there's more odds of her

10  finding it.

11  Q   You talked about the idea that scales are used by

12  the seller.  Is that right?

13  A   Correct.

14  Q   How does a buyer, a user of drugs, know whether

15  they're getting what they paid for if they don't have

16  their own scale?

17  A   I'm not saying that in every instance sellers and --

18  or buyers don't have scales.  I'm not saying that.  I'm

19  saying the majority of the time and with my experience

20  it's usually the dealers that have the scale and not the

21  seller -- or not the purchasers.

22  Q   So just because of the fact that scales were found

23  doesn't necessarily indicate it's possessed with an

24  intent to distribute, does it?

25  A   No.

54

1   Q    In fact, even with quantity doesn't necessarily

2   suggest that it's -- well, or tell you definitely that

3   it's possessed with an intent to distribute, does it?

4   A    No.

5   Q    You talked about some currency that was found on my

6   client.  Did you ever check Ms. Starks to see if she had

7   any currency on her?

8   A    She was searched by a female officer, yes.

9   Q    Do you know if she had any currency?

10  A    No.

11  Q    Okay.  You talked about the fact that large amounts

12  of currency can constitute the proceeds of drug sales;

13  correct?

14  A    Yes.

15  Q    Okay.  And if you had not found any drugs in this

16  car or any drug pipes or anything else and you found

17  someone with $4,000 on them, would you automatically

18  conclude that's drug money?

19  A    It would depend on the circumstances.

20  Q    The police department is suspicious of large amounts

21  of money whether it's with drugs or without it, aren't

22  they?

23  A    Again, it depends on the circumstances; but, yes.

24  Q    But you would agree with me that there are a lot of

25  innocent reasons that someone could have a large amount

```
 1   of money?
 2   A   Sure.
 3   Q   And the particular denominations of money wouldn't
 4   necessarily make it any different either, would they?
 5   A   No.
 6   Q   An individual -- have you ever arrested people or
 7   known people that don't have a bank account?
 8   A   Yes.
 9   Q   Okay.  You mentioned drug ledgers.  Did you see any
10   drug ledgers in this vehicle?
11   A   No.
12   Q   Now, what is a drug ledger?
13   A   Drug ledgers usually consist of the name and a
14   dollar amount or an amount next to it that could mean
15   either the amount of weight of narcotics that they are
16   selling or buying or the amount of money that that
17   individual owes them or something to keep records of who
18   they're selling to and how much money.
19   Q   So it might even be a list of people?
20   A   Yeah.
21   Q   Okay.  When you pulled this vehicle over you --
22   well, actually it was already stopped.  You didn't
23   really effectuate what would be a traffic stop.  Is that
24   my understanding?
25   A   Not a typical traffic stop.  He wasn't moving when I
```

56

```
 1    effectuated my lights.
 2    Q    Right.  So he has already stopped and out of the
 3    vehicle by the time you put your lights on?
 4    A    Correct.
 5    Q    And Ms. Starks was still in the vehicle up to that
 6    point in time; correct?
 7    A    Correct.
 8    Q    So she was there for a period of time after
 9    Mr. Gehringer got out of the vehicle and walked up by
10    that tree; correct?
11    A    As soon as I come pullin' up, she was gettin' out,
12    too, but she got out after I was already -- she got out
13    after the driver Mr. Gehringer; but as I pulled up, she
14    was gettin' out, too.
15    Q    Okay.  Now, Mr. Oakley asked you if you could see
16    her in relation to the driver's side of the vehicle.
17    You saw her actually sitting on the passenger side;
18    correct?
19    A    Yes.
20    Q    And you saw Mr. Gehringer exit from the driver's
21    side; correct?
22    A    Yes.
23    Q    Could you see what she was doing with her hands as
24    you pulled up next to 'em and turned your lights on
25    before she got out of the vehicle?
```

1    A    No.

2    Q    So you don't have any way of knowing whether or not

3    Ms. Starks might have just shoved that baggy with all

4    that stuff in it that you found under the driver's side,

5    do you?

6    A    It would had to have been before I pulled up.  It

7    was far away on the front seat of the pick up.  There

8    was only one seat in the pickup.  She was setting next

9    to the passenger door.  The baggy was found underneath

10    his seat, tucked underneath his seat.  I would have seen

11    her head go over -- her arms aren't that long to put

12    that where it was.

13    Q    Would it be fair to say that your primary focus at

14    least initially was on Mr. Gehringer going up towards

15    the tree because you thought he was going to run?

16    A    When he came out of the car, he ran.  He went to the

17    front of the vehicle, so, yes, I was lookin' -- actually

18    lookin' through the rear window of the truck and through

19    the windshield and saw him walking, so through the

20    vehicle, and noticed her also at the door.

21    Q    You really don't know whether she could have put

22    that into the car, could you?

23    A    I did not see her lean over towards the driver's

24    side.

25    Q    Is there some significance in finding this package

58

1    under the driver's side?

2    A    It leads me to believe that the driver put it there.

3    Q    If it had been found under the passenger side, would

4    you have had the same suspicion that it was the

5    passenger who put it there?

6    A    Yes.

7    Q    Let me ask you this:  When you do these drug

8    interdictions and these arrests and there's multiple

9    people in a vehicle, how do you decide who to arrest?

10   A    Well, it depends on where the drugs are located and

11   it depends on any statements that the individuals in the

12   car make.

13   Q    So you believe whatever the individuals in the car

14   say?

15   A    No, I didn't say that.

16   Q    Well, in this particular case you believed

17   Ms. Starks because you let her go right on the scene,

18   didn't you?

19   A    Correct.

20   Q    Did you interview Ms. Starks to find out what she

21   was even doing there with Mr. Gehringer?

22   A    Yes, I did.

23   Q    And all these items that you submitted to the lab,

24   you submitted the drugs for testing to see if it was in

25   fact drugs.  Is that right?

59

```
 1   A    Yes.

 2   Q    And do you request fingerprint analysis?

 3   A    I did, yes.

 4   Q    Okay.  Did you request in this particular case to

 5   have those items compared to Ms. Starks' prints?

 6   A    No.

 7   Q    But you did request that they be compared to the

 8   known prints of Mr. Gehringer; correct?

 9   A    Yes.

10   Q    Okay.  And that's because you'd already made up your

11   mind at the scene that Mr. Gehringer was the person

12   responsible for the bag found under the driver's side;

13   correct?

14   A    Yes.

15   Q    Okay.  But you don't know for sure if she might have

16   possessed those drugs, do you?

17   A    I don't know if she held them.  No, I don't know.

18   Q    Okay.  When an individual runs away and as in this

19   case where they find the meth -- where you find a meth

20   pipe thrown up by the tree -- sometimes I think police

21   call those dropsy cases, or at least lawyers call 'em

22   dropsy cases.  Are you familiar with that term?

23   A    Yeah.  Throw-down cases is what we call 'em.

24   Q    The reason for that is because a lot of individuals

25   think, well, if they don't catch it on me they can't pin
```

```
 1    it on me.  Is that your understanding why they do that?
 2    A    I guess.
 3    Q    Well, I mean, they've told you, haven't they, hey,
 4    you can't prove it, I didn't have anything to do with
 5    it?
 6    A    The majority of 'em say it ain't mine, I don't know
 7    where it came from.
 8    Q    So one of the things that people do to avoid
 9    apprehension and detection is to run away and throw
10    these things down or drop 'em hoping that you won't be
11    able to find them; correct?
12    A    Sure.
13    Q    Do you know why -- do you have any knowledge as to
14    why the pipe was disposed of but the package that was in
15    the car was not disposed of?
16    A    I have no idea.
17    Q    Okay.  It doesn't make much sense to just hide a
18    meth pipe, does it, and not to hide the drugs?
19    A    In the ten years I've been doing this, I've seen a
20    lot of people make not a whole lot of sense.
21    Q    And we talked about that earlier that there's not a
22    lot of typical stuff in drug cases, is there?
23                        (Witness nods in the
24                         affirmative.)
25    Q    You talked about my client being extremely nervous
```

1    but after that night or before that night you never had

2    any other dealings with Mr. Gehringer, have you?

3    A    No.

4    Q    So you don't know if he has any kind of like a

5    nervous tic or a weird sort of movement about him, do

6    you, when he's --

7    A    No.

8    Q    Do you know whether or not he was different when he

9    was just talking with you or when he was just calm in

10   terms of -- was he more nervous when he was talking and

11   moving around?

12   A    I don't understand the question.

13   Q    Well, I'll strike the question.  Probably not very

14   well phrased.

15        Have you been around people who have used drugs?

16   A    Yes.

17   Q    Do they act the same as people who are not under the

18   influence of drugs?

19   A    No.

20   Q    Particularly methamphetamine.  Do you know how

21   people might react?

22   A    Yes, I do.

23   Q    Does it mess with their motor movements?

24   A    The people I've recognized on meth, not usually

25   their motor movements.

62

1    Q    How about their speech?  Do they talk faster?  Talk
2    slower?
3    A    Faster.  They're kind of incoherent a little bit.
4    Q    Do you believe that an individual can appear to be
5    nervous from some other reason other than whether they
6    are nervous, in other words, from the use of drugs?
7    A    Could a person appear to be nervous?
8    Q    Who's just using drugs.
9    A    Sure.
10   Q    By the way, all of those individual items that were
11   found that have been introduced, including all the
12   baggies, Government Exhibits 105, 106, 107, 108 and then
13   all the packages of meth in 101, those plastic bags are
14   flat surfaces for the most part, aren't they?
15   A    Yeah.
16   Q    And fingerprints can be lifted from those, can't
17   they?
18   A    Yes.
19   Q    In fact, those are pretty good items to get prints
20   from, aren't they?
21   A    I'm not a fingerprint examiner.  I don't know.  I
22   submit it for prints and they do what they do.
23   Q    Okay.  And you handle 'em carefully so that you
24   don't do anything to smudge off somebody's fingerprints;
25   correct?

63

1   A    Correct.

2   Q    How about the scale in Government Exhibit 102, does

3   it have a fairly sizable flat surface that one might

4   obtain a fingerprint from?

5   A    Yes.

6   Q    And you specifically requested that to be

7   fingerprinted?

8   A    I'll have to refer back to my notes.

9           MR. GRADERT:   Could you please.

10  A    Sure.

11                  (Witness complies with request.)

12  A    My notes are in the other room.   I'm sorry.

13  Q    Well, let me just ask you this.   What's the purpose

14  of submitting these items for fingerprint analysis?

15  A    To see if the Defendant's fingerprints were on them.

16  Q    Okay.   They would also be submitted to see if anyone

17  else had maybe handled that; correct?

18  A    Sure.   They would lift any print that was on that at

19  that time I would believe.

20  Q    So I think the way you phrased it you were hoping to

21  find Mr. Gehringer's prints on it but didn't try

22  anything to rule out any other possibilities.   Is that

23  correct?

24  A    The way we submit our evidence for prints is it

25  needs the Defendant's name, his date of birth.   Whether

1    they -- when they pull that, if they pull the

2    fingerprint off that evidence, they compare it to him.

3    I'd imagine they also run it through AFIS if it's not

4    compared to him to see if they find a match with

5    somebody else.

6    Q    Okay.

7            MR. GRADERT:  I think that's all I have.

8    Thank you, Officer.

9            THE COURT:  Redirect.

10                   **REDIRECT EXAMINATION**

11   BY MR. OAKLEY:

12   Q    Let me talk to you a little bit about fingerprint

13   testimony.  You're not a fingerprint examiner; right?

14   A    No.

15   Q    But you submitted evidence to try and obtain

16   fingerprints with it as part of your job; correct?

17   A    Yes.

18   Q    In fact, in most cases do you submit items to be

19   fingerprinted?

20   A    In significant cases, yes.

21   Q    And is it like on TV where they're able to get

22   prints all the time?

23   A    No.

24   Q    Based upon your experience and the evidence that

25   you've submitted, is it likely that you'll get a

65

1     fingerprint on any given case?

2     A    No.

3     Q    In this particular case you testified that the

4     fingerprint examiner was not able to find the

5     Defendant's fingerprint on any of these items; right?

6     A    I don't believe I said that.  I wasn't aware if they

7     found his fingerprints on it or not.

8     Q    Have you seen the fingerprint report?

9     A    No.

10    Q    I'm going to hand you the report and have you look

11    at it.

12    A    Okay.

13    Q    Isn't it true they didn't find any prints at all on

14    the items that you submitted?

15    A    It advises negative results, which I imagine they

16    didn't find any fingerprints.

17    Q    I didn't understand your answer to a question.

18    Mr. Gradert asked you if Ricki Starks was searched and

19    you said that a female came and patted her down and he

20    asked if you knew whether anything was found and I think

21    your answer was no.  But I did not understand whether

22    you didn't know if anything was found or if nothing was

23    found.  Could you --

24    A    I'm sorry.  Nothing was located on her.

25    Q    Nothing was located on Ms. Starks?

1  A    No.

2  Q    Okay.

3  A    Let me clarify that.

4  Q    Yes, sir.

5  A    Nothing criminal was located on her.  She might have

6  had some keys or something of that nature, but the

7  female officer advised me she did not locate anything

8  criminal, any contraband.

9  Q    If so, she would have been arrested I assume?

10 A    Yes.

11 Q    She was allowed to go free?

12 A    Yes.

13 Q    Now, was this vehicle registered to Ms. Starks?

14 A    No.

15 Q    Was this vehicle registered to the Defendant?

16 A    No.

17 Q    Did you talk to the Defendant -- well, let me back

18 up.  Whenever you arrest somebody from a vehicle, that's

19 driving a vehicle, what do you do with the vehicle on

20 your policy?

21 A    It depends.  If the vehicle is legally parked, we

22 give the arrestee or the person we arrest out of the

23 vehicle the option.  Either we can impound the vehicle

24 or we can leave it legally parked where it was at when

25 we stopped the vehicle.

1   Q   Who did you talk to about disposition of this white

2   pickup truck?

3   A   I asked the Defendant Mr. Gehringer if he would like

4   to leave his vehicle legally parked or have somebody

5   come and get it.

6   Q   What did the Defendant tell you he wanted to have

7   done?

8   A   He wanted me to call a female to come pick up his

9   car.

10  Q   And did you do that?

11  A   Yes, I did.

12  Q   And did you leave the keys with the car?

13  A   No.  I asked Mr. -- I asked the female that

14  Mr. Gehringer told me to call if she had a set of keys.

15  Usually a lot of times if people are coming from long

16  ways away we don't have time to set on a vehicle and

17  secure it until the individual gets there to pick it up.

18  She advised she had a set of keys for it.  I advised her

19  that I would take the keys that Mr. Gehringer had and

20  place 'em in his property and the vehicle was at a

21  certain location and she could pick it up at her

22  leisure.

23  Q   Okay.  You talked about on cross-examination

24  Mr. Gradert asked you about drug users having scales.

25  And I think you said that you've been involved in

1   controlled buys where actually law enforcement uses

2   someone to purchase drugs?

3   A   Correct.

4   Q   Based upon your training and experience, how common

5   is it that drug users take their own empty baggies to go

6   purchase drugs?

7   A   I've never seen it in ten years.

8           MR. OAKLEY:  No further questions.

9           MR. GRADERT:  I have no further questions,

10  Your Honor.

11          THE COURT:  All right.  Well, this is a good

12  time for a recess, Ladies and Gentlemen.  15 minutes.

13  Remember and heed the admonition.  You're excused.

14              (Recess.)

15          THE COURT:  Next witness.

16          MR. OAKLEY:  Government calls Ricki Starks.

17                  **RICKI STARKS**

18  Having been first duly sworn to tell the truth, the

19  whole truth and nothing but the truth, testified as

20  follows on:

21              **DIRECT EXAMINATION**

22  BY MR. OAKLEY:

23  Q   Ma'am, could you please state your name.

24  A   I'm Ricki Starks.

25  Q   I'm going to have you sit real close to that

1    microphone so everyone can hear you.  Okay.  I'm sorry.

2    Would you repeat that.

3    A    Ricki Starks.

4    Q    Ms. Starks, I'd like to talk to you about October

5    10th, 2006.  Were you in a vehicle that was stopped by

6    the police on that day?

7    A    Yes, I was.

8    Q    And were you driving that vehicle?

9    A    No, sir.

10   Q    Do you remember what type of vehicle it was?

11   A    I believe it was a truck but I'm not sure of the

12   make and model of it.

13   Q    Where were you at in that truck when it was stopped?

14   A    I was in the passenger seat.

15   Q    And how did you get to be inside that truck on

16   October 10th when it was stopped?

17   A    I was walking on the street and he had stopped and

18   asked if I needed a ride and I said yes.

19   Q    Now, who stopped?

20   A    Todd.

21   Q    Did you know Todd before this?

22   A    No, sir.

23   Q    This was the first time you'd ever seen Todd?

24   A    Yes, sir.

25   Q    Do you see Todd in the courtroom here today?

1    A    Yes, sir.

2    Q    And could you please point Todd out to us and

3    perhaps describe what he is wearing?

4    A    Brown and tan shirt with tan slacks.

5    Q    Since October 10th, have you had any contact with

6    Todd?

7    A    No, sir.

8    Q    So you were just walking and Todd stopped and picked

9    you up?

10   A    Yes, sir.

11   Q    How long were you in this truck before -- driving

12   around before you were stopped by the police?

13   A    Ten or 15 minutes.

14   Q    Now, on October 10th when you got into the truck,

15   did you have any drugs on you?

16   A    No, sir.

17   Q    While you were riding around with Todd before being

18   stopped by the police, did you see any drugs in the

19   vehicle?

20   A    No, sir.

21   Q    And did you have any conversation with Todd?

22   A    Uhm, just, you know, what my name was and, you know,

23   where was I going.  Nothing, nothing too big.  I mean --

24   Q    Did you guys talk about drugs at all?

25   A    No, sir.

1    Q    And at some point did you learn that the police were

2    behind you?

3    A    Yes, sir.

4    Q    And how did you learn that?

5    A    He sped off real fast.

6    Q    Who sped off real fast?

7    A    Todd.

8    Q    Do you know why Todd sped off real fast?

9    A    Uhm, no, not quite sure; but when we got stopped the

10   police said that they were following him from a drug

11   house or something.  I'm not sure.

12   Q    Okay.  Once he sped off, how far did he drive before

13   the police caught up?

14   A    Maybe two or three blocks.

15   Q    And was he in the vehicle with you when the police

16   pulled up?

17   A    Yes, sir.

18   Q    At some point did he get out of the vehicle?

19   A    I can't recall if he did or not.

20   Q    Did you ever see Todd grab anything out of the

21   vehicle?

22   A    Out of the glove box I believe.

23   Q    Out of the glove box?

24   A    Yeah, but I couldn't tell quite what it was.

25   Q    And was this -- how soon before the police stopped

1   did he grab something out of the glove box?

2   A    Just right immediately.

3   Q    Okay.  After he grabbed something out of the glove

4   box, what did he do?

5   A    Uhm, I'm not sure.

6   Q    Do you ever remember Todd getting out of the

7   vehicle?

8   A    Just when the police asked him to get out.

9   Q    Did you ever get out of the vehicle?

10  A    Uhm, yes, sir, when the police asked me to get out

11  also.

12  Q    Do you remember Todd standing by a tree?

13  A    Uhm, I can't recall.

14  Q    Do you remember what time of day this was when the

15  police stopped you?

16  A    It was probably, uhm, around midnight maybe.

17  Q    Okay.  Had you been drinking alcohol that night?

18  A    Yes, sir, I was.

19  Q    Okay.  Were you drunk?

20  A    Uhm, yeah, I was tipsy.

21  Q    Does this effect your ability to remember what

22  happened?

23  A    Uhm, somewhat, but I'm pretty -- I'm pretty sure

24  about everything.

25  Q    Does it effect your ability to remember whether or

1   not you had drugs on you that night?

2   A   No, sir.

3   Q   Did you ever see any drugs in that vehicle at any

4   point?

5   A   No, sir.

6   Q   Did the police talk to you about drugs that they

7   found?

8   A   Yes, sir.

9   Q   And is that how you knew that the drugs were found

10  in the vehicle?

11  A   Yes, sir.

12  Q   You say you didn't have any drugs with you, did you

13  have any paraphernalia to use drugs with you?

14  A   No, sir.

15          MR. OAKLEY:  No further questions, Your Honor.

16          THE COURT:  Yes, sir.

17                  **CROSS EXAMINATION**

18  BY MR. GRADERT:

19  Q   Ms. Starks, my name is Steve Gradert and I have a

20  few questions for you.  If I told you that it's been

21  said that it was at 2:00 in the morning, would that --

22  could that be correct?

23  A   It could have been.

24  Q   Okay.  And do you go out very often and go for walks

25  at 2:00 in the morning?

```
 1    A    Uhm, sometimes, yeah.  Walkin' back from friends'
 2    houses or what-not.
 3    Q    Is that what you were doing that night?
 4    A    Yes.  Trying to get home to my mother's.
 5    Q    Where had you been before you were picked up?
 6    A    I was over at one of my friend's house.
 7    Q    You use drugs at all?
 8    A    Yes, I do.  I smoke marijuana occasionally.
 9    Q    Okay.  Take any pills?
10    A    No, sir.
11    Q    Have you ever used methamphetamine?
12    A    No, sir.
13    Q    Cocaine?
14    A    No, sir.
15    Q    Do you smoke marijuana on a regular basis?
16    A    Yeah.
17    Q    Have you smoked marijuana before you came to court
18    here today?
19    A    No, sir.
20    Q    When was the last time you smoked?
21    A    Last night.
22    Q    Okay.  Have you ever sold drugs?
23    A    No, sir.
24    Q    Have you ever been to jail?
25    A    Yes, sir, for minor consumption of alcohol a while
```

75

```
 1   ago.
 2   Q    When you got pulled over on October 10th of 2006,
 3   did you think you were going to jail?
 4   A    No.
 5   Q    I think you said something about thinking that
 6   Mr. Gehringer reached to the glove box?
 7   A    Uh-huh.
 8   Q    Is that correct?
 9   A    Uh-huh.
10   Q    Did you see him get anything out of the glove box?
11   A    Yeah, I seen him get something out but I couldn't
12   quite tell what it was.
13   Q    Okay.
14   A    It was dark so --
15   Q    And then he left the vehicle; right?
16   A    I'm not sure if he left the vehicle then or when the
17   cops asked me to get out.
18   Q    Okay.
19   A    I can't recall.
20   Q    And you can't remember whether you got out before
21   the police officer got there or --
22   A    I got out when the police officer got there and
23   asked me to get out of the vehicle.
24   Q    So you didn't get out until they asked you to get
25   out?
```

1    A    Right.

2         MR. GRADERT:  I don't have any further

3    questions.

4         THE COURT:  Anything further?

5         MR. OAKLEY:  Nothing further, Your Honor.

6         THE COURT:  Thank you, ma'am.  You're excused.

7    Next witness please.

8         MR. OAKLEY:  United States calls Jeffrey

9    McVay.

10                    **JEFFREY McVAY**

11   Having been first duly sworn to tell the truth, the

12   whole truth and nothing but the truth, testified as

13   follows on:

14                 **DIRECT EXAMINATION**

15   BY MR. OAKLEY:

16   Q    Sir, could you please state your name.

17   A    My name is Officer Jeffrey McVay.

18   Q    And how are you employed?

19   A    With the Wichita Police Department.

20   Q    How long have you have been employed with the

21   Wichita Police Department?

22   A    Since January of 2004.

23   Q    What do you do for the Wichita Police Department?

24   A    I am a patrol officer.

25   Q    What type of training have you had as it relates to

77

1    your job as a patrol officer with the City of Wichita?

2    A   The academy is a six month long training from

3    everything from D.U.I.s to working traffic

4    investigations, accidents, report filing.

5    Q   And is there a particular area of Wichita that

6    you're assigned to?

7    A   Yes, sir.

8    Q   And which area is that?

9    A   At the time of this incident I was assigned to the

10   West Bureau.  Specifically, it was called 14 Beat.

11   Q   And that's out of Patrol West on the west side of

12   Wichita?

13   A   Yes, sir.

14   Q   I'd like to talk to you about an incident that

15   occurred December 19th, 2006.  You were working on that

16   day?

17   A   Yes, I was.

18   Q   And on that day did you respond to an alarm call on

19   the west side of town?

20   A   Yes, sir.

21   Q   About what time was this alarm call?

22   A   It was approximately 11:30 in the evening.

23   Q   And where exactly was the alarm call at?  What

24   property?

25   A   It was an Army recruiting station in the 600 block

1    of north West street.

2    Q    That Army recruiting station, is that the only

3    business that is in that area?

4    A    No, sir.  It's a strip mall with multiple

5    businesses.

6    Q    Other than the Army recruiting station, what other

7    businesses are in there?

8    A    There was a Cost Cutters, a hair salon.  There was a

9    Payday Loan.  And then the largest renter of the strip

10   mall or business section was Homeland Foods.

11   Q    That's a grocery store?

12   A    Yes, sir.

13   Q    Now, are they open 24 hours a day?

14   A    No, they're not.

15   Q    What time did they close on December 19th, 2006.

16   A    At 11 p.m.

17   Q    11 p.m. and what time did you receive the call?

18   A    The audible alarm I was responding to was at about

19   11:30 p.m.

20   Q    So the grocery store was closed when you first

21   received the call?

22   A    Yes, sir.

23   Q    And when you investigated the alarm call, did you --

24   were you able to ascertain that there was no breaking --

25   no crime going on?

1    A    Yes, sir.  It was weather related.  A lot of times

2    with alarms rain will set them off and they're false

3    alarms.

4    Q    Was the Army recruiting station open at 11:30 on

5    December 19?

6    A    No, it was not.

7    Q    Were there any businesses in that strip mall that

8    were open at 11:30?

9    A    No.

10   Q    So was there a lot of traffic in that parking lot of

11   that strip mall?

12   A    There was no traffic.

13   Q    Were there cars, however, that were parked in the

14   strip mall?

15   A    Yes, there was.

16   Q    Do you know why there were cars that were parked in

17   the strip mall?

18   A    The Army recruiting station keeps their work cars

19   there, as well as the Homeland Foods.  Although it's

20   closed, they have stockers and cleaners who park their

21   cars out in the parking lot that were inside the closed

22   business.

23   Q    Let's talk about the cars that would have been in

24   the parking lot of the grocery store.  Were there very

25   many?

1   A   No, sir.

2   Q   At some point did you see someone pull into this

3   parking lot where you were at?

4   A   Yes, I did.

5   Q   And was there anything that caused you to draw your

6   attention to this particular vehicle?

7   A   Yes, sir.

8   Q   What was that?

9   A   The rate of speed as it entered the parking lot off

10  of West street.

11  Q   What type of car was this?

12  A   It was a primer gray Chevy pickup truck.

13  Q   And you said that the speed is what drew your

14  attention?

15  A   Yes, sir.

16  Q   So did you turn and look at this primer grey pickup

17  as it pulled in off of West street?

18  A   Yes, sir.  As it entered from West street, I

19  followed it as it crossed towards the Homeland Foods.

20  Q   This is all in the City of Wichita; right?

21  A   That is correct.

22  Q   As you followed the car as it pulled in from West

23  street, were you able to see how many occupants were in

24  that pickup truck?

25  A   Yes, sir.

81

1    Q    How many were there?

2    A    One.

3    Q    And how far were you away from the driver of that

4    truck?

5    A    As it passed me, within 20 yards as it drove by.

6    Then as it -- the distance got further as it made its

7    turn to go north towards the Homeland Foods entrance.

8    Q    So as the pickup truck pulled in, it pulled by you,

9    then turned away from you?

10   A    Yes, sir.

11   Q    When the pickup truck pulled by you, were you able

12   to see the driver?

13   A    Yes, sir.

14   Q    Do you see the person who was driving that pickup

15   truck on December 19th in the courtroom here today?

16   A    Yes, sir, I do.

17   Q    And could you please identify that person by where

18   he is seated and perhaps describe what he is wearing?

19   A    He is seated wearing a black tie and a brown short

20   sleeve shirt.

21           MR. OAKLEY:  Your Honor, ask that the record

22   reflect the witness has identified the Defendant.

23           THE COURT:  It will.

24   BY MR. OAKLEY:

25   Q    Was there anything that you noted about the

82

1    Defendant when you first saw him as he was driving the

2    pickup truck past you?

3    A   Yes, sir.  I recall his long black hair.  It was to

4    his shoulders.

5    Q   What did the pick up truck do after it passed in

6    front of you and turned back towards the grocery store?

7    A   The pickup truck went up towards the front entrance

8    and over by like the pop machines just north of the

9    front entrance, slammed on its break.  I heard the tires

10   squeal from the wet pavement.  And then it went in

11   reverse back towards the front entrance and in doing so

12   it struck a stop sign which was affixed to the parking

13   lot for pedestrians entering and leaving the grocery

14   store.

15   Q   And you saw this happen?

16   A   Yes, sir.

17   Q   Did you see what the driver did after he hit the

18   stop sign?

19   A   Yes, sir.  Came to a stop and he stuck his head out

20   the driver's window to look back at what he was

21   scraping.

22   Q   When he did that, was he looking towards your

23   direction or away from you?

24   A   He was looking towards me.

25   Q   Were you able to see his face at that point?

1    A    Yes, sir.

2    Q    What did the Defendant do after he turned back and

3    looked at the stop sign he had just hit?

4    A    After realizing what he had struck, he then pulled

5    into an adjacent parking stall facing in a north by

6    northwest direction in front of the grocery store.

7    Q    Were you the only officer that was out at the

8    Homeland grocery store on this evening?

9    A    No, sir.  I had another officer with me.

10   Q    Who was that?

11   A    Officer Wolfram.

12   Q    Were you guys in the same patrol car?

13   A    No, sir.  We were in separate cars.

14   Q    So what did you do after you saw the pickup truck

15   hit the stop sign and then park?

16   A    I cleared our audible to let them know that the

17   current call we were on was a false alarm and I

18   instructed Officer Wolfram to enter his car to give

19   chase because at the time when he pulled forward I

20   didn't realize he was going to park.  I thought he was

21   going to exit out onto Central Street and flee on a hit

22   and run.

23   Q    Did the truck end up fleeing?

24   A    No, sir.  It parked.

25   Q    It parked.  What did you do?

84

1    A    I called in, like I said the audible being done and

2    that we were now going to be out on a car stop at the

3    Homeland Foods in the same parking lot.

4    Q    I'm going to hand you what I've marked as Government

5    Exhibit 208-A and ask if you can identify that?

6    A    Yes, I can.

7    Q    What is that a photograph of?

8    A    It's a photograph looking north to south of the stop

9    sign in the parking lot at Homeland Foods.

10   Q    Was that photograph taken the same day, December

11   19th, 2006?

12   A    Yes, it was.

13   Q    Is that a fair and accurate depiction of the way

14   that stop sign in that parking lot appeared to you on

15   December 19th, 2006?

16   A    Yes, it is.

17          MR. OAKLEY:  Your Honor, at this time

18   Government would move to admit Government Exhibit 208-A.

19          MR. GRADERT:  No objection, Your Honor.

20          THE COURT:  It's received.

21          MR. OAKLEY:  May I publish that by showing it

22   to the jury?

23          THE COURT:  Yes, you may.

24   BY MR. OAKLEY:

25   Q    Officer, up on the screen, is that Government

1    Exhibit 208-A?

2    A   Yes, it is.

3    Q   And can you tell in this photograph the stop sign

4    that the Defendant struck?

5    A   Yes, sir.

6    Q   And I'm going to hand you this laser pointer and

7    have you indicate to the jury that stop sign?

8    A   It's the one centered in the photograph.

9    Q   Okay.  Can you see in this photograph the building

10   that's the Homeland grocery?

11   A   Yes.  You can see the south side of it.

12   Q   Using that laser pointer, can you show the jury

13   where the grocery store is?

14   A   It starts there and spans back to the pharmacy

15   window.

16   Q   Can you see in that photograph where the Army

17   recruiting station is where you would have been when the

18   alarm --

19   A   Yes, sir.

20   Q   Where's it at?

21   A   It's right there.

22   Q   And so can you show us the route that the

23   Defendant's pickup truck came as it passed you while you

24   were standing outside the recruiting place?

25   A   Sure.  West street would be to the right of the

1    photograph.  It traveled this way and then went north

2    and passed the stop sign and then when it went in

3    reverse about 20 feet, that's when it struck the side of

4    the stop sign.

5    Q    And where did the vehicle end up parking at?

6    A    To the north of this stop sign towards the right of

7    the picture in a front stall.

8    Q    So as you look at the picture, it's to the right out

9    of the --

10   A    Yes.  It would be almost directly to the shot-

11   taker's right.

12   Q    Okay.  Did you drive over to where the Defendant was

13   at or did you walk?

14   A    We drove over.

15   Q    And when you got to where the pickup was at, what

16   did you see as far as where the Defendant was at?

17   A    The Defendant had already exited the truck and was

18   being contacted by Officer Wolfram at the Homeland food

19   entry door.

20   Q    How far had the Defendant walked from the time you

21   got into your patrol car and drove over there?

22   A    He had probably spanned 20 yards from the front

23   parking stall to the entrance of the store.

24   Q    Was there anyone else in that pickup truck?

25   A    No, sir.

87

```
 1    Q    Did you see anyone else walking away from that
 2    pickup truck?
 3    A    No, sir.
 4    Q    Is there any doubt in your mind that there wasn't
 5    another person in that pickup truck?
 6    A    There is no doubt.  It was one occupant in the
 7    truck.
 8    Q    Did you have any contact with the Defendant?
 9    A    Yes, I did.
10    Q    And tell us what you first observed when you had
11    contact with the Defendant?
12    A    When I first spoke with him and had contact, I
13    noticed that his eyes were glazed, his pupils were very
14    constricted, and he had a lot of muscular tics, which
15    are indicators of whether it be alcohol or drugs when
16    we're looking at D.U.I.s.
17    Q    So based upon your training and experience, did you
18    believe that you may have had a crime that was
19    occurring?
20    A    Yes, sir.
21    Q    What crime were you investigating?
22    A    Well, we contacted him to investigate the accident
23    and then upon first contact I noticed the indicators
24    which led me to believe that he may be under the
25    influence of drugs, alcohol or both.
```

88

1    Q    And so this was initially a D.U.I. investigation at
2    first?
3    A    That is correct.
4    Q    And have you had any training as it relates to the
5    investigation of driving under the influence cases?
6    A    Yes, sir.  In the academy.
7    Q    And as part of that, are there a series of -- I
8    guess for lack of a better word -- tests that you have
9    drivers conduct in trying to determine whether or not
10   they're under the influence of alcohol or drugs?
11   A    Yes, sir, we do.
12   Q    And how many tests are there that you normally
13   conduct on a D.U.I. investigation?
14   A    The standardized field sobriety test is comprised of
15   three evaluations.
16   Q    And can you tell us what those three are?
17   A    Yes, sir.  The first is a HGN, or horizontal gaze
18   nystagmus, which is dealing with the subject's eyes.
19   The second is a walk and turn.  And the third is a one
20   leg stand.
21   Q    And did you conduct these tests on the Defendant?
22   A    Yes, I did.
23   Q    Now, prior to conducting these tests, did you talk
24   to him about whether or not he had used alcohol or drugs
25   that night?

1   A    Yes, I did.

2   Q    What did he say?

3   A    He declined any alcohol was consumed and no drugs or

4   prescription medication was taken.

5   Q    But despite him saying he didn't use drugs or

6   alcohol, you continued your DUI investigation?

7   A    Yes, sir.  Due to the indicators I had present with

8   his eyes, his nervous tic or muscular tics and the

9   constrictiveness of his pupils.

10  Q    And so you put him through those three battery of

11  tests for the DUI investigation?

12  A    Yes, sir.

13  Q    Let's talk about the first one which I think you

14  said is the horizontal gaze nystagmus test?

15  A    Yes, sir.

16  Q    Was there anything that you observed during that

17  test that led you to believe he might be under the

18  influence of alcohol or drugs?

19  A    Yes, sir.  Initially with the eyes I do a vertical

20  nystagmus to where if that's present, it allows the

21  observer to know that drugs are a factor in the testing.

22  Second, we look for lack of smooth pursuit and

23  horizontal nystagmus at different degrees of moving

24  their eyes to the left or the right.

25  Q    For the jury's benefit, what do you mean by when you

1    say you're looking for nystagmus when the eyes move from

2    left to right?

3    A    Nystagmus is when if they were to focus on a focal

4    point such as my pen, as I move the pen to the right or

5    the left, there becomes a degree of them looking that

6    their eyes begin to pop or wobble involuntarily which is

7    an indicator of drugs or alcohol.

8    Q    You also indicated that you do that vertically,

9    looking up or down?

10    A    That is correct.

11    Q    And you said that that was for drugs?

12    A    The vertical one is exclusive for drugs.

13    Q    Okay.  And what did you observe as the Defendant

14    completed the horizontal gaze nystagmus test?

15    A    That it was clearly and distinctively present in

16    both of his eyes.

17    Q    Was that on both the vertical and the side-to-side

18    horizontal?

19    A    Yes, sir.

20    Q    What was the second test that you conducted?

21    A    The second is a walk and turn test which tests their

22    divided attention skills as well as their dexterity.

23    Q    And what do you make the driver do for the walk and

24    turn test?

25    A    On that, it's a series of nine steps along the line,

1  heel to toe, while they count their steps out loud.  At

2  the completion of the nine steps, they turn around and

3  do nine steps back on that same line leaving their arms

4  at their side.

5  Q   And you conducted this test on the Defendant?

6  A   Yes, sir.

7  Q   How did he do on this test?

8  A   He failed that test.

9  Q   The third test you said is the one legged stand?

10  A   Yes, sir.

11  Q   What do you have the driver do when you're

12  conducting a one legged stand test?

13  A   On that one the subject picks up either the right or

14  their left leg, they choose, and leaving their arms at

15  their side, they extend their leg about six to ten

16  inches off the ground and point their toe and count out

17  loud for 30 seconds, one thousand one, one thousand two.

18  Q   What types of things are you looking for in

19  determining whether or not someone passes that test?

20  A   We're looking for balance and divided attention

21  testing.

22  Q   How did the Defendant do?

23  A   He failed.

24  Q   Now, under state law, once you arrest somebody for

25  D.U.I., is there any further test of that person's blood

1   or breath?

2   A   After the standardized field tests, yes, there are

3   further additional testing that's required.

4   Q   And this is all under state law; right?

5   A   Yes, sir.

6   Q   And under state law, in order to obtain that test,

7   are you required to read an advisory to the person who

8   you've arrested?

9   A   Yes.  Our state law requires an implied consent

10  advisory be read.

11  Q   That's before you ask for a test?

12  A   Yes, sir.

13  Q   What types of tests can you obtain from a subject to

14  determine whether or not they're under the influence of

15  alcohol or drugs?

16  A   Law enforcement officer can request a breath, a

17  blood or a urine test.

18  Q   Now, will all three of those tests determine whether

19  or not someone has used drugs?

20  A   No, sir.

21  Q   Which of those tests will not allow you to determine

22  whether or not someone has used drugs?

23  A   A breath test would not help for drugs.

24  Q   In this particular case, did you arrest the

25  Defendant for driving under the influence?

1    A    Yes, I did.

2    Q    And after arresting, him did you read him the

3    implied consent under state law?

4    A    Yes, sir.

5    Q    And then did you ask him after reading that implied

6    consent to take a test for you to provide the test?

7    A    Yes, I did, sir.

8    Q    Did you ask for a specific type of test?  Either the

9    blood, breath or urine?

10   A    Yes, sir.

11   Q    What test did you ask for?

12   A    I requested a blood test.

13   Q    And why did you ask for a blood test as opposed to a

14   breath test?

15   A    Because all of my field sobriety tests were

16   indicators towards drugs and not alcohol.

17   Q    What did the Defendant say to you when you asked him

18   to provide you with a blood test?

19   A    He declined by stating that he is an addict and he

20   used yesterday and he would come up dirty.

21   Q    Did he tell you what he had used?

22   A    Not at that time, no.

23   Q    Now, at this point when you ask someone to take the

24   test, do you read the Miranda rights?

25   A    At the time of the breath test?

1   Q   Prior to asking -- prior to the implied consent, do
2   you read Miranda?
3   A   No, sir.  We read implied consent first.
4   Q   And is that because under state law someone who has
5   a driver's license implicitly consents to those types of
6   tests as part of driving?
7   A   That is correct, yes, sir.
8   Q   But at some point after the Defendant refused to
9   take the test, did you read him his Miranda rights?
10  A   Yes, I did, sir.
11  Q   And when we say Miranda rights, what are we talking
12  about?
13  A   We're speaking of the rights they have prior to an
14  interrogation or an interview.
15  Q   And when you read someone their Miranda rights, do
16  you have a form that helps you do that?
17  A   Yes.  We have an issued card that we read from.
18  Q   You read the Defendant his Miranda rights?
19  A   Yes, I did.
20  Q   Did you read them from the card?
21  A   Yes, I did.
22  Q   After reading the Defendant his rights, did you ask
23  whether or not he would agree to talk to you?
24  A   Yes, I did.
25  Q   And what did he say?

1    A    He didn't say anything.  He was silent.

2    Q    Did it appear to you that he understood the

3    questions that you were asking him?

4    A    Yes, because I asked him can you hear me, did you

5    understand and he said yes to that.  And then when I

6    asked him would he speak to me, again, he just remained

7    silent.

8    Q    Did you then ask him questions?

9    A    I did not ask any incriminating questions other than

10   like where he lived, his date of birth, things that

11   would have to be filled out for personal information.

12   Q    But before that when you were conducting the test,

13   or trying to determine whether or not he would submit to

14   a blood test, you talked to him about his drug usage?

15   A    Yes.

16   Q    Okay.  And that's when he said that he was an

17   addict?

18   A    Yes.

19   Q    The -- you said that the Defendant was arrested for

20   D.U.I.?

21   A    That's correct.

22   Q    As a result of arresting him, did you search the

23   vehicle?

24   A    Yes, I did.

25   Q    The truck?

96

1    A    Yes.

2    Q    And I'm going to hand you -- I'm going to hand you

3    what's been marked as Government Exhibit 208-B.  Do you

4    recognize that?

5    A    Yes, sir, I do.

6    Q    What is that?

7    A    That's the interior of the Chevy pickup truck.

8    Q    And that's a photograph of the interior?

9    A    Yes, sir.

10    Q    And is that a fair and accurate depiction of the way

11    that the interior of that truck appeared to you?

12    A    Yes, sir.

13            MR. OAKLEY:  Your Honor, at this time I'd move

14    to admit Government Exhibit 208-B.

15            MR. GRADERT:  No objection, Your Honor.

16            THE COURT:  It's received.

17    Q    Can you explain for the jury what you initially saw

18    as you opened the truck to begin to search it?

19    A    Yes, sir.  When I opened the truck, what initially

20    grabbed my attention is on the center bench seat is a

21    brown cotton jersey glove and I could see the butt of a

22    handgun protruding from it.

23    Q    Using that photograph, can you tell where the glove

24    with the handgun is located?

25    A    Yes, sir.

1   Q   Where is it at in that photograph?

2   A   Do you want me to use the pointer to --

3   Q   Yes, please.

4   A   It's right there next to a cell phone.

5   Q   And you said that it was a brown jersey glove with a

6   gun inside of it?

7   A   Yes, sir.

8   Q   Did you ever look at the gun?

9   A   Yes, sir.

10  Q   And did you take the gun and collect it as evidence?

11  A   Yes, I did, sir.

12  Q   I'm going to hand you what's been marked as

13  Government Exhibit 201 and ask if you recognize that?

14  A   Yes, sir, I do recognize it.

15  Q   What is that a photograph of?

16  A   It's -- what is it a photograph --

17  Q   I'm sorry.  What is that?  It's not a photograph.

18  It's an item.  What is it?

19  A   It's a .32 caliber handgun.

20  Q   And is that the same gun that you found in the

21  glove?

22  A   Yes, it is.

23  Q   How do you know that's the same gun that you found

24  in the glove on December the 19th, 2006?

25  A   I recorded the serial numbers down in my case book

1    and called it in on my taped report.

2            MR. OAKLEY:  Your Honor, at this time I'd move

3    to admit Government Exhibit 201.

4            MR. GRADERT:  No objection.

5            THE COURT:  It's received.

6    Q   I'm going to hand you some other items that's been

7    marked in a bag and a pair of scissors and have you open

8    those for me, please.

9                    (Witness complies with request.)

10   Q   Do you see the glove that you found the handgun in?

11   A   Yes, sir, it's here.

12   Q   For the record, I've marked that as Government

13   Exhibit 204.  Do you recognize that?

14   A   Yes, sir.

15   Q   What is that?

16   A   It's a brown jersey glove, right hand.

17   Q   Is that the same glove that you found the gun in?

18   A   Yes, sir.

19           MR. OAKLEY:  Your Honor, I'd move to admit

20   Government Exhibit 204.

21           MR. GRADERT:  No objection, Your Honor.

22           THE COURT:  It's received.

23   Q   (By Mr. Oakley) Other than the glove and gun, what

24   else did you see in the truck?

25   A   There was a black baggy, a Sprite can, a cellular

 1   phone.

 2   Q    I'm going to hand you a photograph that I've marked

 3   as Government Exhibit 208-C.  Ask if you recognize that

 4   photograph?

 5   A    Yes, sir, I do.

 6   Q    What is that a photograph of?

 7   A    It's a closer photograph of the items on the center

 8   console of the Chevy truck -- or, excuse me -- the

 9   center bench seat.

10   Q    Is that photograph a fair and accurate depiction of

11   the way those items appeared to you on December 19th?

12   A    Yes, it is.

13        MR. OAKLEY:  Your Honor, at this time I'd move

14   to admit Government Exhibit 208-C.

15        MR. GRADERT:  No objection.

16        THE COURT:  It's received.

17   Q    (By Mr. Oakley) You said you found a black bag.  Do

18   you see that in the photograph?

19   A    Yes, sir.  It's depicted in the photograph.

20   Q    And can you show the jury using this laser pointer

21   where that bag is?  Do you see the gun and the glove in

22   208-C?

23   A    Yes, sir, I do.

24   Q    Can you show us where it's at in relation to the

25   bag?

1    A    Sure.  It's next to it.  There's the glove and

2    there's the butt of the gun.

3    Q    I'm going to now hand you what's been marked as

4    Government Exhibit 207 and I'm going to ask you to pull

5    that out of there if you would.

6    A    Okay.

7    Q    Do you recognize that?

8    A    Yes, sir.

9    Q    What is that?

10   A    It's the black zipper baggy as shown in the

11   photograph.

12   Q    And how do you know that's the same pouch that you

13   found on December 19th?

14   A    I know it's the same pouch because here's my

15   packaging material, what I packaged the contents in,

16   with my writing and what was inside of it.

17   Q    Did you package all of these together?

18   A    Yes, I did.

19         MR. OAKLEY:  Your Honor, at this time I'd move

20   to admit Government Exhibit 207.

21         MR. GRADERT:  No objection, Your Honor.

22         THE COURT:  207 is received.

23   Q    Could you please hold the black pouch up for the

24   jury so they can see it.

25                    (Witness complies with request.)

1    Q    Did you look inside that pouch when you found it on

2    the Defendant's seat of the Defendant's truck?

3    A    Yes, sir, I did.

4    Q    What did you find in that bag, that pouch?

5    A    Multiple packaged stuff, illegal street drugs, as

6    well as paraphernalia.

7    Q    I'm going to hand you what has been marked as

8    Government Exhibit 208-D and see if you recognize that?

9    A    I do.

10   Q    What is that?

11   A    It's -- I began to pull out the drugs from the black

12   baggy and set it on the seat so I could photograph it.

13   Q    And so that's a photograph of the items that were in

14   the bag after you took them out and put them on the

15   seat?

16   A    Yes, sir.

17   Q    So it's a fair and accurate depiction of the way

18   those items appeared?

19   A    Yes, it is.

20        MR. OAKLEY:  Your Honor, move to admit

21   Government Exhibit 208-D.

22        MR. GRADERT:  No objection.

23        THE COURT:  It's received.

24   Q    (By Mr. Oakley) Did you also take the gun out of

25   the glove in this photograph?

1   A   Yes, I did, for photographing.

2   Q   Now, you said that you found some methamphetamine in

3   that bag.  Do you see the methamphetamine in the

4   photograph?

5   A   Yes, I do.

6   Q   And where is it at?

7   A   There's multiple baggies of methamphetamine with the

8   larger being that one there.

9   Q   I'm going to hand you what's been marked as

10  Government Exhibit 202.  Do you recognize that?

11  A   Yes, I do.

12  Q   What is that?

13  A   It is the methamphetamine.

14  Q   Is that the same methamphetamine you found in that

15  pickup truck on December 19, 2006?

16  A   Yes, it is.

17          MR. OAKLEY:  Your Honor, at this time I'd move

18  to admit Government Exhibit 202.

19          MR. GRADERT:  No objection.

20          THE COURT:  It's received.

21  Q   (By Mr. Oakley) Other than the methamphetamine,

22  what else did you find in that bag?

23  A   There was a baggy of marijuana.  There was some

24  other street drug, cocaine.  There was some pills which

25  I believe were ecstasy.  I did not have the, the

1    resources to test it on-scene.  It was submitted later.

2    As well as a scale and miscellaneous paraphernalia from

3    glass pipes to Zig Zag rolling papers.

4    Q   You said you found some marijuana.  I'm going to

5    hand you what's been marked as Government Exhibit 203.

6    Do you recognize that?

7    A   Yes, I do.

8    Q   What's that a photograph of?

9    A   It's a photograph of the baggy of marijuana.

10   Q   Is that the same marijuana that you found in the

11   Defendant's pickup truck on December 19, 2006.

12   Q   Yes, it is.

13         MR. OAKLEY:  Your Honor, at this time I move

14   to admit Government Exhibit 203.

15         MR. GRADERT:  No objection, Your Honor.

16         THE COURT:  It's received.

17   BY MR. OAKLEY:

18   Q   Officer, you said you found a set of scales?

19   A   Yes, sir.

20   Q   I'm going to hand you what I've marked as Government

21   Exhibit 205.  Do you recognize that?

22   A   Yes, I do.

23   Q   What is that?

24   A   It's a black digital scale.

25   Q   Do you see those scales in Government Exhibit 208-D

1    which is the photograph?

2    A    Yes, sir, I do.

3    Q    And using the laser pointer, can you show us where

4    those are at?

5    A    Right there.

6    Q    And were the scales initially in the bag?

7    A    Yes, sir.

8    Q    In the black bag?

9            MR. OAKLEY:  Your Honor, at this time I'd move

10   to admit Government Exhibit 205, the scales.

11           MR. GRADERT:  No objection.

12           THE COURT:  It's received.

13   Q    (By Mr. Oakley) Did the scales cause you any

14   concern?

15   A    It raised my suspicions of what all this evidence

16   was for.

17   Q    Based upon your training and experience, is there

18   any significance with scales as it relates to a drug

19   case?

20   A    Yes, sir, there is.

21   Q    What is that significance?

22   A    Scales usually are indicative of someone who's

23   distributing or selling the drugs.

24   Q    Let me talk to you a little bit about the amount of

25   meth that you found and the way that it was packaged.

1   How many packages of methamphetamine did you find?

2   A   I believe there were four different packages of

3   methamphetamine.

4   Q   As far as the quantity, how would you describe the

5   quantity of methamphetamine that you found?

6   A   It was a very large amount; however, they weren't in

7   equal packaging.  They were in different weighted

8   packaging.  Which is also an indicator of someone who

9   might be selling because someone is wanting a small bit

10  or a larger amount and it's packaged differently.

11  Q   Let me talk to you a little bit about this

12  photograph, 208-D.  You said that this photograph is

13  after you took items out of the bag.  Were there also

14  some items on the seat, however, before you started

15  removing items from the bag?

16  A   Yes, sir.

17  Q   And could please put up 208-B.  Do you see a

18  cigarette lighter in that photograph?

19  A   Yes, sir.

20  Q   And using the laser pointer, could you show the jury

21  where the cigarette lighter is located?

22                      (Witness complies with request.)

23  Q    (By Mr. Oakley) What part of the cab is that

24  cigarette lighter?

25  A   It's on the driver's portion.

1   Q   Do you see a key in that photograph?

2   A   Yes, I do.

3   Q   Could you, using the laser pointer, could you show

4   the jury the key.

5                    (Witness complies with request.)

6   Q    (By Mr. Oakley) What side of the passenger

7   compartment of that truck is that key located?

8   A   It's on the driver's side.

9   Q   Do you know what that key belongs to?

10  A   It belonged to that Chevy truck.

11  Q   Okay.  It was to start the truck?

12  A   Yes.

13  Q   Let me talk to you about the handgun which has been

14  admitted into evidence as Government Exhibit 201.  Now,

15  I see here today that there is a piece of plastic that's

16  wrapped through the gun.

17  A   Yes, sir.

18  Q   Was that plastic on the gun when you found it?

19  A   No, sir.

20  Q   There's also a magazine that's with that gun; is

21  that right?

22  A   That's correct.

23  Q   And it's been zip-tied to the gun?

24  A   Yes, it has.

25  Q   Is that the way that you found it?  Was it zip-tied

1   like that?

2   A    No, sir.

3   Q    Do you know, was that done for safety here in the

4   courtroom?

5   A    Yes, sir.

6   Q    And the gun is not loaded right now?

7   A    No, it is not.

8   Q    When you found the gun, was it loaded?

9   A    There was not one in the chamber but there were five

10   rounds in the magazine.

11   Q    So the magazine was loaded?

12   A    Yes, sir.

13   Q    And the magazine was in the gun?

14   A    Yes, it was.

15   Q    I'm going to hand you what's been marked as

16   Government Exhibit 201-A and ask if you can tell us what

17   it is in that bag?

18   A    Yes, sir.   It contains .32 caliber ammunition.

19   Q    Is that the ammunition that was in the gun when you

20   found it loaded in the Defendant's truck?

21   A    Yes, it is.

22           MR. OAKLEY:   Your Honor, at this time I'd move

23   to admit Government Exhibit 201-A.

24           MR. GRADERT:   No objection.

25           THE COURT:   It's received.

1    Q    Is that type of gun a semi automatic handgun?

2    A    Yes, it is.

3    Q    You said there wasn't one in the chamber?

4    A    Yes, I did.

5    Q    Are you familiar with the operation of a semi

6    automatic handgun?

7    A    Yes, sir.

8    Q    Do you carry a gun as a police officer?

9    A    Yes, I do.

10   Q    Is it a semi automatic handgun?

11   A    Yes, it is.

12   Q    You said there were bullets in the magazine in the

13   gun but there wasn't one in the chamber.  How difficult

14   is it to put one in the chamber?

15   A    Not difficult at all.  A matter of a fraction of a

16   second.

17   Q    What do you do?

18   A    You hold the gun and you rack it backwards to where

19   by pulling the top of the gun back, it's going to

20   automatically feed one into the chamber.

21   Q    At that point if you pull the trigger, is it going

22   to fire?

23   A    Yes, sir, it will.

24   Q    You said that you arrested the Defendant for driving

25   under the influence.  After you searched the vehicle,

1   did the situation change or were there additional

2   charges that you were concerned about?

3   A   Yes, sir.  More charges were added to the case.

4   Q   At some point did the Defendant make any statements

5   to you about somebody else driving that pickup truck?

6   A   Yes, sir, he did.

7   Q   What did he say?

8   A   He said I wasn't the driver; and, look, there is the

9   person running away.

10  Q   And so he said, look, there's a person running away?

11  A   Yes, sir.

12  Q   Did he point somewhere?

13  A   He wasn't able to point.  He was in handcuffs.  But

14  he motioned towards the north.

15  Q   Motioned kind of using --

16  A   Using his head.

17  Q   Did you look towards the north?

18  A   Yes, I did.

19  Q   Did you see anyone?

20  A   There was no one out there.

21  Q   When he motioned to the north, what was to the north

22  of this parking lot?

23  A   To the north of the parking lot is a Walgreen's as

24  well as an Emprise Bank directly across the street.

25  Q   Do you know if the Walgreen's was open this time of

1  day?

2  A    The Walgreen's is not 24 hours, no, sir.  It's not

3  open.

4  Q    Were there lights in the parking lot of the

5  Walgreen's though?

6  A    Yes.  The Walgreen's was still lit up with the

7  streetlights and parking.

8  Q    If there would have been someone over there, would

9  you have been able to see that person?

10  A    Yes, sir.

11  Q    Did you see anyone?

12  A    No, sir.

13  Q    You said you searched the Defendant's truck.  Did

14  you ever search the Defendant himself?

15  A    Yes, sir.

16  Q    And did you find anything on the Defendant?

17  A    I believe he had a social security card and a wallet

18  on his person.

19  Q    Did you find any cash?

20  A    Yes, sir.

21  Q    And do you remember how much cash you found?

22  A    I believe it was $334 and some change.

23  Q    I'm going to hand you what's been marked as

24  Government Exhibit 206.  Do you recognize that envelope?

25  A    Yes, I do.

111

1    Q    What is that envelope?

2    A    It's an envelope containing 334.80.

3    Q    How do you know there's $334.80 in that envelope?

4    A    It has my writing on it with the amount of currency

5    in it with the date and time I submitted it.

6    Q    That's the money you got off of the Defendant?

7    A    Yes, sir.

8              MR. OAKLEY:  Your Honor, at this time I'd move

9    to admit Government Exhibit 206.

10             MR. GRADERT:  No objection.

11             THE COURT:  It is received.

12   BY MR. OAKLEY:

13   Q    When you arrest someone and you book 'em into jail,

14   do you ask biographical questions of them?

15   A    Yes, sir.

16   Q    Do those biographical questions include employment?

17   A    Yes, we do.

18   Q    On this occasion when you arrested the Defendant and

19   booked him into the jail, did you ask him those

20   biological questions?

21   A    Yes, sir.

22   Q    Did you ask him whether or not he was employed?

23   A    Yes, I did.

24   Q    And what did he say?

25   A    That he was unemployed.

1    Q    Let me talk to you about the truck -- let me back

2    up.  Did the truck have a license plate on it?

3    A    Yes, sir, it did.

4    Q    What was the license tag number?

5    A    The license tag?  It was a Kansas tag, William

6    Young, King 991.

7             MR. OAKLEY:  Your Honor, may I have this

8    witness step over to the easel?

9             THE COURT:  You may.

10                  (Witness complies with request.)

11   Q    (By Mr. Oakley) Officer McVay, I'm going to hand

12   you this marker, this blue marker, and have you step

13   over to the easel.  And if you would put the date of

14   this incident.

15                  (Witness complies with request.)

16   Q    Could you write down the license plate number that

17   was on the truck that you stopped on December 19th,

18   2006.

19                  (Witness complies with request.)

20   Q    (By Mr. Oakley) Then can I have you initial off to

21   the side so we know that you're the one that wrote that.

22             MR. OAKLEY:  Thank you.  Your Honor, I have no

23   further questions.

24             THE COURT:  Yes, Mr. Gradert.

25

### CROSS EXAMINATION

BY MR. GRADERT:

Q   Officer McVay -- excuse me -- if I could use you to assist me.  Could we bring up 208-A?  Thanks.

You've seen Government Exhibit 208-A.  That's the way the parking lot looks; correct?

A   Yes, sir.

Q   And you and Officer Wolfram were clear over at the little retail strip mall that is at the far end to the right of the picture; correct?

A   Yes.

Q   I think you testified today that you were about 20 yards away from where the -- where you saw this truck run into this stop sign.  Is that correct?

A   No.  I was just 20 yards away when I saw him pull in from West street as he crossed me and then he traveled northbound to where the stop sign was.

Q   We've had a previous hearing in this case and do you remember or is it possible that you could have said that it was 30 yards?

A   Yes.  I, I estimated about 30 yards from where I was standing to where the accident occurred.

Q   And so which is it?  Is it 20 or 30?

A   Well, it was 20 when he drove past me because it was driving past where those cars were; and then as he

1    pulled away from me, that was closer to 30.

2    Q   So what you're talking about when you're talking

3    about 20 yards away is as the vehicle passed you;

4    correct?

5    A   Yes, sir.  As I'm seeing a side profile of it.

6    Q   So it's further away than 20 or 30 yards from the

7    Army recruiting station over to the front of the store;

8    is that correct?

9    A   It might have been a little bit.

10   Q   Officer Wolfram was with you, wasn't he?

11   A   Yes, he was.

12   Q   And was he standing right next to you as you were

13   investigating the alarm at the Army recruiting station?

14   A   We weren't standing like interpersonal together, but

15   we were by our patrol cars which were about a stall

16   apart.

17   Q   If Officer Wolfram didn't see the driver of the

18   vehicle, how did you happen to see it?

19   A   Because I was watching it as he pulled in.

20   Q   And you don't know whether Officer Wolfram was or

21   not?

22   A   I can't speak for him.

23   Q   And the thing that got your attention was the noise

24   of the vehicle?  Is that what it was?

25   A   As it came in at a high rate of speed, the engine

1   was going more than a car that was just normally driving

2   down the street.

3   Q   So you actually saw it when it was pulling into the

4   driveway and not after it was already in the parking

5   lot?

6   A   I saw it from West Street as it executed its turn

7   east into the parking lot and I followed it all the way

8   to the accident.

9   Q   Okay.  Now, looking at that parking lot, I think you

10  testified it went across where the cars that are parked

11  there is.  It didn't cut at an angle across the parking

12  lot?

13  A   No, sir.

14  Q   Could it have come across there?  I mean, there

15  wouldn't be anything that would impede it from getting

16  across just at an angle, would there?

17  A   I suppose it could go to an angle; but it went down

18  the stall and then proceeded north up to the front end

19  of the building.

20  Q   Do you see Government Exhibit 208-B?  Did you take

21  that picture yourself?

22  A   Yes, sir.

23  Q   It appears that the door is open; is that correct?

24  A   That is correct.

25  Q   So the idea behind that picture is to let us believe

1    that's exactly how you found these items in this truck;

2    is that correct?

3    A    Yes, sir.

4    Q    Okay.  Would a better example of that have been when

5    the door's closed and looking through the window?

6    A    In good weather it would; but the inclement weather

7    with the rain, and I knew the flash would go off and it

8    would hinder it useless to see it that way.

9    Q    As we look at that picture, you've talked about the

10   cigarette lighter there on the driver's side; correct?

11   A    Yes, sir.

12   Q    And there's also a key there; correct?

13   A    Yes, sir.

14   Q    Does it strike you as unusual that someone would get

15   out of a vehicle and lay the key down right in the

16   middle of the seat?

17   A    I think it's unusual; but I've seen it before, sir.

18   Q    From this picture, I can't quite tell, the little

19   glove, are we actually looking at the handle sticking

20   out of there, of the firearm?

21   A    Yes, sir.

22   Q    And when you first looked at the vehicle, is that

23   the angle that you looked at it?

24   A    Yes, sir, through the window.

25   Q    You didn't pull that out a little bit so that we

117

1    could see it better?

2    A    Not at that one.

3    Q    Was there anybody else there when you were taking

4    those pictures?

5    A    Officer Wolfram was with Mr. Gehringer which was a

6    couple car lengths behind.

7    Q    So you were really the only one that saw this?

8    A    The only one taking these photos, yes.

9    Q    I think you submitted all of the items that you

10   collected in the Government's exhibits here, the scales,

11   32 caliber ammo, the money, the bags of drugs, the black

12   bag.  I don't know, did you submit the telephone, the

13   cell phone?

14   A    Yes, sir, I submitted it.

15   Q    You submitted all of those.  And you submitted all

16   of those for testing and for fingerprints; is that

17   correct?

18   A    Yes, sir.

19   Q    And the purpose of that is to see if you could find

20   out who might have possessed those by finding a print on

21   them; correct?

22   A    To just strengthen the case, yes, sir.

23   Q    Okay.  And when you say strengthen the case, is that

24   because you have some doubt yourself as to whether or

25   not Mr. Gehringer possessed any of these items?

1    A    No, sir.

2    Q    But that's based on your assumption that he was the

3    only one in the vehicle; correct?

4    A    Based on my knowledge he was the only one in the

5    vehicle, yes, sir.

6    Q    And it's also -- well, let's assume that he's the

7    only one in the vehicle.  Do you have any way of knowing

8    whether he knew those items were there?

9    A    No, sir.

10   Q    Okay.  In fact, if the gun was hidden in a glove,

11   it's at least conceivable that it might not have been

12   readily noticeable to someone who was riding in the

13   truck; is that correct?

14   A    Highly unlikely if I could see it through the

15   window.

16   Q    But you could see it through the driver's side.  Did

17   you try to look at that glove from the passenger side?

18   A    No, sir, I did not.

19   Q    Just look at it yourself when you look at Government

20   Exhibit 208-B.  If you could bring that back up.  Do you

21   think that an individual on the passenger side looking

22   down at that would be able to tell whether there was a

23   firearm in that glove from that angle?

24   A    Absolutely.

25   Q    Enough of it was sticking out in your mind?

1    A    Yes, sir.

2    Q    But you'd have to be looking down at the seat;

3    correct?

4    A    Yes, sir.

5    Q    By the way, was there a propane tank in this pickup

6    truck?

7    A    I don't recall.

8    Q    Mr. Gehringer told you, though, that's what he was

9    there for was to get propane; is that right?

10   A    That's correct, sir.

11   Q    But you didn't bother to look to see if he had a

12   propane tank with him?

13   A    I believe there was one in the truck bed; but I was

14   focussed on him and this property so --

15   Q    You ran him through these tests for driving under

16   the influence and you talked about a nystagmus gaze

17   test.  Is that correct?

18   A    Yes, sir.

19   Q    And is that test something that the police

20   department uses to distinguish, did you say, whether

21   they're operating under the influence of drugs or

22   alchol?

23   A    It does not distinguish but it gives more indicators

24   for it.  And when something such as the vertical

25   nystagmus is present, you know that there's going to be

120

```
 1   more than just alcohol because someone with just alcohol

 2   will not show vertical nystagmus.

 3   Q   That's something you've learned in your training?

 4   A   Yes, sir.

 5   Q   Who invented the nystagmus gaze test?  Do you know?

 6   A   I don't know.

 7   Q   Was it somebody in law enforcement?

 8   A   I don't know.

 9   Q   But they teach you at the law enforcement training

10   academy how to use it?

11   A   Yes.

12   Q   You are aware, aren't you, Officer, that it's not

13   even admissible in a Kansas court?

14   A   I've been in cases to where we focus more on the

15   other two and not this issue.

16   Q   Do you know if it's not admissible because it's not

17   deemed to be reliable?

18   A   I don't know the reasons behind it, sir.

19   Q   Mr. Oakley had you write the tag number of this

20   truck on the board and you can see that it also appears

21   to be written up there on another day; is that correct?

22   A   Yes, sir.

23   Q   Appears to be the same tag number?

24   A   Yes, sir.

25   Q   Did you happen to run that tag to see if that tag
```

1    was stolen?

2    A    I did run the tag and it came back -- excuse me -- I

3    ran the VIN and the VIN came back as record not found.

4    Q    So it wasn't registered to Mr. Gehringer?

5    A    No, sir.

6    Q    What about the tag?  Did you know anything about the

7    tag?

8    A    I did not work the accident site on the tag; but I

9    was not informed that it was stolen so I can say that it

10   was not stolen at the time or there would have been

11   additional charges.

12          MR. GRADERT:  Okay.  I have no further

13   questions.  Thank you.

14          THE COURT:  Yes, sir.

15                **REDIRECT EXAMINATION**

16   BY MR. OAKLEY:

17   Q    Mr. Gradert asked you about some of the items that

18   you found for fingerprint analysis?

19   A    Yes, sir.

20   Q    Is it your understanding there were no fingerprints

21   found on the items you submitted?

22   A    That is my understanding.

23   Q    Was this the first time you ever submitted something

24   to the lab to check for prints?

25   A    No, sir.

1    Q    Do you do that in many of your cases?

2    A    Quite a few of the drug related or gun cases, yes,

3    sir.

4    Q    How frequently are you able to find fingerprints on

5    the items you submit?

6    A    Slim to none.

7              MR. OAKLEY:  No further questions.

8              THE COURT:  Mr. Gradert, anything further?

9              MR. GRADERT:  Your Honor, I don't know if I'm

10   getting out of the scope of the redirect.

11                    **RECROSS EXAMINATION**

12   BY MR. GRADERT:

13   Q    I need to ask you how come you decided to do the

14   D.U.I. test and not Officer Wolfram?

15   A    It was my beat so that implies that I'm responsible

16   for all of the reporting, processing and arresting in

17   that particular location.

18   Q    That location that you're in is in west Wichita;

19   correct?

20   A    Yes, sir.

21   Q    And you work out of West patrol?

22   A    Yes, sir.

23   Q    And West patrol is at Central and West Street?

24   A    It's at 616 North Eldor.  It's at Central and Eldor.

25   Q    Is 622 Tracy right in that general vicinity?

1   A    Yes.

2   Q    Are you familiar with Tracy street?

3   A    Yes, I am.

4   Q    Is 622 as far south as Towne West Shopping Center?

5   It wouldn't be that far south, would it?

6   A    No, sir.  It's just south of Central Street.

7   Q    Did you have any knowledge of Mr. Gehringer before

8   that evening?

9   A    No, sir.  I'd heard the name before but I didn't

10  know him.

11  Q    You never met him but you'd heard about him?

12  A    I'd heard the name concerning other arrests.

13  Q    So was he well known to the police in the area?

14  A    I don't know if he was well known.  We have to

15  interwatch our items of particular importance for felony

16  crimes and I recall hearing the name before from those.

17  Q    Had you ever been told by any other officer that he

18  wanted to make a project out of Mr. Gehringer?

19  A    No, sir.

20           MR. GRADERT:  I have nothing further.

21           MR. OAKLEY:  Nothing further, Your Honor.

22           THE COURT:  Thank you, Officer McVay.  Next

23  witness please.

24           MR. OAKLEY:  United States calls Anne Keazer.

25

1        **ANNE KEAZER**

2    Having been first duly sworn to tell the truth, the

3    whole truth and nothing but the truth, testified as

4    follows on:

5        **DIRECT EXAMINATION**

6    BY MR. OAKLEY:

7    Q    Ma'am, would you please state your name.

8    A    Anne Keazer.

9    Q    And how are you employed?

10   A    I'm a service officer for the City of Wichita Police

11   Department.

12   Q    As a service officer with the Wichita Police

13   Department, what are your job duties?

14   A    My current job duties are property and evidence.

15   Q    And so where do you work out of?

16   A    I actually work at the property and evidence

17   facility for the Wichita Police Department.

18   Q    What is the property and evidence facility?

19   A    It is one of two locations where we keep all

20   evidence concerning any crime or anything.  All of the

21   evidence is kept there.

22   Q    Basically if a police officer finds something, it's

23   kept at property and evidence?

24   A    Correct.

25   Q    That would include evidence that is gonna be used in

1    court?

2    A    Correct.

3    Q    Would that also include other things that aren't

4    gonna be used in court and so can be returned to owners?

5    A    Correct.

6    Q    I'd like to talk to you about Wichita police case

7    number 06 C 98152.  Do you know if under that case if

8    some property was returned to an individual by the name

9    of Todd Gehringer?

10   A    Property as in property I returned to --

11   Q    Yes, ma'am.

12   A    There is in fact a property release.  I think you

13   have a copy of it; is that correct?  That shows my name

14   as returning some property to this individual.

15   Q    I want to talk to you about that form.

16   A    Uh-huh.

17   Q    I'm going to hand you what I've marked as Government

18   Exhibit 209.  Do you recognize that?

19   A    Yes, I do.

20   Q    And what is that?

21   A    This is a receipt for property.  It shows a

22   description of property of release where we fill this

23   out with every piece of property that we release,

24   whether it be found in personal or evidentiary evidence.

25   Q    If someone was to go to property and evidence and

126

1    try and claim property that was seized from a case, do

2    they have to show any sort of identification?

3    A    Yes, they do.

4    Q    And so would you -- do they also have to sign that

5    form?

6    A    Yes, they do.

7    Q    And so would you release property to someone without

8    seeing their photo identification?

9    A    No, I would not.

10   Q    In this particular case, did you release property

11   that was taken from a pickup truck back to an

12   individual?

13   A    As to where the evidence came from, without looking

14   at the entire case, I couldn't say where it came from.

15   But if it was from under this case, 06 C 98152, I did in

16   fact release property back.

17   Q    Who did you release the property to?

18   A    It looks like Todd Gehringer.  Would that be the

19   correct pronunciation?  Todd R Gehringer.

20   Q    Okay.  What property did you release to Todd R

21   Gehringer?

22   A    I wrote down I released a green lighter, blue cell

23   phone, cigarettes and keys.

24         MR. OAKLEY:  Your Honor, at this time I'd move

25   to admit Government Exhibit 209.

1          MR. GRADERT:  No objection, Your Honor.

2          THE COURT:  It's received.

3          MR. OAKLEY:  And I have no further questions

4    of this witness, Your Honor.

5                    **CROSS EXAMINATION**

6    BY MR. GRADERT:

7    Q   Is your name Ms. Keazer?

8    A   Yes.

9    Q   I'm sorry.  I didn't catch it for sure.  I'm Steve

10   Gradert from the Federal Public Defender Office.  If you

11   look at Government Exhibit 209, it refers to keys; is

12   that correct?

13   A   Correct.

14   Q   Would it be fairly safe to assume that you have a

15   hard time remembering every piece of property that is

16   claimed or collected and so this form helps you remember

17   what you gave back?

18   A   Correct.

19   Q   So if -- and by the way, in that first section that

20   describes the property released, is that your writing?

21   A   That is my handwriting.

22   Q   Okay.  So you would have written down the word keys;

23   correct?

24   A   Correct.

25   Q   If it had just been a single key, would you have

1    just said key?

2    A    Yes, I would have just put key.

3    Q    You don't remember in this case whether there was

4    like a group of keys together?

5    A    No, I do not; but I did put keys, plural.

6    Q    And there's nothing to indicate on here other than

7    the g-r-n, which I presume that stands for green?

8    A    Green.

9    Q    Lighter.  There's no indicator of what kind of

10   lighter it was or --

11   A    No.

12   Q    Okay.  These items that you have in property and

13   evidence, Ms. Keazer, have they been examined at the

14   laboratory?

15   A    Depends on the evidence and -- it just depends on

16   what it was and how it was submitted, if it was

17   submitted for prints or whatever.

18   Q    So when it's taken into police custody -- let me see

19   if I can understand this -- it goes straight to property

20   and evidence and then to the lab?  Or does some stuff go

21   straight to the lab and then comes back to property and

22   evidence?

23   A    If something is supposed to go to the lab, it would

24   go to the lab first and then it would come to me.

25   Q    So those items could have been at the lab for

1    fingerprint analysis already before you gave 'em up; is

2    that correct?

3    A    Without seeing the actual chain of custody of this,

4    I can't say.  I don't know.

5    Q    By the way, what do you remember -- Mr. Oakley said

6    that you -- or asked you questions about requiring

7    identification from the person to come get it.  But is

8    there anything that they have to show to prove that they

9    own or that they have a right to possess those items?

10   A    They have to show a photo ID.  We have evidence --

11   we have found and personal.  Evidence cannot be released

12   unless a detective says it may be released and only to

13   the individual the detective says can get the evidence.

14   Q    Okay.

15   A    If it's found in personal, they must have a photo

16   ID.

17   Q    But what does a photo ID really show?

18   A    It must show their picture and their name.

19   Q    Okay.  But it doesn't necessarily mean that because

20   they picked these items up that they own them or that

21   they ever possessed them before, does it?  They just

22   have to show --

23   A    My job is if a detective says this piece of whatever

24   goes to this individual, I give it to them.  If it is

25   found and personal, found or personal, and the officer

1   has designated it as such, I must see a photo ID.  So

2   somebody else is telling me who owns the property.

3   Q   Okay.  So the officer would say if Mr. Gehringer

4   comes in, it's okay to give him these items?

5   A   It depends on what type of evidence it is.  If it's

6   evidence or if it's found in personal.  Obviously we're

7   not going to put marijuana in what's found in personal.

8   Q   Right.  Right.  If I had come down to property and

9   evidence and showed you my photo ID and signed this

10  document, could I have picked up these same items?

11  A   No.

12  Q   It could only have been to the person you'd been

13  told could pick it up; correct?

14  A   The owner is the only one that can pick it up.

15          MR. GRADERT:  All right.  I have nothing

16  further.  Thank you.

17          THE COURT:  Anything further?

18          MR. OAKLEY:  No, Your Honor.

19          THE COURT:  Thank you, ma'am.  You're excused.

20  Next witness.

21          MR. OAKLEY:  Your Honor, the Government calls

22  Officer Chris Nixon.

23                    **CHRISTOPHER NIXON**

24  Having been first duly sworn to tell the truth, the

25  whole truth and nothing but the truth, testified as

1  follows on:

2                    **DIRECT EXAMINATION**

3  BY MR. OAKLEY:

4  Q   Sir, would you please state your name.

5  A   Chris Nixon.

6  Q   And how are you employed?

7  A   I'm a police officer with the Wichita Police

8  Department.

9  Q   How long have you been employed as a police officer

10  with the Wichita Police Department?

11  A   Almost seven years.

12  Q   What type of training have you had as it relates to

13  your job as a police officer?

14  A   I've attended the -- I had prior law enforcement

15  experience.  I've attended the Kansas Law Enforcement

16  Training Center in 1995 where I completed eight weeks of

17  formal training there.  Then each year thereafter I've

18  had to complete a minimum of 40 hours of training in

19  multiple areas.  Whatever it may be.  It could be

20  anything related to traffic accident, report writing,

21  things like that.  Then I attended the Sedgwick County

22  Law Enforcement Training Center in 2001 where I attended

23  23 weeks of formal training and then 40 hours

24  consecutive after that each year minimum.

25  Q   So how long total have you had in law enforcement?

1    A    14 years.

2    Q    14 years.  What's your current assignment?

3    A    I'm currently assigned to the Patrol East bureau,

4    first shift; and before that I was on the Patrol West

5    SCAT unit.

6    Q    I want to talk to you about an incident that

7    occurred on May 25th, 2007.  What was your assignment

8    then?

9    A    I was on the SCAT unit on the Patrol West bureau.

10   Q    On patrol west.  Could you explain for the jury what

11   the SCAT unit is?

12   A    The SCAT unit is a Special Community Action Team.

13   We're part of the community policing division.  We're

14   the enforcement unit.  For any complaints that citizens

15   would make, we would investigate them, determine if

16   they're legitimate or not and then, obviously, enforce

17   any violations of the law.

18   Q    Does the SCAT team ever execute search warrants?

19   A    Yes.  Regularly.

20   Q    I want to talk to you, like I said, about May 25th,

21   2007.  Were you involved in the execution of a search

22   warrant on that day at 622 North Tracy?

23   A    Yes, I was.

24   Q    That residence is located in Wichita, Kansas?

25   A    Yes, it is.

1    Q    Whose residence was 622 North Tracy on May 25th,

2    2007?

3    A    The officer that obtained the search warrant had

4    told us that the target or the owner of that residence

5    was a Todd Gehringer.

6    Q    And when we're talking about a search warrant, are

7    there kind of two different components?  One is the

8    entry and then the actual search?

9    A    Correct.

10   Q    Were you involved in both the entry into the

11   residence and involved in the search?

12   A    Yes.

13   Q    Explain for us how you made entry into that

14   residence at 622 North Tracy on this day?

15   A    When we approached the residence, we came from the

16   south on Tracy street just south of Central.  We were, I

17   believe, a six or seven man team at that point

18   consisting of ram officer, knock and announce, shotgun,

19   and then cover officers that follow in behind.

20   Obviously, we're dressed in safety attire such as

21   bulletproof vest.  And when we approached the residence,

22   made entry, attempted to make entry via the front door

23   which faced off to the west.  That door was barricaded

24   with a large amount of property.  And we began hearing a

25   woman screaming inside when we were knocking and

1    announcing what we were doing and what we were there

2    for.  And we had to shift to the south side of the

3    residence to another entry point where we forcibly

4    entered the door.  Ended up subsequently taking a female

5    into custody who also had a child with her in an infant

6    seat.  And there was no other persons in the residence

7    at that time.

8    Q    The only person was the female and the infant?

9    A    Yes.

10   Q    And so you said that this was supposed to be Todd

11   Gehringer's house but he wasn't home at this point?

12   A    Correct.

13   Q    Did you find out that the female was somehow

14   associated with Todd Gehringer?

15   A    I did not do that.  I believe another officer had

16   talked to the female regards their relationship.

17   Q    You said that you weren't able to gain entry into

18   the front door.  Why not?

19   A    There was a large quantity of property, just

20   miscellaneous, anything you can imagine, mowers, weed

21   eaters, just tons of property just piled up against the

22   doorway and along the wall.  You could barely walk

23   through the residence.

24   Q    When you make entry, you actually go into the

25   residence; correct?

135

1    A    Yes.

2    Q    Can you describe for the jury the layout of this

3    house at 622 North Tracy?

4    A    From the door that we came into on the south side of

5    the residence you immediately enter a living room area,

6    which the open area actually is off to the left or the

7    west towards the west door.  That's the open area.

8    Straight back from that door would be the kitchen and

9    then you would make a right turn which led into a small

10   hallway into a bathroom and then just south of that

11   hallway when you enter the hallway was also a laundry

12   room.  If you would go back to where we made entry

13   through the living room, through the open area, and then

14   make an immediate right, from this point in the

15   residence there was a bedroom which had a closet and

16   then a staircase leading up into an attic.

17   Q    How many bedrooms were in this residence?

18   A    I believe there was only one bedroom.

19   Q    You said that you weren't able to get into the front

20   door because of the clutter.  Can you describe the

21   cleanliness of the entire house?

22   A    It was -- it was filthy.  I wouldn't live there.

23   There was dirt, floors were dirty.  There was food,

24   dirty dishes.  It was very unhealthy condition.

25   Q    I'm going to hand you what I've marked as Government

1    Exhibit 410-A.  Ask if you can identify that photograph?

2    A   Yes.

3    Q   What is that a photograph of?

4    A   This is a picture of the kitchen area where the

5    table is and a lot of debris.

6    Q   Is that photograph a fair and accurate depiction of

7    the way the kitchen appeared to you when you executed

8    that search warrant?

9    A   Yes.

10            MR. OAKLEY:  Your Honor, at this time I'd move

11   to admit Government Exhibit 410-A.

12            MR. GRADERT:  Is it 410-A?

13            MR. OAKLEY:  Yes.

14            MR. GRADERT:  No objection.

15            THE COURT:  It's received.

16   Q   You said this is the kitchen area?

17   A   Yes.

18   Q   I believe to your right there's a laser pointer.

19   A   Yes.

20   Q   Do you see the kitchen table in this photograph?

21   A   Yes, I do.

22   Q   And using that laser pointer, could you show the

23   jury where the kitchen table is?

24   A   Kitchen table would be right there with all the

25   property sitting on it.

1    Q    Where's the kitchen sink?  Can you see that in this

2    photograph?

3    A    Yes.  It's right there.

4    Q    I'm going to hand you what's been marked as

5    Government Exhibit 410-B.  Ask if you can identify that.

6    A    Yes.  This is the bedroom that's on the main level.

7    Q    You said there was only one bedroom in this house?

8    A    Yes, that I recall.

9    Q    That you recall.  Is that photograph a fair and

10   accurate depiction of the way that that bedroom appeared

11   to you?

12   A    Yes.

13            MR. OAKLEY:  Your Honor, at this time I'd move

14   to admit Government Exhibit 410-B.

15            MR. GRADERT:  No objection.

16            THE COURT:  It's received.

17   Q    Use that same laser pointer.  You indicated this is

18   the bedroom.  Was there a bed in there?

19   A    Yes.  It's underneath the pile of clothing and

20   property there.

21   Q    Was this photograph taken before or after the search

22   warrant was executed?

23   A    We took photos before we actually began the search

24   and then we take them during the search as well.  I

25   believe that would be before because there's property

1    still on the bed.

2    Q   So you guys didn't put any of the property on the

3    bed or move anything before this photograph was taken?

4    A   No.

5    Q   I'm going to now hand you what's been marked as

6    Government Exhibit 410-C.  Ask if you can identify that.

7    A   Yes.  This is the living room area where we

8    initially attempted entry.

9    Q   And is that a fair and accurate depiction of the way

10   the living room appeared to you on May 25, 2007?

11   A   Yes.

12           MR. OAKLEY:  Your Honor, at this time I'd move

13   to admit Government Exhibit 410-C.

14           MR. GRADERT:  No objection.

15           THE COURT:  It's received.

16   BY MR. OAKLEY:

17   Q   You said that you tried -- that this is the -- would

18   have been the room that you tried to make entry into?

19   A   Yes.

20   Q   Can you see the front door that you tried to open to

21   get into this house?

22   A   Yes.  Front door is right here and this is some of

23   the damage from trying to ram the door open.

24   Q   And can you see from that photograph the reason why

25   you were unable to enter through that door?

1  A    Yes.  This pile of property runs all along this

2  wall.

3  Q    You said that there was a female and an infant?

4  A    Yes.

5  Q    Could you tell when you went into that residence

6  where I guess the room that the infant would sleep in or

7  was staying in?

8  A    No.  Based on what we saw, you would assume there,

9  but it had property in it, too.

10  Q    What time of day did you guys enter into the house

11  to execute the search warrant?

12  A    It was the evening hours.  It was after dark.

13  Q    You said that after you guys enter, you guys take

14  photographs.  At what point do you begin searching the

15  residence?

16  A    Once overall photographs are completed and logged,

17  then we're assigned particular areas, each officer, and

18  we begin our searches and go through there and collect

19  whatever we find.

20  Q    On this particular search warrant, what was your

21  assignment?

22  A    I was assigned to the bathroom area.  I started at

23  the furtherest portion to the northeast of the

24  residence.

25  Q    And did you find anything in the bathroom?

1    A    Yes.  During my search there was a -- there's a

2    shower area.  Then above the toilet there's a wooden

3    cabinet like you would find in your kitchen, a single

4    cabinet, and there was a large amount of green

5    vegetation in a plastic baggy which I believed to be

6    marijuana between the ceiling and the cabinet itself.

7    It was about this far from the ceiling and it was on top

8    of there hidden.

9    Q    You indicated a distance with your hands.  I don't

10   think the court reporter can get that down.

11   A    I think it was approximately three, four inches from

12   the ceiling.

13   Q    From the ceiling?

14   A    That's how far the cabinet was down.

15   Q    And the marijuana was found on top of this cabinet?

16   A    Correct.

17   Q    I'm going to hand you what I've marked as Government

18   Exhibit 404 and ask if you recognize that?

19   A    Yes.  This is the green vegetation I located in the

20   bathroom.

21   Q    How do you know that's the same green vegetation

22   that you located in the bathroom?

23   A    The outer bag is not one, obviously, I placed it in;

24   but the interior plastic zip bag that I've marked with a

25   number one and then I have the police department case

1    number for the search warrant, my initials, date, and

2    then I list where I had located the evidence.  And I

3    located it in the bathroom at 23:05 hours.

4    Q   So based upon the markings that you put on the bag,

5    you can tell that's the same green vegetation?

6    A   Yes.

7    Q   You said based upon your training and experience.

8    Why did you collect green vegetation?  What did you

9    believe it was?

10   A   I believed it was marijuana.

11            MR. OAKLEY:  At this time I'd move to admit

12   Government Exhibit 404.

13            MR. GRADERT:  No objection.

14            THE COURT:  It's received.

15   BY MR. OAKLEY:

16   Q   Other than the bathroom, did you search any other

17   part of the house?

18   A   Yes.  After the bathroom, I then went into the

19   hallway area.  And in the hallway area I located a 30/30

20   lever action rifle which was actually in one of the

21   corners of the hallway.  Collected it as well.  And then

22   continued on to the next room.

23   Q   Was the lever action rifle loaded when you found it?

24   A   No, it was not.

25   Q   I'm going to hand you what's been marked as

 1   Government Exhibit 410-H and ask if you can identify

 2   that photograph?

 3   A   Yes.  This is the lever action rifle that I located

 4   in the hallway area between the kitchen and the

 5   bathroom.

 6   Q   Is that a fair and accurate depiction of the way

 7   that lever rifle appeared to you when you found it on

 8   May 25th?

 9   A   Yes, it is.

10           MR. OAKLEY:  Your Honor, at this time I move

11   to admit Government Exhibit 410-H.

12           MR. GRADERT:  No objection.

13           THE COURT:  It's received.

14   BY MR. OAKLEY:

15   Q   I'm going to now hand you what's been marked as

16   Government Exhibit 401.  Do you recognize that?

17   A   Yes.  This is the rifle I collected from the

18   hallway.

19   Q   That's unloaded here today; correct?

20   A   I'm sorry.

21   Q   That's unloaded here today?

22   A   Yes, it is.  It's secure.

23   Q   There's a zip tie placed in the chamber of that

24   rifle; is that correct?

25   A   Yeah.  This area.

1   Q   Was that on the rifle when you found it?

2   A   No, it was not.

3   Q   So that was put there for security purposes here in

4   the courtroom?

5   A   Correct.

6   Q   Is that the same rifle that you found that's

7   depicted in the photograph?

8   A   Yes, it is.

9   Q   And how do you know that's the same rifle?

10  A   Well, it has -- we mark them on the bottom half

11  right now.  It's marked with the same case number that

12  all the other evidence was with Officer Maines, Officer

13  Maines, who assisted in the submission of this evidence

14  and his -- the date we submitted it, along with just the

15  general markings, you know, that there is a square

16  barrel, 30/30 just like I took a photograph of.

17          MR. OAKLEY:  Your Honor, at this time I'd move

18  to admit Government Exhibit 401.

19          MR. GRADERT:  No objection.

20          THE COURT:  It's received.

21  Q   The photograph, Government Exhibit 410-H, that's the

22  same way it appeared to you when you found this gun?

23  A   Yes.

24  Q   It wasn't in any type of case or anything like that?

25  A   No, it was not.

1   Q    You said this was found in a hallway?

2   A    Yes.

3   Q    Where did the hallway lead to?

4   A    It was between the kitchen and the bathroom.  So if

5   you go to the furtherest north portion of the residence

6   to the north wall of the residence and then make a right

7   or go off to the east through the kitchen, the hallway,

8   the kitchen, then you have the hallway in between it

9   east and west, and the bathroom.  So it was in between

10  those two rooms.

11  Q    After you searched that hallway, did you search any

12  other part of the house?

13  A    Yes.  I went directly south after searching the

14  hallway and went into a laundry room which was piled

15  with clothes approximately one to two foot deep

16  depending on what portion of the room you were in.

17  Q    And in the laundry room, what did you find?

18  A    I began digging through the clothes and located a 12

19  gauge pump shotgun with a flash suppressor on the end of

20  it.

21  Q    I'm going to hand you what's been marked as

22  Government Exhibit 410-F and ask if you can identify

23  that photograph?

24  A    That's the shotgun I located in the laundry room

25  along the north wall.

145

1   Q   Is that photograph a fair and accurate depiction of

2   the way the shotgun appeared to you when you found it?

3   A   Yes.

4           MR. OAKLEY:  Your Honor, at this time I move

5   to admit Government Exhibit 410-F.

6           MR. GRADERT:  No objection.

7           THE COURT:  It's received.

8   BY MR. OAKLEY:

9   Q   Using the laser pointer, could you show us the

10  shotgun in this photograph?

11  A   Shotgun is right here.

12  Q   And I guess in order for us to get a little

13  orientation as far as what we're seeing here, can you

14  show us the floor or the ground in this photograph?

15  A   Well, it's underneath the clothing, but it's -- the

16  clothing, like I said, was approximately a foot deep all

17  the way through the entire laundry room.  And this is

18  the north wall so from here down, the stock's probably

19  there at least twelve inches under clothing.

20  Q   Did you move any clothing when you took this

21  photograph?

22  A   I pulled some back from there but I could see the

23  barrel when I initially saw it and began crawling around

24  through the clothing and pulling things around.

25  Q   So the entire shotgun was not hidden by the

```
 1   clothing?

 2   A   No, it was partially stuck out.

 3   Q   Hand you what's been marked as Government Exhibit

 4   402 and ask if you recognize that?

 5   A   Yes.  This is the shotgun that was recovered from

 6   the laundry room.

 7   Q   And, again, how do you know that's the same shotgun

 8   that you recovered in the laundry room?

 9   A   Again, from my description and then the markings

10   that Officer Maines placed on the bottom trigger portion

11   with the case number and ID and the date we located it.

12            MR. OAKLEY:  Your Honor, at this time I would

13   move to admit Government Exhibit 402.

14            MR. GRADERT:  No objection.

15            THE COURT:  It's received.

16   BY MR. OAKLEY:

17   Q   The plastic that's on this gun was not on it when

18   you found it?

19   A   No, it was not.

20   Q   Was the gun loaded?

21   A   No, it was not.

22   Q   After you searched the laundry room, where else did

23   you search?

24   A   I then went into the kitchen area and assisted

25   Officer Conner who was going through all the property
```

1    there.

2    Q    What did you find in the kitchen?

3    A    I went to the kitchen table.  There was a lot of

4    property.  There was a green case which contained a

5    digital scale inside of it with some residue, a crystal

6    type residue which I believed to be methamphetamine and

7    field tested it.  I found other miscellaneous kinds of

8    paraphernalia, Zig Zag papers.  Found an empty vial that

9    had some residue in it which I also believed to be

10   methamphetamine.  And a baggy containing some pills with

11   some orange powder in it.  Items of that nature.

12   Q    I want to hand you what I've marked as Government

13   Exhibit 407 and ask if you recognize that.

14   A    Yes.  That's the green case with the scale inside of

15   it that I located.

16   Q    Is that the same green case and set of scales that

17   you found on May 25, 2007?

18   A    Yes.  The case and then there's the digital scale in

19   there as well and they're sealed in the same bag that I

20   marked with my initials, case number and the date I

21   recovered it.

22           MR. OAKLEY:  Your Honor, at this time I would

23   move to admit Government Exhibit 407.

24           MR. GRADERT:  Your Honor, I don't have any

25   objection but I missed somehow or another where that

1    item was located.

2            THE COURT:  Go ahead and tell him, Officer.

3    A    It was on the kitchen table.

4            MR. GRADERT:  Okay.  Thank you.

5            THE COURT:  It's received.

6    BY MR. OAKLEY:

7    Q    Could I have you open that item and show the jury

8    the scales?

9    A    Yes.

10            (Witness complies with request.)

11    A    Actually I think I can open it from the top here.

12    Inside the external bag I have the internal bag that I

13    originally submitted it in.  Has a forensic science

14    center sticker on top of it with initials from whoever

15    tested the item.  Inside -- I need to cut this bag open.

16    Inside of the bag that I submitted the property in

17    there's a digital scale and, obviously, it has a lid

18    that covers the scale to protect it.  Inside on that

19    scale was the crystal white residue that I was

20    explaining earlier which I believed to be

21    methamphetamine.  And then it was concealed in this

22    case, the scale and everything.

23    Q    So when you found it, the scale was in the case?

24    A    Correct.

25    Q    What caused you concern about a set of scales with

1   white crystal substance on it?

2   A   People that use or sell drugs typically will keep

3   scales on them to make sure that they're -- when they

4   make their sale or they're getting what they purchased

5   as far as quantity wise, so they'll weigh and measure

6   prior to receiving or packaging for sale or receiving.

7   Q   So based upon your training and experience, have you

8   seen both sellers and buyers of drugs possess scales?

9   A   Yes.

10  Q   Is there one group that it's more necessary for?

11  A   Typically you'll find people that deal in drugs will

12  use scales more frequently because they're weighing a

13  lot more, where buyers will tell 'em what they want and

14  go based on they trust 'em, they trust that they're

15  gettin' what they purchased.

16  Q   Let me have you go ahead and put that back in the

17  bag.  If we could show Government Exhibit 410-A.  Thank

18  you.  Can you see in this photograph where you found the

19  set of scales?

20  A   It was on this side of the table.  I don't know --

21  can't exactly pinpoint where, but I was on this side and

22  Officer Conner was going through this side at the time.

23  Q   You said that you found another substance on the

24  table that you believed to be methamphetamine?

25  A   Yes.  On the same table.  I found everything on this

1    table in the kitchen.  It was just piled up in different

2    areas and you had to dig through it to find things; but

3    I also found a clear vial with a black cap which had

4    some crystal substance in it and I also found a bag

5    which had some white pills and some orange powdery stuff

6    in the bottom of it.

7    Q    I'm going to hand you what's been marked as

8    Government Exhibit 405.  Do you recognize that?

9    A    Yes.  This is a piece of aluminum foil that I

10   located in the bedroom of the residence.

11   Q    That was found in the bedroom?

12   A    I believe I -- yes, this was found in the bedroom.

13   Q    You said that you found rolling papers on the table?

14   A    I thought I did.  It may have been the bedroom as

15   well.  I found paraphernalia different places.

16   Q    Let me hand you what I've marked as Government

17   Exhibit 406 and let's talk about that first.

18   A    Okay.

19   Q    What's Government Exhibit 406?

20   A    There's some Zig Zag papers, rolling papers, and zip

21   bags -- yeah, some small zip bags.

22   Q    And do you know where you found those?

23   A    If I could open the package, I have it marked where

24   I found them and I can't see it on the inside.  This is

25   obstructing my view of where I located them.

1    Q    Go ahead and open it then.

2    A    Okay.  Inside the bag of my original brown envelope

3    and with it is the Zig Zag rolling papers and a zip bag,

4    small zip bag, and according to my notes, located on the

5    kitchen table.

6              MR. OAKLEY:  Your Honor, at this time I'd move

7    to admit Government Exhibit 406.

8              MR. GRADERT:  No objection.

9              THE COURT:  It's received.

10   Q    What significance -- why would you collect rolling

11   papers?

12   A    Drug users use Zig Zag rolling papers to roll

13   marijuana cigarettes.  People also use it for rolling

14   tobacco, but there were cigarette cartons that are from

15   the manufacturer laying about so we have to assume

16   they're using the rolling papers for the use of

17   marijuana since there wasn't tobacco laying about the

18   residence, loose tobacco.

19   Q    Marijuana, how is it usually ingested?

20   A    Through smoking.

21   Q    Through smoking?

22   A    Yes.

23   Q    Now let me talk to you about the item I tried to

24   give you earlier, Government Exhibit 405.  What is that?

25   A    This is a piece of aluminum foil with some burning

1    on it.

2    Q    And can I have you open that and see if you can tell

3    us where you found that?

4    A    Yes.  The aluminum foil was located on the top of

5    the dresser.  This would have been from the bedroom.

6    Q    After you searched the kitchen, where did you

7    search?

8    A    I then went to the bedroom on the main level and

9    immediately as you enter from the living room to the

10   bedroom to your left there was a dresser and that was

11   sitting on top of the dresser and it was very

12   distinctive because of the aluminum foil was kind of

13   spread out long and it had burning underneath it.  And

14   then it had some melted I believe was methamphetamine on

15   it because typically they'll heat -- they'll put the

16   methamphetamine on it, heat the bottom of it and then

17   take a straw and inhale the fumes or the smoke that

18   comes from it.

19   Q    And that foil and the crystal substance that you

20   believe to be methamphetamine is contained in this

21   exhibit?

22   A    Yes.

23   Q    Which is Government Exhibit 405?

24   A    Yes.

25              MR. OAKLEY:  Your Honor, at this time I'd move

1   to admit Government Exhibit 405.

2               MR. GRADERT:  No objection.

3               THE COURT:  It's received.

4   Q   You said there were black marks on the foil?

5   A   Yes.

6   Q   What would that indicate to you?

7   A   That it's been heated.  It was burnt.  Had a flame

8   of some sort underneath it.

9   Q   Would that be more typically associated with someone

10  who's using meth or someone who's going to sell meth?

11  A   Use it.

12  Q   And so the meth that you found in Government Exhibit

13  405, that wouldn't typically be the way that someone

14  would sell it?

15  A   No, not at all.

16  Q   Did you find anything else in the bedroom?

17  A   I believe I found some cash, and without referring

18  to my report I don't recall anything at this time.

19  Q   Let's talk about the cash.  Where did you find it?

20  A   It was right beside the aluminum foil.  It was in

21  like a little small wooden tray that you just stick

22  things in.

23  Q   And how much cash did you find?

24  A   I believe it was $100 and it was all in 20s.

25  Q   All in 20s.  So five 20s?

1    A    Yes.

2    Q    When you collected these items, were you the person

3    who submitted them?

4    A    Myself and Officer Maines who was my partner.  We

5    pretty much collected multiple items for everybody.

6    Everybody collected items and then we all transported it

7    down, then we all submit it.

8    Q    Were there other items found that you haven't

9    testified to that other officers found?

10   A    Yes.

11   Q    And do you recall if another firearm was found?

12   A    Yes.  I believe there was a third long gun found.  I

13   believe it was a shotgun.  I don't know who located it

14   or where they located it, but I assisted in the

15   submission of it at property and evidence.

16   Q    So you took part in submitting that third shotgun?

17   A    Yes.

18   Q    I'm going to hand you what's been marked as

19   Government Exhibit 403.  Do you recognize that?

20   A    Yes.  It's a 12 gauge shotgun that was submitted.

21   Q    And that shotgun was found at 622 North Tracy?

22   A    Yes, it was.

23   Q    But as far as which particular location in the

24   house, you don't know?

25   A    Yeah.  It came from inside the house, but

1    specifically where, I wouldn't know.

2    Q    You said that you found some currency in the house.

3    Do you know if anyone else found any currency?

4    A    I believe, I believe Officer Parker may have found

5    some currency.  I don't believe I could give you a

6    hundred percent, but I believe more currency was found.

7    Q    Let me take the shotgun from you and let me hand you

8    what's been marked as Government Exhibit 408.  Would you

9    guys have submitted all of the currency together?

10    A    That's a possibility, but typically when I recover

11    items I -- sometimes we separate it because we find

12    particular things.  For example, if he was to find drug

13    paraphernalia throughout the house, we sometimes

14    separate it where we found each piece throughout the

15    house and other times you'll have so much you'll put it

16    all in one box and say it's from that house.  So depends

17    on the amount.

18    Q    Can you tell from I guess looking at the

19    documentation that's with Government Exhibit 408 if that

20    is currency that was found at 622 North Tracy?

21    A    Yes.  It has the address markings with Officer Mark

22    Parker's ID showing he recovered it from there with the

23    same case number.

24    Q    Does it appear to you there's more than $100 that

25    you found?

1    A    Yes.

2    Q    How much currency is in that envelope?

3    A    According to the package, says it contains $300 in

4    U.S. currency.

5    Q    You said that when you were searching the kitchen

6    table someone else was -- you were searching one side

7    and someone else was searching the other?

8    A    Yes.

9    Q    Who was searching the other side?

10   A    Officer Conner.

11   Q    Did you see Officer Conner find anything?

12   A    I believe he did but I don't remember what he would

13   have recovered.  We kind of focus on our own duties.

14         MR. OAKLEY:  Your Honor, at this time I move

15   to admit Government Exhibit 408 which is the currency.

16         MR. GRADERT:  I have no objection.

17         THE COURT:  It's received.

18         MR. OAKLEY:  Your Honor, I'd also move to

19   admit Government Exhibit 403 which is the shotgun.

20         THE COURT:  Any objection?

21         MR. GRADERT:  No objection.

22         THE COURT:  It's received.

23         MR. OAKLEY:  No further questions.

24         THE COURT:  Mr. Gradert.

25

## CROSS EXAMINATION

BY MR. GRADERT:

Q   Officer Nixon, you said that Todd Gehringer was the target; is that correct?

A   Yes.

Q   And what do you mean when you say target?

A   Due to Officer Parker's investigation, we were, we were advised when we come to assist on the search warrant.  He'll tell the residence, who the person is that is suspected of doing whatever crime or might be serving the search warrant on and that's how I obtain that information.

Q   When you got to the residence you said that Mr. Gehringer wasn't there though; is that correct?

A   Correct.

Q   There was just the female and the child?

A   Correct.

Q   Ms. Elwell?

A   I don't know who she is.

Q   And at some point in time was she also -- was she arrested following this search?

A   I don't know if she was arrested or not.  I was assigned to assisting on the search and another officer does interviews and I don't know if she was arrested or not.

158

1    Q    Being involved in numerous searches of residences,

2    one of the things that you do is try to establish who

3    the residence belongs to; correct?

4    A    Yes.

5    Q    Like, for example, sometimes you'll take like

6    utility bills and those types of things to see if you

7    can prove that's that person's residence?

8    A    Yes.

9    Q    When you encounter a home where multiple people

10   live, how do you make the determination of, you know,

11   who's responsible for what in there?

12   A    As far as any individuals that reside there?

13   Q    Yes.

14   A    Depending on circumstances, I've had warrants where

15   during interviews each person will identify what room

16   they're in as far as the person's contact.  Other times

17   we have persons with individual rooms.  And then they'll

18   have same billing address, different name, but they have

19   that property left in the room.  Those are the ways --

20   Q    In this case where it appears there's more than one

21   person that lives there, were you able to make a

22   determination of whether or not the things that were

23   there belonged to Mr. Gehringer or the female who was

24   there?

25   A    No, I did not do that.

159

1    Q    Okay.  When we look at these pictures we see a lot

2    of clutter, but I also notice there's things like a

3    grandfather clock.  Do you recall seeing that in one of

4    the photos?

5    A    Yeah.  I think I have the photo here in front of me.

6    Q    I think it's in 410-C if you could bring that up.

7    A    Yes, it's 410-C.

8    Q    And there's kind of an ornate piece of furniture,

9    too, if you're looking at the photograph, to the right

10   of the door there that has some items on it.  Do you

11   know what that is?  What that piece of furniture is?

12   A    No, I don't.  It looks like a storage cabinet of

13   some kind.

14   Q    A lot of the stuff in there looks to be like

15   antiques, does it not?

16   A    I guess, but depending on who's collecting it I

17   would assume.

18   Q    Well, like, for example, way over there on the far

19   right of 410-C there's a real old fashioned telephone.

20   I don't think very many of us have those phones in our

21   house today, do we?

22   A    I don't, certainly.

23   Q    Looking at these things, I mean, you're able to make

24   some determinations about drug things, but when you look

25   at something like this and you see all this junk in the

160

1    house, does it, you know, look like somebody's engaged

2    in antique collection?

3    A    I can't make that assumption.  It's just somebody

4    has a lot of property as far as I'm concerned.

5    Q    Do you recall whether or not there were any coin

6    collections or stamp collections that were recovered as

7    evidence in this case?

8    A    Yes, I do remember that.

9    Q    Were they fairly extensive collections?

10   A    There was a lot of coins.  I couldn't tell you how

11   many.

12   Q    By the way, were those taken by the police

13   department?

14   A    Yes, we did submit those.

15   Q    Okay.  And, I mean, those things are -- it's not

16   against the law to have those kinds of things, is it?

17   A    No.

18   Q    Okay.  Why are they taken as evidence?

19   A    Because my supervisor told me to collect them and

20   submit them.

21   Q    Okay.

22   A    Because sometimes it could be stolen property.  We

23   don't know.  There's nobody there to verify.  And with

24   that amount of money, you've got to err on the side of

25   caution.

1    Q    If those things aren't found to be stolen, are they

2    returned eventually to the owner?

3    A    As far as I know, yes.

4    Q    These pictures, I'm trying to remember whether you

5    indicated that these pictures were taken before or after

6    the search?

7    A    These photos?  Not all of them, but --

8    Q    410-A, B and C.

9    A    410-C was prior, before the search.  410-B, before

10   the search.  And 410-A, before the search.  From my

11   recollection.

12   Q    One of the reasons I asked specifically about that.

13   In 410-B -- if you could pull that up -- looks like all

14   the drawers are pulled out.  And when you search, I

15   assume you search each and every drawer; is that

16   correct?

17   A    Yes, sir.

18   Q    And would it be fair to say that in the course of

19   searches that a lot of things are tossed and it's a

20   little bit messy after you conduct the search?  I mean,

21   sometimes you leave the house pretty trashed after

22   you've searched it, don't you?

23   A    Not -- what do you mean trashed?  I don't understand

24   your question.  We don't go in there and damage

25   property.  We move property from one point to another.

162

```
 1    Q    But you don't put it back, do you?
 2    A    Yes, sometimes we do.  It just depends on what we're
 3    moving around.
 4    Q    Okay.  All of the guns that were found in this house
 5    on May 25th were unloaded; is that correct?
 6    A    As far as I recall, yes.
 7    Q    Okay.  And I don't think Mr. Gehringer is charged
 8    with possessing these guns in relation to a drug
 9    trafficking crime, but let me just ask you this.  If you
10    were using a gun for protection or for whatever reason
11    you would be using it in drug trafficking, wouldn't it
12    be better to have a loaded gun ready and --
13    A    I can only speak personally.  That's subjective, I
14    think, to the individual; but long guns typically I
15    don't find those loaded, but it just depends on the
16    situation.
17    Q    For that matter, in the course of your career in
18    police work and investigations, are the kinds of guns
19    that we have in the house here the kinds of guns that
20    you typically see that are maybe associated with drug
21    traffickers?
22    A    Some of the guns, yes.
23    Q    But they're also the type that can be used just for
24    hunting and --
25    A    Yes.
```

```
1    Q    -- or collection?

2    A    Yes.

3    Q    There's nothing unusual or illegal about these guns?

4    A    Not that I noticed, no.

5    Q    Do you recall whether there were any guns that were

6    like black powder like guns or BB guns or anything like

7    that found in the house that you guys didn't seize?

8    A    Not that I saw.

9    Q    Okay.  You talked a little bit about the difference

10   between the evidence of using and selling and I think,

11   for example, on the scale you talked about the fact that

12   maybe more often the seller uses a scale than maybe the

13   user.  Is that correct?

14   A    Sometimes.  It goes both ways.

15   Q    It can go both ways?

16   A    Right.

17   Q    And in the course of your experience have you found

18   it to be unusual or -- well, not unusual, but less than

19   the norm for a drug dealer or a seller to be hooked on

20   drugs themselves?

21   A    Can you rephrase that so I --

22   Q    Well, just to be real simple, you don't find very

23   many people that sell drugs that are drug addicts, do

24   you?

25   A    Again, sometimes we do.
```

1   Q    Is there -- would it be safe to say that more often

2   than not they aren't though?  They may use some drugs

3   but they're not bad addicts?

4   A    From my experience and the warrants that I've

5   conducted, they use some sort of drug.  It may not be

6   every drug they sell, but usually it's some drug.  It

7   could be marijuana.  I've had some that actually use

8   crack and sell crack.  So, again, that's --

9   Q    It's all across the board, isn't it?

10  A    Yes, it is.

11  Q    I mean, you see all types?

12  A    All types; different drugs.

13  Q    Sometimes, would you agree with me, that if someone

14  is using drugs heavily that it's not very smart in terms

15  of business dealings when you're selling drugs; and also

16  it might lead to your apprehension a lot easier?  Would

17  you agree with me on that?  If you're using?

18  A    If you're using or selling drugs, it can lead to

19  apprehension from the police.

20  Q    If you're using drugs while you're selling drugs?

21  A    I don't know if that's a wise business choice but --

22  Q    That's really all I was getting at.  By the way,

23  you've never used drugs yourself, Officer Nixon?

24  A    No.

25  Q    Okay.  So -- in fact, if a Wichita police officer

165

```
 1    uses drugs and anybody finds out about it, they're gonna

 2    be fired; is that correct?

 3    A    Yes.

 4    Q    So they don't give anybody any kind of training in

 5    experiencing what it's like to take drugs, do they?

 6    A    No.

 7    Q    And so it would be fairly safe to say that most

 8    Wichita police officers don't have any idea what it's

 9    like to really be a drug addict; correct?

10    A    Not to be one; but I think observation, you know,

11    dealing with people, you can only assume what it would

12    be like.

13    Q    You wouldn't know necessarily how much one person

14    might use versus another person, though, would you?

15    A    No.

16    Q    The drugs that were found in the house on May 25th,

17    it didn't appear to you, did it, that they were there

18    for sale?

19    A    From what I observed, no.

20    Q    Is that based on the fact that it's a small

21    quantity?

22    A    Correct.

23    Q    And the -- you would have seized or brought in here

24    ledgers or those kinds of things that reflect that the

25    people that lived there were engaged in drug trafficking
```

1   if you found those things, wouldn't you?

2   A   Yes.

3   Q   And you didn't find any of that type of thing?

4   A   I did not, no.

5          MR. GRADERT:   Thank you.   I have no further

6   questions.

7          THE COURT:   Redirect.

8                    **REDIRECT EXAMINATION**

9   BY MR. OAKLEY

10  Q   Mr. Gradert asked you about your training and

11  experience as it relates to drug users versus drug

12  sellers.   Is it uncommon for you to find addicts who

13  sometimes support their habit by selling drugs?

14  A   Yes, that does happen.

15  Q   That does happen?

16  A   Yes.

17  Q   How often do you find somebody who has an addiction

18  to drugs and they also have a lot of cash?

19  A   Not very often.   They usually have low amounts of

20  currency or they'll -- usually, from my experience,

21  wherever you have a user, they typically will then begin

22  to start committing thefts, burglaries, to support the

23  habit because they can't -- they don't have enough money

24  to do it.

25  Q   How common is it for you to find drug sellers with

1   large amounts of cash?

2   A   We find them with large amounts of cash all the

3   time.

4            MR. OAKLEY:  No further questions, Your Honor.

5            THE COURT:  Yes, sir.

6            MR. GRADERT:  I have no further questions.

7            THE COURT:  Thank you, Officer.  You're

8   excused.

9   A   Thank you.

10           THE COURT:  Well, Ladies and Gentlemen, we'll

11  take our evening recess.  Would it bother anyone to

12  start at 8:30 tomorrow morning?

13           MR. GRADERT:  Judge, I'm the only one it might

14  bother.  I've got an appointment at 7:30 with a client

15  for a hearing tomorrow afternoon that one of my

16  colleagues is going to have to cover for me and I'm

17  trying to get it all prepared.  I was hoping we wouldn't

18  begin before 9.

19           THE COURT:  We'll start at 9.  How fast are we

20  moving?

21           MR. GRADERT:  I think we're moving really

22  fast, Your Honor.  At least that's my impression.

23           MR. OAKLEY:  I'm still fairly confident that

24  we will be able to get through our evidence tomorrow.

25           THE COURT:  All right.  9:00.  Remember and

168

1   heed the admonition.  I'll see you in the morning.

2                 MR. GRADERT:  Thank you, Judge.

3                         (Recessed for the evening at

4                 5:02 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25