1                    (Beginning at 9:10 a.m. June 4,

2                    2008, the following proceedings

3                    continued. )

4                    (Jury is NOT present.)

5          THE COURT:  You all wanted to see me about

6    something before the jury comes out.

7          MR. OAKLEY:  Yes, Your Honor.  One of our

8    witnesses is Dana Elwell.  You've heard about --

9    Mr. Gradert referred to her in opening statement.  It's

10   the girlfriend of the Defendant.  We have met with her

11   and she has always been cooperative and last night she

12   tells me that she believes that she is going to try and

13   assert the Fifth Amendment for anything that we ask her

14   that's related to the search warrant on May 25th.

15   Apparently she was charged and may have either received

16   or is trying to get a diversion from that.  I've asked

17   her attorney in that state case, Christy Jones, to

18   appear and she's been kind enough to do so.  Your Honor,

19   I think I know a way around this.  I won't ask her about

20   anything related to that particular incident.  Quite

21   frankly, the only things that I'm going to ask her

22   besides background will be does she know whether or not

23   the Defendant uses drugs, and does she know whether or

24   not the Defendant sells drugs.  And I can't imagine that

25   either of those two questions would give her the right

 1    to assert the Fifth.  But I wanted to bring that up in

 2    case the Court wanted me to question her outside the

 3    jury's presence at some point to make sure that we

 4    weren't going do have any issues.

 5             THE COURT:  Come forward and tell me what you

 6    think.

 7             MS. JONES:  Honestly, Your Honor, I'm still a

 8    little concerned because the way that the state court

 9    has charged her basically is she knew he was selling

10    drugs and she used occasionally.  So whether or not she

11    knew he was selling drugs, if we do not end up entering

12    diversion and going to trial on this, could be very

13    material.

14             THE COURT:  They've charged her in state court

15    with --

16             MS. JONES:  Simple possession.

17             THE COURT:  Simple possession.  You'll have to

18    explain to me how asking her if she knew that this

19    Defendant used drugs could incriminate her on a simple

20    possession charge.

21             MS. JONES:  As far as using, I would agree

22    that it would not.  Again, my concern comes with did she

23    know he sold drugs because that is a big part of how the

24    state has charged her.

25             THE COURT:  Well, this is a using case.  This

1    isn't really a sale case.  This is a -- I can't

2    remember, there's so many counts in the indictment, but

3    it's mostly it's that he's a drug user which isn't an

4    issue anyway.

5            MR. OAKLEY:  Your Honor, we do have the

6    incident that was the D.U.I. investigation.  We charged

7    him with possession with intent to distribute meth and

8    then also the 924(c).  Then he is also charged with two

9    other possession with intent counts from two other

10   incidents.

11           MR. GRADERT:  Judge, I would object to having

12   her testify in a piecemeal fashion because it doesn't

13   give me a full opportunity to necessarily cross-examine

14   her and/or --

15           THE COURT:  Well, what would you cross-examine

16   her about if the only thing she testified about was the

17   fact that she knows that your client uses drugs?  She

18   couldn't --

19           MR. GRADERT:  Well, if she only testified that

20   she knew that my client uses drugs, I really don't know

21   if I would have any objection to that, I suppose, Your

22   Honor.  But if she comes in --

23           THE COURT:  Well, since you've already told

24   the jury that he does, I don't see how you could.

25           MR. GRADERT:  Well, I'm not too keen on the

1   idea of her coming in and testifying that she knows that

2   he sells drugs as well since that's somewhat of an issue

3   in this case as to various counts alleging that he's in

4   possession with intent to distribute.

5          THE COURT:  Well, let me look at something

6   here real quick and maybe we can resolve this.  You all

7   may sit down.  You don't need to stand.

8                    (Off-the-record.)

9          THE COURT:  Well, I have to say honestly, I, I

10  have a hard time visualizing that testimony by the

11  witness to the effect that the Defendant in this case

12  sells drugs could incriminate her; but I'm not going to

13  get involved in that.  But I see no reason, nor do you,

14  why she can't testify that the Defendant uses drugs.  I

15  don't see how that's any different than anyone else

16  saying that, whether she had been charged or not.  Do

17  you agree?

18         MS. JONES:  I would agree that does not

19  incriminate her in any way.

20         THE COURT:  Right.

21         MR. OAKLEY:  Your Honor -- I'm sorry -- what

22  if I limited my question to does she know whether or not

23  the Defendant has sold drugs to other people?

24         THE COURT:  What do you think?

25         MR. GRADERT:  Could I render my opinion,

1    Judge?

2              THE COURT:  After her lawyer renders --

3              MS. JONES:  Again, Your Honor, that is

4    basically the content of her statement to the police.

5              THE COURT:  I think so.  I think so.  And I

6    don't know why you need it.  But why screw up a case

7    with evidence that is somewhat questionable that you

8    don't need.  Now, Mr. Gradert.

9              MR. GRADERT:  I was just going to say, Your

10   Honor, I mean, obviously, I don't represent Ms. Elwell.

11   She did call me about this matter about being subpoenaed

12   and I wanted to make sure everybody knew that I did not

13   tell her that she shouldn't cooperate with the

14   government, but I did --

15             THE COURT:  For cryin' out loud, I know you

16   wouldn't do that.

17             MR. GRADERT:  But I --

18             THE COURT:  Here's what I want to know,

19   though.  Do you want her to be examined outside the

20   presence of the jury on this limited topic or do you

21   want to just let her get up on the witness stand and you

22   cross-examine her?

23             MR. GRADERT:  Well, if it's limited to just

24   the usage, I'm okay, Your Honor.  I think if she were to

25   talk about having knowledge that my client was selling

1   drugs in a residence that she was living in and

2   sharing --

3           THE COURT:  I'm not going to let 'em get into

4   that.

5           MR. GRADERT:  All right.  Well, I think that's

6   fine and I probably don't really have anything to

7   cross-examine her about as far as that goes.

8           THE COURT:  I wouldn't think so.

9           MR. OAKLEY:  Your Honor, if we're limited to

10  just the drug use, I think the Court's correct, we've --

11  I don't feel like we need to put her on, so we won't put

12  her on just to testify about drug usage.

13          MR. GRADERT:  Resolved.

14          THE COURT:  Thank you for coming over.

15          MS. JONES:  Thank you very much.

16          THE COURT:  All right.  If there's nothing

17  else, we'll get the jury in here and soldier on.

18                  (Jury enters the courtroom. )

19          THE COURT:  Good morning everyone.  Call your

20  next witness.

21          MR. TREASTER:  Your Honor, United States would

22  call Officer Wolfram.

23                  **JERAMY WOLFRAM**

24  Having been first duly sworn to tell the truth, the

25  whole truth and nothing but the truth, testified as

1    follows on:

2                    **DIRECT EXAMINATION**

3    BY MR. TREASTER:

4    Q    Please state your name for the record.

5    A    Officer J R Wolfram.

6    Q    Sir, how are you employed?

7    A    With the Wichita Police Department.

8    Q    How long have you been employed with them?

9    A    Approximately seven and a half years.

10   Q    What are your primary duties for the Wichita Police

11   Department?

12   A    At that time I was -- I'm a patrol officer/traffic

13   officer.

14   Q    What do you do now?

15   A    I am a traffic officer now.  Back then I was a

16   patrol officer.

17   Q    So were you on duty on December 19th of 2006 in the

18   evening hours?

19   A    Yes, I was.

20   Q    And about, oh, 11:00 that evening what were you

21   doing?

22   A    I was working an audible alarm.

23   Q    Where was that at?

24   A    About 610 North West Street, which was the Army

25   recruiting center there at Central and West street.

1    Q    Were there any other officers there with you?

2    A    Yes.  Officer McVay was.

3    Q    And your purpose in going there with the alarm, what

4    were you looking for?

5    A    I was looking for open doors, broken glass, anything

6    like that.

7    Q    Did you find anything like that?

8    A    No.

9    Q    Were you also that evening involved in an

10   investigation of a property damage on a stop sign?

11   A    Yes, I was.

12   Q    Could you explain to the jury how that came about?

13   A    We were standing in the parking lot of the Army

14   recruiting center, and that's right next to the Homeland

15   Foods there at Central and West street, and we were

16   standing there and I saw a gray Chevy pickup go up past

17   the main doors, went a little bit north of the doors and

18   then backed up into a -- they have a stop sign outside

19   the door for their traffic that goes in and out of the

20   store and the vehicle backed into that sign.

21   Q    Okay.  Based upon that, what did you do?

22   A    Officer McVay and I started to go towards where the

23   vehicle was.  I believe I started to walk towards my

24   patrol car as I saw the vehicle, once it hit the sign,

25   it started to pull forward.  I didn't know whether it

1    was going to leave the parking lot or if it was going to

2    park so I went ahead and walked to my patrol car to get

3    inside of it.

4    Q    And what was the purpose of that?

5    A    To try to get over to where the vehicle was and to

6    stop it from running into the stop sign.

7    Q    Were you able to do that?

8    A    When I was driving towards the area that I last saw

9    the vehicle, which was in front of the store, I noticed

10   an individual walking towards the store and I saw the

11   vehicle was parked there in the parking lot.

12   Q    So did you ever see the driver of the vehicle?

13   A    No, I did not.

14   Q    But you saw someone, what, near the vehicle or near

15   the front door of the place?

16   A    Yes.

17   Q    How far was he away from -- when you saw him, how

18   far away was he from the truck, the pickup?

19   A    Not very far.  I don't know if I remember exactly in

20   feet or anything, but it wasn't very far though.

21   Q    Was he walking away from the truck or towards the

22   truck?

23   A    He was walking away from the vehicle towards the

24   front doors of Homeland Foods.

25   Q    Did you see anybody else at that time around that

1    pickup truck?

2    A    No, I did not.

3    Q    Did you see anybody in the parking lot at all on

4    foot?

5    A    No.

6    Q    So he is headed towards the front door of the

7    Homeland Foods?  This person you saw?

8    A    Yes.

9    Q    What happens next?

10   A    I parked my patrol vehicle, get out, and he's

11   standing there at the door and then he turns away and

12   starts walking back I believe towards his vehicle and I

13   have to raise my voice to get his attention so I can

14   contact him.

15   Q    Okay.  Were you able to contact him?

16   A    Yes, I was.

17   Q    What did he do?

18   A    Asked him if he knew that he had hit the sign.

19   Q    And did he respond to that question?

20   A    He stated he did know that he hit it, had hit the

21   sign.

22   Q    Did he tell you at that point he wasn't the driver

23   of the vehicle?

24   A    No, he did not.

25   Q    Based on what you -- when you were talking to him,

1   did he appear to be the driver of the vehicle?

2   A   Yes.

3   Q   Okay.   What happened after that?

4   A   He identified himself through his social security

5   card as a Todd Gehringer.   Then Officer McVay was right

6   there.   I ran him for a valid driver's license and any

7   warrants and found --

8   Q   Did he have a valid driver's license?

9   A   No, he did not.

10   Q   What was his status?

11   A   Status was what we call RV4 which is revoked.

12   Q   He had a revoked driver's license?

13   A   Yes.

14   Q   So in order to ID himself, he gave you his social

15   security card?

16   A   Yes, sir.

17   Q   And from that you were able to run him?

18   A   Yes, sir.

19   Q   At that point then do you and Officer McVay kind of

20   split the duties of this encounter?

21   A   Yes, sir.

22   Q   And what was your primary task at that point?

23   A   I worked the accident and completed the accident

24   form for him backing into the sign.

25   Q   So you're dealing with the vehicle backing into the

1    sign and --

2    A    Uh-huh.

3    Q    What is Officer McVay, what's his task at that

4    point?

5    A    He is pursuing a D.U.I. at that time.

6    Q    Did you do -- did you search the vehicle at all?

7    A    No, I did not.

8    Q    Okay.  What was the case number assigned to this

9    case?

10   A    The WPD case number was 06 C 98152.

11   Q    And that was for your involvement and Officer

12   McVay's involvement in this accident/D.U.I.

13   investigation?

14   A    Yes.  That covered both.

15   Q    Could you put up 208-A.  I'm going to show you a

16   picture that's already been admitted into evidence,

17   Government's Exhibit 208-A.  Do you recognize that

18   photo?

19   A    Yes, I do.

20   Q    Is there a pointer up there?  A laser pointer?

21   A    Yes, there is.

22   Q    Could you point in that picture where you were at

23   approximately when you first saw the vehicle?

24   A    I believe I was over here.  We were standing right

25   there.

181

1   Q   Do you know the path that the vehicle traveled to

2   get into the parking lot?

3   A   No, I don't.  I did not see the vehicle enter the

4   parking lot.  I just only saw it when it was right there

5   by the double doors, which would be right over here.

6   Q   So the first time you really -- it catches your

7   attention is it's pretty close to that stop sign?

8   A   Uh-huh, yeah.

9   Q   And is that the stop sign that he hit?

10  A   Yes, it is.

11  Q   Now, your encounter with the Defendant, where was it

12  at generally?  Is it on that photo?

13  A   Do what now?

14  Q   Where your contact with the Defendant was.

15  A   Yeah.  It was just right over -- I believe I first

16  contacted him right over, over here.  Pretty close by

17  the -- you can't see the double doors, but they're about

18  right there though.

19          MR. TREASTER:  No further questions.  Thank

20  you.

21          THE COURT:  Yes, sir.

22                  **CROSS EXAMINATION**

23  BY MR. GRADERT:

24  Q   Officer Wolfram, did you know Todd Gehringer before

25  this December 19th incident?

1    A    No.  I'd never met him before.

2    Q    But you had heard about him through your west

3    patrol, hadn't you?

4    A    I'm not for sure if I had or not.  To be honest with

5    you, I can't remember if we had knowledge of him or if

6    we had heard his name before.  But I'd never met him

7    before though.

8    Q    Do you know whether Officer McVay indicated to you,

9    yeah, I've heard this guy's name before, or anything

10   like that?

11   A    I cannot recall if he did or not.

12   Q    Okay.  I think you testified that you did not

13   actually see the truck pull in; is that correct?  To the

14   parking lot?

15   A    No, I did not.

16   Q    Okay.  Where were you in relation to Officer McVay

17   when you were investigating the Army recruiting burglary

18   alarm?

19   A    I believe we were finishing up.  I believe we were

20   pretty close to each other.

21   Q    Standing in the -- by your patrol vehicles?

22   A    I don't know if we were standing -- we were in the

23   parking lot.  I'm not sure exactly where our patrol

24   vehicles were.

25   Q    Okay.  But you didn't notice the pickup truck pull

1    into the parking lot?

2    A    No.

3    Q    Did you hear it at all?

4    A    No.  I believe the only time I noticed it was

5    whenever it was in front of the double doors.

6    Q    So that's the first time you saw it?

7    A    Uh-huh.

8    Q    Did you actually see it strike the sign?

9    A    Yes, I did.

10   Q    Okay.  But you did not see anyone exit, actually

11   exiting the vehicle; is that correct?

12   A    No, sir.

13   Q    The first time you came into contact with

14   Mr. Gehringer, was he walking toward the store or was he

15   walking away from the store?  Do you recall?

16   A    I believe he was -- first time I contacted him or --

17   Q    Yes.

18   A    He was standing right by the double doors.

19   Q    Okay.  Did you see him walking toward the store?

20   A    Yes.  Whenever I was walking to my vehicle I did

21   look over and saw him walking toward the double doors.

22   Q    Was your attention primarily focussed on him as he

23   walked to the store?

24   A    It was just in the general area where he was

25   walking.  Like where he parked the vehicle and where the

184

1     front of the store was, it was pretty close there.

2     Wasn't much of a distance between the two.

3     Q   You weren't looking back to the west or to the north

4     at all, were you?  You were kind of watching the

5     direction of the store which would be a little

6     northeast; is that correct?  From your position?

7     A   Yeah.

8     Q   Okay.  So if someone was walking down the street or

9     running down the street or across the street there on

10    Central, you didn't see that, did you?

11    A   No.  But prior to him hitting the sign, there was

12    nobody walking or out in the area.

13    Q   No one that you saw?

14    A   Nobody I saw.

15    Q   Okay.  And I think you said that you remembered him

16    saying that he knew that he hit the sign; correct?

17    A   Yes, sir.

18    Q   Are you -- when you said that he said he knew he had

19    hit the sign, was he referring to someone else or was he

20    referring to himself?

21    A   I believe he was referring to himself.

22    Q   But you're not sure?

23    A   I don't know exactly what he was thinking.  That's

24    the question I was asking was whether he as a driver

25    knew that he had hit the sign.

185

1    Q    He had hit the sign was his quote.

2    A    Yeah, uh-huh.

3    Q    And at some point in time do you recall

4    Mr. Gehringer telling you that he wasn't the driver of

5    that truck?

6    A    I don't believe he ever said that he wasn't.  He

7    stopped answering questions about the accident.

8    Q    Okay.  I'm curious, were you the first one of you

9    and Officer McVay to encounter Mr. Gehringer?

10   A    Yes.

11   Q    Officer McVay's testified that he did the D.U.I.

12   field testing.  Is there some reason why you didn't do

13   that yourself?

14   A    No.  Just we normally split cases.

15   Q    Okay.  Did you not think that Mr. Gehringer looked

16   to be under the influence?

17   A    I noted that his eyes were glazed.

18   Q    I noticed in the report that you had prepared that

19   the license tag which was WYK-991, I think your report

20   indicated that there was a history on the MCT return.

21   What is the MCT return?

22   A    MCT return is whenever we run a tag, if there is

23   incidents, say, if the vehicle is stopped, someone is

24   arrested out of the vehicle, or if it's a suspect

25   vehicle like a larceny or anything, that gets put in.

1   It is associated with the tag so whenever we run tags

2   then those numbers and stuff come up.

3   Q   Would that also be where it would show or indicate a

4   stolen tag?

5   A   Yes.

6   Q   And if a tag is stolen, is it seized or confiscated

7   as evidence in a case?

8   A   Yes.

9   Q   Was that done in this particular case on December

10  19?

11  A   Yes.  The tag was taken but it wasn't because it was

12  stolen.

13  Q   Okay.  Why was it taken then?

14  A   The tag didn't come back to the vehicle and/or there

15  was no history or there was no ownership of the tag on

16  the vehicle.  I believe.  I can't --

17  Q   So this particular tag didn't go with this vehicle?

18  A   Correct.  But it was not stolen, no.

19  Q   Okay.

20          MR. GRADERT:  I have no further questions.

21  Thank you.

22          MR. TREASTER:  Nothing further, Your Honor.

23          THE COURT:  Thank you, Officer.  You're

24  excused.  Next witness.

25          MR. OAKLEY:  United States calls Officer

1   Kenton Conner.

2                       **KENTON CONNOR**

3   Having been first duly sworn to tell the truth, the

4   whole truth and nothing but the truth, testified as

5   follows on:

6                    **DIRECT EXAMINATION**

7   BY MR. OAKLEY:

8   Q   Sir, could you please state your name.

9   A   Kenton Connor.

10   Q   And how are you employed?

11   A   I am a police officer with the Wichita Police

12   Department.

13   Q   How long have you been a police officer?

14   A   On June 12 it will be ten years.

15   Q   I want to talk to you about a search warrant that

16   was executed on May 25, 2007.  Were you involved in the

17   execution of that search warrant?

18   A   Yes, sir.

19   Q   Was that at 622 North Tracy?

20   A   Yes, sir.

21   Q   Do you know whose residence that is?

22   A   Todd Gehringer's.

23   Q   And when that search warrant was executed, you were

24   along with other officers?

25   A   That is correct.

1   Q   And who was present at the time that the search

2   warrant was executed?

3   A   Let me check the names.  Dana Elwell.

4   Q   Was there also an infant that was there?

5   A   Yes, sir.

6   Q   Was Todd Gehringer present when you guys executed

7   that search warrant?

8   A   No, sir, he was not.

9   Q   After you guys made entry, did you kind of divide up

10  responsibilities as far as searching the residence?

11  A   Yes, sir.

12  Q   Was there a particular area of the residence that

13  you searched?

14  A   I was assigned the kitchen and then also an attic

15  area.

16  Q   I want to talk to you about your search of the

17  kitchen.  Could you please put up 410-A.  I'm showing

18  you what's been marked and admitted into evidence as

19  Government Exhibit 410-A.  Do you recognize that

20  photograph?

21  A   It appears to be the kitchen.

22  Q   Is that the way that the kitchen appeared before you

23  guys started searching?

24  A   As I recall, yes.

25  Q   Is there a particular area of the kitchen that you

1  searched?

2  A   I searched the whole kitchen; but that table area

3  and the counter to the left, I spent quite a bit of time

4  in.  That picture shows --

5  Q   Did you find a police scanner?

6  A   On the counter on the left side of the picture is

7  where I located the scanner.

8  Q   I believe there is a laser pointer up here.  Using

9  this pointer, could you show the jury where you found

10  the scanner?

11  A   It was somewhere in this area.

12  Q   Could you explain for the jury what a police scanner

13  is?

14  A   It's a device that can pick up different frequencies

15  that police use, radio traffic, listen to different

16  things going on on the police radios.

17  Q   Now, is it illegal to have a scanner to listen to

18  police traffic?

19  A   No, sir.

20  Q   Why did you collect a scanner from this residence?

21  A   Uhm, from past experience, it's used often times by

22  people involved in criminal activity to listen to where

23  police officers may be.

24  Q   I'm going to hand you what I've marked as Government

25  Exhibit 409 and ask you to open that.  Do you recognize

1   that?

2   A    That would be the scanner that was located.

3   Q    That's the scanner you found in the Defendant's

4   residence?

5   A    That is correct.

6            MR. OAKLEY:  Your Honor, at this time I'd move

7   to admit Government Exhibit 409.

8            MR. GRADERT:  No objection.

9            THE COURT:  It's received.

10  BY MR. OAKLEY:

11  Q    I'm going to now hand you what's been marked as

12  Government Exhibit 410-I.  Do you recognize that?

13  A    That is a picture of the scanner sitting on the

14  countertop.

15  Q    Does that photograph show where you found that

16  scanner?

17  A    Yes, sir, it does.

18  Q    Is that photograph a fair and accurate depiction of

19  the way that that scanner appeared when you found it?

20  A    Yes, sir.

21           MR. OAKLEY:  Your Honor, at this time I'd move

22  to admit Government Exhibit 410-I.

23           MR. GRADERT:  No objection.

24           THE COURT:  It's received.

25  Q    Would you please show 410-I.  Using that laser

```
 1   pointer, can you show the jury where the scanner was
 2   when you found it in that photograph?
 3   A    Right there.
 4   Q    And that was on the countertop that was against the
 5   wall?
 6   A    It really wasn't right against -- well, the
 7   countertop was against the wall, yes.
 8   Q    Can you see the wall in that picture?
 9   A    Yes.
10   Q    Can you show us with the laser pointer where that --
11   A    Where the wall is?
12   Q    Where the wall is.
13   A    Right there.
14   Q    In the kitchen, did you find anything else?
15   A    I located a few bullets.
16   Q    And were these bullets in a gun or were they --
17   A    They were just loose.
18   Q    Just loose?
19   A    Yes.
20   Q    You said that you also searched the attic?
21   A    Yes.
22   Q    Did you find anything in the attic?
23   A    Safe full of coins.  There was -- that we took.
24   There was some BB guns which we did not take as
25   evidence.  Some, as I recall, bows and arrows, fossils,
```

1   rock collections, computer, just things.  The only thing

2   that was taken from there was the coin collection.

3   Q   Now, you said that you searched the kitchen and the

4   attic; but did you see the rest of the house?

5   A   Yes.  I had to walk through it as we cleared it and

6   then to get to the attic, yes.

7   Q   How would you describe the cleanliness of that

8   house?

9   A   It was very cluttered.  Dirty.

10        MR. OAKLEY:  No further questions, Your Honor.

11        THE COURT:  Yes, sir.

12                    **CROSS EXAMINATION**

13   BY MR. GRADERT:

14   Q   Is it Officer Connor?

15   A   Yes, sir.

16   Q   The scanner in 409, was it in working order or do

17   you know?

18   A   I do not know, sir.

19   Q   Okay.  Do you have a scanner in your home?

20   A   No, sir.

21   Q   Okay.  Do you know other officers who do?

22   A   I can't say if I do or not.

23   Q   Do you know if people just use 'em as a hobby to

24   listen to law enforcement traffic?

25   A   Yes, sir, they do.

193

1   Q   And they can't listen to everything that the police

2   department is using.  You have some frequencies that

3   aren't available to those scanners.  Is that my

4   understanding?

5   A   I'm not sure on that.

6   Q   The safe full of coins, were there actually more

7   than one safe full of those kinds of collectibles?

8   A   Yes, sir.

9   Q   Okay.  Did it appear that -- I think you mentioned

10  some fossils.  Like arrowheads?

11  A   I don't recall if it was arrowheads or something

12  stuck in a rock.

13  Q   Stamps.  Do you remember?

14  A   I don't remember stamps.

15  Q   Did it look like these were things that someone was

16  collecting?

17  A   It's possible.

18  Q   Were they separated like the coins were separate

19  from the fossil type stuff?

20  A   Yes.

21  Q   Okay.

22          MR. GRADERT:  I have no further questions.

23  Thank you.

24          THE COURT:  Anything further?

25          MR. OAKLEY:  Nothing further, Your Honor.

1        THE COURT:  Thank you, Officer.  You're

2    excused.  Next witness.

3        MR. TREASTER:  Your Honor, the United States

4    would call Task Force Agent Kevin Bradford.

5                    **KEVIN BRADFORD**

6    Having been first duly sworn to tell the truth, the

7    whole truth and nothing but the truth, testified as

8    follows on:

9                   **DIRECT EXAMINATION**

10   BY MR. TREASTER:

11   Q   Please state your name for the record.

12   A   Kevin Bradford.

13   Q   Sir, how are you employed?

14   A   I'm a detective with the Sedgwick County Sheriff's

15   Office.

16   Q   And have you also had a collateral duty that you've

17   been doing recently?

18   A   Yeah.  I just finished up a tour as a task force

19   officer with the Bureau of Alcohol, Tobacco and

20   Firearms.

21   Q   As a task force officer for ATF, what did you do?

22   A   Investigated gun cases; any matters that ATF was

23   involved in.

24   Q   How long have you been a police officer?

25   A   19 years.

1    Q    And how long were you a task force officer with ATF?

2    A    Three years.

3    Q    Were you serving as a task force officer for ATF on

4    December 3rd, 2007?

5    A    Yes, I was.

6    Q    And were you conducting surveillance on a residence

7    owned by Todd Gehringer?

8    A    Yes, I was.

9    Q    Could you tell the members of the grand jury what

10   you were doing that day when you were doing

11   surveillance?

12   A    They were gettin' ready to serve a federal search

13   warrant at his residence and we were told to go out and

14   just observe who's coming and going and if the residence

15   appeared to be occupied, unoccupied, if there appeared

16   to be small children at the residence, dogs, that kind

17   of thing.

18   Q    Is that for the safety of both the officers and the

19   occupants of the residence?

20   A    Yes, it is.

21   Q    What was the address of the residence you had under

22   surveillance?

23   A    I don't remember the exact address.

24   Q    Would 622 North Tracy here in Wichita be --

25   A    Yeah, that would probably be correct.

1    Q    Okay.  And who was with you that day?

2    A    That day was Special Agent Steve Gravatt.

3    Q    And is he with ATF?

4    A    Yes, he is.

5    Q    Did you ever see the Defendant that day while you

6    were doing your surveillance?

7    A    Yes, I did.

8    Q    And could you tell the jury what you saw him doing

9    that day?

10   A    The Defendant came out of his house, walked over to

11   the Braum's, came out of the Braum's with two gallons of

12   milk.

13   Q    Do you know approximately what time this was?

14   A    I guess it was around 9:30 in the morning.

15   Q    Mid-morning sometime?

16   A    Yes.

17   Q    And how far was it approximately from the

18   Defendant's residence to the Braum's?

19   A    It was about a block away.

20   Q    So you watched him come out of his house?

21   A    Yes.

22   Q    And then he travels to the Braum's?

23   A    Correct.

24   Q    And then you see him coming out of the Braum's?

25   A    Correct.

1   Q   And then what do you do?

2   A   I had a -- I carry a badge on surveillance on a

3   chain.  I took it out of my shirt, stepped out of my

4   car, hollered at him, called him Todd, and asked him to

5   come over to the car.

6   Q   Okay.  So this badge that you have, it's on a chain

7   around your neck?

8   A   Yes.

9   Q   And you pulled it out even before you made contact

10  with him?

11  A   Yes.

12  Q   Was he looking at you when you pulled it out?

13  A   No.

14  Q   So it's -- is it right here in the middle of your

15  chest?

16  A   Yeah, it falls about mid chest.

17  Q   So if you had it on right now, I could see it

18  clearly?

19  A   Yes, sir.

20  Q   It's not gonna be covered by a jacket or anything?

21  A   I had a jacket on that day so I don't know.  It's on

22  a chain inside so --

23  Q   But it should be right front and center?

24  A   Yes.

25  Q   So you approached the Defendant and you said what?

1   A    I said Todd, and then I said I need to speak to you

2   a minute and I asked him to come over.

3   Q    Okay.  Do you know where -- is Special Agent Gravatt

4   around you at this time or do you know where he's at?

5   A    Special Agent Gravatt was trying to get over to the

6   Braum's.  He wasn't aware, I don't believe, that he had

7   come out yet.

8   Q    Were you guys in separate vehicles?

9   A    Yes.

10  Q    So you approached the Defendant.  You call his name.

11  Then what happens?

12  A    Asked him to come over.  He told me that he needed

13  to take his milk home.  I said I need to talk to you a

14  minute.  He said he needed to take his milk home.  I

15  asked him to come over to the car and set it down.  He

16  acted like he was going to set his milk down and then he

17  turned around and bolted.

18  Q    Ran?

19  A    Yes.

20  Q    When he takes off running, what happens?

21  A    About that time is when I realized Special Agent

22  Gravatt was behind me and they took off across the field

23  like two rabbits.

24  Q    Okay.  So Defendant's running, Special Agent's

25  running after him.  And what do you do?

1   A   I'm falling in behind 'em.  They get to a small low

2   lying barb wire fence.  Mr. Gehringer stops.  We think

3   he's going to stop, but he manages to hop over a fence

4   holding two gallons of milk.

5   Q   Okay.

6   A   He got caught on the fence, fell down, busted his

7   milk open, scattered milk all over himself.

8   Q   Then what happens?

9   A   Well, we thought he was done; but he jumps up,

10  smiles at us, takes off again.

11  Q   And then so both of you are back chasing him again?

12  A   Special Agent Gravatt goes over the fence, goes

13  after him.  I go around to his residence over by the

14  side gate believing that he might try to come up over

15  his privacy fence and to get back into his residence.

16  Q   Okay.  So you go kind of -- Special Agent Gravatt

17  follows him.  You kind of go around?

18  A   Yes.

19  Q   What happens next?

20  A   Special Agent Gravatt, we could hear him hollerin'

21  but I don't know where he's at.  So I go back around

22  over to about the point to where they went over the

23  fence and then Special Agent Gravatt is leading him back

24  towards the fence area.

25  Q   Okay.  Now he's basically detained or in custody at

1   that point?

2   A   Yes.

3   Q   Okay.  Did you search the Defendant at any time that

4   day?

5   A   I did.  When he came back over the fence, we put

6   handcuffs on him and then at that point I checked his

7   pockets.

8   Q   Okay.  Did you find anything of interest on him that

9   day?

10  A   Drug paraphernalia.

11  Q   Drug paraphernalia.  I'm going to show you what's

12  been premarked as Government Exhibit 510.  Does that

13  item, or items, do they look familiar to you?

14  A   Yes.

15  Q   Why do they look familiar?

16  A   These are items Mr. Gehringer had on his person.

17  Q   Okay.  And how can you tell that those are the

18  items?

19  A   Well, these are the items that I took off of him and

20  they're also the items that were packaged that I signed

21  for the packaging.

22  Q   So it's packaged there and your signature is on that

23  package?

24  A   That's correct.

25  Q   And that indicates these are the items that you

1    seized from Mr. Gehringer that day?

2    A    Yes.

3              MR. TREASTER:  Your Honor, I'd move for

4    admission of Exhibit 510.

5              MR. GRADERT:  It hasn't really been identified

6    yet, Your Honor.  I don't really object.  I know what it

7    is but --

8    BY MR. TREASTER:

9    Q    Okay.  Could you describe in more detail what's all

10   in that package?

11   A    Some digital scales, some single baggies that are

12   commonly known to us to be used to distribute drugs in

13   and then some broken pipes.

14   Q    Is it glass or --

15   A    Yeah.  They're glass pipe.

16   Q    And the baggies, do they have anything in 'em or are

17   they empty?

18   A    These appear not to have been used yet.

19   Q    And you say those are commonly used to package drugs

20   in?

21   A    Yeah.  Normally people that distribute narcotics use

22   the scale to weigh it out and then they put their

23   product in one of those small type bags for the customer

24   and then they make the exchange.

25             MR. TREASTER:  Again, Your Honor, offer

 1   Exhibit 510 to be admitted.

 2            THE COURT:  Mr. Gradert, do you have an

 3   objection to 510?

 4            MR. GRADERT:  I'm sorry.  No, Judge.

 5            THE COURT:  It's received.

 6            MR. TREASTER:  Thank you.

 7   Q    (By Mr. Treaster) Did you have any further contact

 8   with the Defendant that day?

 9   A    Yeah.  Myself and Special Agent Gravatt then

10   interviewed the Defendant back at the offices of the

11   Bureau of Alcohol, Tobacco and Firearms.

12   Q    Do you recall when that interview started

13   approximately?

14   A    No.  If you have a copy of the Miranda sheet, I

15   could tell you.

16   Q    Okay.  I'll hand you what's been marked as

17   Government Exhibit 502.  Do you recognize that document?

18   A    Yeah.  This is the advice of rights and waiver which

19   most people know as the Miranda warning.

20   Q    Okay.  So when you interviewed the Defendant, did

21   you advise him of his rights per Miranda?

22   A    I did.

23   Q    And did you use this form to do that?

24   A    Yes, sir, I did.

25   Q    And on that form does it list the individual's

```
1    Miranda rights?

2    A   Yes, sir, it does.

3    Q   What else is on that form?

4    A   A waiver that he reads, his signature, his printed

5    name, my signature, my printed name, the date of 12-3 of

6    '07 and the time of 11:25.

7    Q   And 11:25 indicates what?

8    A   The time that we initiated this interview.

9    Q   Okay.

10              MR. TREASTER:  Your Honor, move for admission

11   of Government Exhibit 502.

12              MR. GRADERT:  No objection.

13              THE COURT:  It's received.

14   BY MR. TREASTER

15   Q   You read him his rights per Miranda.  You're in the

16   interview room with him.  Who else is there?

17   A   Special Agent Gravatt.

18   Q   Okay.  What did you talk about with the Defendant

19   that day?

20   A   We talked about some of his past dealings with law

21   enforcement.  We told him that they were serving a

22   search warrant at his residence.  We tried to tell him

23   what we were looking for and we talked to him about the

24   drugs that we found following the chase of him, that

25   kind of stuff.
```

```
 1    Q    Okay.  Now, did you -- when you said you told him
 2    about the things you were searching for.  What types of
 3    things were you searching for at his residence?
 4    A    Stolen firearms.
 5    Q    Now, you're doing the interview with Special Agent
 6    Gravatt.  Are there other agents back at the house
 7    actually executing the search warrant?
 8    A    Yes, sir.
 9    Q    Okay.  Are you in communication with them during
10    this time?
11    A    We would get in phone calls from the RAC, Officer
12    Atterbery.
13    Q    RAC is what?
14    A    Resident Agent in Charge.  He's the boss, the
15    supervisor in charge of that office.
16    Q    So he's feeding you information, you're feeding him
17    information.  Is that how it works?  Back and forth?
18    A    Yeah.  Basically he was just advising me of things
19    to ask about.
20    Q    Okay.  Did you talk to the Defendant at all about
21    his drug use?
22    A    Yes, we did.
23    Q    And what did he tell you?
24    A    That he was a -- kept calling himself an addict.
25    Q    Did you tell you what types of drugs he used?
```

1    A    Methamphetamine and marijuana.

2    Q    Did you ask him about any drugs that were found on

3    the path that he ran when you guys were chasing him?

4    A    Yes, we did.

5    Q    And what did he tell you?

6    A    He admitted the drugs that Special Agent Gravatt

7    found belonged to him and that he had thrown 'em during

8    the time that Special Agent Gravatt was chasing him.

9    Q    Did he say why he threw 'em down?

10    A    Didn't wanna get caught with 'em.

11    Q    Did you ask him about his employment?

12    A    Yes, we did.

13    Q    What did he say he was doing for employment?

14    A    He wasn't currently employed but he was trying to

15    get his job back with Carpet Value.  Apparently he's a

16    very good ceramic tile layer.

17    Q    Did he tell you how long he had been unemployed for?

18    A    I don't recall if he did or not.

19    Q    Did you talk to him about getting consent to search

20    any other property of his?

21    A    Yes.

22    Q    And what property did you talk about?

23    A    He had a storage unit.

24    Q    And where was that located at?

25    A    It's over on Douglas, I believe.

1    Q    Okay.  And did he consent to that search of that

2    storage unit?

3    A    Yes, he did.

4    Q    And did you do that verbally or in writing or both?

5    A    Both.

6    Q    I'll hand you what's been premarked as Government

7    Exhibit 501.  Can you identify that for the jury please?

8    A    Yeah.  This is a voluntary consent to search for his

9    storage unit, Max Secure Storage, 3540 West Douglas,

10   unit G-9.  And he signed it.  I signed it.  And looks

11   like Special Agent Jones signed it as well.

12   Q    So he consented to the search of this storage unit

13   he owned over on west Douglas?

14   A    Yes, he did.

15             MR. TREASTER:  Your Honor, move for the

16   admission of Exhibit 501.

17             MR. GRADERT:  No objection.

18             THE COURT:  It's received.

19   BY MR. TREASTER:

20   Q    Did you talk to him about what might be located in

21   this storage unit?

22   A    Yes, we did.

23   Q    And what items of interest did you have?

24   A    He had some firearms that were located he told us in

25   a backpack and some ammunition; and then he had some of

1     what he described as a military type smoke bomb.

2     Q    He said all those things were located in this

3     storage unit?

4     A    Yes, sir.

5     Q    Did you ask him about any firearms that he had

6     inside his residence?

7     A    Yes, we did.

8     Q    What did he tell you?

9     A    Told us that he knew of a shotgun and a BB gun if we

10    hadn't got that stuff before and then he had some black

11    powder firearms.

12    Q    Did he talk about any illegal firearms that he had

13    or anything like that?

14    A    No, I don't believe so.

15    Q    Did you talk to him about buying and selling

16    firearms, he himself?

17    A    Yeah.  We questioned him about it because we've

18    gotten several reports that Mr. Gehringer deals in

19    stolen property, especially firearms.

20    Q    Okay.  So what did he tell you about him buying

21    firearms or anything like that?

22    A    Well, he denied buying any stolen firearms.  He said

23    there was a guy that came over and tried to sell him an

24    M-1 that he thought might have been stolen.

25    Q    So he told the guy -- he told you that he told the

208

1    guy he didn't want the gun?

2    A    Correct.

3    Q    Did you ask him about -- he admitted to you that he

4    was a user of meth; correct?

5    A    Correct.

6    Q    Did you ask him about where he got his drugs?

7    A    We did.

8    Q    And what did he tell you?

9    A    First told us a bar.  We asked him which one and he

10   said take your pick, any of 'em.  And then he named off

11   the name of a female that he was getting drugs from.

12   Q    Okay.  Did he -- did you ask him if he dealt in

13   drugs?  If he sold drugs?

14   A    Yes, we did.

15   Q    What did he -- how did he respond to that?

16   A    I think he said occasionally.

17         MR. TREASTER:  No further questions, Your

18   Honor.

19         THE COURT:  Yes, sir.

20                    **CROSS EXAMINATION**

21   BY MR. GRADERT:

22   Q    Officer Bradford, I didn't know you weren't on ATF

23   any more.

24   A    No, sir.

25   Q    Are you back with the Sheriff's Department?

1    A    Yes, sir.

2    Q    Okay.  So are you officer or detective?

3    A    Detective.

4    Q    Detective.  You were on ATF back in July of '06,

5    weren't you?

6    A    Yes.

7    Q    Were you already aware prior to December 3rd of 2007

8    that Mr. Gehringer had been under investigation by your

9    office?

10   A    I had heard about that, yes, sir.

11   Q    Okay.  And were you aware prior to that surveillance

12   on December 3rd that other agents of ATF had been to

13   visit him and question him about guns?

14   A    Yes, sir.

15   Q    And were you aware of any earlier incidents in which

16   Mr. Gehringer gave guns to ATF agents?

17   A    Yes.

18   Q    Okay.  That would have been in February of '07;

19   correct?

20   A    I don't know the exact time, sir.

21   Q    Okay.  Were you aware of the fact that his house had

22   been searched by the Wichita Police Department in I

23   believe the 25th of -- I want to say it's May but I

24   can't remember now.  Yes.  May 25th of '07?

25   A    I was not aware of that, no.

1   Q   Okay.  Did ATF coordinate with the Wichita Police
2   Department in this investigation on December 3rd?
3   A   Initially?
4   Q   Yes.
5   A   I don't believe so, no.  I talked with a beat
6   officer.  When we were sittin' off in the neighborhood,
7   some of the neighbors called in because, you know, got
8   these weird guys sittin' off in your neighborhood, you
9   don't know who they are, so the beat officer came by to
10  check us out to find out what we were doing there.
11  Q   So as I understand it then, the December 3rd, 2007,
12  search warrant was gonna be executed entirely by the
13  Bureau of Alcohol, Tobacco and Firearms?
14  A   Initially, yes, that was my understanding.
15  Q   Okay.  You say there were people that thought that
16  you were kind of suspicious or weird sittin' out there
17  sittin' off the house?
18  A   Yeah.
19  Q   Okay.  Is that because you guys are in undercover
20  cars that aren't marked identifying you as law
21  enforcement?
22  A   Well, I think so; but I think that neighborhood has
23  got so much crime to it that any time they see somebody
24  that doesn't fit the neighborhood, they get a little
25  scared of what's going on.

```
1    Q    They might have thought that you were a criminal

2    yourself; right?

3    A    Yes, probably.

4    Q    Okay.  And you weren't dressed in anything to

5    identify -- like the shirts we see on TV sometimes that

6    say ATF or BATF or anything like that, were you?

7    A    No.  I had on some jeans, a shirt and a jacket.

8    Q    So the only thing that would have identified you as

9    law enforcement would be that badge that you had on;

10   correct?

11   A    Correct.

12   Q    Okay.  And did you know Mr. Gehringer before that

13   day?

14   A    I had seen him.  I don't know him.

15   Q    So you don't know if he had ever seen you before?

16   A    I don't suppose that he ever has to my knowledge.

17   Q    Okay.  And you were sitting off, which is the word

18   for sitting back and conducting surveillance, waiting on

19   the search warrant.  Is that correct?

20   A    Yes, sir.

21   Q    One reason -- one thing I'm curious about is because

22   he had been searched before and he had been talked to by

23   ATF agents a long time before.  Was there some new

24   information that you had that caused you to get another

25   search warrant at that point in time?
```

1   A   I'm not aware of that, sir.  You'd have to talk with

2   Special Agent Jones on that.

3   Q   Okay.  When you approached him, were you still in

4   your car?

5   A   When I approached him?

6   Q   Yes.  The first time when you called him out by

7   Todd?

8   A   No.  I was out of my car standing in front of it.

9   Q   How far away from him were you at that point in

10  time?

11  A   Probably ten feet.

12  Q   Okay.  He ran almost immediately after you called

13  out his name, didn't he?

14  A   No.  I think he was trying to figure out who I was

15  and then he realized that -- pretty quick that he pretty

16  much thought I was a cop, I think, because I think he

17  saw my badge.

18  Q   But you don't know for sure?

19  A   I don't know for sure.  Then I asked him to step

20  over to the car and put the milk down and so we probably

21  had a conversation of maybe a minute, minute and a half

22  before he bolted.

23  Q   And that minute or minute and a half, had you

24  actually identified yourself, other than maybe him

25  seeing your badge, as an ATF agent?  Or were you just

```
 1   wanting to talk to him?
 2   A    No, I did not.  I just told him I needed to talk to
 3   him.
 4   Q    Okay.  You did eventually get the search warrant
 5   then I take it; is that correct?
 6   A    They already had a search warrant.
 7   Q    And searched the house?
 8   A    Yes, sir.
 9   Q    And you were looking for stolen firearms?
10   A    It was my understanding that's what was on the
11   warrant, yeah.
12   Q    And you didn't find any stolen firearms in the
13   residence, did you?
14   A    I don't know, sir.
15   Q    Okay.  And basically the only thing you found -- he
16   had told you what you were gonna find in there was the
17   shotgun and some BB guns.  Is that correct?
18   A    I really don't know what was found in the residence.
19   The only thing I know is what I found on him.
20   Q    Okay.  And what you found on him.  I want to make
21   sure I understand how that worked.  Some things I think
22   you said were thrown; correct?  Or thrown away?
23   A    Yeah.
24   Q    And who found those?
25   A    Special Agent Gravatt.
```

214

1   Q   Where were they thrown?  Fairly close to where he

2   was running?

3   A   You'd have to talk to Special Agent Gravatt.  I

4   don't know.

5   Q   The only things you found on him were those things

6   that were in Government Exhibit 510; correct?

7   A   The things that were in his pockets.

8   Q   The baggies?  The scale?

9   A   Yeah.  He had on a black motorcycle type jacket and

10  it was in there.

11  Q   And those were in the jacket?

12  A   Yeah.

13  Q   Okay.  Indicated that the baggies that were in 510

14  didn't appear to have been used but you -- did you

15  submit them for testing?

16  A   Did I?  No, sir, I did not.

17  Q   So you don't know whether they might have been

18  tested for residue or --

19  A   No.  I don't think they were; but you can tell by

20  looking at them.  They don't appear to have been used or

21  even seals broken on 'em.

22  Q   By the way, where do you get those little baggies?

23  A   Well, the clear ones that are in there you can buy

24  at like Walgreen's, places like that.  And I'm not real

25  sure where they get the colored ones.

215

1    Q   Do you know why -- is Walgreen's involved in illegal

2    drug distribution or do you know why they would sell

3    those?

4    A   Yeah.  Because some people like to have -- I mean,

5    they buy vitamins, wanna make daily packs of vitamins in

6    it, whatever.

7    Q   So it's a way to hold your daily pills or --

8    A   Yes, sir.

9    Q   When you interviewed Mr. Gehringer you say he

10   admitted to you that he was a drug addict; correct?

11   A   Yes, sir, several times.

12   Q   And he told you where he bought his drugs?

13   A   Yes, sir.

14   Q   I think the last question that Mr. Treaster asked

15   you was whether or not he had indicated that he sells

16   drugs and you said you thought he did and then you

17   didn't elaborate on that.  Could you check your report

18   to see where in your -- you did make a report in this

19   case, didn't you?

20   A   Uhm, what I have before me is a transcription of the

21   interview.  I don't have a separate report.  Special

22   Agent Gravatt has a report on that interview.

23   Q   Do you have the ability to look at that portion of

24   the report where you were talking to him about his usage

25   or sales of drugs and see if you can find anywhere in

216

1    there where he indicated that he sold drugs?

2                    (Off-the-record.)

3    A   On Page 24 I was talking to him about people

4    bringing stuff over to his house.  Pinching off, which

5    is pinching off a little bit of drugs, selling a little

6    bit more to make money to cover his own deals.  Talking

7    to him about stuff that we knew about.

8    Q   So basically he'd trade drugs then maybe for

9    things --

10   A   Yeah.

11   Q   Okay.  For some of the items that he had in his

12   house?

13   A   Yes.

14   Q   Okay.  But he didn't actually say he sold drugs, did

15   he?

16   A   No.  I think he just pinches off.

17   Q   Okay.  And maybe shares it with some people from

18   time to time?

19   A   Yeah.  It -- Mr. Gehringer works on a barter system.

20   Q   Okay.  Barter and also cash; correct?

21   A   Excuse me.

22   Q   Cash?

23   A   Cash is a commodity, yes, sir.

24   Q   And let me ask you this.  This storage unit that you

25   obtained a consent, which I think is Government Exhibit

1   501, to search, you didn't have, before that December

2   3rd, 2007, a search warrant for the storage unit, did

3   you?

4   A    To my knowledge, no, sir.

5   Q    Okay.  Did you even have any knowledge of the

6   existence of that storage unit?

7   A    Yes.

8   Q    Did you ask him for permission to search it or did

9   he give -- tell you why don't you go get this stuff out

10  of my storage unit?

11  A    If it's all right with you, I can refer to -- I

12  think I've got it on the first part of this interview.

13                    (Off-the-record.)

14  A    Because initially we talked about the storage unit

15  and I asked him if it was all right if we went to take a

16  look at it.  On Page -- do you have a copy of this?

17  Q    I have it.

18  A    On Page 4 I was talking to him and I asked him if he

19  had a problem with the agents going over and looking in

20  his storage unit and he said no.

21  Q    And he told you I think specifically where you were

22  going to find these guns in a backpack or something like

23  that?

24  A    Yes, sir.

25  Q    And did he tell you he wanted you to take those

1    things?

2    A    Yeah.  He said that he was -- take that stuff and he

3    was -- he told us where the stuff was at in the storage

4    unit because he didn't want us to go in with sirens and

5    make a big production that we were searching his storage

6    unit.

7                MR. GRADERT:  Okay.  I have no further

8    questions.  Thank you.

9                THE COURT:  Anything further of Detective

10   Bradford?

11               MR. TREASTER:  Nothing further, Your Honor.

12               THE COURT:  Thank you, sir.  You're excused.

13   A    Thank you, sir.

14               THE COURT:  Next witness.

15               MR. TREASTER:  United States would call

16   Special Agent Steve Gravatt.

17                        **STEPHEN GRAVATT**

18   Having been first duly sworn to tell the truth, the

19   whole truth and nothing but the truth, testified as

20   follows on:

21                     **DIRECT EXAMINATION**

22   BY MR. TREASTER:

23   Q    Please state your name for the record.

24   A    Stephen Gravatt.

25   Q    Sir, how are you employed?

1    A    With ATF.  Special agent.

2    Q    And how long have you been with ATF?

3    A    About a year now.

4    Q    And how long -- and what did you do before you were

5    with ATF?

6    A    I was a special agent with U.S. Customs in San

7    Diego.

8    Q    And how long were you with customs?

9    A    Four years.

10   Q    And before that, were you in law enforcement?

11   A    Yes.  Kansas City, Missouri, police officer for five

12   years.

13   Q    So in total you've been in law enforcement about ten

14   years?

15   A    About ten years.

16   Q    Were you working on December 3rd, 2007, here in

17   Wichita, Kansas?

18   A    Yes.

19   Q    And were you doing surveillance on 622 North Tracy?

20   A    Yes.

21   Q    Could you tell the jury about what happened that

22   morning?

23   A    We were set up on surveillance anticipating -- we

24   were waiting for some agents to come back with a search

25   warrant, so we were sitting on the house until the

1    search warrant was completed and they showed up.

2    Q   Okay.  On that morning did you happen to see the

3    Defendant?

4    A   Yes.

5    Q   And when did you see him?

6    A   When he left the residence.

7    Q   And what did he do?

8    A   He walked just to the north and east from his

9    residence towards Braum's.

10   Q   What happened after he walked to Braum's?

11   A   When he walked out of the house, we got instructions

12   to actually go ahead and detain him.  We called back to

13   the office where they were doing the brief and we were

14   instructed to go ahead and detain him.

15   Q   This was in anticipation of the search warrant?

16   A   Yes.

17   Q   Once you received the request to detain him, what

18   happened?

19   A   He exited Braum's.  As he walked in the parking lot,

20   myself and Task Force Officer Bradford approached him.

21   Bradford got to him before I did and identified himself.

22   As soon as he did, he took off runnin'.

23   Q   Okay.  Where were you at in relation to this

24   conversation?

25   A   I was on the northeast side of the parking lot.  I

1    had just parked my car and Kevin had gotten out of his

2    vehicle and identified himself and before I could even

3    get out of the car, he had taken off on foot.

4    Q    Okay.  Defendant -- was he holding anything at that

5    time?

6    A    Two gallons of milk.

7    Q    Okay.  Once you see the Defendant take off, what

8    happened?

9    A    I exited my vehicle and I took off on foot.  I

10   continued to chase him until I got him in custody.

11   Q    Could you tell the jury about the chase, how it

12   happened?

13   A    Kevin went towards the front of the house and he

14   took off behind his house and jumped over the first -- I

15   think it was a barbed wire four foot fence.  He got up

16   from that and I couldn't catch him in time and went over

17   the fence.  He got up and busted the milk and he got up

18   and took off runnin' again.  He got to a four foot

19   fence.  By the time I got over that first one, I

20   couldn't catch him before he got to the second one.  He

21   got over it.  And then I got behind him and then when he

22   got to the third fence, I finally caught him.

23   Q    And what happens at that point?

24   A    Well, I'd have to describe it as like a dog run

25   because it was boxed in on all four sides.  There was a

1    lot of brush growing up with everything.  And as he was

2    running, he was reaching for something.  And we were

3    already doing a search warrant for guns so I didn't know

4    if he was armed or not.  I had drawn my weapon and I'm

5    giving him commands to stop and he wasn't listening.  He

6    wasn't -- he didn't stop.  He kept running.

7    Q   He didn't stop?

8    A   But he was reaching in his front waistband.  I

9    couldn't see what he was doing and I drew down on him

10   and he continued to run.  And he got to that third fence

11   and that's when I saw his hands come up and he grabbed

12   the top of the fence and was trying to go over.  And

13   it's -- it would be described as like a school yard

14   fence.  There's no post at the top.  It's just real

15   flimsy.  He was actually leaning on it just trying to

16   flip over.  And I grabbed him and pulled him back and we

17   tussled for a few minutes and he finally gave up.

18   Q   Okay.  So he gives up.  What do you do with him at

19   that point?

20   A   After he gave up, I walked him back out because I

21   got out of my car so fast I didn't have my handcuffs.

22   So I walked him out, trying to get some assistance.

23   When we got back over the second fence that he jumped,

24   we had gotten over that one; and when I got him back out

25   there to the very first fence that he jumped, I got

1   assistance from there and he was placed in handcuffs.

2   Q   Now, did you participate in the interview with

3   Mr. Gehringer at some point?

4   A   Yes.  After he was placed in handcuffs, put in the

5   patrol car, he was escorted back to our office where he

6   was interviewed.

7   Q   And Task Force Agent Bradford and you conducted that

8   interview primarily?

9   A   That's correct.

10   Q   At some time during that interview were you

11   requested to come back to the scene of the chase?

12   A   Yes.  I had just gotten back to the building.  I had

13   gotten a phone call from Special Agent Monti requesting

14   they wanted to know the description of exactly where we

15   had done the foot chase because they weren't on-scene

16   yet and they were trying to trace his footsteps.  So I

17   actually went back to the scene, walked with them,

18   traced the steps.  And right where he had been reaching

19   and went over the fence, there were four -- I think

20   there was three bags on this side of the fence and one

21   on the other side.  And it had turned out to be meth and

22   marijuana.

23   Q   Okay.  So at the same location where you're seeing

24   him reach into his waistband approximately, that's where

25   you see these baggies?

1   A   Yes.

2   Q   And you're the one that took the other agents and

3   showed 'em where those things were at?

4   A   That's correct.

5   Q   I'll show you what's been premarked as Government

6   Exhibit 511-A.  Can you identify that?

7   A   Yes.  That's the three bags I said were on this side

8   of the fence that he didn't get over and then there was

9   one on the other side.

10  Q   All right.  Is that an accurate representation of

11  what you saw that morning?

12  A   Yes.  Nothing was disturbed.  It was left in place

13  until I identified it and then I left and the other

14  agents returned it.

15  Q   They collected it and photographed it?

16  A   Correct.

17  Q   I'll show you what's been premarked as Government

18  Exhibit 511-B.  Can you tell the jury what that photo

19  is?

20  A   Yes.  This is a couple of the bags that were thrown

21  on the ground.

22  Q   That's a more close up view of those bags?

23  A   Yes.

24  Q   Is that an accurate representation of what you saw

25  that morning?

1    A    Yes.

2    Q    And could you identify Government Exhibit 511-C?

3    A    This was the fourth bag that went through the fence.

4    It was on the other side of the fence where he was

5    apprehended.

6    Q    Is that also an accurate representation of what you

7    saw that morning?

8    A    Yes.

9            MR. TREASTER:  Your Honor, I'd move for the

10   admission of Government Exhibit 511-A, B and C.

11           MR. GRADERT:  No objection.

12           THE COURT:  They're received.

13           MR. TREASTER:  Could you publish 511-A please.

14   Q    We've got 511-A.  Could you tell the jury what

15   they're seeing there in that photograph?

16   A    This is --

17   Q    There's a pointer up there.

18   A    I'm sorry.

19   Q    There's a little laser pointer up there.

20   A    These three bags, these are the three bags that were

21   on this side of the fence as he was apprehended on this

22   side.  And then on the other side, there's actually

23   another one.  There was actually four bags total.

24   Q    And then 511-B please.  And is that just a close-up

25   of the two of the bags from 511-A?

```
 1    A    That's correct.

 2    Q    And 511-C.  And what is this?

 3    A    This is the other -- this is the fourth bag that

 4    actually when he threw it down it actually went through

 5    the fence so it landed over there.  So agents had to

 6    jump the fence to go get it.

 7    Q    And those items were in fact collected; right?

 8    A    Correct.

 9    Q    And have you reviewed those items in preparation for

10    your testimony today?

11    A    I have.

12    Q    I'll hand you what's been premarked as Government

13    Exhibit 506.  Can you identify that?

14    A    Yes.  This is the marijuana that was found at the

15    scene.

16    Q    And you know that's the same marijuana how?

17    A    I'm sorry.

18    Q    How do you know that's the same marijuana that you

19    found that morning?

20    A    It's got my initials on it.

21    Q    On the baggy itself?

22    A    Correct.

23    Q    And can you identify Government Exhibit 507?

24    A    This is the methamphetamine that was found on this

25    side, on the side of the fence that he was apprehended.
```

1    And I also have my initials on it.

2    Q    Based on your initials you know that that's the

3    items that you found?

4    A    That's correct.

5    Q    Could you open both of those packages, please.

6                     (Witness complies with request.)

7              MR. TREASTER:  Your Honor, move for the

8    admission of Government Exhibit 507 and 507-A through C.

9    I'm sorry, Your Honor.

10   Q    Could you identify A through C, the separate baggies

11   of 507?

12   A    There's three separate bags in here that's on the

13   first picture that you showed.  It has the three

14   individual bags and there's three in this one.

15   Q    And they're individually marked 507-A, B and C?

16   A    This one is A.  The baby bottle is B.  And the

17   residue is C.

18             MR. TREASTER:  Your Honor, I'd move for the

19   admission of Government Exhibit 507-A through C and 506?

20             MR. GRADERT:  No objection.

21             THE COURT:  They're received.

22             MR. TREASTER:  No further questions, Your

23   Honor.

24                   **CROSS EXAMINATION**

25   BY MR. GRADERT:

1  Q   Agent Gravatt, when you first saw Mr. Gehringer he

2  had been approached by your colleague Agent Bradford; is

3  that correct?

4  A   That's correct.

5  Q   And -- but you were just right behind him, weren't

6  you, in terms of --

7  A   I was actually across the parking lot.

8  Q   Okay.  I think you indicated that as soon as

9  Bradford had ID'd himself that Mr. Gehringer took off

10  running; is that correct?

11  A   Yes.

12  Q   But you don't know whether -- you didn't know from

13  your location whether Agent Bradford had actually

14  identified himself as an ATF agent, do you?

15  A   I can't say for certain.  I mean, that's generally

16  what we do.  We're going to approach somebody, that's

17  the first thing you do is identify yourself as law

18  enforcement.

19  Q   How do you do that?

20  A   Well, I know I saw Kevin reach in and grab his ID

21  that we carry around our neck that's got our badge on it

22  and, I mean, I can't tell you exactly what was said, but

23  I'm sure he identified himself as law enforcement.

24  Q   So you saw Agent Bradford like reach into his coat?

25  A   Reach inside and pull his chain out.

1    Q    Okay.  If somebody that you were approaching like,

2    for example, Mr. Gehringer reached into a jacket like

3    this, what might you think that he was doing?

4    A    I can't say.

5    Q    Would you be concerned that he might be going for a

6    gun?

7    A    That's always possible.

8    Q    But you're saying you didn't see 'em sitting there

9    chatting for a minute or so?  I mean, it was like he

10   took off running right away.  Is that correct?

11   A    No, not immediately.  There was a brief -- there

12   were some words exchanged.  I don't know what was said.

13   But, I mean, it wasn't just like that, no.

14   Q    How far apart were they?

15   A    Oh, probably seven or eight feet.

16   Q    Mr. Gehringer admitted to you at some point in time

17   that those items that you found there in those

18   Government exhibits before you that were by the fence

19   were his and that he had thrown them, didn't he?

20   A    He did confess to it, yes.

21   Q    And he told you that he uses drugs; right?

22   A    Yes.

23         MR. GRADERT:  That's all I have.  No further

24   questions.

25         THE COURT:  Anything further?

1          MR. TREASTER:  Nothing further, Your Honor.

2    Thank you.

3          THE COURT:  All right.  Thank you, sir.  Let's

4    take our morning recess, Ladies and Gentlemen.  About 15

5    minutes.  Remember and heed the admonition.

6                    (Recess.)

7          THE COURT:  Next witness please.

8          MR. OAKLEY:  United States calls Nelda Hunter.

9                    **NELDA HUNTER**

10   Having been first duly sworn to tell the truth, the

11   whole truth and nothing but the truth, testified as

12   follows on:

13                 **DIRECT EXAMINATION**

14   BY MR. OAKLEY:

15   Q    Ma'am, could you please tell us your name.

16   A    Nelda Hunter.

17   Q    And what's your occupation?

18   A    Secretary.

19   Q    And where are you a secretary at?

20   A    Carpet Value.

21   Q    And what type of business is Carpet Value?

22   A    Commercial floor covering.

23   Q    And are you familiar with an individual by the name

24   of Todd Gehringer?

25   A    Yes, sir.

1    Q    And how do you know Todd Gehringer?

2    A    Todd was a subcontractor for Carpet Value.

3    Q    When you say subcontractor, he wasn't actually an

4    employee of Carpet Value?

5    A    Correct.

6    Q    But as a subcontractor, you guys contracted with

7    him?

8    A    Yes.

9    Q    As a subcontractor, what were his duties?

10   A    Todd's a ceramic and stone layer and when we would

11   have jobs that required ceramic tile or stone, he would

12   install it for a certain fee.

13   Q    And how long had he worked for you, for Carpet

14   One -- or Carpet Value?  Excuse me.

15   A    Approximately five years.

16   Q    When was the last time that he worked as a

17   subcontractor for Carpet Value?

18   A    March of '06.

19   Q    March of 2006?

20   A    Yes.

21   Q    And he hasn't worked for Carpet Value since then?

22   A    No, sir.

23            MR. OAKLEY:  No further questions, Your Honor.

24                      **CROSS EXAMINATION**

25   BY MR. GRADERT:

1    Q   Ms. Hunter, my name is Steve Gradert.   I'm

2    Mr. Gehringer's lawyer.   And I just have a couple of

3    questions.   Todd did ceramic and stone laying; correct?

4    A   Correct.

5    Q   I assume he must have been pretty good at it for

6    Carpet Value?

7    A   Yes, sir, very good.

8    Q   And did that pay pretty well?

9    A   Yes, sir.

10   Q   How much money would you say he made -- did he get

11   paid per job?

12   A   Per foot.

13   Q   Per foot.   Okay.   And how much is that?

14   A   It varied.

15   Q   Would he make thousands of dollars?

16   A   Yes.

17   Q   In a year?

18   A   Yes.

19   Q   Could he make as much as 60, $70,000 in a year?

20   A   60?

21   Q   60 or 70,000?

22   A   Yes, he could.

23   Q   Do you remember if he did make that much money at

24   any time?

25   A   I didn't look at the reports after our accountant

1    done 'em up; but he could have, yes, because I've got

2    other ceramic layers that have, yes.

3    Q    Okay.  Do you know if Todd had a bank account that

4    his checks were directly deposited in?

5    A    Checks were given directly to him.

6    Q    They didn't go into an account?

7    A    No.

8    Q    Okay.  And was he -- he was paid by check, though,

9    and not just in cash?

10   A    He was paid by check.

11   Q    Okay.

12   A    And a 1099 was offered to him.

13   Q    Would he be considered for re-employment if he was

14   able to?

15   A    That's not up to me.  That would be up to the owner

16   of the company.

17   Q    Okay.

18        MR. GRADERT:  All right.  Thank you very much.

19   No further questions.

20                    **REDIRECT EXAMINATION**

21   BY MR. OAKLEY:

22   Q    Ma'am, you said that he was a good tile layer.  Were

23   there any problems with his performance?

24   A    As his work?

25   Q    As far as getting him to work?

1   A    Sometimes.

2   Q    Could you explain what kind of problems he had?

3   A    He wouldn't show up.

4   Q    And was that something that was rare or how frequent

5   did that occur?

6   A    It was rare in the beginning; but toward the end of

7   his employment, it was very frequent.

8   Q    You said -- Mr. Gradert asked you if he could make

9   more than $60,000 in a year.  That's assuming that he

10  worked frequently; correct?

11  A    Yes.

12  Q    And so I assume -- you said that it got to be pretty

13  frequent that he wouldn't show up.  I assume he wouldn't

14  get paid if he didn't show up?

15  A    Right.  If you don't work, you don't get paid.

16          MR. OAKLEY:  No further questions.

17          MR. GRADERT:  Nothing further, Your Honor.

18          THE COURT:  Thank you.  You're excused, ma'am.

19  Next witness please.

20          MR. OAKLEY:  United States calls Special Agent

21  Mike Jones.

22                      **MIKE JONES**

23  Having been first duly sworn to tell the truth, the

24  whole truth and nothing but the truth, testified as

25  follows on:

## DIRECT EXAMINATION

BY MR. OAKLEY:

Q   Sir, could you please state your name.

A   Michael Jones.

Q   And how are you employed?

A   I'm a special agent with the Bureau of Alcohol,
Tobacco, Firearms and Explosive.

Q   How long have you been employed with ATF?

A   I've been here three and a half years.

Q   As a special agent with ATF, what do you do?

A   As an ATF agent we're responsible for investigating
violations of federal firearms, explosives and arson
laws, as well as alcohol/tobacco division.   In my time
here I've been a part of a gun task force that works the
Sedgwick County area so most of the cases that I've
worked have involved gun crimes.

Q   Do you ever investigate crimes involving controlled
substances, illegal drugs?

A   Absolutely.   In this area at least guns and drugs
tend to go hand-in-hand.

Q   Have you had any specific training as it relates to
your job as a special agent with ATF?

A   I have.   I attended seven months of -- at the
Federal Law Enforcement Training Center in Lakewood,
Georgia, which covered investigative techniques as well

1    as training in the law and how it relates to ATF's

2    specific missions.

3    Q    Have you had any training as it relates specifically

4    to drug trafficking offenses?

5    A    I have.  Prior to being an ATF agent, I was a United

6    States customs inspector in Chicago.  I received a lot

7    of training in global narcotics trafficking routes as

8    well as current smuggling trends.  And then when I came

9    on to ATF I received some training in the kind of street

10   value, or street level narcotics trade, values of

11   amounts of narcotics commonly sold on the street.  I've

12   also interviewed a number of individuals involved in the

13   narcotic trade and have received information from them

14   during those interviews.

15   Q    During your -- let me back up.  How long were you

16   with customs?

17   A    I was with customs for five years.

18   Q    During your time with ATF have you had occasion to

19   investigate criminal offenses involving drugs?

20   A    I have.

21   Q    You said that some of your training with ATF has

22   related to the value of narcotics?

23   A    That's correct.

24   Q    Have you received any training as to the value of

25   methamphetamine specifically?

237

1    A   I haven't received training.  I've learned about it

2    through the investigations that my office has worked.

3    We do undercover purchases and confidential informant

4    work in the office and learn about the values, or the

5    prices of common quantities of narcotics through those

6    investigations.

7    Q   And based upon that, do you have any idea how much

8    meth goes for in Wichita, Kansas, on the street?

9    A   An ounce of methamphetamine is typically sold for

10   anywhere between 1,000 and 1400, depending on how much

11   is currently out there and what the quality of the stuff

12   that's out there usually is.

13   Q   Do you know how much methamphetamine sold in gram

14   quantities goes for?

15   A   It would depend on, again, a lot of the -- how much

16   of it's out there and the quantity.  And typically as

17   you breakdown into smaller quantities -- how am I trying

18   to say this -- the price will, will not reflect an exact

19   division into those quantities because they're trying to

20   make a profit on it.  So, you know, I think if, you

21   know, if an ounce were going for 1200, a half ounce

22   would probably be 7 or 800.  Quarter of an ounce would

23   be three or four hundred and then on down into lower

24   quantities.

25   Q   So, in other words, you get a bulk discount the more

238

1     you buy basically?

2     A    Yes.

3     Q    I want to talk to you specifically about an

4     investigation into the Defendant Todd Gehringer.   Are

5     you the case agent on this investigation?

6     A    I am.

7     Q    Could you explain for the jury what it means to be a

8     case agent?

9     A    In this instance this case started out as a couple

10    different instances that the Wichita Police Department

11    brought to the attention of the Wichita field office.   I

12    looked at those cases or those incidents from the police

13    department and decided that they would be worthy of

14    federal prosecution.   I then began collecting the

15    necessary reports from the officers, from lab personnel,

16    copies of any audio recordings of traffic stops, that

17    kind of thing.   Collected the evidence, brought the

18    evidence over from the police department into our

19    custody and, you know, I maintain the bulk of the

20    information that we have on the case as it relates to

21    the charges that we're bringing against the Defendant.

22    Q    When did you first become involved in investigating

23    Todd Gehringer?

24    A    We first had contact with Mr. Gehringer as it

25    related to another defendant who was being prosecuted

1    through our office.  We had contact with him and that

2    was in July of 2006.  I didn't open up a case on

3    Mr. Gehringer until early 2007 when two incidents from

4    the police department on October 10th and December 19th

5    were brought to our office.

6    Q    And ultimately Mr. Gehringer was charged with these

7    offenses in December of 2000; is that correct?

8    A    I'm sorry.  Say that again.

9    Q    Ultimately the Defendant was charged with these

10   offenses in December of 2007?

11   A    Yes, that's correct, in 2007.

12   Q    Can you explain for the jury why it took from early

13   2007 until December for you to be in a position for this

14   case to be prosecuted?

15   A    Well, I started with the October 10th and December

16   19th cases and started trying to get reports and get the

17   necessary paperwork and evidence; and shortly -- or

18   about the time I was getting those two cases ready for

19   presentation to the United States Attorney's office,

20   Mr. Gehringer was involved in a traffic stop with the

21   Kansas Highway Patrol on February 2nd of '07.  We looked

22   at adopting that case also and wrapping that up in the

23   same investigation.  So I went through the process again

24   of finding the reports and getting the drugs tested and

25   getting the evidence over to our office.  As a part of

1       that, we then, through various sources, determined that

2       Mr. Gehringer was possibly involved in distribution of

3       narcotics so -- and that relates then to the February

4       26, '07 incident in which we initially were trying to

5       identify who Todd's sources and his, and his buyers

6       were.  That incident came up and I went through the

7       process again of collecting reports and evidence and

8       everything.  I was getting that together and then the

9       police department did a search warrant on his house on

10      May 25th of '07 which we were not -- we were not

11      initially a part of that search warrant execution but

12      they informed us of it.  And I went through the process

13      again of adopting that case and getting the paperwork

14      and the evidence.  And it was I believe early fall of

15      2007 that I got everything together and presented it to

16      the United States Attorney's office.  And then we were,

17      you know, going through the case and determining what to

18      charge Mr. Gehringer with in an indictment when the

19      December 3rd incident came around.

20      Q   And so it wasn't any type of investigative strategy

21      that you waited from early 2007 until December 2007

22      before arresting or -- arresting the Defendant?

23      A   No.  At one point we did attempt to, you know,

24      identify his suppliers and buyers; but most of the time

25      I was just trying to, you know, collect the documents

1    and the evidence on this case as well as the other cases

2    I was working.  My investigative strategy is typically

3    treading water.

4    Q   You said that you had contact with the Defendant on

5    February 26, 2007?

6    A   Yes.

7    Q   I want to talk to you about that incident.  Tell us

8    what happened?

9    A   We had a set up -- my -- we, as in the ATF Wichita

10   field office, set up that night to conduct surveillance

11   on Gehringer's residence and on Mr. Gehringer in an

12   attempt to identify the people who were coming and going

13   from his residence as well as who he was meeting with

14   when he came and went from the residence.  Thereby, you

15   know, attempting to identify his suppliers and his

16   buyers.  At one point my command staff decided that --

17   we had observed Mr. Gehringer out in his yard of his

18   residence and it was determined that we would then make

19   contact with him there and work it from a different

20   angle.  So myself, Special Agent Doug Monty with the

21   ATF, and task force officer of ours at the time John

22   Barrier approached Mr. Gehringer in his front yard while

23   we had other agents continuing to conduct surveillance

24   on the residence kind of watching our back to make sure

25   that no one came up on us, you know, that we weren't

1    aware of.  We contacted Mr. Gehringer in his yard and

2    identified ourselves.  We were in plain clothes at the

3    time.  We were not identified as law enforcement

4    officers.  But we went up real casually, identified

5    ourselves, asked to talk to him.  And we initially began

6    talking to him in relation to a couple stolen firearms

7    that -- the first case that we had contacted Gehringer

8    on involved stolen firearms and we contacted him -- this

9    is the July 2006 case.  We had contacted him on that

10   date because we had heard that one or more of the stolen

11   firearms from that case had been brought to

12   Mr. Gehringer for sale.  So on February in '07 we

13   contacted him in relation to a couple of those firearms

14   that we had not recovered in that previous case.

15   Mr. Gehringer, you know, freely talked to us.  We asked

16   him about the two -- I think it was two firearms that

17   were still outstanding.  And he said a couple times that

18   he was not in possession of those firearms, that he had

19   seen one of them but had not purchased it from the

20   person who brought it to him.  At one point we asked

21   Mr. Gehringer if we could -- if he would consent to let

22   us search his residence real quick just to make sure

23   that those guns weren't there.  He said that he did not

24   want us to search his residence.  We continued to talk

25   to him, you know, trying to come up with a way, you

1    know, to satisfy our interest in these two stolen

2    firearms, and at one point he voluntarily stated that he

3    had some other firearms in the residence but they

4    weren't the two that we were looking for.  We asked him

5    if we could come into the residence to examine those

6    firearms just to be sure and he said that was okay.  He

7    let us into the side door of his residence which, which

8    enters into kind of the back of the living room near the

9    kitchen.  And there was a cabinet or a couple cabinets

10   against the wall just as you enter the residence and

11   there were three long guns, or three either rifles or

12   shotguns, behind those cabinets, which we, you know,

13   took out and examined and determined they weren't the

14   stolen firearms we were looking for.

15   Q    Let me stop you and back up a little bit.

16   A    Sure.

17   Q    Where was the Defendant living at on February 26,

18   2007?

19   A    He was at 622 North Tracy in Wichita, Kansas.

20   Q    And that's the same residence that the Wichita

21   Police Department executed a search warrant at in May?

22   A    That's correct.

23   Q    And is that the same residence that you guys would

24   later execute the search warrant in December?

25   A    That's correct.

1    Q    Okay.  But this was February, 2007, February 26,

2    2007?

3    A    Yes.

4    Q    You said that he showed you three long guns?

5    A    That's true.

6    Q    That were behind the door?

7    A    Yeah.  They were behind the door kind of wedged

8    between a cabinet and the door and the wall if I

9    remember right.

10           MR. OAKLEY:  Your Honor, with the Court's

11   permission, can I have the witness come down and get the

12   three firearms that he initially found.

13                    (Witness complies.)

14   Q    When the Defendant showed you those firearms, you

15   said that you were able to ascertain that they were not

16   the ones that were stolen?

17   A    Correct.

18   Q    After he showed you the firearms, what did you do?

19   A    At that point there were a couple other people.

20   There was Todd's significant other, Dana Elwell, was in

21   the residence with their child, as well as two other

22   unknown individuals.  So we, myself and Special Agent

23   Monty, took Todd right outside the door to talk to him a

24   little bit and left Task Force Officer Barrier in the

25   residence to make sure that people in there weren't

1    accessing other firearms or weapons.  Special Agent

2    Monty and I talked to Gehringer.  We asked him about his

3    drug use.  He stated that he's an addict.  We asked him

4    when the last time that he used was and he said it was

5    earlier that day.  And at that point we explained to

6    Mr. Gehringer that being an unlawful user of a

7    controlled substance in possession of firearms is a

8    federal offense.  Mr. Gehringer indicated that he was

9    not aware of that.  We said that that's okay.  We asked

10   him to surrender the three firearms that we had

11   recovered to us because it was illegal for him to

12   possess them and he agreed to do so.  We then asked him

13   if there was any -- or if there were any other firearms

14   or any other contraband in his house and I think at that

15   point he, he stated that there were some other firearms

16   in the attic of the residence.  We asked him if we could

17   have consent to search his house for any other firearms

18   that he might be in possession of and he agreed to let

19   us in the house to do so.  During the search of his

20   residence we recovered four more long guns.  I believe

21   it was four from the attic of the residence as well as a

22   black plastic case that had several handguns in it.  We

23   also recovered a small amount of marijuana and some

24   prescription pills from the kitchen area.  All of these

25   items were abandoned to ATF by Mr. Gehringer on that

1    date.

2    Q    You said that you talked to the Defendant about his

3    drug usage and he said the last time that he had used

4    was earlier that day?

5    A    I believe so, yes.

6    Q    Did he tell you what kind of drugs he used?

7    A    I don't remember if he said specifically.  I think

8    it was implied or assumed that it was methamphetamines

9    that he used.

10   Q    Now, you said that you told the Defendant that it

11   was unlawful for someone who uses illegal drugs to

12   possess firearms and he indicated to you that he didn't

13   know that?

14   A    That's correct.

15   Q    Based upon your training, does someone have to know

16   that it's illegal for it to be a crime?

17   A    No.  In some instances, knowledge of the actual

18   crime is required; but in many cases such as this, it's

19   not required that you know that you are in violation of

20   the law to actually be in violation of the law.

21   Q    You said that he ended up showing -- or discussed

22   with you his drug usage.  Did he show you in the house

23   where the drugs were at?

24   A    I don't remember if he indicated where they were or

25   not.  They were -- it was not difficult to find them.

1   They were fairly out in the open in the kitchen area if

2   I remember correctly.

3   Q    But you guys actually found them?

4   A    I think so.

5   Q    And you said that you found other long guns.  Are

6   these the other guns that you found on that day?

7   A    They are.

8   Q    Agent Jones, you're the one who secured all these

9   firearms before bringing them here into court?

10   A    I am.

11   Q    And they're unloaded and secured?

12   A    Every one of them.

13   Q    You said that initially -- well, let me back up.

14   You said that the Defendant ended up abandoning this

15   property to ATF.  Did you have him fill out a written

16   form in order to abandon the property?

17   A    We did.  I think while I was speaking with Gehringer

18   and having him list out the items, Special Agent Monty

19   was recording them on an ATF abandonment form.

20   Q    I'm going to hand you what's been marked as

21   Government Exhibit 316 and ask if you recognize that?

22   A    I do.  This is ATF Form 3400.1, Notice of

23   Abandonment of Property.

24   Q    Is that the form that you had the Defendant fill out

25   to abandon those firearms to ATF?

1    A    It is.

2            MR. OAKLEY:  Your Honor at this time I move to

3    admit Government Exhibit 316.

4            MR. GRADERT:  No objection.

5            THE COURT:  It's received.

6    BY MR. OAKLEY:

7    Q    Let's talk about the firearms that you found.  Can

8    you show me again the three firearms the Defendant

9    initially showed you.

10                        (Witness leaves the stand to

11                        inspect the firearms.)

12   A    These are the three.

13   Q    Let's talk about the one that you have in your hand.

14   That's been marked as Government Exhibit 303?

15   A    Yes.

16   Q    What type of firearm is that?

17   A    This is a Hamilton Rifle Company Model 27, .22

18   caliber rifle with no serial number.

19   Q    That's one of the three the Defendant initially

20   showed you?

21   A    Yes.

22   Q    That was behind the door?

23   A    Yes.

24            MR. OAKLEY:  Your Honor, at this time I'd move

25   for admission of Government Exhibit 303.

1          MR. GRADERT:  No objection.

2          THE COURT:  It's received.

3    BY MR. OAKLEY:

4    Q   Can I see one of the other firearms that he

5    initially showed you.  This has been marked as

6    Government Exhibit 305.  Do you recognize that?

7    A   Yes.  This is one of the other three firearms we

8    initially recovered.

9    Q   And what type of firearm is that?

10   A   This is a Marlin Firearms Company Glenfield Model

11   10, 22 caliber rifle, unknown serial number.

12          MR. OAKLEY:  Your Honor, at this time I move

13   to admit Government Exhibit 305.

14          MR. GRADERT:  No objection.

15          THE COURT:  It's received.

16   BY MR. OAKLEY:

17   Q   Let's talk about the third firearm.  It's Government

18   Exhibit 304.  Do you recognize that?

19   A   I do.  This is the third firearm we found initially.

20   Q   What type of firearm is that?

21   A   This is a Winchester Model 190, 22 caliber rifle,

22   serial number B 962737.

23   Q   After you collected these firearms, did you ever

24   test fire any of them?

25   A   I test fired all the firearms in this case.

1    Q    And did the firearms function as designed?

2    A    They did.  Well, I believe, I'd have to check my

3    report, but I believe these two firearms, 305 and 304, I

4    did not attempt to test fire this one because of the

5    poor state of that firearm's condition.

6    Q    And that's Exhibit 303?

7    A    Yeah.

8    Q    Why would the firearm's poor state of condition

9    effect your ability to test fire it?

10   A    Well, the way we conduct test fires is we take a

11   round of ammunition and remove the bullet from it and

12   the explosive powder and then put the casing with the

13   live primer into the chamber of the firearm and test

14   fire the firearm.  And the primer is still a small

15   amount of high explosive.  That, coupled with the, I

16   guess, the rust and the poor condition of the firearm, I

17   didn't want to injure myself or anybody else by test

18   firing that firearm.

19   Q    You said that the Defendant showed you more

20   firearms.  Are these the other firearms that he showed

21   you?

22   A    Those are the other long guns he showed us, yes.

23   Q    The other long guns he showed you.  Let's talk about

24   these.  Do you know where each of these came from?

25   A    I believe they came from the attic of his residence.

1    Q    I'll hand you the first one that's been marked as

2    Government Exhibit 308.  Do you recognize that?

3    A    I do.

4    Q    And what is that?

5    A    This is a Springfield Arms Corporation Model

6    Oldtimer, 410 gauge shotgun.  An unknown serial number.

7    Q    That's the same shotgun -- that's one of the long

8    guns that the Defendant showed you?

9    A    Yes.

10   Q    And that came from the attic?

11   A    It did.

12        MR. OAKLEY:  Your Honor, move to admit

13   Government Exhibit 308.

14        MR. GRADERT:  No objection.

15        THE COURT:  It's received.

16   BY MR. OAKLEY:

17   Q    Going to show you what's been marked as Government

18   Exhibit 312.  Do you recognize that?

19   A    I do.  This is another firearm that came from the

20   attic.

21   Q    And what type of firearm is that?

22   A    This is a Mauser Model 1895, 303 (sic) caliber,

23   serial number F 9774.

24   Q    That's a rifle?

25   A    It is.

 1              MR. OAKLEY:  Your Honor, at this time I'd move

 2      to admit Government Exhibit 312.

 3              MR. GRADERT:  No objection.

 4              THE COURT:  It's received.

 5      BY MR. OAKLEY:

 6      Q    Show you what's been marked as Government Exhibit

 7      309.  Do you recognize that?

 8      A    I do.  This is another firearm taken from the attic.

 9      Q    What type of firearm is that?

10      A    This is a Franchi 20 (sic) gauge shotgun, unknown

11      model, serial number 71490.

12              MR. OAKLEY:  Your Honor, at this time I'd move

13      to admit Government Exhibit 309.

14              MR. GRADERT:  No objection.

15              THE COURT:  It's received.

16      Q    I'm going to hand you what's been marked as

17      Government Exhibit 307.  Do you recognize that?

18      A    I do.  This is the last long gun taken from the

19      attic.

20      Q    And what type of gun is that?

21      A    This is a Marlin Firearms Company Glenfield Model

22      60, 22 caliber rifle, serial number 26490483.

23              MR. OAKLEY:  At this time I'd move to admit

24      Government Exhibit 307.

25              MR. GRADERT:  Which brand was that?

1    A    Manufacturer is Marlin Firearms Company.

2              MR. GRADERT:  No objection.

3              MR. OAKLEY:  I believe I haven't moved to

4    admit 304.  I'd move to admit that one at this time.

5              MR. GRADERT:  That's correct.  No objection,

6    Your Honor.

7              THE COURT:  304 is received.

8    BY MR. OAKLEY:

9    Q    The long guns that came from the attic, did you also

10   check -- test fire those?

11   A    I did.

12   Q    And did they all test fire?

13   A    I believe the Mauser I was unable to test fire

14   because I believe we were unable to find the right

15   caliber of ammunition to test fire it.

16   Q    Is that kind of a unique caliber?

17   A    I think so on this one.  Again, I'd have to check my

18   notes which I don't have in front of me but -- I believe

19   that was kind of a unique caliber we weren't able to

20   find.

21   Q    But all the rest test fired and fired as designed?

22   A    Yes.

23   Q    You said that there was also some handguns that the

24   Defendant showed you from the attic?

25   A    They were not recovered from the attic.  There was a

1    black plastic case just outside the front door which he

2    gave to us and told us there were firearms in there.

3    Q    Do you have those with you today?

4    A    I do.

5    Q    How many of those were there?

6    A    There are five of them.

7    Q    Let me have you look at first of all the one that's

8    marked 310.  Could I have you show that to the jury.

9                    (Witness complies with request.)

10   Q    What type of handgun is that?

11   A    This is a Herrington and Richardson Model Premiere,

12   32 caliber revolver, serial number 348072.

13   Q    Herrington and Richardson, is that sometimes

14   referred to as a H & R?

15   A    Yes.

16   Q    And that was one of the guns that was in the case?

17   A    That's correct.

18             MR. OAKLEY:  Your Honor, at this time I move

19   to admit Government Exhibit 310.

20             MR. GRADERT:  No objection.

21             THE COURT:  It's received.

22   BY MR. OAKLEY:

23   Q    Let me have you show the jury what's been marked as

24   Government Exhibit 314.  Do you recognize that?

25   A    I do.  This is another firearm that was recovered

1    from the case.

2    Q   What type of firearm is that?

3    A   It is a Colt Police Positive 38 caliber revolver,

4    serial number 154162.

5              MR. OAKLEY:  Your Honor, move to admit

6    Government Exhibit 314.

7              MR. GRADERT:  No objection.

8              THE COURT:  It's received.

9    BY MR. OAKLEY:

10   Q   Let me have you show the jury Government Exhibit

11   311.  What type of handgun is that?

12   A   This is a Herrington and Richardson, or H & R, Model

13   73, 32 caliber revolver, serial number A P 115046.

14   Q   And, again, that was in the case?

15   A   It was.

16             MR. OAKLEY:  Your Honor, at this time I move

17   to admit Government Exhibit 311.

18             MR. GRADERT:  No objection.

19             THE COURT:  It's received.

20   BY MR. OAKLEY:

21   Q   And let's show the jury Government Exhibit 313.  Do

22   you recognize that?

23   A   I do.  This is another firearm recovered from the

24   case.  It's a Rossi Model 68 revolver, 38 caliber,

25   serial number D 251494.

```
 1            MR. OAKLEY:  Your Honor, at this time move to
 2   admit Government Exhibit 313.
 3            MR. GRADERT:  No objection.
 4            THE COURT:  It's received.
 5   BY MR. OAKLEY:
 6   Q    Were you able to test fire the handguns?
 7   A    I was.
 8   Q    And did they all test fire as designed?
 9   A    I believe so.
10   Q    You said looking at your notes would help you
11   refresh your recollection?
12   A    Yes.
13   Q    Are your notes at the table?
14   A    Yeah.  They're under the manila envelope.
15            MR. OAKLEY:  Your Honor, can the witness come
16   down and get his notes?
17            THE COURT:  Sure.
18                  (Witness complies.)
19   A    According to my report, three of the firearms
20   recovered that day were either unsafe to test fire or we
21   didn't have the correct caliber of ammunition.  The rest
22   test fired.
23   Q    And that's -- out of the total, you test fired all
24   except for three?
25   A    That's correct.
```

1   Q    And that's because either you felt they were too

2   unsafe or you didn't have the right ammunition?

3   A    That's correct.

4   Q    I think I may have actually missed a --

5   A    Yes.  There's one more firearm.

6   Q    There was one more.  And that's been marked as 306.

7   What type of weapon is that?

8   A    This is a Derringer and it looks kind of funny right

9   now because of the way I've got it secured open.  But

10  were I to cut the plastic here, there are two barrels

11  here that would rotate down and then I'm holding the

12  handle and the barrels would be pointing that way.

13  Q    Is a Derringer a handgun or considered a long gun

14  or --

15  A    It's considered a pistol, a handgun.

16  Q    Handgun.  And what's the, I guess, the make and

17  model of that?

18  A    This is a Rohm model RG 15, 22 caliber Derringer,

19  serial number 40555.

20  Q    When you say Derringer, that's not a brand.  That's

21  the type of handgun that it is?

22  A    That's correct.

23          MR. OAKLEY:  Your Honor, move to admit

24  Government Exhibit 306.

25          MR. GRADERT:  No objection.

```
 1            THE COURT:  It's received.
 2  BY MR. OAKLEY:
 3  Q   You said you also found some drugs and paraphernalia
 4  at the Defendant's house.  Do you have those with you?
 5  A   I do.
 6  Q   Let's talk about that.  I'm going to hand you first
 7  of all what's been marked as Government Exhibit 301.
 8  Can you tell us what that is?
 9  A   This is a heat sealed bag containing a plastic baggy
10  containing a green leafy substance that tested positive
11  for marijuana.
12  Q   And where was that found?
13  A   This was in a small box that looked like a book, I
14  believe, on the kitchen table of the residence.
15            MR. OAKLEY:  Move to admit Government Exhibit
16  301.
17            MR. GRADERT:  No objection.
18            THE COURT:  It's received.
19  BY MR. OAKLEY:
20  Q   Let me talk to you about the box that looked like a
21  book that this was found in.  Do you have that?
22  A   I do.  It's Government Exhibit 315.
23  Q   315.  And could you explain for the jury what that
24  is.
25  A   That's a wooden box that's designed to look like the
```

1  novel Huckleberry Finn and it's hollowed out on the

2  inside so you can put things in it and hide it on your

3  book shelf and people don't know that your valuables or

4  whatever are in it.

5  Q   Where did you guys find that?

6  A   I believe it was on the kitchen table that was

7  containing the marijuana.

8  Q   Then did you guys have to open it or was it already

9  open?

10  A   I don't remember.

11  Q   But it wasn't on a book shelf or hidden in any way?

12  A   No.

13         MR. OAKLEY:  Your Honor, move to admit

14  Government Exhibit 315.

15         MR. GRADERT:  No objection.

16         THE COURT:  It's received.

17  Q   Did you also find some pills?

18  A   We did.  That's Government Exhibit 302.

19  Q   And where did you find those?

20  A   I don't remember the exact location in the

21  residence.  It was either in the living room or in the

22  kitchen.

23  Q   How do you know the item that you have in front of

24  you is the same pills that you found at the Defendant's?

25  A   Because when we recovered all the evidence from the

1    residence, we took it all with us back to the ATF office

2    in one, you know, box or bag or whatever, and I then

3    secured the item in this heat sealed bag that's got

4    my -- the case number, my name, badge number, date and

5    signature on it.

6              MR. OAKLEY:  Your Honor, at this time move to

7    admit Government Exhibit 302.

8              MR. GRADERT:  No objection.

9              THE COURT:  It's received.

10   BY MR. OAKLEY:

11   Q   You said that you talked to the Defendant about the

12   firearms and drugs.  Let's first of all talk about the

13   firearms.  Did he ever tell you where he got those from?

14   A   I don't believe he did.  After we recovered the

15   evidence, we transported it, as well as Mr. Gehringer,

16   back to our office.  And we did not arrest Mr. Gehringer

17   at the time.  We asked him if he would want to come to

18   the office to talk to us.  And this was along the lines

19   of determining who his buyers and who his suppliers

20   were.  So we brought him back to the office and

21   discussed with him things that, you know, such as where

22   he gets his drugs, who he sells it to, where did the

23   firearms come from, does he know if any of them are

24   stolen, those kind of questions.

25   Q   Did he provide you with that information?

1    A    Not really.  Nothing very specific.  He gave us a

2    couple names of individuals who we knew also used and

3    dealt narcotics.  I don't believe he told us where he

4    recovered or where he got any of the firearms from.

5    Q    Did the Defendant ever tell you that he was a drug

6    dealer?

7    A    I don't believe so on this date.  I think we assumed

8    it and spoke to him in a context, you know, that we

9    wanted to know where he got his drugs from and who he

10   provided drugs to.

11   Q    He told you that he was a drug user?

12   A    He did.

13   Q    You said the Defendant wasn't arrested.  Why not?

14   A    Well, as we explained to the Defendant on that day,

15   we are always trying to find, you know, the next guy up

16   in the food chain, you know, the guy who's pushing more

17   weight than the guy that we've got or the guy who's

18   dealing in more firearms or, I guess, you know, machine

19   guns and that kind of nature, the next guy up.  So we

20   discussed that with him and we offered him the chance

21   to, you know, inform for us, to work with us in

22   identifying and then bringing for prosecution these

23   people who are, you know, supplying him with guns and

24   drugs.  At the end of our conversation that night I

25   think we gave -- I think we gave Todd a ride back to his

1    home or somewhere of his choosing and I provided him

2    with my contact information and asked him to stay in

3    contact with me and if he knew of anyone or found anyone

4    who was selling or would provide him with firearms or

5    drugs, to contact me so that we could then take law

6    enforcement action on that.

7    Q   Did he ever contact you after that day?

8    A   I believe two or three weeks later he called me

9    because somebody had stolen his truck and wanted some

10   help from me on that and I wasn't able to provide him

11   with any assistance.

12   Q   Did he tell you anything about any guns or drugs?

13   A   He did not.

14   Q   Just the truck.  As the case agent in this case,

15   have you had an opportunity to look at the evidence that

16   was collected by the Wichita Police Department?

17   A   I have.

18   Q   And would that include the firearms that were

19   collected?

20   A   Yes.

21   Q   I want to hand you what's already been admitted into

22   evidence as Government Exhibit 201.  Do you recall, was

23   this the firearm that was found in the Homeland parking

24   lot in the truck?

25   A   This was.  According to the Wichita Police

263

1    Department chain of custody.

2    Q    And can you tell us what type of firearm that is?

3    A    This is a Cobra Enterprises Model CA 32, 32 caliber

4    pistol, serial number C P 021804.

5    Q    And is that what's commonly referred to as a semi

6    automatic pistol?

7    A    Yes.

8    Q    Now, when someone is going to fire a semiautomatic

9    pistol, how do you get a round into the gun so that it

10   will shoot?

11   A    You have to have a round in the magazine of the

12   firearm and the magazine inserted into the handle of the

13   firearm.  You then pull the slide -- if you're pointing

14   the gun away from you, you pull the slide towards you to

15   allow the mechanism in the firearm to bring the round of

16   ammunition from the magazine into the chamber of the

17   firearm so it can be fired.

18   Q    Okay.  So assuming that there are ammunition in the

19   magazine and the magazine is in the gun, how easy is it

20   to fire the handgun?

21   A    Very.  All you need to do is, you know, like I said,

22   bring the weapon up, point it, pull the slide back and

23   you're ready to fire the weapon.

24   Q    Have you also had a chance to look at the guns that

25   were found during the May 25th search warrant that the

1   Wichita Police Department executed at the Defendant's

2   house?

3   A   I did.

4   Q   Let me show you --

5              MR. OAKLEY:   Your Honor, may the witness come

6   down and make sure I get the right gun.  Let me have you

7   step down and get those guns.

8                        (Witness complies with request.)

9   Q   Let me talk to you first of all about what's already

10  been admitted into evidence as Government Exhibit 402.

11  Do you know what type of shotgun that is?

12  A   This is a High Standard Model 200, 12 gauge shotgun

13  with no serial number.  It's also marked with a brand

14  name of JC Higgins Model 20, Sears and Robuck.

15  Q   Let me talk to you about another one of the guns

16  that was found on May 25th that's already been admitsed

17  into evidence as Government Exhibit 403.  What type of a

18  long gun is that?

19  A   This is a Savage Arms Model 94, 12 gauge shotgun

20  with no serial number.  This is also marked with a brand

21  name of J C Higgins Model 101.1, Sears and Robuck.

22  Q   Finally let's talk about the last long gun that was

23  found during that search warrant.  This has been

24  admitted into evidence as Government Exhibit --

25  A   401.

 1    Q    -- 401.  What type of long gun is that?

 2    A    This is a Marlin Firearms Model 336, Zane Grey

 3    Century rifle, Elder, 30/30, serial number ZG 04127.

 4    Q    Let me now talk to you about December 3rd, 2007.

 5    Were you involved in a search warrant that was executed

 6    at the Defendant's house on that date?

 7    A    I was.

 8    Q    Now, was that an ATF search warrant?

 9    A    It was.

10    Q    Was WPD initially involved in that search warrant?

11    A    They were.  Two of the officers on the Wichita

12    Police Department SCAT South team called me at

13    approximately 11:00 on Sunday night and said that they

14    had arrested an individual who was providing information

15    to them that the Defendant Mr. Gehringer had several

16    stolen firearms at his residence and he was getting

17    ready to trade those firearms for narcotics.  The

18    individual that they had arrested was involved in this

19    transaction in some way.

20    Q    So based upon that, you obtained a search warrant?

21    A    Yes.

22    Q    And the search warrant was for the Defendant's

23    residence?

24    A    It was.

25    Q    And what was that address?

1    A    622 North Tracy in Wichita, Kansas.

2    Q    And, again, that's the same one that you were at in

3    February?

4    A    Correct.

5    Q    Now, what was your involvement in the execution of

6    the search warrant?

7    A    I was -- had it gone according to plan, I would have

8    been on the entry team that secured the residence and

9    then I would have been there to kind of direct the

10   searching of the residence.  As it turned out, I was in

11   the judge's chambers having the warrant signed when

12   Agent Gravatt and Task Force Officer Bradford contacted

13   Mr. Gehringer and the foot chase ensued.

14   Q    And so while that was going on, you were getting the

15   warrant signed -- you got the warrant signed?

16   A    I did.

17   Q    And then did you go over to execute the warrant?

18   A    I did.

19   Q    Now, was there anyone at the house on Tracy when you

20   guys executed the warrant?

21   A    Yes.  Mr. Gehringer's significant other Dana Elwell

22   was there with their child.

23   Q    Did you do anything in the execution of the search

24   warrant at the house?

25   A    I interviewed Ms. Elwell.  I did not -- I did not

1    search any portion of the residence.

2    Q   At some point did Agent Gravatt and TFO Bradford get

3    consent to search a storage unit?

4    A   Yes.  I was present for this also.  Once I was

5    finished interviewing Ms. Elwell, I traveled back to the

6    Wichita field office and sat in on the interview for a

7    short time with Mr. Gehringer, Agent Gravatt and Task

8    Force Officer Bradford, and at that time we sought

9    consent from Mr. Gehringer to search the storage unit

10   that we knew that he maintained on west Douglas.

11   Q   That's here in Wichita?

12   A   It is.

13   Q   In the district of Kansas?

14   A   Yes.

15   Q   When the Defendant gave you consent to search that

16   storage unit, did he give you anything else that would

17   allow you to get into the unit?

18   A   He gave us the keys to the man door of the storage

19   unit as well as the overhead door of the storage unit.

20   He also gave us the access code for the gate to the

21   storage unit property.

22   Q   And so in order to actually get up to the unit,

23   there's a gate?

24   A   Yes.

25   Q   And he gave you the code for that gate?

1    A    Yes.

2    Q    And then for the storage unit itself, how was it

3    secured?

4    A    I believe there was a padlock on the -- I think

5    there was a padlock on the man door and the overhead

6    door -- or maybe it was a deadbolt on the man door and

7    padlock on the overhead door.

8    Q    But he gave you a key for both doors?

9    A    Yes.

10   Q    I'm going to show you what's been marked as

11   Government Exhibit 513-A and ask you if you recognize

12   that?

13   A    I do.

14   Q    What is that?

15   A    This is a picture of the front of the storage unit

16   that Mr. Gehringer rented with the man door and the

17   overhead door open.

18   Q    Did you do anything else to verify that that storage

19   unit belonged to the Defendant?

20   A    Yeah.  On a couple occasions prior to this, as well

21   as on this date, I contacted the site manager for this

22   storage unit complex who verified to me that

23   Mr. Gehringer was renting the storage unit and paying

24   the bills on it.

25   Q    I'm going to hand you what's been marked as

269

1    Government Exhibit 503-A.  Do you recognize that?

2    A   I do.  This is a copy of the storage rental

3    agreement that the storage facility provided to me at

4    which time Gehringer signed for unit G-9 in their

5    storage unit.

6            MR. OAKLEY:  Your Honor, at this time I'd move

7    to admit Government Exhibit 503-A.

8            MR. GRADERT:  No objection.

9            THE COURT:  It's received.

10   Q   Let me talk to you about the picture.  Again, you

11   said that was the storage unit.  Is that photograph a

12   fair and accurate depiction of the way the storage unit

13   appeared to you?

14   A   It is.

15           MR. OAKLEY:  Your Honor, move to admit

16   Government Exhibit 513-A.

17           MR. GRADERT:  No objection.

18           THE COURT:  It's received.

19   BY MR. OAKLEY:

20   Q   About how big was this storage unit?

21   A   According to the rental agreement, it is 20 feet by

22   34 feet in size.

23   Q   How full was it?

24   A   Extremely.

25   Q   Before you guys went in to search the storage unit,

1  did you talk to the Defendant about what you were

2  looking for in there?

3  A   We did.  We informed him that we were looking for

4  some firearms that were reported stolen that we believed

5  him to be in possession of.  We described the firearms

6  generally to him and he stated he did have firearms like

7  that.  He identified a location behind this, and this

8  was -- he drew this, drew a diagram out for us.  And

9  stated there was -- just inside the front door there was

10  a board or something leaning up against some other stuff

11  and underneath that or behind that was a green knap sack

12  which contained handguns.  Then he also said there was a

13  wooden cabinet which we found to be here that contained

14  numerous rounds of ammunition and military type smoke

15  grenades.

16  Q   Let me talk to you first of all about the

17  ammunition.  Did you find ammunition in there?

18  A   We did.

19  Q   How much ammunition did you find?

20  A   Over 4500 rounds of ammunition of all different

21  calibers.

22  Q   You said that the Defendant said there would be

23  smoke, military grade smoke grenades in there?

24  A   Yes.  And we found several of those as well.

25  Q   Were they at the same location the Defendant told

271

1    you they would be?

2    A   They were.

3    Q   You said that behind the board that he said there

4    would be guns.  Did you find guns there?

5    A   We did.  There was a green backpack there with

6    several handguns in it.

7    Q   I'm going to hand you this box.  Do you recognize

8    any of the items that are in there?

9    A   Yeah.  The box contains items that were recovered

10   both from the storage unit as well as from his residence

11   on December 3rd of '07.

12   Q   I want to talk to you about the things that were

13   found at the storage unit because that's where you were

14   involved in.  Correct?

15   A   Correct.

16   Q   Okay.  Do you see the guns that you found from the

17   storage unit in there?

18   A   I do.

19   Q   Let's talk about those.  First I'm going to hand you

20   what's been marked as Government Exhibit 509-A.  Do you

21   recognize that?

22   A   I do.  This is 505 A.

23   Q   Excuse me.  505 A.  What is that?

24   A   This is a Ruger Model Redhawk 44 caliber revolver,

25   serial number 500-10674, that was recovered from that

1    backpack.

2    Q    That's a 44 caliber Redhawk?

3    A    Yes.

4            MR. OAKLEY:  Your Honor, at this time I'd move

5    to admit Government Exhibit 505-A.

6            MR. GRADERT:  No objection.

7            THE COURT:  It's received.

8    BY MR. OAKLEY:

9    Q    Going to show you what's been marked as Government

10   Exhibit 505-B.  Do you recognize that?

11   A    Yes.  This is another firearm recovered from the

12   backpack.  This is a Ruger Model Blackhawk, 45 caliber

13   revolver, serial number 46-78409.

14           MR. OAKLEY:  Your Honor, move to admit

15   Government Exhibit 505-B.

16           MR. GRADERT:  No objection.

17           THE COURT:  It's received.

18   BY MR. OAKLEY:

19   Q    Let's talk about 505-C.  Do you recognize that?

20   A    Yes.  This is another firearm from the backpack.

21   This is a Ruger Model Blackhawk 357 Salero, serial

22   number 35-344 -- it's a 357 caliber, serial number

23   35-34432.

24           MR. OAKLEY:  Your Honor, move to admit

25   Government Exhibit 505-C.

273

1          MR. GRADERT:  No objection.

2          THE COURT:  It's received.

3  Q   Talk about 505-D?

4  A   This is another Ruger model Blackhawk 357 caliber

5  revolver, serial number 32-47482.

6          MR. OAKLEY:  Your Honor, move to admit

7  Government Exhibit 505-D.

8          MR. GRADERT:  No objection.

9          THE COURT:  It's received.

10 Q   There were two Ruger 357 Blackhawks but, obviously,

11 they have different serial numbers?

12 A   Correct.

13 Q   Let's talk about 505-E.  What is that?

14 A   This is a Smith and Wesson, Model 60, 38 caliber

15 revolver, serial number 45619.

16         MR. OAKLEY:  Your Honor, move to admit

17 Government Exhibit 505-E.

18         MR. GRADERT:  No objection.

19         THE COURT:  It's received.

20 BY MR. OAKLEY:

21 Q   Finally, let's talk about 505-F.

22 A   This is a Llama Model IX-A 45 caliber pistol, serial

23 number C 31340.

24         MR. OAKLEY:  Your Honor, move to admit

25 Government Exhibit 505-F.

274

1          MR. GRADERT:  No objection.

2          THE COURT:  It's received.

3   BY MR. OAKLEY:

4   Q   Are those all the hand guns that were found in the

5   bag?

6   A   They are.

7   Q   Were any of the handguns loaded?

8   A   I don't recall.  I would have to check my notes.

9   Q   Would looking at your notes help you refresh your

10  recollection?

11  A   Yes.

12              (Off-the-record.)

13  A   I don't believe any of the firearms were loaded.

14  Q   I'm going to hand you what's been marked as

15  Government Exhibit 513-B.  Do you recognize that

16  photograph?

17  A   Yes.  This is a photograph of the backpack that the

18  firearms were found in.

19  Q   Is that a fair and accurate depiction of the

20  backpack and the way that you found it?

21  A   It is.

22          MR. OAKLEY:  Your Honor, move to admit

23  Government Exhibit 513-B.

24          MR. GRADERT:  No objection.

25          THE COURT:  It's received.

1    Q    In this photograph can you use that laser pointer

2    and show the jury where the bag was found?

3    A    This is the backpack right here.  Here's the board

4    or the wood panel that we had to lean away from it in

5    order to find it.

6    Q    That was actually leaning up and you guys had to

7    move it?

8    A    Yes.

9    Q    I'm going to hand you what's been marked as

10   Government Exhibit 513-C.  Do you recognize that?

11   A    I do.  This is a photograph of the handguns that we

12   recovered and the gun cases that we recovered as well as

13   some other firearms related items.

14   Q    And so when you found the guns in the bag, were they

15   in cases themselves?

16   A    Most of them were, yes.

17   Q    Is that photograph a fair and accurate depiction of

18   the way the guns appeared when you guys took them out of

19   the bag and out of the cases?

20   A    It is.

21        MR. OAKLEY:  Your Honor, move to admit

22   Government Exhibit 513-C.

23        MR. GRADERT:  No objection.

24        THE COURT:  Received.

25

1    BY MR. OAKLEY:

2    Q   And that's the -- you guys obviously had to unzip

3    the cases and lay the firearms out in order to take that

4    picture?

5    A   Correct.

6    Q   You said that there was ammunition that was found.

7    I'm going to hand you what's been marked as Government

8    Exhibit 513-D.  Do you recognize that photograph?

9    A   I do.  This is a photograph of ammunition cans which

10   contained both ammunition as well as the military type

11   smoke grenades.

12   Q   Is that the way that that ammunition appeared when

13   you guys found it.

14   A   Yeah.  Once we removed it from the cabinet and

15   opened up some of the ammo cans.

16   Q   And so that's kind of like the previous picture that

17   you guys set that out and took the photograph.  That's

18   not where you found them?

19   A   Correct.

20            MR. OAKLEY:  Your Honor, move to admit

21   Governmnet Exhibit 513.

22            MR. GRADERT:  No objection.

23            THE COURT:  It's received.

24   BY MR. OAKLEY:

25   Q   Those cans that are on the left of that picture, do

1    you know what type of cans those are?

2    A    Those are military type ammunition cans.

3    Q    Do they all contain ammunition?

4    A    No.  This one right here, those circles in there,

5    those are the tops of the smoke grenades.  Those are the

6    little canisters which contain smoke grenades also.

7    Q    Did the -- it looks like there are four cans that

8    are closed.

9    A    I believe those contained ammunition.

10   Q    I'm going to hand you what's been marked as

11   Government Exhibit 513-E.  Do you recognize that

12   photograph.

13   A    I do.  This is a closer up photograph of the

14   previous photograph.

15   Q    Is that a fair and accurate depiction of the -- I

16   guess you can see the smoke grenades in that photograph?

17   A    Yes.

18   Q    Is that a fair and accurate depiction of the way

19   those items appeared in which you guys laid them out?

20   A    Yes.

21          MR. OAKLEY:  Your Honor, move to admit

22   Government Exhibit 513-E.

23          MR. GRADERT:  No objection.

24          THE COURT:  Received.

25

1    BY MR. OAKLEY:

2    Q   Again, this is just I guess a view of the same ammo

3    cans as we saw earlier, just a close-up of the smoke

4    grenades and the boxes of ammunition?

5    A   Yeah.  Here you can see the smoke grenades here and

6    here.  And this box contained ammunition as well as that

7    one.  And those are boxes of ammunition.  And here are

8    canvas pouches that contain ammunition also.

9    Q   Were they all the same caliber of ammunition?

10   A   No.  There were several different caliber types.

11   Q   You said the Defendant told you where you could find

12   the ammunition and the guns.  Did you guys search

13   anything else in the storage unit?

14   A   Yeah.  We searched the entire storage unit.

15   Q   Did you find anything else?

16   A   I don't believe so.  No.  We, we did find some

17   property that we believed to be stolen and we notified

18   the Wichita Police Department burglary section and they

19   came down and took a look at some of that stuff also.

20   Q   But you weren't involved in that?

21   A   No.

22   Q   And you don't know whether or not that property,

23   whether it was stolen or how it was stolen or anything

24   about that property?

25   A   I don't.

1    Q    You said that initially that you guys were looking

2    for stolen firearms.  Were you ever able to ascertain

3    whether or not any of the firearms that you collected

4    were in fact stolen?

5    A    Yes.  I believe all six of the handguns we recovered

6    from the storage unit were stolen in a residential

7    burglary here in Wichita, Kansas.

8    Q    Do you know when they were reported stolen?

9    A    I would have to check my notes for the exact date;

10   but it was late October that they were reported.

11   Q    Of what year?

12   A    Of 2007.

13   Q    Do you know who stole the firearms?

14   A    I don't.

15            MR. OAKLEY:  No further questions, Your Honor.

16            THE COURT:  What do you say we take our noon

17   recess.  Are you going to be a long time?

18            MR. GRADERT:  I'll be longer than ten or 15

19   minutes probably, Judge.

20            THE COURT:  I think it would be a good time to

21   take our noon recess and we'll take a recess until 1:00.

22   Ladies and Gentlemen.  Rememer and heed the admonition

23   please.  You're excused.

24                 (Jury excused for noon recess.)

25            THE COURT:  Be seated.  We're really moving

280

1    along here.  How many more witnesses do you think you'll

2    have?  I've been keeping track on your witness list

3    but --

4            MR. OAKLEY:  I think now we'll have the three

5    chemists and Wes Williamson.  I believe that we've

6    entered into a stipulation on the interstate nexus that

7    will not require us to call Neal Tierney.

8            MR. GRADERT:  That's correct, Your Honor.

9    I've explained very carefully to Mr. Gehringer that the

10   fact that these firearms have been transported across

11   state lines at one time or another is not really at

12   issue here.  Well, at least we're not disputing that

13   they have been.

14       Mr. Gehringer, we modified the stipulation to make

15   sure that it didn't appear that Mr. Gehringer had

16   transported them across state lines so it doesn't state

17   that; but I believe Mr. Gehringer is okay with that.  He

18   has executed the document and I've executed the document

19   today as well.

20           THE COURT:  Well, let me talk to him about

21   that.  Mr. Gehringer, of course, you don't have to

22   stipulate to anything in a case like this.  You can make

23   the Government prove that the firearms crossed state

24   lines.  The Government does not have to prove that you

25   took them across state lines.  Or you can, as you

```
1    apparently have decided, to agree that they have moved

2    across state lines before you possessed them.  That's

3    entirely up to you.  Is it your decision to stipulate?

4                DEFENDANT MR. GEHRINGER:  Yes, sir.  I believe

5    it would be a waste of the Court's time to mess with, to

6    hassle.

7                THE COURT:  Well, I agree with you a hundred

8    percent; but it's still your right to make the

9    Government --

10               DEFENDANT MR. GEHRINGER:  It's irrelevant.  I

11   mean, it's -- there's no gun manufacturers here in

12   Kansas that I know of and it would be a waste of the

13   Court's time, and the point of --

14               THE COURT:  I appreciate that and that you're

15   saving time.  Now, Mr. Gradert indicated in his opening

16   statement that you intend to testify.

17               DEFENDANT MR. GEHRINGER:  Yes, sir.

18               THE COURT:  And that will be up to you and

19   Mr. Gradert at the time, when the time comes; but, for

20   now, so I don't have to send the jury out at the time,

21   you understand that you do not have to testify and that

22   if you do not, I will instruct the jury that that can't

23   be held against you.

24               DEFENDANT MR. GEHRINGER:  I believe it would

25   be in my better interest if I did testify, Your Honor.
```

1    I think it would be detrimental if I didn't.

2              THE COURT:  All right.  So that's your

3    decision.

4              DEFENDANT MR. GEHRINGER:  Yes, sir.

5              THE COURT:  All right.  Fair enough.

6              DEFENDANT MR. GEHRINGER:  Not coerced.  Fully

7    voluntarily.

8              THE COURT:  Thank you very much.  You may be

9    seated.

10        I've given you my instructions.  I'll add an

11   instruction in there about the stipulation because I had

12   taken that out.  I didn't know you were going to

13   stipulate.  But we may have time to go over the

14   instructions today.  But I don't think we'll probably be

15   able to have closing argument today.  So let's take our

16   lunch recess and we'll see how far we go this afternoon.

17             MR. OAKLEY:  Your Honor, would you like the

18   signed, executed stipulation?

19             THE COURT:  Well, no.  How do you want to do

20   that?  Do you want to read it into the record and then

21   mark it as an exhibit?

22             MR. OAKLEY:  We'll mark it as an exhibit.

23             THE COURT:  That would be fine.

24             MR. GRADERT:  That would be fine, Your Honor.

25                  (Noon recess.)