```
 1              THE COURT:  All right.  Next witness please.
 2    Oh, sorry.  We'll have cross-examination of Mr. Jones.
 3                      CROSS EXAMINATION
 4    BY MR. GRADERT:
 5    Q   Mr. Jones, you indicated that this investigation or
 6    that at least some investigation of Mr. Gehringer
 7    started back in July of 2006; correct?
 8    A   That's correct.
 9    Q   And you were present when you went out to talk to
10    Mr. Gehringer about that?
11    A   I was.
12    Q   And that -- you had some information provided by
13    somebody that Mr. Gehringer might know something about
14    some guns from a burglary in the Whitewater, Kansas,
15    area; is that correct?
16    A   Yeah, Harvey County.
17    Q   And it was believed that that burglary was done by
18    somebody named Barry Fillman?
19    A   Yes.
20    Q   And Mr. Fillman was prosecuted here in federal
21    court?
22    A   He was.
23    Q   Got a 20 year sentence?  20 plus years?
24    A   I don't remember for sure, but, yeah.
25    Q   Okay.  In the course of all of your investigations
```

1    of Mr. Gehringer, did you ever find any of the guns

2    taken from that burglary that Mr. Fillman apparently had

3    done?

4    A    No.  We recovered -- I think of 13 guns, we

5    recovered all but two of them.  None of them from

6    Mr. Gehringer.

7    Q    So when you went back in February, that was one of

8    your reasons for going back was to just double check to

9    see if he might have those last two stolen guns; is that

10    right?

11    A    That and to open up conversation with him.

12    Q    Okay.  Now, when you get information from these

13    informers, are they people that just come to you out of

14    the clear blue and say, hey, I want to help you with an

15    investigation?

16    A    Not generally.  That does happen.  Most of the time

17    we arrest them for some charge and allow them the

18    opportunity to tell their side of the story and to

19    improve their, their chances of prosecution.

20    Q    Yeah.  Because they get a reduced sentence

21    sometimes.  Sometimes they don't even get charges if

22    they cooperate.  Correct?

23    A    Depending on their level of cooperation, yes.

24    Q    And you, as an experienced law enforcement officer,

25    you deal with those kind of people very carefully, don't

285

1    you?  Because sometimes they lie to save themselves; is

2    that correct?

3    A    Sure.

4    Q    And let me ask you this, back in July of 2006, Todd,

5    Mr. Gehringer let you search the residence; is that

6    correct?

7    A    As far as I remember.  I was not -- I was not in the

8    residence and in Todd's presence for the initial

9    conversation.  I arrived on the scene shortly afterward

10   and my coworkers were already in the residence looking

11   around.

12   Q    Okay.  On that date there were no guns found as I

13   understand it?

14   A    Not that I'm aware of.

15   Q    Okay.  There was some cocaine found, though; is that

16   correct?

17   A    I believe so, yes.

18   Q    But he was never arrested for the cocaine or -- at

19   all on July -- in July, 2006, was he?

20   A    Not by us, no.

21   Q    And as far as you know, he was never charged with

22   that cocaine that he supposedly had?

23   A    No.  Task Force Officer Barrier was with us at that

24   time and as a task force officer from the Wichita Police

25   Department, he took custody of the narcotics that we

1    seized on that date, entered them into Wichita Police

2    Department custody.  Because at the time we did not have

3    a nexus to firearms to charge Mr. Gehringer through, you

4    know, the ATF.

5    Q    So if there aren't firearms involved with the drugs,

6    then it doesn't become an ATF investigation?

7    A    Technically our jurisdiction is over the Gun Control

8    Act and the National Firearms Act.  We do not have

9    jurisdiction over Controlled Substances Act.  We do have

10   jurisdiction over narcotics as they relate in a couple

11   different charges to firearms.  At the time, we did not

12   have any firearms at Mr. Gehringer's residence.  We

13   didn't even have, I don't believe, a weight necessary

14   for federal prosecution of the narcotics.  So Task Force

15   Officer Barrier took the narcotics, turned it in to the

16   Wichita Police Department property and evidence and then

17   I assumed he was going to seek prosecution on the state

18   level for Gehringer for those narcotics.

19   Q    Do you know if that was ever done?

20   A    I don't believe so, no.

21   Q    In order to get -- when you encountered

22   Mr. Gehringer on that incident, was he outside also?

23   A    If I remember correctly, we didn't find him at his

24   residence.  We found him on the other side of town.

25   Talked to him --

```
 1   Q    That's right.  I remember you went to the residence
 2   and Ms. Elwell was there and she contacted him and then
 3   he got ahold of you and met you; correct?
 4   A    I can't remember.  I remember finding him in a
 5   parking lot out on the west side of town, speaking to
 6   him -- and I didn't actually speak to him.  I was in my
 7   car away from the meeting just, you know, watching the
 8   officers who were talking to him, watching their back.
 9   Q    But then it was after that that you went back to the
10   house and he let you search; right?
11   A    Yes.
12   Q    And he gave you his permission to look for those
13   things; correct?
14   A    Look for?
15   Q    To look for the guns that you were looking for,
16   stolen guns?
17   A    Yeah.  As far as I know.
18   Q    Did anyone tell Mr. Gehringer that you weren't there
19   for anything except guns?
20   A    I don't know.  I was not present for most of the
21   conversation with Mr. Gehringer.
22   Q    Okay.  So in order to get him to agree to search, he
23   wasn't promised that he wouldn't be prosecuted in any
24   way?
25   A    I have no knowledge of that.
```

1    Q    Okay.

2    A    I know that's not --

3    Q    You're not saying it wouldn't have happened or

4    couldn't have happened?

5    A    That is not our practice to make promises of that

6    nature to anyone we contact.

7    Q    Okay.  During the course of that July meeting,

8    Mr. Gehringer did tell you that this Fillman person did

9    try to come to him and sell him guns, didn't he?

10   A    I believe he said that, yes.

11   Q    And he indicated that he didn't want to do that;

12   correct?

13   A    I believe so.

14   Q    And then it was after that that he let you look?

15   A    Yes.

16   Q    Okay.  Going back to the informers.  If they're on

17   probation or parole, are there guidelines that you have

18   to work with or let the courts or the probation or the

19   parole office know that you're working with an

20   informant?

21   A    Yeah.  We, if they're on some type of supervised

22   release, we need permission from their supervising

23   officer and generally their supervisor in order for them

24   to sign up, as we call it, with us and become a

25   registered informant for us.

1  Q   Do you know if the informer or informers that were

2  used in the July incident were on probation or parole?

3  A   I don't know.  I'm not exactly sure where that

4  information came from.  That was not my investigation.

5  I was there to assist the other officers.  I know if

6  someone wants to provide information of criminal

7  activity to us, whether or not they're on probation or

8  parole makes no difference.  It's when we -- well, it's

9  when we document them as an informant and then have

10  them -- instruct them to make contact with the criminal

11  element in order to arrange for firearms and/or

12  narcotics purchases, at that point if they are on

13  probation or parole, we then need permission to work

14  with that individual.  But for someone who, you know, we

15  contact in an interview or interrogation situation, if

16  they want to provide information to us of other criminal

17  activity, we don't need to seek permission from their

18  supervising officers in order to obtain that

19  information.

20  Q   Okay.  You're familiar with what a controlled buy or

21  a controlled sale is, aren't you?

22  A   Yes.

23  Q   And the alcohol, tobacco and firearms agency

24  utilizes those to sometimes discover the commission of

25  crimes; correct?

1    A   I don't know if I use the word discover.  I mean,

2    we -- if we have, you know, information from an

3    informant, an informant says that he can purchase

4    firearms or narcotics, we will arrange to do that, you

5    know, in a way that fits with our guidelines and

6    policies so that we can then, you know, it's one way to

7    obtain evidence of criminal activity is to have an

8    undercover or an informant make a purchase of a

9    controlled substance or a contraband item from an

10   individual.

11   Q   And the kinds of things you would be looking for --

12   well, let me -- I said controlled buys and controlled

13   sales.  If ATF is working in an undercover capacity or

14   through an informant and they sell, for example, or

15   offer to sell drugs in exchange for guns or money or

16   whatever, it's okay for you to do that.  Is that

17   correct?

18   A   Yes.  We are allowed to sell narcotics or firearms

19   to the criminal element as long as that person is not

20   allowed to leave the scene of that transaction with

21   those items.  So if we were to do that, if we were to

22   sell a firearm to a prohibited person, there would be an

23   arrest made immediately concluding that transaction.

24   Q   Okay.  And sometimes you use the informant but

25   sometimes you'll get the informant to maybe introduce

1   somebody in an undercover capacity so that you can kind

2   of cut the informant out and law enforcement can get

3   involved directly.  Is that correct?

4   A    Sure.

5   Q    That way the informant doesn't have to be a witness?

6   A    Correct.

7   Q    It also takes them out of the risk; correct?

8   A    Correct.

9   Q    Okay.  Did you -- I mean, you believed that

10  Mr. Gehringer was involved in the sale or the purchasing

11  of firearms; is that correct?

12  A    Correct.

13  Q    Did you make any attempts to do a controlled sale of

14  firearms to him?

15  A    We did not.  We did not have an informant who was

16  willing to do that for us, who was willing to introduce

17  an undercover to Mr. Gehringer.  We did not have an

18  informant who was willing to go in and buy from

19  Mr. Gehringer.

20  Q    Is it not possible to -- for somebody that's in the

21  regular business of buying and selling firearms, is it

22  impossible for somebody to just say, hey, I got

23  information from so and so that you're a guy that, you

24  know, might be able to work a deal with and --

25  A    Sure.  We call that a cold hit.  When you, you know,

1   just contact somebody kind of out of the blue and

2   attempt to make some conversation about criminal

3   activity and make a purchase or a buy.  The success rate

4   for that does not usually warrant the time that is spent

5   on those.  And being, you know, the Wichita field office

6   is a small office, we try to pick and choose our law

7   enforcement actions based on the most probable outcome.

8   So doing a cold hit just, in this case, didn't make

9   sense.  There's also a higher level of risk for whoever

10  we send in on that cold hit because the person we're

11  sending, you know, our undercover in on doesn't know

12  them and may be more suspicious of them than if someone

13  introduced them.

14  Q   By the way, when you do those undercover type

15  things, sometimes you don't utilize someone who looks as

16  clean cut as you, Agent Jones, do you?  Sometimes it's

17  somebody like Agent Williamson who has the long beard

18  and the earrings and long hair?

19  A   Yeah.  Usually, though, I mean, anything's possible;

20  but most narcotics and firearms undercover purchases are

21  not done in a suit and tie.

22  Q   The same thing about the drug issue.  You never did

23  buy any drugs from Mr. Gehringer through an informant

24  or --

25  A   No.

1   Q   And the same reasons?

2   A   Yeah.

3   Q   So really the only information that you had that he

4   bought or sold guns, or drugs, for that matter, was from

5   these other people that were already in some kind of

6   trouble?

7   A   That and other law enforcement officers who had had

8   contact with Mr. Gehringer, who had contact with, you

9   know, other people who they had arrested.  Basically

10  Mr. Gehringer had a reputation in Wichita as being

11  someone you could get dope from, somebody you could take

12  it to, someone you could take stuff to to, you know, to

13  sell or trade for dope.

14  Q   Okay.  In fact, we've heard some of that from some

15  of the officers in here from the West Patrol that they

16  had heard of him, or whatever.  They may not know him,

17  but they'd heard of him.  Correct?

18  A   Yeah.

19  Q   Todd was generally, other than the time when he ran

20  from Agents Bradford and Gravatt, he was generally

21  pretty cooperative with you when you came to talk to

22  him, wasn't he?

23  A   When I came to talk to him, yes, he was.  He had run

24  from law enforcement on several other occasions however.

25  Q   Okay.  Todd told you that he was a drug addict right

1    off the bat; correct?

2    A    Yeah.  Every time he was contacted by law

3    enforcement, he got around to telling us that.

4    Q    I was going to -- even the ones that you weren't

5    involved in.  Every time he got caught, he told 'em that

6    he was a drug addict, didn't he?  That's kind of

7    unusual, isn't it?

8    A    Yeah.  Not too many people come out and tell us

9    immediately that they're using drugs or they're addicted

10   to drugs.

11   Q    In your experience, do you think that he was like,

12   you know, crying out for some kind of help or something,

13   drug counseling?

14   A    I don't know.

15   Q    I mean, you guys really aren't interested in helping

16   anybody like that.  You're trying to get the guns off

17   the streets and the drugs off the streets.  Right?

18   A    My function and my training is not -- I'm not in a

19   position to assist with the treatment of narcotics

20   addiction.  That's not -- that doesn't mean we're not

21   interested in rehabilitating.  That just means that I am

22   not -- we don't have the capacity to do that in my

23   position.

24   Q    Okay.  By the way, back on -- in the July visit, I'm

25   assuming that Mr. Gehringer told you he was a drug

1   addict at that time, didn't he?

2   A   I don't know.  I was not present for those

3   conversations.

4   Q   You know if you or anyone else told him that it was

5   against the law to have guns and be a user of controlled

6   substances?

7   A   I don't know.

8   Q   You know that users of controlled substances -- I

9   think you told Mr. Oakley that it doesn't require you to

10  know that it's against the law.  Correct?

11  A   It's not an element of the crime, no.

12  Q   And that's one of the things that Judge is going to

13  tell the jury later on, that that's not an element of

14  the crime.  As you understand it; right?

15  A   I assume so.

16  Q   Okay.  How does somebody find out -- well, actually

17  there's a number of different kinds of people that are

18  prohibited from possessing firearms; is that correct?

19  A   There are nine different categories of prohibited

20  persons under the Gun Control Act.

21  Q   What are they?

22  A   Biggest ones we deal with are felon in possession

23  and user in possession.  Being an illegal immigrant.

24  Being a fugitive from justice.  Being adjudicated by a

25  judge as a mental defective.  Having renounced your

1    citizenship.  Having been court marshaled from the Army

2    or from the military.

3    Q    Domestic violence?

4    A    Yeah.  Having been convicted of a misdemeanor crime

5    of domestic violence.  Eight or nine.

6    Q    How does somebody find out that they're a prohibited

7    person?  I mean, with a felon, they're told usually when

8    they're convicted and they get sentenced that you can't

9    ever possess a gun again.  Right?

10   A    True.

11   Q    And they also can't possess ammunition, can they?

12   A    Yeah.  Under the Gun Control Act, possession of

13   ammunition carries the same weight as possession of a

14   firearm.

15   Q    And the same thing is true for all those categories

16   of people?  Including users?

17   A    Correct.

18   Q    So if Gehringer was in possession of ammunition, he

19   could be charged and convicted of that, too; correct?

20   A    I'm sorry.  Could you repeat the question?

21   Q    If Mr. Gehringer had been charged with possession of

22   ammunition --

23   A    Yes.

24   Q    -- it's your theory he could be convicted of that

25   because he's a drug addict; right?

1    A    Right.

2    Q    But he's not charged with any ammunition charges;

3    correct?

4    A    No, I don't believe so.

5    Q    Although he -- it appears that there was some ammo

6    found in his, maybe, storage unit?  Maybe some in the

7    house?

8    A    Yes.  We did recover ammunition.

9    Q    Do you know why he isn't charged with that?

10   A    That's -- you'd have to ask the U.S. Attorney's

11   Office.

12   Q    Okay.  I don't think he'll be a witness but -- do

13   you find very many people that -- I mean, does somebody

14   tell an illegal alien when he comes across the border

15   that they can't have a gun?

16        MR. OAKLEY:  Objection, Your Honor.

17   Relevance.

18        THE COURT:  Sustained.

19   BY MR. GRADERT:

20   Q    Do the people that -- do very many of the people

21   that you arrest and charge with being a user in

22   possession of a firearm indicate to you in any way that

23   they didn't know that was a violation of law?

24        MR. OAKLEY:  Same objection, Your Honor.

25        THE COURT:  Same ruling.

```
 1   BY MR. GRADERT:
 2   Q   Did Mr. Gehringer indicate to you that he didn't
 3   know that it was against the law?
 4           MR. OAKLEY:  Same objection, Your Honor.
 5           THE COURT:  Same ruling.
 6   Q   When you encounter somebody in Mr. Gehringer's
 7   situation and they may be in possession of some
 8   ammunition or firearms, is it discretionary with the ATF
 9   about whether or not they're going to arrest and pursue
10   charges against them?
11   A   Yes.
12   Q   And so back in February of '07 when you got those
13   firearms, you could have chosen to go ahead and
14   prosecute him for those right then and there; is that
15   correct?
16   A   I could have submitted the, you know, the case to
17   the U.S. Attorney's Office for prosecution right then
18   and there; and I would have, had I had everything
19   necessary to present that case, I would have.
20   Q   Okay.  Well, you had him saying he was a drug addict
21   and you had the guns so what more would you need?
22   A   I need reports from everybody involved in the
23   incident.  I need lab reports from the tests of the
24   narcotics to show that they are narcotics.  I need
25   interstate nexus determinations of the firearms.  I
```

```
1   would also, rather than sending the, you know, the case

2   up on Mr. Gehringer piecemeal, I wanted to have, you

3   know, each of the cases that had come before that ready

4   also and there were some things that I was still missing

5   from that.

6   Q   Okay.  When you have somebody that -- I mean, do you

7   know what the purpose of a user of controlled substances

8   in possession of a firearm law is even, really, based on

9   or why we have that law?

10  A   I didn't write the law.  I enforce it.

11  Q   Is it to keep somebody that may be whacked out on

12  drugs from having guns and doing something bad with

13  them?

14  A   I don't know the reasons for the passing of the law.

15  Q   Don't you think it would be a good idea to arrest

16  somebody that's, you know, got those guns and take 'em

17  off the street when you catch 'em with 'em?

18  A   Depends on the situation.  You know, if we can, if

19  we can get someone like Mr. Gehringer to work for us and

20  to then effect prosecution of more people because of his

21  cooperation, then it's gonna do us a lot more good to

22  have him, you know, out on the street, so to say,

23  cooperating with us than sitting in jail where he can't

24  really do anything.

25  Q   Okay.  Would you not agree that sometimes when you
```

300

1    make that kind of decision that that creates a little

2    bit of a danger to society by letting those people just

3    run free while you're trying to get 'em to be

4    informants?

5    A    Yeah.  I mean, yes, there's a danger to society when

6    they're free before we talk to them.

7    Q    When he gave you the guns, he signed an abandonment

8    of property form; is that correct?

9    A    Correct.

10   Q    And does that abandonment of property form indicate

11   that the individual has no possessory interest in the

12   items that you have?

13   A    The way I understand it, it's all through the asset

14   forfeitures property branch; but basically they are

15   relinquishing legal claim to those items.

16   Q    So that gives you the ability to take 'em?  It would

17   be like if you just found a gun laying out in the front

18   yard and nobody claimed it, you could take it; correct?

19   A    Correct.  We have the authority to take the firearms

20   without the abandonment form in this instance.

21   Q    And Mr. Gehringer did that to you?  Told you he

22   didn't want those guns.  He didn't want 'em around once

23   he knew that -- you had told him that he was not

24   supposed to have them.  Is that correct?

25   A    He agreed to abandon them to us, yeah.

1    Q    The guns that we've seen here that have been

2    introduced into evidence, could any of those guns be

3    characterized as antiques?

4    A    Under -- from a legal definition under the Gun

5    Control Act, I do not believe any of those firearms meet

6    the definition of an antique firearm or we would not

7    have been able to charge it.

8    Q    Okay.  So there are some distinctions in your

9    regulations about some guns that can be possessed by

10   anybody if they're considered an antique legally?

11   A    If they were manufactured prior to I believe January

12   1st, 1899, they are considered antique under the Gun

13   Control Act and are then not prohibited from being

14   possessed by any of the nine categories of prohibited

15   persons.

16   Q    So anybody can have those kinds of guns?

17   A    Correct.

18   Q    And is that because -- I don't know -- the Second

19   Amendment, or, whatever, they didn't want people to not

20   be able to collect guns?

21   A    I don't know why that is.

22   Q    Okay.  Even if some of these guns weren't considered

23   legally antiques, the rifles, the long guns, the

24   shotgun, almost everything in that group are, they're

25   pretty old guns, aren't they?

1    A    Correct.  They -- most of them fired ammunition that

2    is readily available at any, you know, any store that

3    sells ammunition.

4    Q    But the guns themselves are old?

5    A    Yeah.  I don't know the age of the manufacture of

6    the weapon.  I don't know how old you consider old

7    but --

8    Q    But a couple of those guns were so old that you

9    couldn't even get ammo for it; correct?

10   A    One of them had a fire type ammunition that we were

11   not able to find.

12   Q    And would you say that those are the kinds of guns

13   that somebody has in a gun collection?

14   A    I don't collect guns, I don't know.

15   Q    You've been involved in drug investigations where

16   there's a firearm that's used or possessed or carried in

17   connection with a drug trafficking offense, haven't you?

18   A    Yes.

19   Q    And the reason for that is because a lot of times

20   drug dealers wanna have a gun ready and loaded and ready

21   to go in case somebody tries to steal their drugs or

22   whatever?

23   A    Correct.

24   Q    Rob from them?

25   A    Correct.

1    Q    Okay.  Obviously, you've probably seen all types of

2    guns involved in relation with drug trafficking

3    offenses; but are these rifles and shotguns, the guns

4    that you would typically see associated with somebody in

5    a drug trafficking situation?

6    A    The firearms we recovered from his residence did not

7    appear to be in a state that he was using them to

8    protect his drug stash.  They were, you know, behind,

9    you know, all kinds of stuff in the house.  Most of 'em

10   were not loaded.  Unlike the firearm that was on the

11   front seat of his truck on the December 19th incident

12   which had a full magazine, I believe, and was sitting

13   next to the driver's seat of the truck.

14   Q    So that would be one that would be at least

15   indicative that it might have something to do with the

16   drugs; is that correct?  The ones on the 19th of

17   December?

18   A    Yeah, I believe it did.

19   Q    Okay.  It was fully loaded?

20   A    Yes.

21   Q    And, by the way, that gun was substantially newer

22   make and model than any of the guns that you had from

23   the residence; is that correct?

24   A    I don't know the year of manufacture of that

25   firearm; or any of the others.

1    Q   By the way, I assume that all of these guns that

2    you've collected -- and we've talked with the officers

3    in the police case where there was a gun found -- about

4    it being submitted for fingerprints.  Did you submit any

5    of these guns for fingerprints?

6    A   I did not submit any firearms for fingerprinting.

7    Some of the firearms recovered by the Wichita police

8    department were submitted.  Most of the firearms we

9    recovered, Todd admitted to us that they were in his

10   possession so there was no need to submit them for

11   fingerprints.

12   Q   They were in his storage unit or they were in --

13   A   His house.

14   Q   -- his house.  So there wasn't any real need to, in

15   your mind, to shore up your proof that Todd possessed

16   these items by the necessity of a fingerprint.  Correct?

17   A   No.  He admitted to possessing them.

18   Q   Okay.  By the way, that gun that was found on

19   December 19th in that pick up truck at the Homeland

20   grocery store, is that a gun that has the kinds of

21   surfaces that can, that they can obtain a fingerprint

22   from?

23   A   I don't know.  I'm not a fingerprint expert.  I know

24   that we rarely in any case get fingerprints lifted off

25   of firearms.  Or at least workable fingerprints.

1    Q    It's difficult.  But they're often submitted for

2    fingerprint analysis; correct?

3    A    Yes.

4    Q    And you have gotten some that have a fingerprint on

5    them, haven't you?

6    A    I can't think of any in any of my investigations

7    that have.  I don't know about other investigations.

8    Q    They're now doing even DNA testing from samples off

9    the handle of guns to see if an individual possessed it,

10   aren't they?

11   A    Yes.  Firearms can be swabbed for the presence of

12   DNA.

13   Q    And, once again, the purpose of all those is to see

14   if the person that they're trying to accuse of being in

15   possession of that gun actually had it; correct?  Or it

16   would at least aid them in that investigation?

17   A    Correct.

18   Q    Sometimes they can rule out whether it might be

19   somebody else?

20   A    Yes.

21   Q    In other words, if you found another person's

22   fingerprint on the gun found in the Homeland parking lot

23   on December 19th, might indicate -- wouldn't necessarily

24   guarantee -- but it might indicate that somebody else

25   had touched or handled that gun; correct?

1   A    Yeah.   That doesn't preclude it from also being

2   touched by anyone else.

3   Q    Right.   And by the way, they can get fingerprints

4   off of ammo; correct?

5   A    I believe it's possible.

6   Q    They can get it off of like the clip or the magazine

7   of a gun?

8   A    Uh-huh.

9   Q    Just any surface that really is there, they can get

10  a fingerprint; correct?

11  A    I'm told they are able to.   I've never seen it.

12  Q    It's difficult?

13  A    Yes.

14  Q    The guns in the storage shed, were those submitted

15  for prints?

16  A    No.

17  Q    Did Todd tell you how those got into his storage

18  shed?

19  A    He didn't tell me.   I don't remember if Agent

20  Gravatt or Task Force Officer Bradford spoke in depth

21  with him about it.   I was not present for that portion

22  of the interview.

23  Q    So you don't know whether he actually ever handled

24  those guns or put them in that storage unit himself, do

25  you?

1    A    I don't know.

2    Q    And, once again, those were also abandoned to you;

3    is that correct?

4    A    No.  He didn't -- he told us where they were

5    located.  We never had him fill out an abandonment form

6    for them.

7    Q    There was never any evidence that Todd had anything

8    to do -- you said that those handguns that were found at

9    the storage shed, some of them had been reported stolen

10   from a burglary or something?

11   A    I believe all of them had.

12   Q    You don't have any evidence to indicate that Todd

13   had anything to do with stealing the guns?

14   A    I don't have any evidence, no.

15   Q    By the way, on those guns that you indicated that

16   didn't have serial numbers earlier, are those -- did it

17   appear that the serial numbers had been obliterated or

18   scratched off of those or did they just never ever have

19   serial numbers?

20   A    I was unable to locate serial numbers.  It is

21   possible that they were manufactured without serial

22   numbers.

23   Q    So there was a time when they manufactured guns

24   without a serial number?

25   A    Yeah.  It was prior to 1968.  It was not required by

1    U.S. law to have a unique identifying serial number

2    stamped on the firearm.

3    Q    There are methods of recovering a serial number if

4    it has been obliterated or polished over or whatever,

5    aren't there?

6    A    If you can find the location where it was

7    obliterated from.  Sometimes that's difficult also.

8    Q    But there's no evidence in this case that these

9    were -- that anything was done to tamper with the serial

10   newspapers?

11   A    I couldn't find it, no.

12        MR. GRADERT:  I have no further questions.

13   Thank you.

14        THE COURT:  Yes, sir.

15                  **REDIRECT EXAMINATION**

16   BY Mr. Oakley:

17   Q    Just so we're clear, none of the firearms that were

18   collected and introduced into evidence in this case are

19   legally defined as antiques; correct?

20   A    That's correct.  None of them are antique.

21   Q    So if the Defendant were found to be a user of

22   controlled substance, he couldn't lawfully possess any

23   of the firearms that have been introduced into evidence?

24   A    That's correct.

25        MR. OAKLEY:  Nothing further, Your Honor.

309

1       MR. GRADERT:  Nothing further, Your Honor.

2       THE COURT:  Thank you.  You may resume your

3   seat.  Next witness please.

4       MR. TREASTER:  Your Honor, United States would

5   call Forensic Chemist Mary Ayers.

**MARY AYERS**

6

7   Having been first duly sworn to tell the truth, the

8   whole truth and nothing but the truth, testified as

9   follows on:

**DIRECT EXAMINATION**

10

11  BY MR. TREASTER:

12  Q   Please state your name for the record.

13  A   Mary Ayers.

14  Q   Ma'am, how are you employed?

15  A   At the Sedgwick County Regional Forensic Science

16  Center.

17  Q   What do you do for them?

18  A   I'm in the drug identification unit.

19  Q   What does that mean?

20  A   It means that I test items that are submitted by law

21  enforcement that are removed from people or possibly

22  from an undercover buy.

23  Q   So you're a forensic chemist?

24  A   Yes.

25  Q   How long have you been a forensic chemist?

310

1    A    I started with Wichita Police Department in January

2    of 1981.

3    Q    And you've been doing this ever since?

4    A    Yes.  Continuously.  My job was transferred from

5    Wichita Police Department to the Sedgwick County Center.

6    Q    So is it safe to say you've tested and identified

7    literally thousands of drug exhibits?

8    A    Yes, I have.

9    Q    Have you testified in front of many courts of law?

10   A    Yes, I have.

11   Q    As an expert?

12   A    Yes, I have.

13   Q    Have you testified in this courtroom?

14   A    Yes, I have.

15   Q    Okay.  When you receive an item to be submitted, how

16   does that process work?

17   A    We receive the items.  They're submitted by the

18   agencies to our property and evidence clerk.  And then

19   the chemist, we pick up a folder that has some of the

20   paperwork, or copies of the paperwork, and we go check

21   out that evidence from the property and evidence clerk

22   and then take it back to our individual areas to test.

23   Q    And when you receive those items, routinely do you

24   check to make sure they have not been tampered with?

25   A    Yes.  There's always seals that are intact.  Many

1    seals.  There's external seals on the outside packaging

2    of the evidence and then there's normally inside seals

3    also on much of the evidence.

4    Q    And prior to coming to court today, you reviewed the

5    evidence in this case?

6    A    Yes, I did.

7    Q    And did you recall finding any evidence of any

8    tampering on any of the evidence that you examined?

9    A    Some of the evidence had been repackaged for your

10   presentation purposes, so it was not in the original

11   packaging that I saw it in originally.

12   Q    Okay.  And then when you did see it originally, was

13   there any evidence of tampering when you got it?

14   A    No, there was not.

15   Q    What types of tests do you use to test these items?

16   A    The first test we're gonna do is we're writing a

17   basic just a description of the item.  And we will weigh

18   the items first before we do any kind of testing.  Then

19   there's screen tests that we do.  Certain classes of

20   drugs, like with marijuana, there's a sort of a three

21   test series that we'll do with methamphetamine or

22   cocaine.  There is a screening test that we have that

23   we'll run the powders for both the cocaine and the

24   methamphetamine.  And then we do our final testing with

25   a gas chromatograph GC/MS mass spectrometer.

1    Q    The GC/MS, what's it do for you?

2    A    That's going to give us a definitive sort of a

3    fingerprint or an identification.  It gives us a pattern

4    that we know that it is either methamphetamine or

5    cocaine.  It has a retention time based on how the

6    substance moves through the column and then it also has

7    a distinctive ion pattern and we compare that against

8    known standards.

9    Q    Okay.  And with methamphetamine, do you do something

10   a little different with that as far as figuring purity?

11   A    Yes.  We do what's called a quantitation and we do

12   that for federal court only.  And then that is figuring

13   the purity of the substance.

14   Q    And so if you have a substance that's tested

15   positive for methamphetine, when you test that purity,

16   you can tell how much if you remove whatever binder or

17   excess is in there is actually pure meth.  Is that

18   the --

19   A    What we do is we have an internal standard that we

20   use.  In this case we use tridecain and we set up a

21   curve of known hundred percent methamphetamine down to

22   25, 15, 10%, depending upon where we need to have a

23   linear curve.  So then we will calculate based on that

24   curve and our unknowns what the percentage is.

25   Q    Okay.  Did you follow these testing methods when you

1    tested the evidence in this case?

2    A   Yes, I did.

3    Q   I'm going to hand you what's already better than

4    admitted as Government Exhibit 202.

5    A   Okay.

6    Q   Do you recognize this item?

7    A   I do the internal parts of it.

8    Q   And how do you, as you look at that, how do you

9    figure out what it is?

10   A   Well, I see my distinctive initials on it.  I see

11   the green evidence tape.  This brown evidence sack.  I

12   can see the case heading, which is Todd Gehringer.  The

13   PD case number.  And my initials.  I handled this

14   originally two different times on 1-31 of '07 and 6-26

15   of '07.

16   Q   And the reason that you handled it twice, the first

17   time was it to determine what the item was and the

18   second time to determine the purity of the item?

19   A   That would be correct.

20   Q   And there are actually -- is there actually multiple

21   baggies in this one exhibit?

22   A   Yes.  I've got to find the right report because I

23   thought we were going through a different order.  Now

24   you switched me.

25   Q   I apologize.

1    A    Okay.  Our case number was 060483 when it was

2    resubmitted and there is a 001-A, B and C.  There was

3    three items that were quantitated in this package.

4    Q    So three items.  Were those each a different size of

5    baggies with a crystal substance in them?

6    A    Yes.  One of 'em, 1-A, was a plastic baggy that

7    contained white crystals.  1-B was just a portion of a

8    baggy where they had torn like a baggy corner and it was

9    tied in a knot.  1-C was a ziploc plastic coin bag that

10   contained the white crystals.

11   Q    So in your what you call your lab, item 1-A, what

12   was that item?  What did it test to be?

13   A    All right.  Your net weight without any packaging

14   was 69.02 grams and the purity was 44%.

15   Q    And that tested for what substance?

16   A    Methamphetamine.

17   Q    Okay.  And then the 44% is then multiplied against

18   the 69.02 to figure out how many grams pure?

19   A    30.36 grams.

20   Q    Okay.  Your lab item 1-B?

21   A    That was 21.44 grams of methamphetamine.  And it was

22   48%, so that would calculate to 10.29 grams of pure.

23   Q    Okay.  And then your lab item 1-C?

24   A    That was 2.79 grams at 50% purity, which would be

25   1.39 grams.  So would you like a total of all those

1    three items?

2    Q    Sure.

3    A    Was 42.04 grams of pure.

4    Q    Okay.

5    Q    I'll hand you what's been marked as Government

6    Exhibit 203 and it's been admitted.  Do you recognize

7    that item?

8    A    Yes.  Once again, I can see my -- I can recognize --

9    I can't totally see my initials that are underneath

10   here, but I see my date and recognize my handwriting on

11   the outside sack.

12   Q    Okay.

13   A    And I recognize my markings on some of those

14   internal seals.  As I sealed them back with the green

15   tape, I can see my sample numbers.

16   Q    And did you test this item?

17   A    Yes, I did.

18   Q    Did you say when --

19   A    No.

20   Q    Did you -- I apologize.

21   A    Yes, I did.

22   Q    And what did it test for?

23   A    203 has marijuana containing tetrahydrocanninol.

24   That is sample number 1-A.  Number 1 --

25   Q    And that's marijuana?

1    A    Yes, it is.

2    Q    And it weighed what?

3    A    It weighed 10.75 grams.  That was the total weight

4    including packaging.

5    Q    Okay.  Now I'll hand you what's been admitted as

6    Government Exhibit 207.  Do you recall reviewing this

7    package that's marked Government 207?

8    A    Yes.  We looked at it this morning when I was here.

9    I'm just trying to find it.  Here it is.  With the

10   scale.  Okay.

11   Q    All right.  Now, this is actually -- it was a black

12   bag with a lot of items inside it.

13   A    Black zipper case, yes.

14   Q    And then you actually looked through that and tested

15   specific items out of that case.  Is that correct?

16   A    Yes, I did.  There was six items in this submission

17   that I tested.

18   Q    And I want to talk to you about three of those items

19   in particular.

20   A    Okay.

21   Q    One has already been admitted as Government Exhibit

22   205.  I'll hand you that.  Do you recall that item?

23   A    Yes.  This is what I designated as 1-E.  It's a

24   Pocket Tech PT 2-200 scale.  And it had residue on it.

25   Q    And are you able to test just residue?

1    A    Yes.  We wash with chloroform.  And so I would have

2    opened it up and then just rinsed the surfaces with

3    chloroform.  I also spray it up underneath the little

4    plate and if there's any -- a lot of times there's more

5    residue underneath the top of the pan.

6    Q    That they actually weigh on?

7    A    Yes, that they're weighing on.  Because they're not

8    clean and they're sort of messy and you get other drugs

9    down underneath there that they don't remove so it's a

10   good place to find some.

11   Q    So you tested that and did it test for the presence

12   of any narcotic or drug?

13   A    Yes.  It had methamphetamine residue present.

14   Q    Then I'll hand you what's been marked as Government

15   207-A.  Did you test this item?

16   A    Yes, I did.  This was my sample designation of 1-A

17   and this packaging was not their original packaging.  I

18   transferred the item into this.

19   Q    Into that from the -- it was in the black case

20   itself?

21   A    It was just in the black case itself.

22   Q    And what did it test for?

23   A    Marijuana containing tetrahydrocannabinol with a net

24   weight of 0.72 grams.

25   Q    So a very small amount?

318

1    A    Yes.

2    Q    I'll hand you what's been marked as Government

3    Exhibit 207-B.  Was that also found in the black bag?

4    A    Yes.  This was my sample designation of 1-B.

5    Q    And what did you describe it as?

6    A    As a glass bubble pipe with residue.

7    Q    And did you test it?

8    A    Yes, I did.

9    Q    And what did it test for?

10   A    Methamphetamine residue.

11   Q    Okay.

12          MR. TREASTER:  Your Honor, I'd move for

13   admission of Government 207-A and B.

14          MR. GRADERT:  No objection.

15          THE COURT:  They're received.

16   BY MR. TREASTER:

17   Q    All right.  Did you do testing on a subsequent

18   submitted case as well for Mr. Gehringer?

19   A    Yes, I did.

20   Q    I'm going to hand you what has been admitted as

21   Government 507.

22   A    Okay.

23   Q    Do you recognize that?

24   A    Yes.  Right away I see my initials M-C-A and 12-6 of

25   '07 when I first handled this package.

1    Q    And did you test it in accordance with your

2    procedures?

3    A    Yes, I did.

4    Q    And did it test for any controlled substances?

5    A    This one is 002 and it was a cigarette cellophane

6    containing plant material.

7    Q    And did you test that plant material?

8    A    Yes, I did.

9    Q    And what did it test for?

10   A    Marijuana containing tetrahydrocannabinol with a

11   gross weight of 1.55 grams.

12   Q    I'll hand you what's been admitted as Government

13   Exhibit 507.  Do you recognize 507?

14   A    Yes.  Once again, I see my initials, M-C-A, and 12-6

15   of '07.  Packaging is removed.  But it should be this

16   one here and this was a heat sealed bag.  The heat

17   sealed bag was this outer bag containing the bags on the

18   inside.  And there are three different ones, A, B and C,

19   with my initials, case numbers and dates.

20   Q    Are they marked Exhibit 507-A, B and C as well?

21   A    Yes.  And now you're going to see some additional

22   ones and they have my initials and said that they were

23   transferred by me.  This was the sample that was ground

24   up to do the quantitations.

25   Q    And is there then a corresponding smaller baggy that

320

1    goes with A, B and C?

2    A    There's an 03, 003-A and an 003-B.  And it goes with

3    the 003-A and 003-B.

4    Q    And just for the record, that goes with 507-A and

5    507-B?

6    A    Uh-huh.

7    Q    Respectfully?

8    A    Yes.

9    Q    Now, you tested what we called 507-A.  Did you find

10   any controlled substances in 507-A?

11   A    No, there was no controlled substances in A.

12   Q    And it's just simply as you described it like a

13   white crystal powder or --

14   A    I can describe it as a Ziploc plastic coin bag

15   containing white crystal, yes.

16   Q    And then you tested -- did you test our 507-B?

17   A    Yes, I did.

18   Q    And what did it test for?

19   A    That was methamphetamine with a net weight of 4.92

20   grams, a purity of 62%.  So figuring the percent as 100%

21   pure, it would be the equivalent of 3.05 grams.

22   Q    Of methamphetamine?

23   A    Of methamphetamine.

24   Q    And then the item marked 507-C, was it tested?

25   A    No, because it was just a residue.

```
 1    Q    Okay.  Then the last item I'll hand you here has not
 2    been admitted yet but it has been marked as Government
 3    Exhibit 508.  Could you identify that item please?
 4    A    Yes.  Once again, this was submission 004.  My
 5    initials M-C-A and the date 12-6 of '07 is there.  And
 6    inside this is the baggy and it contained coffee
 7    filters, there was 11 coffee filters, and they were
 8    commingled with material and debris.
 9    Q    And did you test the material and debris?
10    A    Yes.
11    Q    How did you do that?  Did you combine stuff off of
12    each one or --
13    A    Yeah.  They were all just sort of scraped together
14    into one because they were all packaged together in one
15    envelope.  So I tried to get as much as possible off of
16    all of them as an aggregate.
17    Q    And then did you test it?
18    A    Yes, I did.
19    Q    And what did it test for?
20    A    Methamphetamine with a net weight of 0.96 grams, a
21    purity of 16%, so that's the equivalent of .15 grams
22    pure.
23    Q    And so the total between 507 and 508 of
24    methamphetamine pure, would it be correct to say, 3.2
25    grams?
```

1    A    Yes.

2              MR. TREASTER:  No further questions, Your

3    Honor.  Thank you.

4              THE COURT:  Mr. Gradert.

5                    **CROSS EXAMINATION**

6    BY MR. GRADERT:

7    Q    Ms. Ayers, the only question that I really have is

8    most of the time we don't deal in gram quantities and so

9    can you kind of describe in just a general term how much

10   a gram is?

11   A    A gram?

12   Q    Yes.  Or how does it equate in I guess the metric

13   scale of measurements?

14   A    That is metric.

15   Q    Or not the metric.  Our regular scale of --

16   A    Okay.  28.35 grams is an ounce.

17   Q    And what's the largest quantity of meth that you had

18   in this situation?  I think it was about 42 grams,

19   wasn't it?

20   A    Yes, it was.  And that was all of the 202

21   submissions, the A, B and C, was 42.04 grams.  So that's

22   about -- well, it's 1.48 ounces, so about 1 and a half

23   ounces.

24   Q    About an ounce and a half?

25   A    Uh-huh.

1    Q    Okay.  If you, like my pen for example, do you have

2    any idea what something like that might weigh in

3    terms --

4    A    Different things have different densities so, you

5    know, if you wanted to take little bags of sugar or

6    little bags of flour, just think of a ten pound bag of

7    sugar and a ten pound bag of flour, they're different

8    size bags because the materials have a different

9    density.

10   Q    Okay.  But when you're talking about less than two

11   ounces of anything, that's a small quantity, isn't it?

12   A    It's smaller than a pound for sure.

13   Q    Okay.  Thank you.

14            MR. GRADERT:  I have no further questions.

15   Q    Oh, one other thing.  You did do purity?

16   A    Yes.

17   Q    And how are you able to determine how pure something

18   is from your sample that you use?

19   A    I use a known standard that's 100% purity and so

20   when I run that hundred percent I'm going to get a peak

21   of a certain height when I have an unknown and you run

22   that in the same conditions, the same way, you're going

23   to get another height.  So it's a proportionality.  It's

24   just a standard algebraic equation to figure basically

25   if this height is 100%, this height is X percent and

324

1    you're solving for X.

2    Q    And do you do purity in anything other than

3    methamphetamine?

4    A    We don't typically do it; but for federal court

5    purposes, we would do it for PCP.

6    Q    But not for like cocaine or marijuana or anything?

7    A    We used to a long time ago but sentencing is not

8    based on purity any more.  We just determine if it's

9    crack cocaine the hydrochloride form or the base form

10   and so we're not doing purity any more.

11   Q    And when I talk about purity, like in

12   methamphetamine, that's because it's mixed with other

13   substances; is that correct?

14   A    Yes.

15   Q    And that's what dilutes its purity?

16   A    Yes.

17   Q    Okay.

18            MR. GRADERT:  Thank you.  I have no further

19   questions.

20            MR. TREASTER:  Nothing further, Your Honor.

21            THE COURT:  Thank you very much.  You're

22   excused.  Next witness.

23            MR. TREASTER:  Your Honor, United States would

24   call forensic chemist Lillian Ngong.

25

325

1                    **LILLIAN NGONG**

2   Having been first duly sworn to tell the truth, the

3   whole truth and nothing but the truth, testified as

4   follows on:

5                 **DIRECT EXAMINATION**

6   BY MR. TREASTER:

7   Q    Please state your name for the record.

8   A    Lillian Ngong.

9   Q    Could you spell your last name please?

10  A    N-G-O-N-G.

11  Q    And what do you do, ma'am?

12  A    I'm a forensic chemist.

13  Q    And who do you work for?

14  A    Sedgwick County Forensic Science Center.

15  Q    And how long have you done that?

16  A    At the center?

17  Q    Now long have you been a forensic chemist?  I'm

18  sorry.

19  A    About 18 years.

20  Q    How long have you worked at the regional forensic

21  science center?

22  A    13 years.

23  Q    And have you had to testify in court before as an

24  expert?

25  A    Yes, sir.

```
 1    Q    Have you ever had to testify in federal court as an

 2    expert?

 3    A    Yes.

 4    Q    Generally how is testing done by you on items

 5    submitted in relation to drugs?

 6    A    It depends on what we receive, so our testing is

 7    depending on what we receive.

 8    Q    So based upon what you see submitted, then that

 9    dictates what path you're going to go in your testing?

10    A    Yes, sir.

11    Q    Okay.  Is there steps taken to assure the

12    credibility of the evidence that you test?

13    A    Yes.

14    Q    And, in general, how is that done?

15    A    Are you talking about the --

16    Q    To keep the credibility of the witness -- or the

17    evidence.  How do you keep it so it's not tampered with?

18    A    With us or --

19    Q    No.  The laboratory.  How do you protect the

20    evidence?

21    A    We have lockers where we lock our evidence if it's

22    in our custody.

23    Q    Okay.  And when you receive an item to be tested, do

24    you review it to see if it appears to be tampered with?

25    A    Yes, sir.
```

1    Q    And you reviewed the items of evidence used in this

2    case; is that correct?  That you tested?

3    A    Yes, sir.

4    Q    Did you -- when you received them initially, before

5    you tested them, did you see any signs of any tampering

6    with any of the items?

7    A    No.

8    Q    And, in general, what tests do you run on suspected

9    drugs?

10   A    It all depends if it's a powderlike substance or if

11   it's a plant material.

12   Q    If it's a plant material, what would you do?

13   A    If it's a plant material, we -- what we do first is

14   we describe what we receive and then we do -- we weigh,

15   weigh the material.  And after we weigh, we do a

16   microscope test.  We do a Duquenois-Levine and then we

17   confirm it by a gas chromatography/mass spectrometry.

18   Q    That's GC/MS?

19   A    Yes.

20   Q    And then if it's not a plant material, if it's a

21   crystal type substance, what tests would you use there?

22   A    If it's like crystallines, powdery substance, we do

23   the same.  We weigh -- we have a standard operating

24   procedure generally.  So we weigh, then we do

25   presumptive test, which is color test, and we do three

```
 1    tests.  And then we confirm it again by gas
 2    chromatography/mass spectrometry.
 3    Q   Are these tests all accepted by the scientific
 4    community?
 5    A   Yes, sir.
 6    Q   Did you use those tests that you've described
 7    already in relation to this case?
 8    A   Yes, sir.
 9    Q   And did you follow those procedures?
10    A   Yes.
11    Q   I'm going to hand you what has been marked
12    Government Exhibit 101-A.  Do you recognize that item?
13    A   Yes, sir.
14    Q   And what is that item?  How would you describe it?
15    A   It's a plastic Ziploc bag and it has yellow --
16                        (Off-the-record discussion
17                         between Mr. Gradert and
18                         Mr. Treaster.)
19    BY MR. TREASTER:
20    Q   What day did you -- did you actually test this item?
21    A   Yes, sir.
22    Q   And do you know what day you tested it on?
23    A   Can I look at my notes?
24    Q   Please.
25    A   I picked it up from our evidence custodian on June
```

1 26, 2007.

2 Q Okay.  Did you then test lab item -- or the exhibit

3 Government Exhibit 101-A?

4 A Yes, sir.

5 Q And what did it test to be?

6 A Test contained methamphetamine.

7 Q And how many grams of methamphetamine?

8 A 14.36 grams.

9 Q Okay.  And the purity of that, did you test the

10 purity?

11 A Yes, I did.  One minute.  65%.

12 Q And did you figure out how much pure that is?

13 A 9.33.

14 Q 9.33 grams of pure meth?

15 A Yes.

16 Q Hand you what's been marked as Government Exhibit

17 101-B.  Do you recognize that item?

18 A Yes.

19 Q How do you recognize it?

20 A It has my initials.

21 Q And did you also test this item?

22 A Yes.

23 Q And what did it test for?

24 A Methamphetamine.

25 Q How many grams?

1    A    11.13 grams.

2    Q    And did you test its purity?

3    A    Yes.

4    Q    And how pure was it?

5    A    88%.

6    Q    And so how many grams pure of meth is that?

7    A    9.79.

8    Q    Hand you what's been marked as Government Exhibit

9    101-C.  Do you recognize that item?

10   A    Yes.

11   Q    And how do you recognize it?

12   A    It has my initials.

13   Q    And did you test this item as well?

14   A    Methamphetamine.

15   Q    And how many grams?

16   A    4.68 grams.

17   Q    And did you test its purity?

18   A    Yes.

19   Q    How pure was it?

20   A    90%.

21   Q    Nine zero?

22   A    Yes.

23   Q    So 90% pure?

24   A    Yes.

25   Q    How many grams pure would that be then?

1    A    4.21.

2    Q    And I'll hand you Government Exhibit 101-D.  Do you

3    recognize this item?

4    A    Yes.

5    Q    How do you recognize it?

6    A    It has my initials.

7    Q    And did you test it?

8    A    Yes.

9    Q    And what did it test for?

10   A    Methamphetamine.

11   Q    How many grams?

12   A    2.45 grams.

13   Q    And how pure?

14   A    52%.

15   Q    And that would equate to how much pure meth?

16   A    1.27.

17   Q    And did you total these four bags up?

18   A    Yes, sir.

19   Q    And how much total pure meth would that be?

20   A    24.6 grams.

21   Q    I'll hand you what's been marked as Government

22   Exhibit 102.  You did not test this item, did you?

23   A    No, I did not.

24   Q    And what does this item appear to be to you?

25   A    A scale.

332

1    Q    Digital scales?

2    A    Yes.

3    Q    I will hand you what's been premarked as Government

4    Exhibit 104.  Do you recognize that item?

5    A    Yes.

6    Q    And how do you recognize it?

7    A    It has my initials.

8    Q    And did you test it?

9    A    Yes, sir.

10   Q    And could you describe for the record what that item

11   appears to be?

12   A    Call it a round bottom glass flask.

13   Q    And what did it test for?

14   A    Methamphetamine.

15   Q    Did you do a quantitative testing on that one?

16   A    No.

17   Q    So there wasn't a big chunk of meth or anything in

18   there?

19   A    Right.

20   Q    It was just residue?

21   A    Yes.

22   Q    I'll hand you two packages.  Government Exhibit 106

23   and Government Exhibit 108.  Do you recognize each of

24   those?

25   A    Yes, I do.

333

1    Q    How do you recognize them?

2    A    It has my initials.

3    Q    And in particular, 106.  What did you find was

4    contained in there?

5    A    Yes.

6    Q    And what did you find contained in there?

7    A    Oxycodone.

8    Q    And is it in a pill form?

9    A    Yes.

10   Q    How many pills?

11   A    36.

12   Q    36 pills of oxycodone?

13   A    Yes.

14   Q    And 108, what did that turn out to be?

15   A    It had 16 pills, different pills, inside, so I have

16   to go down the list.

17   Q    Can you list what those different 16 pills turned

18   out to be?

19   A    First one I have two of long white pills and those

20   were hydrocodone.  And I have five oval blue pills that

21   are prazelam (ph).  And I have four pills with some

22   pieces, some broken ones in there, and those were

23   carisoprodol.  I have one and a half round orange pills

24   that were amphetamine.  And one round yellow pill that

25   was clonazepam.  And three oval white pills that were

1    ibuprofen.

2    Q    Ibuprofen like you buy over the counter?

3    A    Yes.

4            MR. TREASTER:  Your Honor, at this time

5    Government would move to admit 101-A, B, C, D, 102, 104,

6    106, 107 and 108.

7            MR. GRADERT:  No objection.

8            THE COURT:  They're received.

9            MR. OAKLEY:  No further questions, Your Honor.

10                    **CROSS EXAMINATION**

11   BY MR. GRADERT:

12   Q    I hope I'm pronouncing your name right.  Is it

13   Ngong?

14   A    Yes.

15   Q    I don't think -- is there any way, looking at those

16   exhibits, 1-A through D, that you just talked about --

17   and what did you say the total net weight of those were

18   once again?

19   A    24.6.  Is that the one you're asking?

20   Q    Yes.  Yes.  24 grams?

21   A    Yes.  24.6.

22   Q    Is there any way to tell just looking at those -- in

23   fact, like, could you hold each of those four bags up.

24   Can I look at that for just a moment.

25        Is there any way to tell just from looking at an

1    item like that how much that might be?  I mean, can you

2    estimate it with all your experience without actually

3    putting it on a scale?

4    A    No, I can't.

5    Q    You can't.  So it actually has to be weighed and you

6    weigh it on something that is highly calibrated, I

7    assume, and get a precise weight?

8    A    Yes, sir.

9    Q    And do you check that against -- I mean -- because

10   the weight of drugs is so important in sentencing now

11   days, do you check it on other scales to make sure that

12   your weight calculation is correct or do you always use

13   the same scale?

14   A    I always use my scale.

15   Q    How often is that scale checked to make sure that

16   it's in working order?  My scale at home says I weigh

17   210 pounds but I think I weigh about 218.  How often is

18   it checked?

19   A    Every day before we use -- before I use the scale,

20   we have to do a self calibration there.  But every three

21   months we have weights that are certified weights that

22   we check, we use to check all our scales.  And once a

23   year we have an outside vendor who comes in and

24   recertifies all the scales.

25   Q    Okay.  And all of these weights that you've given,

1   when we talk about net weight, we're talking about the

2   packaging material is not included in those weights, is

3   it?

4   A    It's not included.

5   Q    Okay.  So you actually take it out of the bag and

6   put it on the scale and weigh the whole amount; correct?

7   A    Yes, sir.

8   Q    And then the other, the purity weight, is just the

9   weight based on the calculation of the percentage that's

10  pure; correct?  In other words, you don't have any way

11  of separating it out and weighing the pure versus the

12  mixture; correct?

13  A    We just take -- we just take it out of here and go

14  to purities.  Is that what you're asking?  I don't know.

15  Q    Yes.  That's all I wanted to know.

16  A    Okay.

17  Q    But one can't tell just looking at that without

18  putting it on a scale how much it weighs?

19  A    I cannot.

20  Q    Okay.  And you've seen a lot of these samples;

21  correct?

22  A    Yes.

23  Q    Probably hundreds or thousands of them?

24  A    A whole lot.

25          MR. GRADERT:  Thank you very much.  No further

337

1    questions, Your Honor.

2              MR. TREASTER:  Nothing further, Your Honor.

3              THE COURT:  Thank you, ma'am.  Next witness.

4              MR. TREASTER:  United States would call

5    forensic chemist Randall Fornshell.

**RANDALL FORNSHELL**

7    Having been first duly sworn to tell the truth, the

8    whole truth and nothing but the truth, testified as

9    follows on:

**DIRECT EXAMINATION**

11   BY MR. TREASTER:

12   Q    Please state your name for the record.

13   A    Randall Fornshell.

14   Q    Sir, how are you employed?

15   A    Sedgwick County Regional Forensic Science Center.

16   Q    And what do you do for them?

17   A    I am a drug chemist.

18   Q    A forensic chemist?

19   A    Yes, sir.

20   Q    And how long have you done that?

21   A    I've done it for a little over three years right

22   now.

23   Q    And, in general, as a forensic chemist, what do you

24   do day-in and day-out?

25   A    On a daily basis we analyze drug samples, evidence.

338

1    Q    And in that three year period have you had to
2    testify in a court of law as an expert?
3    A    Yes, sir.
4    Q    And when you testified, you testified about your
5    testing of substances for drugs?
6    A    Yes, sir.
7    Q    How is the testing done for illegal substances?  How
8    do you do that?
9    A    It's a multistep process.  First the sample is
10   weighed.  Then a presumptive test is done on the sample.
11   And then finally confirmation test.
12   Q    Okay.  And did you follow those test procedures when
13   you tested the items for this case?
14   A    Yes, sir.
15   Q    And also when you looked -- when you initially take
16   possession of these items for testing, do you check for
17   evidence of any tampering?
18   A    Yes.
19   Q    Do you recall finding any evidence of any tampering
20   on the items related to this case?
21   A    No, sir.
22   Q    If you would have, would you have noted that in your
23   report?
24   A    Yes, sir.
25   Q    When did you do the testing in relation to this

339

```
 1   case?

 2   A    May I look at my notes?

 3   Q    Please.

 4   A    Testing was done 7-19-07.

 5   Q    I'm going to hand you what's been admitted as

 6   Government Exhibit 404.  Do you recognize that item?

 7   A    Yes, sir.

 8   Q    And how do you recognize it?

 9   A    I have my initials, date and lab number on the

10   evidence tape.

11   Q    And did you test this item?

12   A    Yes, I did.

13   Q    And what did it test for?

14   A    Marijuana containing THC, tetrahydrocannabinol.

15   Q    Did you weigh that marijuana?

16   A    Yes, sir.

17   Q    And how much marijuana was there?

18   A    34.72 grams.

19   Q    Hand you what's been marked and admitted as

20   Government Exhibit 405.  Do you recognize that item?

21   A    Yes, sir.

22   Q    And how do you recognize it?

23   A    The same.  It has my initials, lab number and date

24   on the evidence tape that I put on the sample.

25   Q    And what's contained in there?
```

1    A    My notes say it's a piece of aluminum foil.

2    Q    And then did you test that aluminum foil or --

3    A    Yes, sir.

4    Q    And what did it test for?

5    A    Positive for methamphetamine.

6    Q    And did you get a weight?

7    A    The weight on that was 0.17 grams.

8    Q    So almost like residue?

9    A    Pretty close to residue.

10   Q    And, lastly, I'm handing you Government Exhibit 407.

11   Do you recognize this item?

12   A    Yes, sir.

13   Q    And how do you recognize it?

14   A    I have my initials, lab number and date written on

15   the evidence tape.

16   Q    And what is this item?  How did you describe it in

17   your notes?

18   A    My notes say contains one canvas pouch, not tested,

19   and one digital scale containing residue.

20   Q    So the scale was inside of a pouch, a canvas pouch?

21   A    Yes, sir.

22   Q    You didn't do any tests on the canvas itself?

23   A    Correct.

24   Q    But you did test the scales?

25   A    Yes.

1   Q   And what did it test for?

2   A   Positive for methamphetamine.

3   Q   Was there a quantity or was it simply residue?

4   A   It's residue.

5          MR. TREASTER:  No further questions, Your

6   Honor.

7          THE COURT:  Yes, sir.

8                     **CROSS EXAMINATION**

9   BY MR. GRADERT:

10  Q   Is it Fornshell?

11  A   Yes, sir.

12  Q   Mr. Fornshell, I wanted to ask something real quick

13  that I forgot to ask the other chemists that had

14  testified here.  The items that you've tested, were they

15  submitted for fingerprint analysis to another part of

16  your forensic laboratory?

17  A   We don't do fingerprints at our laboratory.

18  Q   Can you tell looking at the items that you tested

19  where they tested or checked for fingerprints somewhere?

20  A   I have no idea.

21  Q   Okay.  Typically when you test drugs, are they

22  tested for fingerprints prior to your receipt of them

23  for the test of drugs or do you test to determine

24  whether they're drugs and then submit them to someone

25  else for that purpose?

```
 1    A    In the past they've been fingerprinted first.
 2    Q    And typically how are you able to tell that that's
 3    the case?
 4    A    There is a different evidence tape put on the
 5    sample.
 6    Q    And sometimes is there a presence of something that
 7    they use to determine fingerprints on the packaging?
 8    A    Yes, sir.
 9    Q    The Government's Exhibit 405 that you have there in
10    front of you, that's the pipe; is that correct?
11    A    I don't know if it's a pipe or not.
12    Q    It's a glass tube type thing.  Can I look at it for
13    just -- I'm sorry.  Okay.  But that was an item that I
14    think that you indicated had .17 grams of marijuana
15    detected; is that correct?
16    A    Methamphetamine.
17    Q    Methamphetamine.  Okay.  And I think Mr. Treaster
18    asked you if that was kind of a residue like amount; is
19    that correct?
20    A    It had a weighable amount.
21    Q    It's a weighable amount but it's a small amount?
22    A    .17 grams.
23    Q    What constitutes residue in your opinion?
24    A    Less than .01 grams.
25    Q    And when you refer to residue, what is residue?
```

343

```
 1    A    It's a visible material on the submitted sample.

 2    Q    Is it the result of other of that same substance

 3    that's maybe been used, or used up primarily?

 4    A    Not necessarily used up.

 5    Q    Okay.  Can you tell with residue if, like, if it's

 6    methamphetamine residue, can you tell if that residue

 7    has been, for example, heated or burned or anything like

 8    that?

 9    A    We could tell if it's been heated.  Sometimes on the

10    container it has burn marks or charred marks on it.

11              MR. GRADERT:  All right.  I have no further

12    questions.  Thank you.

13              MR. TREASTER:  Nothing further of this

14    witness, Your Honor.

15              THE COURT:  Thank you, sir.  You're excused.

16              MR. TREASTER:  Your Honor, I apologize.  Ask

17    leave of the Court.  Could I recall Ms. Ngong.  I have

18    one item, Government Exhibit 301, that I need her to

19    testify about.

20              THE COURT:  Any objection?

21              MR. GRADERT:  No objection, Your Honor.

22                        **LILLIAN NGONG**

23    Having been previously duly sworn to tell the truth, the

24    whole truth and nothing but the truth, testified further

25    as follows on:
```

1                        **DIRECT EXAMINATION**

2    BY MR. TREASER:

3    Q    Ms. Ngong, I apologize.   I forgot to ask you about

4    one of the items that you tested.   I'm going to hand you

5    what's been admitted as Government Exhibit 301.  Do you

6    recognize that item?

7    A    Yes.

8    Q    And why do you recognize it?

9    A    It has our evidence tape and my initials.

10   Q    And did you test this item?

11   A    Yes.

12   Q    And what did it test for?

13   A    It had three items inside.

14   Q    And how did you describe those items?

15   A    First one I have was plant material.   Second was 14

16   oval white pills.   And the third was -- was 14 oval

17   white half score pills.   And twelve white half score

18   pills.

19   Q    And what did the plant material test for?

20   A    Marijuana containing tetrahydrocannabinol.

21   Q    And how many grams of marijuana?

22   A    26.33.

23   Q    And then the pills, what did they test for?

24   A    The pills which I'm calling number 2 contains

25   hydrocodone.   And number 3 was Bactrim.

```
 1              MR. TREASTER:  No further questions, Your
 2    Honor.
 3              MR. GRADERT:  No questions.
 4              THE COURT:  Thank you, ma'am.
 5              THE COURT:  Who's your next witness?
 6              MR. OAKLEY:  Special Agent Wes Williamson.
 7              THE COURT:  How long will he take?
 8              MR. OAKLEY:  He'll take a while, Your Honor.
 9              THE COURT:  Let's take a recess, ladies and
10    gentlemen.  About 15 minutes.  Remember and heed the
11    admonition.
12                   (Recess.)
13              THE COURT:  Yes, sir.
14              MR. OAKLEY:  Your Honor, United States calls
15    Special Agent Wes Williamson.
16                   WESLEY WILLIAMSON
17    Having been first duly sworn to tell the truth, the
18    whole truth and nothing but the truth, testified as
19    follows on:
20                   DIRECT EXAMINATION
21    BY MR. OAKLEY:
22    Q   Sir, would you please state your name.
23    A   My name is Wesley Williamson.
24    Q   How are you employed?
25    A   I'm a special agent with the Bureau of Alcohol,
```

1    Tobacco, Firearms and Explosives.

2    Q    How long have you been employed with ATF?

3    A    Since July, 2001, so about six and a half years.

4    Q    What did you do prior to that?

5    A    I was a police officer with the Kansas City,

6    Missouri, police department.

7    Q    What do you do for ATF?

8    A    I'm a special agent.  I investigate crimes of

9    federal law and state law.

10   Q    I want to talk to you about your training and

11   experience.  But before that, let me talk to you about a

12   specific incident.

13   A    Okay.

14   Q    Were you involved in the execution of a search

15   warrant on December 3rd, 2007?

16   A    Yes, I was.

17   Q    And was that search warrant at 622 North Tracy?

18   A    I believe so.

19   Q    Here in Wichita?

20   A    Yes, sir.

21   Q    Was that the residence of Todd Gehringer?

22   A    Yes, it was.

23   Q    And did you actually search any part of that

24   residence on December 3rd?

25   A    I believe I searched the garage and the kitchen

1    area.

2    Q    Let me talk to you about your search of the kitchen.

3    Did you find anything in the kitchen?

4    A    I believe we found baggies, empty baggies.  And then

5    there was a, I believe it turned out to be

6    methamphetamine on some coffee filters up in the kitchen

7    cabinets.

8    Q    Let me hand you what's been marked as Government

9    Exhibit 512-A.  Ask if you recognize that?

10   A    These were the baggies that were -- or some of the

11   baggies that were found on the kitchen table in the

12   kitchen.

13   Q    And that's a photograph of those baggies?

14   A    Yes, it is.

15   Q    And does that photograph fairly and accurately

16   depict the way those baggies appeared to you on December

17   3rd?

18   A    Yes.

19          MR. OAKLEY:  Your Honor, I'd move to admit

20   Government Exhibit 512-A.

21          MR. GRADERT:  No objection.

22          THE COURT:  512-A is received.

23   BY MR. OAKLEY:

24   Q    Would you please show that.  I'm going to hand you

25   now what's been marked as Government Exhibit 509.  Do

348

1    you recognize that sack?

2    A    This is the sack that we recovered the baggies or

3    some of the baggies that were found in the kitchen in.

4    Q    How do you know that sack contains the baggies that

5    you found?

6    A    Because it says plastic container containing empty

7    plastic baggies.  Then my name is wrote on the front.

8    Q    I'm going to hand you a pair of scissors and ask you

9    to open that bag.

10                   (Witness complies with request.)

11   Q    Can you show the contents of that bag to the jury.

12   A    These were the bags that were laying open on the

13   kitchen table.  These are baby bottle bags like for a --

14   it's been a while -- the type that slide into a baby

15   bottle.

16        I believe we found some meth that was contained in

17   some of this.

18        This was also on the kitchen table.  It's a Blue

19   Cross/Blue Shield -- looks like a big pill, but you open

20   it up and contained inside are numerous -- oops -- other

21   baggies that are clean and new.  These were also on the

22   table.

23   Q    And are those baby bottle baggies, can you see that

24   in the photograph that's been admitted at 512-A?

25   A    Those are right there in the center.  You can kind

1    of see the blue writing on the clear bag.

2            MR. OAKLEY:  At this time I'd move to admit

3    Government Exhibit 509.

4            MR. GRADERT:  No objection.

5            THE COURT:  It's received.

6    BY MR. OAKLEY:

7    Q    Why did you collect empty baggies?

8    A    As part of the investigation we wanted to show

9    that -- with this and other information will show that

10   the person's selling narcotics.

11   Q    I'm going to show you what's been admitted into

12   evidence as Government Exhibit 507-B.  I'll let you

13   package that up.

14        Now I'll hand you what's been admitted into

15   evidence as Government Exhibit 507-B.  Do you recognize

16   that?

17   A    This is the same -- I don't know what the word or

18   what the actual name of it is -- but it's the same

19   plastic bag as you see there on the table.  It's -- you

20   slip it into a baby bottle.  I guess instead of cleaning

21   the bottle, you just throw the bag out and put a new bag

22   and put new formula or milk or something like that into

23   that.  And this is the same as that is.  And I believe

24   this was -- this is methamphetamine that's in it.

25   Q    If you know, was that some of the items that was

1    found by Agent Gravatt out in the grass after a foot

2    chase.

3    A   Yes, it is.

4    Q   You said that when you searched the kitchen you also

5    found some coffee filters?

6    A   Yes, sir.

7    Q   I'm going to hand you what's been marked as

8    Government Exhibit 508.  Do you recognize that?

9    A   Yes, sir.

10   Q   What is that?

11   A   The label says it's coffee filters containing

12   methamphetamine.  Inside the heat sealed bag is a bag

13   that I wrote on that says -- I can't read the whole

14   thing -- found in upper cabinet, kitchen, top filter

15   with meth, approximately 31.1 grams.  And that's my

16   writing on the inside bag.

17   Q   And you found that item?

18   A   Yes, sir.

19   Q   In the kitchen in the cabinet?

20   A   Yes.

21            MR. OAKLEY:  Your Honor, at this time I'd move

22   to admit Government Exhibit 508.

23            MR. GRADERT:  No objection.

24            THE COURT:  It is received.

25   Q   I've now handed you what's been marked as Government

351

1      Exhibit 512-B.  Do you recognize that?

2      A    Yes, I do.

3      Q    What is that a photograph of?

4      A    It's the photograph of the coffee filters that

5      contain the methamphetamine in 508 that were on the

6      table.  Also in that photograph you can see the large

7      plastic pill thing from 509 that contains the smaller

8      plastic bags.

9      Q    Is that a fair and accurate photograph of the way

10     that those things appeared to you after you found them

11     on December 3rd?

12     A    They were actually found up in a cabinet and we --

13     to photograph 'em I had to bring them down and then

14     place them in a bag.

15     Q    So that photograph was taken after you located the

16     items?  You moved them down to photograph them?

17     A    Yes, sir.

18     Q    Other than that, is it fair and accurate?

19     A    Yes.  It is.

20            MR. OAKLEY:  Your Honor, move to admit

21     Government Exhibit 512-B.

22            MR. GRADERT:  No objection.

23            THE COURT:  It's received.

24     BY MR. OAKLEY:

25     Q    That photograph is a little bit dark.  You said that

1    you can see the coffee filters in that photograph?

2    A    Yes.  The coffee filters are right here.

3    Q    You could also see the plastic pill that had the

4    baggies?

5    A    There's the white end of it.  I believe there's the

6    blue end of it right there.

7    Q    Is there any significance to the fact that the

8    coffee filters had methamphetamine in them?

9    A    Initially I thought we were gonna run into a meth

10   lab when I started seeing coffee filters because that's

11   kind of the end method of getting the methamphetamine or

12   separating the methamphetamine out is to use coffee

13   filters.

14   Q    Did you find anything else, though, that would

15   indicate this was a methamphetmine lab?

16   A    No, we did not.

17   Q    So do you know why there was methamphetamine in the

18   coffee filters?

19   A    I could speculate.

20   Q    But it doesn't appear that anyone was cooking

21   methamphetamine?

22   A    Not from what I saw, no.

23   Q    You said you also searched the garage?

24   A    Yes, sir.

25   Q    Was this an attached garage?

1    A    It was not.

2    Q    It was a detached garage?

3    A    Yes, it was.

4    Q    Were you the only one that searched that garage?

5    A    I believe Kansas Bureau Investigator Chris

6    Bumgardner assisted me; and I believe in and out there

7    was some other people but I don't recall who they were.

8    Q    Do you know, were there two firearms that were found

9    in that garage?

10   A    Yes, there were.

11   Q    I'm going to hand you first what's been marked as

12   Government Exhibit 504-A.  Do you recognize that?

13   A    Yes, sir.

14   Q    What is that?

15   A    This was a -- I'm going to read off the label.  It's

16   a J P Sauer shotgun.  It's a Model 12, caliber 20.  It's

17   a side by side shotgun, serial number 249339.

18   Q    And that was found in the garage on Tracy?

19   A    No, sir.  It was found in the kitchen.

20   Q    In the kitchen.  I'm sorry.  Who found that?

21   A    I did.

22   Q    You found that in the kitchen?

23   A    Yes, sir.

24          MR. OAKLEY:  Your Honor, at this time I'd move

25   to admit Government Exhibit 504-A.

```
 1              MR. GRADERT:  No objection.

 2              THE COURT:  It's received.

 3   BY MR. OAKLEY:

 4   Q   Let me talk to you now about the garage.  Did

 5   somebody find a firearm in the garage?

 6   A   Yes.

 7   Q   I'm going to hand you what's been marked as

 8   Government Exhibit 504-B.  Do you recognize that?

 9   A   I believe this was the firearm that Chris Bumgardner

10   found in the garage.  It was in a black briefcase type

11   thing, or suitcase, or -- I don't think it was a

12   briefcase, but a suitcase type.  Had -- I believe there

13   was other firearms -- or not firearms, but pieces, and I

14   believe there was a black powder -- I can't talk

15   today -- a black powder pistol in there also.

16   Q   Okay.  You were with -- were you in the garage when

17   Special Agent Bumgardner found that firearm?

18   A   Yes, I was.

19   Q   And that's a firearm; right?  That's not a black

20   powder gun or anything like that?

21   A   This is a firearm, sir.

22   Q   Is that commonly referred to as a Derringer?

23   A   It is.

24   Q   I'm sorry.  What was the make and model of it?

25   A   This is a Davis Industries, Model DM 22, or caliber,
```

1    22 caliber.  It's a double shot or two shot Derringer

2    basically.

3              MR. OAKLEY:  Your Honor, at this time I'd move

4    to admit Government Exhibit 504-B.

5              MR. GRADERT:  No objection.

6              THE COURT:  It's received.

7    BY MR. OAKLEY:

8    Q    That's not classified as an antique firearm under

9    federal law, is it?

10   A    Not that I know of.

11   Q    I told you I wanted to talk to you about your

12   training and experience and I'd like to do that now.

13   You've talked about your experience in law enforcement.

14   What type of training have you had as it relates --

15   A    I went to the Kansas City police academy back in

16   1992.  I went to the ATF academy in 2001.  I've been to

17   an advanced ATF undercover school.  I've been to a state

18   and local advanced undercover school.  I've been to

19   several other undercover schools.  Training wise,

20   yearly, we do firearms training -- or quarterly we do

21   firearms training.  Some years we do legal updates.  You

22   got me out of order.

23   Q    Let me talk to you about your experience as a law

24   enforcement officer.  It sounds like a lot of your

25   training has related to undercover buys?

1    A    Yes, sir.

2    Q    Are you also familiar with the purchase of guns or

3    drugs using a confidential informant?

4    A    Yes, I am.

5    Q    I want to talk to you about that first.  Can you

6    explain for the jury what we're talking about when we

7    say use a confidential informant or a CI to make buys?

8    A    In some instances, say a gentleman is selling

9    methamphetamine or firearms, and a person will come

10   forward and say my friend Bob -- we'll just use Bob as a

11   name -- is selling drug or guns.  And that person has

12   either decided they want to do the right thing or they

13   want to come in for money or they have a pending charge,

14   to assist themselves and they'll work with law

15   enforcement.  And they'll go in and actually purchase

16   drugs or firearms from the individual selling.  We

17   generally call those people confidential informants.

18   Q    Now, when you as a law enforcement officer utilize a

19   confidential informant, do you just send 'em in and say

20   go buy drugs and let us know when it happens or do you

21   have some kind of control over them?

22   A    It's a very strictly controlled process.  For us,

23   we'll search them completely for narcotics, firearms,

24   currency.  I mean, it consists of getting them down to

25   their underwear.  If they're using their own vehicle,

1      we'll search their vehicle.  Many instances the whole

2      event is recorded.  We try and get the best evidence.

3      If we can do video recording, we'll do video.  If we can

4      do audio, we'll do audio.  And then the paramount thing

5      about everything is safety.  We're there to -- we're not

6      there to get anybody hurt.  We're just there to enforce

7      the law.  And we'll do what we have to do to do that.

8      But after the process, after the person goes in and

9      makes the purchase -- excuse me -- go back.  We'll use

10     our money, the Government's money.  Send that person

11     with our money.  It will be recorded.  We call it

12     prerecorded buy money.  Once the deal is done, we'll

13     come back out, we'll grab the confidential informant,

14     the confidential informant will again be searched to

15     make sure they're not retaining any of our money, not

16     retaining any of the evidence.  And be debriefed.  If it

17     was recorded then the recording will be downloaded to a

18     disk and duplicated and transcribed along with the

19     debriefing of the CI or confidential informant.

20     Q   We're talking about debriefing, does that mean just

21     talking to the confidential informant who bought the

22     drugs?

23     A   Not exactly.

24     Q   What is a debriefing?

25     A   I'm sorry -- that is exactly right.

1    Q    That is exactly right?

2    A    Yes, sir.  It's basically asking them what happened.

3    Q    And so during the debriefing you learn, you know,

4    how the drug transaction occurred?

5    A    Yes.

6    Q    Have you ever been a part of using a confidential

7    informant?

8    A    Yes, I have.

9    Q    Do you have any idea how many times?

10   A    Lots.  Number wise, as far as drug purchases, I have

11   over 200 narcotics purchases where I did the purchase.

12   Q    This is where you actually did the purchase?

13   A    Right.

14   Q    As an undercover?

15   A    Yes, sir.

16   Q    We'll get to that in a second.  But you've also used

17   CI's?

18   A    I didn't keep track of my confidential informant

19   buys.

20   Q    Do you ever run into people on the street where

21   you're able to maybe not use 'em as a CI but you talk to

22   them about the drug trade?

23   A    Yes.

24   Q    And are you ever able to gain information about how

25   drug dealers work and operate through these contacts?

```
 1    A    Yes.

 2    Q    Have you yourself talked to people who have bought

 3    drugs?

 4    A    Yes.

 5    Q    Do you have any idea how many number of those people

 6    you've talked to?

 7    A    Every day.

 8    Q    Now let's get to the undercover stuff.  Can you

 9    explain for the jury what you're talking about when you

10    say that you've operated as an undercover?

11    A    Basically in my position I will try and contact --

12    what we want to do is we want to gain best evidence.  So

13    to do that we want to record or have somebody that's

14    been embedded or has -- I can't think of the word --

15    uhm, that's law enforcement, to get in and contact those

16    groups and make those purchases from those individuals

17    and that way you don't have to worry about somebody

18    that's a confidential informant.  You don't have to

19    worry about their criminal history or something like

20    that might be a hiccup in their testimony.  Where I've

21    testified on numerous occasions, confidential informant

22    might not have.  So the undercover process is I try and

23    meet people and I will try and buy the narcotics or

24    firearms or bombs, explosives, or whatever they're

25    selling that's illegal, directly from them without using
```

1    an informant.

2    Q   You've done this?

3    A   Yes.

4    Q   I don't want to embarrass you but, you know, you

5    have body jewelry and long hair.  Is that a personal

6    preference or is that part of the job?

7    A   I don't know any more.

8    Q   Does it help you when you're operating undercover to

9    I guess look the part?

10   A   I've, I've purchased narcotics and firearms when

11   clean shaven.  In fact, the first, first time I was

12   undercover with the Kansas City police department, one

13   day I was in uniform and the next day I was buying crack

14   on the street.  So it's -- I can't seem to talk today,

15   but I can talk pretty well when I'm out on the street.

16   Q   How many times have you acted as an undercover and

17   purchased either drugs or guns?

18   A   At one point several years ago I was actually asked

19   this and asked to prepare for that number.  We went back

20   and found the logs from Kansas City, and I've got over

21   200 narcotic purchases, which includes -- and I should

22   say over 200 purchases.  And in those purchases was

23   narcotics, firearms, and a variety of different kind of

24   drugs.  Narcotics.  Stolen property.  I can't think of

25   anything else offhand.

1    Q    You said that you figured out that over 200 a few

2    years ago.  Do you remember when -- how many years ago

3    it was you figured out that?

4    A    I think it was 2004.

5    Q    Have you done any undercover stuff since 2004?

6    A    A little bit.

7    Q    Do you have any idea how many you've done since

8    then?

9    A    As an ATF agent I -- it's not necessarily that we're

10   doing buys all the time.  A lot of my time is spent just

11   working in an undercover capacity, meeting people,

12   hanging out with certain groups.  I've had

13   investigations where I made no buys, I was just there

14   for intelligence.  So that's -- that kind of is harder

15   to judge.  When I was a street detective or street

16   narcotics detective in Kansas City, we would go out and

17   buy crack cocaine off the street.  We would buy

18   methamphetamine off the street.  We would go into

19   houses, buy heroin or LSD, marijuana if I didn't say

20   that, and cocaine.  And so -- but with my ATF

21   experience, I've got more long term experience where I'm

22   actually spending time with groups than just actual

23   purchases.

24   Q    So that 200 controlled buy doesn't count the time

25   you've been with ATF?  Or at least much of the time?

362

```
 1    A    Much of the time.  And I'm gonna -- that number is

 2    probably substantially higher because we couldn't find

 3    some of the logs from the first year that I was in the

 4    street narcotics unit.

 5    Q    So 200 was a low --

 6    A    200 is what we was able to count.

 7    Q    You said that you've bought methamphetamine before?

 8    A    Yes, sir.

 9    Q    Based upon your training and your experience, your

10    contact with people who sell methamphetamine, are you

11    familiar with how it's packaged?

12    A    Yes.

13    Q    By drug dealers?

14    A    Yes, sir.

15    Q    Are you familiar with the items that drug dealers I

16    guess use as tools of their trade?

17    A    Some of 'em, yes.

18    Q    Have you ever testified in court?  You said that

19    you've testified in court about your, your

20    investigations, but have you ever testified as an expert

21    before in court?

22    A    I believe I've been asked to testify as an expert.

23    I don't recall if I was deemed by the court as an

24    expert.

25    Q    Have you ever given opinions based upon your
```

1   training and your experience as it relates to drug

2   investigations?

3   A   Yes, I have.

4   Q   Do you have any idea how many times that you've

5   given an opinion based on your training and experience?

6   A   In federal court, probably half a dozen times.

7   Q   You know Special Agent Jones; is that right?

8   A   Yes, I do.

9   Q   And we know that you're involved in this case

10  because of the -- your involvement on December 3rd.

11  Have you had a chance to look at some of the evidence

12  from not only December 3rd but the other incidents

13  involving Todd Gehringer?

14  A   Yes, I have.

15  Q   Before we talk about it, let's talk generally.  When

16  you're trying to determine whether or not someone is

17  possessing drugs for their own use or to distribute,

18  what types of things would you commonly find that may

19  indicate that they are more likely a distributor than a

20  user?

21  A   A big indicator is your packaging material and your

22  scales.  And just the quantity of narcotics that that

23  person is possessing.

24  Q   Let's talk about scales.  Is it only drug

25  distributors who have scales?

1    A    No.

2    Q    Some drug users may have scales?

3    A    Absolutely.

4    Q    Why?

5    A    Drugs is a dirty business.  Everybody's trying to

6    get over on the other person.  As a drug dealer, I tell

7    you I'm selling you an eight ball, which is 3.5 grams,

8    well, it's probably an eight ball with the packages or

9    it's, you know, it's 3.2 grams.  So essentially I've

10   just ripped you off .3 grams, which to an addict or

11   someone that's using, that's quite a, you know, not a

12   huge amount, but it's enough to probably get a little

13   bit of high out of.  And it's money.  They're trying to

14   rip off money.  When you get -- the drug trade is just

15   like anything else, you know, if you ask for $5 worth of

16   anything, you want $5 worth of what you're asking for.

17   Q    Drug distributors would have scales as well?

18   A    Absolutely.

19   Q    You said that you've been able to look at the

20   evidence that was collected in this investigation from

21   each incident?

22   A    Yes, sir.

23   Q    And were you able to find incidents where the

24   Defendant -- or at least where there were scales

25   collected?

365

```
 1    A    Can I look at my notes?

 2    Q    Yes, sir.  Would that help you refresh your

 3    recollection?

 4    A    I know there were scales but I can tell you exactly

 5    how many -- or at least which incidents had scales.

 6    Four out of the five incidents that I looked at had a

 7    scale recovered.

 8    Q    Does that give you any indication as to whether or

 9    not someone was possessing those scales to weigh their

10    own drugs or to distribute?

11              MR. GRADERT:  I'm going to object.  That calls

12    for speculation.

13              THE COURT:  Overruled.

14    BY MR. OAKLEY:

15    Q    Go ahead.

16    A    Just from looking at the incident and saying, okay,

17    there's a scale there, no, it does not give me an

18    indication.

19    Q    As far as looking at each individual incident.  What

20    if you looked at all of them together?

21    A    Well, not -- I'm sorry -- I may have misunderstood

22    your question.  If I just look at it and see a scale, I

23    can't, from my opinion, I can't say that that's a user

24    or distributor.  But if I look at everything that was

25    recovered during these incidents, then I would say that
```

366

1    that person was a distributor.

2    Q    And what do you base that on?  Why would you say

3    that?

4    A    If I may.  Can I go down through the incidents?

5    Q    Yes, sir.

6    A    And these are my notes from the, from the incident

7    reports.  On the 10-10 or October 10, 2006, there was 31

8    grams of methamphetamine.  Separate baggies.  I believe

9    they were in separate baggies.  And then there was extra

10   new baggies or clean baggies.  There was a scale and

11   numerous pills.  And then on -- I need to go get

12   glasses.  12-19, or December 19th, 2006, there was 94

13   grams of meth, a scale, a firearm, recovered.  On 2-26

14   or February 26 of '07, there was a fake book safe, some

15   hydrocodone, marijuana and a gun.  On 5-25-07 there was

16   a scale, marijuana, a quantity of meth -- I'm sorry -- 6

17   grams of meth, some rolling papers and some baggies.

18   And also I reviewed an interview during that one.  On

19   12-3 of '07, again there was a scale that was recovered

20   at the search warrant, numerous empty baggies, including

21   what is in 509, and some, again, meth, and I believe

22   some marijuana was also recovered.

23        When I look at all these incidents and the amount

24   of meth and the amount of clean empty baggies, it would

25   indicate to me that this person is selling narcotics.

1    Q   One of the things that you talked about that you

2    took into consideration was the presence of empty

3    baggies on quite a few occasions.  Do people that use

4    drugs not have baggies?

5    A   People that use drugs will have baggies all the

6    time.  And generally those baggies are gonna have

7    residue in 'em.  Where in this instance, these baggies

8    are clean and unused.  They're still attached where

9    there's actually two baggies together.  To use 'em you'd

10   rip 'em apart and then open 'em up to place your drugs

11   in.

12   Q   So I guess the significance of baggies is clean

13   baggies as opposed to baggies that have been used?  Or

14   that's some significance?

15   A   You can generally tell when a baggy has had

16   methamphetamine or a drug in it because it's powdery,

17   the static charge which keeps a portion of the drug to

18   the bag.  And -- but again, these are together and

19   unused.  I've never experienced a person bringing their

20   own -- a user bringing their own bag to purchase drugs.

21   And as part of my law enforcement, I have sold drugs.

22   Sounds terrible but --

23   Q   You were operating as a --

24   A   I was a policeman selling drugs to a defendant, yes.

25   Q   And those people didn't bring their own empty

368

1    baggies for you?

2    A    No, sir.

3    Q    You said that one of the things that you took into

4    consideration was the amounts of meth?

5    A    Yes, sir.

6    Q    Based upon your training and experience, do you have

7    any idea as far as what is the amount of meth that

8    someone who's an addict would typically use?

9              MR. GRADERT:   I'm going to object without more

10   foundation, Your Honor.

11             THE COURT:   Sustained.

12   BY MR. OAKLEY:

13   Q    You've talked about your experience with selling.

14   Do you have any experience with people who use drugs?

15   A    Yes.  I do.

16   Q    What type of experience do you have?

17   A    I've spent a whole lot of time sittin' with

18   narcotics users talking to 'em.  How much they use.  How

19   they use.  When they use.  Why they use.  I've done

20   interviews where they knew I was the law enforcement and

21   spoke with them also about how they use, you know, when

22   they use, you know, the amounts.  So it's -- I'm in the

23   drug trade but I'm a cop so I know -- I have an opinion

24   about it.

25   Q    Specifically have you talked to meth users?

```
 1   A   Yes, I have.
 2              MR. GRADERT:  I'm going to object to anything
 3   that any meth user said.  Would be hearsay, Your Honor.
 4              THE COURT:  Overruled.
 5   BY MR. OAKLEY:
 6   Q   Based upon your experience, do you have an idea as
 7   far as what users of meth would typically use?
 8   A   From what they've told me, yes, I do.
 9              MR. GRADERT:  Again I'll object on hearsay,
10   Your Honor.
11              THE COURT:  Overruled.
12   BY MR. OAKLEY:
13   Q   This isn't based on one specific person that's told
14   you, but collectively?
15   A   Yes, sir.
16   Q   How much is typical for a user of methamphetamine to
17   use?
18   A   That is a hard question to answer because you'll
19   have some people like a female or a male that have just
20   started using methamphetamine, they're gonna use a
21   smaller quantity.  Where somebody that's -- and
22   generally in my experience the males that have been
23   using methamphetamine for several years, they can get
24   into a larger quantity or almost -- I've had a guy tell
25   me that he was smoking or shooting an eight ball a day.
```

1    Which is 3.5, 3.5 grams.  You know, of course, they

2    can't continue that.  The body is going to just shut 'em

3    down and they're gonna sleep for, you know, several days

4    at a time after that.  They can only go for so long.

5    But I would say a fair amount for an addict would maybe

6    be a gram, gram a day for a couple days until their body

7    shuts down.  And then, you know, they sleep.  They have

8    to sleep.  The body has to sleep at one point or

9    another.  And then they can start that over again.

10   Q    Based upon your training and experience, do people

11   who use methamphetamine, are they able to stockpile

12   methamphetamine?

13   A    Stockpile as in like --

14   Q    As in keep meth, you know, so they can use over a

15   period of a month or two months or an extended period of

16   time?

17   A    I have not known any to be able to stockpile.

18   Q    Do you know why?

19   A    It's an addiction.  It's a terrible addiction.

20   The -- even the people that get off of it, there's a

21   huge reoccurrence for methamphetamine because it's such

22   a huge addiction.  So generally if an addicted person

23   has methamphetamine, they are gonna use it until it's

24   gone or they're gone.

25   Q    You've bought and sold meth yourself.  Do you have

1    any idea how much it goes for?

2    A    Ounce quantities -- there's different purities or

3    different grades of meth.  A lot of what's going on on

4    the street now is everybody is trying to call their meth

5    ice.  In the old days, ice was a very pure form of

6    methamphetamine.  Now it's basically -- it's

7    methamphetamine that looks pretty.  It gets its name ice

8    because when you look at it, it almost looks like ice

9    crystals.  Or some of 'em -- I've seen crystals, you

10   know, four or five inches long.  A lot of it's the

11   purity of that has come down, some because they're using

12   a cut.  It's called MSM, methyl -- it's a long word,

13   it's a chemical word.  But the ice, true ice is probably

14   $1600 an ounce, which an ounce is 28 -- I think 28.35

15   grams.  About 28 grams approximately.  You get down into

16   your grams, anywhere from -- $50 a gram wouldn't be

17   uncommon.

18   Q    You talked a little bit about the purity.  Is there

19   any way for a meth user to be able to determine how pure

20   it is when they purchase it?

21   A    I understand some meth users when they use it they

22   can tell.  As far as just looking at it, I don't believe

23   you can just look at it and tell the purity.

24   Q    And so when you talk about somebody using a gram of

25   meth a day, that's not a gram of pure meth, is it?  I

1   mean, would they have any way of being able to tell they

2   were using a gram of pure meth?

3   A   I'm using that gram as kind of a reference number.

4   Are they using pure meth or really cut meth?  You know,

5   I'm just going on experience of what people told me, and

6   I guess I probably didn't ask was it, you know, and they

7   wouldn't be able to tell you, was it a hundred percent

8   pure, was it 85% pure.  So that would be a tough

9   question.

10  Q   It would take a chemist to be able to say the purity

11  level?

12  A   Yes.

13  Q   When you -- when someone purchases methamphetamine,

14  you talked about how much it is per ounce.  Do you get a

15  better rate the more you buy?

16  A   Generally, yes.

17  Q   So if you get a better rate the more you buy, why

18  don't people stock up like they do at Sam's and go buy a

19  case of toilet paper that will last you a couple months?

20  A   I'm sorry.  I missed the question.

21  Q   Why don't people stock up?  If you get a better

22  price for the more that you purchase, why don't you see

23  people stocking up?

24  A   A lot of it is it's a pure money issue.  When you're

25  talking anywhere from $1100 to $1600 an ounce, I mean,

1    that's a lot of money.  So to get multiple ounces, I

2    mean, so if you're at the low end and you're gettin',

3    say you're gettin' a cut rate of, you know, $800 an

4    ounce or even down to $500 an ounce, to by multiple

5    ounces, you're up to 15 to $2000 for four ounces.  And

6    then if you're, in my experience, if you're an addict,

7    you're gonna use as much as you're sellin' if that's

8    what you're tryin' to do.  So your profit margin is cut

9    way down because you're using what you're -- you're

10   using your product.  It's the supply and demand.  If you

11   use up your product before you can sell it, you don't

12   have money to go back and buy more.

13   Q    Let me talk to you about that a little bit.  Is it

14   uncommon, based upon your training and experience, to

15   find people who sell meth who are also users themselves?

16   A    All the time.

17   Q    One of the other things that you talked about when

18   you're looking at the factors and determining user

19   versus distributor is money.  Why is that a factor?

20   A    I mean, you've got to look at the person.  Is the

21   person employed?  Is he drawing social security?  What's

22   his ability to do -- to draw income?  If that person has

23   no income or -- he's either lied on his taxes or he's

24   sellin' drugs.  You know, the larger the amount of

25   money, apparently, it would appear, the more of the drug

1    that he's selling.

2    Q    Is the drug trade a cash trade?  I mean, have you

3    ever bought meth using a credit card?

4    A    I've traded, but no credit card.

5    Q    Personal checks I mean.

6    A    No checks.

7    Q    They're using --

8    A    I've heard of people taking a check but I've never

9    scene a person --

10   Q    Based upon your training and experience, is it more

11   common to use cash?

12   A    Cash is king.

13   Q    Let me talk to you a little bit about the

14   dangerousness of the drug trade.  Are there any dangers

15   associated with selling drugs?

16   A    Absolutely.

17   Q    What are those dangers?

18   A    You know, it's money and drugs.  Money and drugs and

19   guns.  Money and drugs and guns, you got violence.  The

20   possibility is endless.  The addiction factor on top of

21   everything else.  I mean, it's not uncommon to see even

22   in the newspapers an addiction has caused somebody to

23   lose their entire house, their life's savings, their

24   children and their family.  If you're willing to do that

25   for a drug, you know, what's gonna stop you from doing

1  that during a -- doing something blatantly aggressive

2  during a drug deal.  Nothing.  And that's why you'll see

3  so many drug on drug assaults.

4  Q   Based upon your training and experience, do drug

5  dealers ever possess firearms?

6  A   All the time.

7  Q   What's the purpose for possessing a firearm if

8  you're a drug dealer?

9  A   Protect themselves.

10 Q   Have you ever had experience where someone that

11 you've investigated has possessed a firearm to help them

12 sell drugs?  In other words, either to protect their

13 drugs or to --

14 A   I've had experiences where I've been held at gun

15 point while I was purchasing narcotics.  It's --

16 that's -- you know, they feel that's their protection.

17 Stops them from being robbed, from their drugs being

18 taken and their money being taken.

19 Q   In your review of the evidence in this case, did you

20 consider an incident that occurred on December 19th,

21 2006, at a parking lot at Homeland grocery store?

22 A   Yes, sir.

23 Q   And do you know how much the quantity was of

24 methamphetamine that was found in a pickup truck on that

25 day?

376

1    A    It was 94 grams of meth, I believe, from the lab

2    report.

3    Q    And after purity, do you know, was that about 42

4    grams?

5    A    I didn't look at that part.  I'm sorry.

6    Q    But the 94 was before the purity analysis was taken

7    into consideration?

8    A    I think that was the total weight.

9    Q    Whether we're talking about 42 grams or ninety some

10   grams, is that a quantity that you would typically

11   associate with somebody who uses or sells?

12   A    94 grams I would say is a distributor amount.

13   Q    Based upon your review of the evidence, was there a

14   firearm that was found in that case?

15   A    Yes, there was.

16   Q    Do you know where the firearm was found at?

17   A    Reading the report, I believe the firearm and the

18   drugs and the scale were sitting on the seat of the

19   truck.

20   Q    Do you know what kind of firearm it was?

21   A    I don't.

22   Q    When you're looking at a firearm and trying to

23   ascertain whether or not somebody is using it as part of

24   their drug trade, what do you look at?

25   A    The proximity of the firearm to the narcotics.  Any

1    statements that person might have made.  The -- you can

2    look at the person.  You know, what's their history?  Do

3    they have any other firearms and drug connections?  And

4    just really the proximity of the firearm to them and

5    where the drugs were.

6    Q    Whether or not it's loaded make a difference?

7    A    No.  I've run across people that were admittedly

8    using their gun to protect their narcotics trade but

9    didn't have, didn't have a round in the chamber but they

10   might have, you know, still had rounds in the magazine.

11   So I think a lot of it is the outward appearance, hey,

12   I've got a gun, don't mess with me.

13   Q    Now, you're an ATF agent.  Do you have a gun?

14   A    Yes, I do.

15   Q    Do you have a handgun?

16   A    Yes, I do.

17   Q    Is it a semi automatic handgun?

18   A    Yes, it is.

19   Q    If the magazine of your gun is loaded, there's

20   bullets in it, and it's in the gun but there's not one

21   in the chamber, how difficult is it to put the gun into

22   a position that's ready to be fired?

23   A    Nothing at all.  Just pull the slide back and the

24   slide will catch the round and put it in the chamber.

25   Q    Let me talk to you about that December 19th

1  incident.  Based upon your training and experience,

2  based upon your review of the evidence, do you have an

3  opinion as to whether or not the drugs that were

4  possessed in that incident were possessed with the

5  intent to distribute?

6  A    In the 12-19?

7  Q    Yes, sir.

8  A    Absolutely it was meant for distribution.

9  Q    Based upon your training and experience and review

10 of the evidence, do you have an opinion as to whether or

11 not the firearm that was in that truck was possessed

12 with the intent to use in furtherance of the drug

13 trafficking offense?

14 A    In my opinion, yes, it was.

15         MR. OAKLEY:  No further questions.

16         THE COURT:  Mr. Gradert.

17         MR. GRADERT:  Thank you, Your Honor.

18                   **CROSS EXAMINATION**

19 BY MR. GRADERT:

20 Q    Agent Williamson, let me ask you this:  Have you

21 ever used drugs?

22 A    Excuse me.

23 Q    Have you ever used drugs?

24 A    Yes, I have.

25 Q    Illegal drugs?

1    A    Yes, sir.

2    Q    And is that part of your job or --

3    A    No, sir.

4    Q    Before you were working?

5    A    Yes, sir.

6    Q    Okay.  You don't use 'em any more?

7    A    Prescription.

8    Q    Okay.  When you're engaged in undercover drug

9    trafficking, have you ever been asked to use drugs?

10   A    Yes, sir.

11   Q    Have you ever used them while you were working?

12   A    I've had one exposure.

13   Q    And the reason that sometimes drug dealers will do

14   that is to make sure that you're legit because if you're

15   using it, you're probably not a cop; right?

16   A    That's a possibility.

17   Q    In fact, I see where undercover agents all the time

18   say they simulate using drugs.  How do you simulate like

19   injecting heroin?

20   A    I don't.

21   Q    Okay.  How about marijuana?

22   A    I don't.

23   Q    Okay.  You talked a little bit about baggies.  These

24   are tiny baggies; correct?  Pretty small?

25   A    Yes, sir.

1   Q   You know what other legitimate purposes baggies

2   have?  Those baggies?

3   A   These baggies?  I believe they're sold for like

4   jewelry.

5   Q   Okay.  Have you ever seen any other purposes for

6   them?

7   A   Drugs.

8   Q   Where can you buy them?

9   A   These are commonly found at the head shops.  I think

10  some of the smaller convenience stores sell 'em.

11  Q   Can you get 'em at Walgreen's or Dillon's?

12  A   Never seen 'em there.

13  Q   Okay.  It's true, isn't it, though, that any kind of

14  a sandwich bag raises suspicion in undercover narcotics

15  work; correct?

16  A   No, sir.

17  Q   So if I've got a case next week where they come in

18  with a bunch of baggies that are regular sandwich bags,

19  nobody should be able to say those are suspicious?

20  A   If I just have a box of sandwich bags?

21  Q   Okay.  I might call you next week.

22  A   I'll be out of town.

23  Q   Coffee filter.  Those -- you were suspicious of

24  those because you thought they might be indicative of a

25  meth lab somehow or another; is that correct?

381

```
 1    A    Yes, sir.

 2    Q    What about coffee filters has anything to do with a

 3    meth lab?

 4    A    Actually, part of my experience, I spent three years

 5    with a methamphetamine task force.  During that time I

 6    purchased meth, gram quantities to pound quantities.  I

 7    also processed meth labs.  Which basically we would

 8    investigate, find a meth lab and then work on

 9    disassembling the meth lab.  And the coffee filters were

10    used to strain the methamphetamine out of a solution.

11    Q    Okay.  And -- but, of course, almost -- most

12    households have coffee filters in them, don't they?

13    A    Mine does.

14    Q    Okay.  And if there's meth on it, that doesn't

15    necessarily mean there's a meth lab; correct?

16    A    No, sir.  It does not mean that.

17    Q    And you made that determination in this case that

18    there was no meth lab?

19    A    We didn't find anything else to indicate.

20    Q    Did you have some reason to believe there was a meth

21    lab there at the house?

22    A    Well, the coffee -- I believe the coffee filters

23    were found early into my search.  And when I see that,

24    I'm thinkin', okay, now we need to start looking for the

25    chemicals, the glassware, anything else that's
```

1    associated with the meth lab.  And I don't believe we

2    found anything else.

3    Q   Did you have some suspicion even before that that

4    there might be a meth lab there?

5    A   Not that I remember.

6    Q   The shotgun that you talked about here a little

7    while ago that was found in the kitchen.  That was

8    unloaded, wasn't it, when you found it?

9    A   I believe it was.

10   Q   And that Derringer that was found in the garage, was

11   it loaded?

12   A   I don't believe so.

13   Q   Okay.  When people use firearms in their drug

14   trafficking -- and you've had a lot of experience with

15   this -- do you see very many old antique like guns?

16   A   I'm sorry.  Say that again.

17   Q   Do you see very many old guns involved in those

18   kinds of situations?

19   A   I actually was held at -- on a separate occasion at

20   gunpoint with a black powder pistol, which is not -- not

21   necessarily -- it was an old gun, but it was a replica

22   of a Civil War gun.

23   Q   So occasionally a drug dealer will use any kind of a

24   gun to protect their drugs or to engage in their drug

25   trafficking.  Is that what you're saying?

1    A    Yes.

2    Q    Okay.  But it's not as -- I mean, we've talked

3    about -- Mr. Oakley talked to you about what's typical.

4    What's typical is the new semi automatics and more

5    modern pistols; is that correct?

6    A    I've seen everything.  I mean, you know, we've had

7    assault rifles.  We've had pistols.  We've had older

8    stuff.  We've had the Colt 1911 used in drug deals.  So,

9    I mean, it's all across the spectrum what kind of

10   firearm.  It's the intimidation of the firearm.

11   Q    So there's so many different possibilities that it's

12   really hard to say what is typical.  Is that what you're

13   saying?

14   A    I don't think there is a typical firearm for a drug

15   deal.

16   Q    Okay.  In fact, drug deals generally are varied?  I

17   mean, we could probably sit here and talk about a whole

18   bunch of different kinds that we've just had together.

19   Is that a fair statement?

20   A    We've never dealt drugs together.

21   Q    I mean that we've maybe talked about?

22   A    Yes, sir.

23   Q    In your training -- you've talked a lot about your

24   training.  Mr. Oakley went through a lot of things, your

25   police training, your undercover school, your yearly

384

1    firearms training, legal updates, all those kinds of

2    things.  You've never been trained by a drug dealer,

3    have you?  I mean, do they bring drug dealers in to tell

4    you how they do it?

5    A    We've actually -- actually one of the DEA schools

6    that I went to, we actually sat through about a three

7    hour lecture from a drug dealer.

8    Q    A recovered addict or something like that?

9    A    Well, at the end of it he used what he made so I

10   don't know if he was recovering.

11   Q    Which brings me to another point.  When you say

12   something about used what they made.  Even though there

13   is the possibility that there are those who both use and

14   sell, it's not a very good business scheme, is it, to

15   sell and use?

16   A    Oh, that's a poor business scheme.

17   Q    Pardon me?

18   A    It's a poor business scheme to use your product.

19   Q    In fact, like in your example of the person that

20   gave you some teaching skills about it, they eventually

21   used up all that they had to sell and that's the end of

22   it, isn't it?

23   A    In that instance they didn't.  I mean, they made a

24   small quantity and they used it.

25   Q    When you're out selling -- or, excuse me -- when

385

1    you're out using, though, and you've got like a habit or

2    whatever, an addiction, it exposes you to being caught

3    easier, doesn't it, when you're out, you know, trying to

4    purchase drugs from people, from different people?

5    A    That's a possibility.

6    Q    Mr. Gehringer over here, did you actually involve

7    yourself at all in attempting to buy guns or drugs from

8    him at all during the course of your overall

9    investigation of him?

10   A    I think we made a run at him one time.

11   Q    And when you made a run at him, how did you do that?

12   With an informant?

13   A    I believe we had an informant, yes, sir.

14   Q    And it didn't work?  I mean, he didn't sell

15   anything, did he?

16   A    No.

17   Q    Is that because he didn't have anything or do you

18   know?

19   A    I believe we were just trying to buy firearms and he

20   said they weren't available or they were at somebody

21   else's house.  We weren't trying to buy drugs at that

22   time.

23   Q    Did you record that with a wire or any kind of a

24   tape recording?

25   A    I don't recall if we did that one or not.

386

1  Q   So whatever you would have gotten back would have

2  been from whatever your informer told you; is that

3  correct?

4  A   It would -- there would be -- there's -- there might

5  be some notes on it.  I don't recall the -- I recall the

6  incident, but I don't remember what happened with it.

7  Q   Sometimes you don't always send your informers in

8  with a wire because somebody might want to check it and

9  see if they're wired so that they can be recorded.  Is

10 that correct?

11 A   Sometimes.

12 Q   Okay.  Or maybe in the initial stages of an

13 investigation?

14 A   Just depends.

15 Q   You did say, I think, though, that different -- as

16 far as the use of drugs, that people that you've

17 encountered use varying amounts.  Some will use more

18 than others; correct?

19 A   Yes.

20 Q   And is there a maximum amount of like, say,

21 methamphetamine that a person can use before it, you

22 know, kills them?  Or is that going to vary between

23 people, too?

24 A   I would have to say that would vary.  That would be

25 almost a doctor question.

387

1   Q   What's the most you've ever seen anybody use in,

2   say, a 24 hour span?

3   A   I had a guy tell me he was using an eight ball, or

4   3.5 grams a day.

5   Q   So in a seven day week, 21, 21 grams?

6   A   He couldn't make it seven days.  He would only make

7   it a day or two and then it was a body burn out where he

8   was just shut down and have to, you know, sleep.  His

9   body would just force him to sleep or crash.

10   Q   And people that would have that kind of thing going

11   on where they use a lot of drugs and they sleep, they'd

12   miss work, they'd miss their -- not make it to their

13   jobs.  Correct?

14   A   It's --

15   Q   I think you said people have lost their homes,

16   they've lost their jobs because of drugs; right?

17   A   Yes, sir.

18   Q   Have you run into very many street level drug

19   dealers who had jobs where they made 60, 70, $80,000 a

20   year?

21   A   Street level drug dealer that made 60, $70,000 a

22   year?  Are you counting the drug proceeds or just --

23   Q   No.  I'm just talking about on their regular job.

24   A   A regular job that's reported to IRS?  Legal?

25   Q   Well, sometimes maybe people don't always report it

```
 1    to the IRS but it was that much money that they --
 2    A   I have experience with a guy that was probably
 3    making that from a family trust but not -- not that he
 4    had a job doing that, no.
 5    Q   So it's kind of unusual to see these drug dealers or
 6    even addicts who have fairly good incomes; correct?
 7    A   I'm sorry.  Say that again.
 8    Q   It's unusual to see both distributors or users of
 9    drugs who have incomes or sources of income outside of
10    the drug area that are sizeable.  Is that a fair
11    statement?
12    A   No.
13    Q   I mean, it's not typical?
14    A   I know several addicts of narcotics that have very
15    good incomes.
16    Q   I think you said, you know, a drug addict doesn't
17    want to -- they'll use up whatever they have, though; is
18    that correct?
19    A   Yes, sir.
20    Q   And so if you use it all up on Monday, are you gonna
21    be out looking for it again the next day, Tuesday?
22    A   Probably.
23    Q   Okay.  And then if you use all that you get on
24    Tuesday, you're going to be looking for it again on
25    Wednesday; right?
```

389

```
 1    A    That's reasonable.

 2    Q    So if you could buy it -- Mr. Oakley talked about

 3    Sam's.  You know, if you go to Sam's and you buy a big

 4    old can of pork and beans, you don't have to go to the

 5    store every day and buy a little can.  You can just eat

 6    out of that thing for a whole week.  Makes sense,

 7    doesn't it?

 8    A    Yes, sir.

 9    Q    Okay.  And if a drug dealer had the ability, the

10    financial wherewithal, to do that, wouldn't it make

11    sense to buy in a larger quantity for not only the

12    reason that you don't have to go out every day and try

13    to get some new, but also because it keeps you from

14    running the risk of being out there and being caught on

15    a daily basis.  Is that a fair statement?

16    A    That would make sense if the addiction wasn't

17    involved.

18    Q    Because they'll use up all that they have?

19    A    I believe in my opinion, yes.

20    Q    But you said earlier that they can only use so much

21    and then they pass out and then when they wake up

22    they're gonna wanna get more.  So if they already have

23    it there, that makes it easy, doesn't it?

24    A    It would make it easier.

25    Q    You were asked to analyze each of these incidents
```

1    that allegedly involves Mr. Gehringer and I think you

2    gave an opinion about -- I don't remember if you gave an

3    opinion about the incident on October 10th of 2006.  Did

4    you have an opinion on that?

5    A    Well, I think what I did is I took all the incidents

6    involved and from everything that was recovered during

7    all of them, I would say that Mr. Gehringer is dealing

8    in drugs.

9    Q    Okay.  So a lot of your theory in this case is based

10   on the fact that he was arrested a lot of different

11   times and there were drugs or firearms associated with

12   him; is that correct?

13   A    Yes.

14   Q    So you might not have been able to make the same

15   kind of assumption or speculation if he had just, like,

16   been arrested after the first one and that was the only

17   one you had to base it on.  Is that what you're saying?

18   A    If you want, we could break it down into each

19   incident.

20   Q    Well, let's talk about October 10.  Let's just talk

21   about that one.  That's a car stop with him; correct?

22   A    Yes.

23   Q    And how much methamphetamine is found in that?

24   A    31 grams.

25   Q    31 grams.  May or may not be enough for

1   distribution -- or for personal use.  You think it may

2   be enough for distribution.  Correct?

3   A   It's -- with the amount, and I believe it was in

4   four separate baggies, and then, of course, he had extra

5   baggies and a scale.  I would say that there's enough

6   there to give an opinion that he's distributing.

7   Q   Or that whoever had that bag was distributing;

8   correct?

9   A   Or whoever had that bag was distributing.

10  Q   Because you're drawing the assumption that that bag

11  was Mr. Gehringer's; correct?

12  A   I am.

13  Q   Okay.  But you don't know, do you?

14  A   I was not there.

15  Q   Do you know that there was another individual in the

16  vehicle with him?

17  A   I believe there was a female.

18  Q   Have you had cases where you've arrested somebody

19  where there's multiple people in a car?

20  A   Yes.

21  Q   How do you determine who possessed the item in the

22  car?

23  A   Each incident is different; but you could do

24  interviews, fingerprints if you're able to, DNA.

25  Q   What if you don't have any of those?

392

1    A   The location of where it was in the car.  I'm

2    sorry --

3    Q   Okay.  Would it be better to determine in a car, for

4    example, if the drugs are found under the driver's seat

5    that the driver possessed it?

6    A   It would be more likely than not I guess.

7    Q   If there was somebody in the back seat right behind

8    the driver's seat, though, who could easily stuff that

9    up underneath there, would that then be an indicator?

10   Or would you be looking at the person in the front seat

11   driver's position and the person in the back seat?

12   A   I think in each incident you would have to look at

13   the total incident and look at all the interviews and

14   what was found and make a determination from there.

15   Q   Is it safe to say that sometimes you have drug cases

16   where there's multiple people arrested in a house or a

17   car and you arrest everybody that's in the car or in the

18   house?

19   A   Yes, that has happened.

20   Q   And then are they all prosecuted or do sometimes

21   they -- somebody will end up cooperating or saying,

22   well, yeah, he did it, it's his stuff?

23   A   It would depend on the incident.

24   Q   How do you know who to believe in those kinds of

25   instances?

1    A    You take the facts of what they're telling you and

2    weigh it with what you can corroborate.

3    Q    But you can't really know for sure, can you?

4    A    Well, I believe on the October 10th incident

5    Mr. Gehringer had exited the vehicle and a meth pipe was

6    found at his feet.  I think, according to the report, it

7    had been raining but the meth pipe was dry which would

8    indicate to me that that meth pipe probably belonged to

9    Mr. Gehringer.  And since there was narcotics in the

10   car, I don't know, just from what I've read, I would

11   probably say that the narcotics and the associated stuff

12   belonged to him.

13   Q    Well, let me ask you this.  If an individual runs

14   from a car to ditch their meth pipe to avoid being

15   apprehended for drugs, wouldn't it also make sense to

16   ditch the other stuff?  Get rid of the stuff so you

17   don't get caught?

18   A    If he had it on him at the time.  If it was

19   underneath the seat, he might not have been able to

20   reach for it.

21   Q    Okay.  But people do sometimes run and try to throw

22   their drugs down or get rid of them hoping that somebody

23   is not going to find it; is that correct?

24   A    All the time.

25   Q    Don't you think that's what happened with the meth

394

1    pipe in this case?

2    A   It's possible.

3    Q   Is it possible that since he may have had a meth

4    pipe that he was using drugs and that he was maybe

5    buying some drugs from somebody to use?

6    A   It's possible.

7    Q   That's possible, too?

8        On the December 19th incident, you've based your

9    opinions, as I understand it, on the quantity of drugs,

10   whether it's the 94 grams of gross weight or the 42

11   grams of purity.  Either way, it looks like it's enough

12   for distribution.  Is that correct?

13   A   Yes, sir.

14   Q   Okay.  That's the largest quantity at any one time

15   in this particular case; is that also correct?

16   A   I believe so.

17   Q   Of any individual instance?

18   A   Yes, sir.

19   Q   Okay.  And part of that decision is also based on

20   the cumulative effect of the scale and a loaded firearm,

21   too; correct?

22   A   Yes, sir.

23   Q   And you don't have any way of really knowing for

24   sure of whether or not the drug -- the person who had

25   those drugs, assuming that they were for distribution,

395

1    was gonna have that gun in there for any reason related

2    to the drugs, do you?  Other than the proximity?

3    A   On this, with the amount and the proximity and the

4    scale, I would say since they were close together, I

5    would say they're all enjoined.

6    Q   Well, in the front of a pickup truck there's really

7    only a small compartment for maybe three people to sit

8    in and a glove box and underneath the seat.  If the gun

9    was underneath the seat or in the glove box, would your

10   opinion be the same?

11   A   If -- I'm sorry -- if the gun was underneath the

12   seat or in the glove box?

13   Q   Yes.

14   A   It wouldn't be as easy for me to -- I'd have a

15   tougher time; but, again, you have to look at the total

16   circumstances.  Did he interview -- did he say anything

17   during the interview?  Did he mention where he was

18   coming from?  What he was doing?

19   Q   Fingerprints, that type of thing?

20   A   If they were available, yes.

21   Q   Because that's part of the problem in a case like

22   this is if -- we can make maybe the assumption that

23   somebody that had those items was engaged in drug

24   trafficking and maybe they had a gun they were using in

25   drug trafficking, but we really need to know who that

1    person is; is that correct?

2    A    I'm not sure -- I'm not tracking what you're asking.

3    Q    If you found all those things but don't have any

4    idea who they belong to or who had them, how would you

5    attribute them to anybody?  I mean, you can make your --

6    A    If you found a gun, a bag of dope and a scale in the

7    middle of the field, it would be very tough.  You know,

8    you would try fingerprints with firearms.  And baggies

9    are very tough to fingerprint.  DNA is very expensive

10   and tough thing to do also.  I mean, you look at the

11   circumstance.  And according to the reports in this

12   incident, he had exited the vehicle after he hit a sign,

13   walked to a closed store and then the police contacted

14   him.

15   Q    So your opinion is based on the items found but also

16   on your reliance on what some Wichita police officer

17   claims that he saw; correct?

18   A    Yes, sir.

19   Q    Okay.

20              THE COURT:  How much more do you have?

21              MR. GRADERT:  I'm about done, Judge.  I think

22   we're nearly done here.

23              THE COURT:  Okay.

24   BY MR. GRADERT:

25   Q    What was the next incident, though, that you talked

1    about rendering an opinion about whether or not there
2    was drug trafficking?  Was it the May search warrant?
3    A   Well, I think I -- I think overall -- I gave an
4    overall opinion from all the incidents that it appeared
5    that he was trafficking or distributing.
6    Q   But I did want to ask you about, you know, when you
7    find all these unloaded rifles and shotguns laying
8    around in the house, if you're a drug dealer and you
9    have a gun in your house, it's there for -- I mean, it
10   might just be for your general protection but it might
11   be to protect your drugs, too.  Is that correct?
12   A   That is true.
13   Q   Okay.  If you have bullets but don't put 'em in the
14   gun, does that do very much to enhance your protection
15   of your drug operation?  I mean, if you don't need to
16   hold a fake gun or an unloaded gun up because you have
17   the ammunition to put in it but you don't, does that
18   make much sense to you in terms of protecting your drug
19   operation?
20   A   Question you're asking -- can you --
21   Q   Well, let me see if I can rephrase that.  Does it
22   make a lot of sense to have a bunch of unloaded guns
23   around to protect a drug operation?
24   A   You mean --
25   Q   In your home?

1    A    You'd have to look at it.  I mean, are they, are

2    they there for your drug operation or are they there as

3    just laying around for intimidation, just the fact that

4    you've got guns.  I mean, you'd have to look at the

5    incident.

6    Q    Well, how would that impact, say, somebody who

7    was -- thought that Mr. Gehringer was a drug dealer and

8    wanted to come up and rob the house?  He wouldn't have

9    any idea what he had laying around in the house in the

10   way of guns necessarily, would he?

11   A    Not necessarily.

12   Q    Okay.

13           MR. GRADERT:  I think that's all I have.

14   Thank you.

15           MR. OAKLEY:  I have no further questions, Your

16   Honor.

17           THE COURT:  All right.  I think what we'll do

18   is take another recess, Ladies and Gentlemen.  It's been

19   a while.  About 15 minutes.  Remember and heed the.

20                   (Jury excused from the courtroom

21                    for recess.)

22           THE COURT:  Be seated.  What's the status of

23   your case?

24           MR. OAKLEY:  Your Honor, we intend to mark and

25   admit and read the stipulation and then we will rest.

```
 1              THE COURT:  All right.  Do you want to make a
 2     motion now or do you want to wait until the stipulation
 3     is in?
 4              MR. GRADERT:  Well, might as well make it now,
 5     Judge, because I don't want to take a break between the
 6     stipulation and --
 7              THE COURT:  Doesn't seem like there would be
 8     much point in it.
 9              MR. GRADERT:  You know, there's a -- Rule 29
10     motions are always tough for me in terms of judgment of
11     acquittal, but we don't have -- there's no evidence in
12     this case of my client actually selling any drugs.
13     Everything is based on speculation and on the theory
14     that because of certain quantities of drugs or presence
15     of firearms, that he possessed drugs with an intent to
16     distribute.  And I would submit that that's insufficient
17     evidence, Your Honor, to sustain a conviction on those
18     charges.
19         I specifically believe that the evidence is
20     inadequate with regard to the incident on October 10 in
21     which there are two people present in the vehicle.  And
22     there's no proof in that instance at all as to who in
23     that vehicle may have possessed those drugs.  And I'd
24     ask the Court to consider dismissing at least that
25     charge.
```

1              THE COURT:  Well, you know the standard.  I

2      can't weigh the evidence at this point.  I have to

3      consider the evidence in the light most favorable to the

4      Government.  Some of the evidence is stronger than

5      others on some of the counts.  But I believe that

6      there's sufficient evidence to go to the jury on all of

7      the counts.  So I'm denying the motion.

8          Now, how long do you -- Mr. Gehringer, do you still

9      want to testify?

10             DEFENDANT MR. GEHRINGER:  Yes, Your Honor.  I

11     think it would be in my best interest.

12             THE COURT:  All right.  How long do you think

13     that his testimony will last, Mr. Gradert?

14             MR. GRADERT:  You know, I really have no idea,

15     Your Honor.  I just don't.  What we'll probably do is go

16     through each of these incidents and talk about his

17     relationship to those incidents.  We'll do a little

18     background with him and, you know, about his job.

19             THE COURT:  Have you seen the Government's

20     motion in limine?

21             MR. GRADERT:  I have, Your Honor, and, of

22     course, I kind of anticipated that I might eventually

23     see that or at least hear it in some argument.  And, you

24     know, I know the Court's aware that I've been kind of

25     alluding to something regarding knowledge and things

1    along, in this --

2         THE COURT:  I wouldn't call it alluding.

3         MR. GRADERT:  Well, I'll be frank, Your Honor,

4    Mr. Gehringer, you know, did not know that it was

5    against the law for him to possess these firearms.  And,

6    frankly, I, I guess we have some laws that people don't

7    know exist, but this is one where I just think that it's

8    not very fair to convict somebody of possession.

9         THE COURT:  Well, here's what I'm going to do.

10   It's 4:00.  We've been at it all day.  I'm going to give

11   you an opportunity in the next day, because we won't be

12   here tomorrow, to look at the motion in limine.  If you

13   can -- and I don't think you'll be able to find any --

14   but if you can come up with some case law to support

15   your theory that the Government must prove that he knew

16   that it was against the law for a drug user to possess

17   firearms, then I'll give that consideration.

18        MR. GRADERT:  I've been looking pretty hard

19   for a long time, Judge, and I haven't been able to find

20   one.

21        THE COURT:  I'm going to give you another day.

22        MR. GRADERT:  I can tell you this.  Part of my

23   theory though, Your Honor, is that -- well, and this is

24   where I may be totally off base -- but on the, on the

25   day that he's charged with each of these incidents, he

1    abandons, essentially, those items.  And I have a

2    question about -- and I notice they cited US vs. Adkins,

3    which is one of my cases on temporal possession, and I

4    know this Court's heard a lot of different arguments

5    from my colleague on that.  I made bad case law, I

6    think, when I took that case up.  And I tried it in

7    front of Judge Rogers years ago.  But I, I've been

8    looking and I would also ask the Court if I'm unable to

9    find anything, whether or not there's anything to

10   indicate that an abandonment of property is somewhat

11   like a withdrawal in a conspiracy, that you -- it goes

12   to the intent issue rather than the knowledge issue.

13   And it seems to me that that's what happened here.

14            THE COURT:  I don't know.

15            MR. GRADERT:  It's a general intent crime.

16            THE COURT:  You're always so inventive on

17   these things that -- I mean, I told Teresa, you know,

18   that's one of your strong points is that you're

19   inventive.  But I think you're going to have to present

20   me with some case law that would say that this is

21   relevant and that I should instruct the jury on it.

22   And, frankly, I haven't looked to see if there's any

23   cases on abandonment of firearms and whether that would

24   somehow indicate that the Defendant -- but even so, all

25   of the case law that I'm able to, and I think probably

1    all that you've ever been able to find, including all

2    the Tenth Circuit case law, basically says that this is

3    a strict liability type of crime.  And under those

4    circumstances, it's very hard for me to believe that you

5    could use an abandonment theory because there's no

6    intent requirement here.  I don't know.  I'm not -- I

7    think it's probably a good thing that we have a day

8    here.

9            MR. GRADERT:  Judge, let me ask you this, too.

10   Is it your intention then before we even put

11   Mr. Gehringer on to go ahead and release the jury then

12   today since we've been going so long --

13           THE COURT:  Yeah.

14           MR. GRADERT:  -- and begin Friday with his

15   testimony.

16           THE COURT:  Right.  What I think we need to do

17   today, if you've had time to go over the instructions,

18   is to go over the instructions today.  These are all

19   straightforward instructions.  Have you had time to look

20   at them?

21           MR. GRADERT:  I've been looking for the

22   abandonment of property instruction, Your Honor, but I

23   haven't looked at the rest of them very --

24           THE COURT:  What we'll do is I'll excuse the

25   jury until 10:00 on Friday morning.  That way we can

404

1    come in here at 8:30 or 9, we can go over the

2    instructions.  If you've found some case law that

3    supports your theory and you've had time to look over

4    the Government's motion in limine, we can argue that at

5    the time before Mr. Gehringer testifies so we don't have

6    a bunch of problems and objections and everything during

7    his testimony.  That will still give us -- because I

8    assume he's your only witness.

9            MR. GRADERT:  Yes, Your Honor, he is my only

10   witness.

11           THE COURT:  So I assume that that would still

12   give us plenty of time on Friday to argue and instruct

13   and let the jury deliberate.

14           MR. GRADERT:  Okay.  Thank you very much, Your

15   Honor.

16           THE COURT:  Is that all right with everyone?

17           MR. GRADERT:  That would be fine.  I assume

18   the Government is then going to rest then after the

19   stipulation here today.

20           MR. OAKLEY:  Yes, Your Honor.

21           THE COURT:  Let's bring in the jury.

22                  (Jury returns to the courtroom.)

23           THE COURT:  Please be seated.  Call your next

24   witness.

25           MR. OAKLEY:  Your Honor, at this time the

1    parties have entered into a stipulation that I've marked

2    as Government Exhibit 601.  I would move to admit it

3    into evidence and read it into the record.

4              THE COURT:  Any objection?

5              MR. GRADERT:  No objection, Your Honor.

6              THE COURT:  All right.

7              MR. OAKLEY:  Stipulations.  It is hereby

8    stipulated and agreed by and between counsel for the

9    United States and counsel for the Defendant, Steve

10   Gradert, with express consent of the Defendant, Todd R

11   Gehringer, as follows:  Prior to any firearm being found

12   in Kansas which has been admitted into evidence in this

13   case, each firearm has previously been shipped or

14   transported in interstate or foreign commerce in order

15   that it could come to the State of Kansas.  Therefore,

16   the Defendant is stipulating that the Government has

17   proved the interstate nexus element of the offenses

18   listed in Counts 1, 5, 7 and 10 of the Second

19   Superseding Indictment beyond a reasonable doubt and

20   that no further evidence is needed to prove this element

21   and those offenses.

22        Signed, Matt Treaster, Assistant U.S. Attorney,

23   Steve Gradert, Assistant Public Defender, and Todd R

24   Gehringer, Defendant.

25             THE COURT:  All right.  Thank you very much.

1    Government have any further evidence?

2            MR. OAKLEY:  At this time, Your Honor, the

3    Government would rest.

4            THE COURT:  All right.  I think what we're

5    going to do, Ladies and Gentlemen, it's 4:15.  I'm going

6    to let you go home today and come back at 10:00 on

7    Friday morning.  By that time the lawyers and I --

8    because I'm going to be gone tomorrow, remember.  The

9    lawyers and I will have had a chance to go over these

10   instructions and if we have any further evidence at that

11   time, we'll have the evidence.  Then I will read the

12   instructions to you.  You each will have a copy of them

13   to read and take to the jury room.  We'll have the

14   closing argument.  So probably around noon, maybe a

15   little after, on Friday, we will give the case to you

16   and you can deliberate.  So remember and heed the

17   admonition and I'll see you at 10:00 on Friday.

18                    (Jury excused for the evening at

19                    4:14 p.m.)

20           THE COURT:  Teresa has a couple of additional

21   instructions for you.

22           MR. GRADERT:  Judge, I was going to ask Teresa

23   if I could perhaps ask her if I could get a copy of

24   the -- an extra copy of the jury instructions, proposed

25   instructions, so that Mr. Gehringer could look those

1    over this evening.

2            THE COURT:  Oh, sure.  We'll fix you up with

3    one.  Okay.  I'll see you on Friday morning at 8:30.  Is

4    that going to be a problem for anybody?

5            MR. OAKLEY:  No, Your Honor.

6            THE COURT:  That ought to give us plenty of

7    time to hash out these issues and get the case ready to

8    go on Friday to the jury.

9            MR. GRADERT:  Thank you, Judge.

10                   (Recessed for the day at 4:15

11                   p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25