1              (Beginning at 8:37 a.m. June 6,

2              2008, the following proceedings

3              continued.)

4              (Jury is NOT present.)

5         THE COURT:  Well, let's take up the

6    Government's motion in limine.  Have you found any

7    cases, Mr. Gradert, that allow you to offer evidence

8    that the Defendant -- the ignorance of the law is a

9    defense to this case?

10         MR. GRADERT:  I have not, Your Honor.  I will

11   inform the Court of this.  I wasn't able yesterday

12   because of other obligations to get any proposed jury

13   instructions, but I was able late last night to do a

14   little bit of research and I've been thinking as I've

15   been preparing for this case and even during the course

16   of this case about the issue of entrapment by estoppel.

17   I know the Court's probably familiar with that doctrine.

18   To be frank, I'm not too sure how closely it might apply

19   in this case but here's --

20         THE COURT:  Because they gave him his guns

21   back or didn't take his guns?  Is that your theory?

22         MR. GRADERT:  Well, actually the theory is is

23   that because Mr. Gehringer relied upon -- and he'll

24   testify again here today -- that he relied upon the

25   assurances of the ATF that if he gave 'em those guns and

1    he abandoned those guns, that nothing would -- he

2    wouldn't be charged with that.  Now, I've looked at all

3    kinds of cases on the entrapment by estoppel issue and,

4    of course, the first thing I looked for was to see

5    whether or not, like in the entrapment defense, whether

6    or not there was a predisposition issue.  And apparently

7    there is not.  The issue apparently, as I understand it,

8    is that if an individual relies upon law enforcement to

9    tell them something and what they've told them is an

10   incorrect statement of the law or an incorrect statement

11   about the legality of whatever it is that they're doing,

12   then -- and they rely upon that to their detriment that

13   that would be something that you could use as a defense.

14   This isn't the classic case of -- most of the cases I

15   looked at involve firearms dealers who would tell an

16   individual that it's okay for you to purchase this

17   firearm or whatever because of the fact that perhaps you

18   only were convicted of a misdemeanor rather than a

19   felony and it was wrong information.  And -- but because

20   they relied upon it, they possessed it.  The part about

21   the lack of predisposition is is that even if an

22   individual has maybe possessed firearms on a prior

23   occasion that it seems that the act that kicks the

24   entrapment by estoppel in is the moment that the

25   government party or the government agent informs the

1    individual -- or misinforms the individual about their
2    right in that legal situation.  Now, I'm not suggesting
3    that ATF told my client that it was lawful for him to
4    possess the firearms.  In fact, I think what's actually
5    going to -- what's been testified to and what my client
6    would probably agree is is that he didn't know, as we've
7    talked about, that it was against the law for him to
8    possess firearms.  And so basically what I would be
9    saying is is that the law enforcement -- and they will
10   probably disagree with this -- in fact, I think in our
11   motion hearing there was some disagreement about whether
12   or not they had told the defendant that they would, you
13   know, promise him anything or that they wouldn't
14   prosecute him for anything.  But that's what my client's
15   going to testify to, Your Honor, and so that's a point
16   of controversy.  Government may even present rebuttal
17   evidence to suggest to the contrary.  It's kind of a
18   stretch of the theory of entrapment by estoppel, Your
19   Honor, but it's one that I'd like to at least propose to
20   the Court for its consideration.  And I don't have an
21   actual entrapment by estoppel instruction but I do have
22   some case law indicating what the language of that
23   instruction would consist of.
24            THE COURT:  Well, I've got a couple of Tenth
25   Circuit cases here, which I know you found, one is this

1    <u>Hardridge</u> case and -- which is a 2004 case, and the

2    <u>Guiterrez-Gonzalez</u> case, which is a 1999 case.  And then

3    those cases cite the <u>Nichols</u> case.  There must be an

4    active misleading by a government agent; an actual

5    reliance by the defendant which is reasonable in the

6    light of the identity of the agent; the point of law

7    misrepresented and the substance of the

8    misrepresentation.  Moreover, the government agent must

9    be one who is responsible for interpreting,

10   administering or enforcing the law, defining the

11   offense --

12          MR. GRADERT:  I think that part of that case,

13   Your Honor, I think the Tenth Circuit concluded that

14   like a licensed firearm dealer wouldn't necessarily

15   qualify as that second prong of that; but certainly

16   agents of the Bureau of Alcohol, Tobacco and Firearms

17   would.  So that part I'm fairly confident in.  It's that

18   first part that I think is the big question in this case

19   but --

20          THE COURT:  But I don't know why I should

21   allow him to put on evidence that he was actually -- or

22   actively mislead.  I think we've heard that before.

23   Now, I don't remember hearing him say at the suppression

24   motion that he was actively mislead that a drug dealer

25   could keep weapons or drug user -- excuse me -- could

412

 1    keep weapons --

 2              MR. GRADERT:  That's the crux of this, Your

 3    Honor.  He wasn't mislead.  They told him specifically

 4    that it was against the law for a user.  My theory on

 5    this is that because he was told that if he abandoned

 6    them to them that no charges would be brought against

 7    him.  He would not have given them the permission to go

 8    get those guns had he not thought that that was the

 9    state of the law; and because of that, I would submit

10    that he should have the defense of entrapment by

11    estoppel.

12              THE COURT:  What's the Government's position?

13              MR. OAKLEY:  Your Honor, I think there's a

14    couple problems with that.  First of all, if he puts

15    Mr. Gehringer on the stand and asks Mr. Gehringer what

16    an ATF agent said, that's hearsay.  If he wants to know

17    what the ATF agent said, outside of the courtroom he

18    needs to put the ATF agent on.

19         Secondly, and I don't concede that the ATF agent is

20    going to say, yeah, we told him that, you know, that we

21    weren't going to prosecute him.  But even if they did

22    say that, this was in February after he had showed them

23    the guns.  They said you can't possess these, you are a

24    user.  Do you want to abandon those to us?  He says yes.

25    There's nothing, first of all, that's misleading about

413

1    that.  That's a correct statement of the law.  They

2    didn't tell him that they weren't going to prosecute

3    him; but even if they did, that doesn't mean that he's

4    entitled to go out and possess firearms in the future.

5    Also, that statement is made after he has demonstrated

6    that he was in possession of firearms on that day and so

7    there's nothing about their statement after they learn

8    of that that effects, you know -- we've already had this

9    in the suppression hearing.  That certainly didn't

10   coerce his confession or his statement.  So, first of

11   all, I don't know how he's going to get that evidence

12   in; but even if he does get that evidence in, that

13   certainly is not a defense.

14           THE COURT:  Do you think there's a hearsay

15   objection?  Because that would be offered for the truth,

16   obviously.

17           MR. GRADERT:  It would be, Your Honor, and I

18   suppose I could probably call Agent Jones initially in

19   my case in chief and ask him about those questions

20   before I ask him -- before I ask my client those

21   questions.  I actually think -- I was thinking I asked

22   Agent Jones that when he was up on the witness stand

23   before about what he had told him before he took those

24   firearms so I thought that had already been testified

25   about.

1          THE COURT:  Well, I don't know.  I can't

2    exactly remember the testimony at the suppression

3    hearing on that point but --

4          MR. GRADERT:  I could certainly call Agent

5    Jones myself to just get that point out.  That's really

6    all I would need to do in that regard before I put

7    Mr. Gehringer on the stand.

8          THE COURT:  Well --

9          MR. GRADERT:  You know, Your Honor, I've

10   looked an awful lot at this issue of entrapment by

11   estoppel because it's a due process argument basically

12   and it's kind of funny because I found an old 1957,

13   United States Supreme Court case called Lambert vs. The

14   People of the State of California and it was one of

15   those cases that clearly said the rule that ignorance of

16   the law will not excuse his deed in our law but it also

17   talks about due process and the fact that a person who

18   is wholly passive and unaware of any wrongdoing should

19   be able to avail himself of a claim that his due process

20   was violated, which would kick in the entrapment by

21   estoppel defense.  And I just have a -- I understand,

22   I've done the legislative history, the constitutional

23   vagueness of this statute has been challenged time and

24   time again and the history of the act is that they don't

25   want people that are thought to be potentially dangerous

1   like drug users or mental defects or people who are in

2   our country illegally or people who are under protective

3   orders to be in possession of firearms; and I suppose

4   that all of those people have already either done

5   something that's been illegal or are in the process of

6   doing something illegal and that's why they decided to

7   make it sort of a strict liability crime.  But it just

8   seems fundamentally unfair to me that they don't get any

9   kind of notice at all.  Like a convicted felon does.

10  Which we all know are told very specifically that they

11  cannot possess firearms and ammunition.

12          THE COURT:  Well, that's an argument that if

13  he's convicted, you can make to the Court of Appeals;

14  but I don't think that there would be any basis for me

15  to buy that argument here when you've got Tenth Circuit

16  cases that say that this is basically a strict liability

17  general intent law.  I'm not going to allow any evidence

18  that would give rise to an estoppel defense.  I'm not

19  going to instruct on an estoppel defense.  And I'm going

20  to grant the Government's motion in limine.  Just don't

21  think that's what this case is about.  There's just no

22  law.  If you had any law at all that would support it, I

23  might allow the evidence in; but there's just no law

24  that says that ignorance of the law is an excuse in this

25  particular case, this particular statute.  And that's

1          the ruling of the Court.  I'm sorry, but that's the law.

2                    MR. GRADERT:  And I understand that, Your

3          Honor.  Just to make sure that my record is clear, and I

4          know the Court's, you know, knows that that's what I'm

5          doing here, is that what my proffer would be would be

6          that he would testify that he was told by the agents

7          that if he -- that it was against the law for him to

8          have them and that if he did have them and he would

9          abandon them to them that they would not prosecute him.

10         And that's what I would base my theory of entrapment by

11         estoppel.

12                   THE COURT:  But I don't think that's

13         entrapment by estoppel.  I think if they had told -- if

14         they had not told him that it was against the law for a

15         drug addict to have weapons, then that would be one

16         thing; but it almost seems like that argument would be

17         if somebody gets stopped for speeding and they get a

18         warning ticket, you know, and later get stopped for

19         speeding in the same area, you know, they could say,

20         well, I didn't have, you know -- it's not analogous

21         totally but --

22                   MR. GRADERT:  That's a pretty good analogy

23         though, Judge, I have to admit.

24                   THE COURT:  You know, we start down that road

25         in these cases -- we just can't do it.  But I, as

1    always, appreciate your effort.  As I've told you many

2    times, you represent your client so well because of your

3    inventiveness.  Sometimes it works and sometimes it

4    doesn't.

5            MR. GRADERT:  Thank you, Judge.  Mr. Gehringer

6    I think, Your Honor, really basically from the very

7    outset of this case has had a difficult time

8    understanding that concept of this law that ignorance of

9    the law is not a defense and I've tried to explain that

10   to him and I think he still struggled with it some even

11   up to this current point and --

12           THE COURT:  Well, I know you've told him.  I'm

13   telling him.  I suspect that if he's convicted that the

14   Court of Appeals will tell him.  I don't know who else

15   there is out there to tell him about it.  But that's

16   just the way it is.  And, you know, I guess,

17   Mr. Gehringer, just thinking aloud here, the problem I

18   see in your case is that if you were told this and then

19   nothing ever happened and it was only on one occasion

20   that maybe that would be a reasonable belief on your

21   part; but this is a series of these.  And I don't think

22   that it would be appropriate for me to make an exception

23   in this case.

24        Well, let's go through these instructions and you

25   all know about how I'm going to handle these

1    instructions so I'm not going to put that on the record.

2    They're in the order that I think they should be given

3    but if you want to argue that the order should be moved

4    around, that's fine.  They will -- they'll be numbered

5    and there will be page numbers to them when we finalize

6    them so -- members of the jury.  Any problem?

7            MR. OAKLEY:  No, Your Honor.

8            MR. GRADERT:  No, Your Honor.

9            THE COURT:  The indictment?  Any problem with

10   that?

11           MR. OAKLEY:  No, Your Honor.

12           MR. GRADERT:  No, Your Honor.

13           THE COURT:  An indictment is but a formal

14   method of accusing a defendant of a crime.

15           MR. OAKLEY:  No objection.

16           MR. GRADERT:  No objection, Your Honor.

17           THE COURT:  On or about?

18           MR. OAKLEY:  No objection.

19           MR. GRADERT:  No objection.

20           THE COURT:  A separate crime is charged.

21           MR. OAKLEY:  No objection.

22           MR. GRADERT:  No objection.

23           THE COURT:  Then we go into the elements, the

24   elements of Count 1.

25           MR. OAKLEY:  The only question I had, Your

419

1    Honor, was on, since the stipulation, on the second

2    page, third, the firearm was transported across state

3    lines, if that was necessary.

4         THE COURT:  You bet.  The Tenth Circuit says

5    that the stipulation as to the element does not relieve

6    the Government of the burden to prove it and the Court

7    to instruct on it.

8         MR. GRADERT:  Your Honor, there is one thing

9    that I had noted a question mark on when I reviewed

10   these on that and it's on the first page of that

11   instruction.

12        THE COURT:  Yes, sir.

13        MR. GRADERT:  It's the first element in which

14   it says the defendant was an unlawful user of a

15   controlled substance, that is, marijuana, or was a drug

16   addict.  I didn't know if maybe Teresa just threw the

17   marijuana in there from a previous instruction or

18   whatever.  We have a later instruction I think that says

19   he's a controlled user of methamphetamine and I don't

20   know if that would create some confusion to the jury.

21   I'd certainly love to be able to argue that they didn't

22   prove that --

23        THE COURT:  I think you're right.

24        MR. GRADERT:  It may -- I'm gonna suggest that

25   maybe it should just read an unlawful user of a

1    controlled substance period without naming the substance

2    in both this instruction and perhaps the latter one that

3    addresses it.

4             THE COURT:  No, you're right, because Count 1

5    does not -- that's my fault, not Teresa's fault.  Law

6    clerks are without fault.

7             MR. GRADERT:  And I would never want to blame

8    a law clerk, Judge.

9             THE COURT:  Okay.  We'll say that was an

10   unlawful user of a controlled substance, semi colon,

11   take out marijuana or was a drug addict because it

12   doesn't allege drug addict in Count 1.  Any objection?

13            MR. OAKLEY:  No, Your Honor.

14            MR. GRADERT:  No objection, Your Honor.

15            THE COURT:  All right.  Now, Count 2.

16            MR. OAKLEY:  No objection.

17            MR. GRADERT:  No objection.

18            THE COURT:  Count 3.

19            MR. OAKLEY:  No objection.

20            MR. GRADERT:  No objection.

21            THE COURT:  Count 4.

22            MR. OAKLEY:  No objection.

23            MR. GRADERT:  No objection.

24            THE COURT:  Count 5.

25            MR. OAKLEY:  No objection.

1           MR. GRADERT:  No objection.

2           THE COURT:  Count 6.

3           MR. OAKLEY:  No objection.

4           MR. GRADERT:  No objection.

5           THE COURT:  Count 7?

6           MR. OAKLEY:  Your Honor, it would just be the

7    same thing that we talked about under first.  I think it

8    said that he was a drug addict and he used

9    methamphetamine.

10          THE COURT:  Just a second, let's look at Count

11   7.  Yeah, it doesn't say anything about -- we'll put a

12   semi colon after substance.

13          MR. GRADERT:  Count 5 includes both of the

14   drugs, Your Honor, methamphetamine or marijuana.  That

15   might be a more correct statement of this but --

16          THE COURT:  No, we'll take it out.  Count 8.

17          MR. OAKLEY:  No objection.

18          MR. GRADERT:  No objection.  Although, Your

19   Honor, while I'm thinking about it, when I made my Rule

20   29 motion, I didn't specifically refer to Count 8, but

21   as I look at the instruction and I was looking at the

22   amount or the weight of the methamphetamine in that

23   case -- and I know the standard for the determination of

24   a Rule 29 motion -- but when I looked at the fact that

25   it was 3.2 grams as charged and remembering the

1   testimony of the agents regarding, you know, quantity

2   being an issue in determination of possession with

3   intent to distribute, I might renew my motion

4   specifically as to that charge, indicating that that's

5   not even an amount that I think that one could conclude

6   or infer was possessed with an intent to distribute.

7           THE COURT:  Well, he's not charged in this

8   count with -- yes, he is.  I'm sorry.

9           MR. GRADERT:  In fairness to the Government,

10   Your Honor, there may very well be some other things

11   that one could infer but --

12           THE COURT:  I'll let you add this to your

13   motion and, of course, you're entitled to renew your

14   motion at the end of all the evidence.

15           MR. GRADERT:  Thank you, Your Honor.

16           THE COURT:  And, frankly, I can't remember.

17   There wasn't any dispute about the 3.2 grams, was there?

18           MR. GRADERT:  No.  Not about the actual

19   weight.

20           THE COURT:  It's the amount.  All right.

21   Count 9.

22           MR. OAKLEY:  Your Honor, the last paragraph,

23   third, I think in this case we specifically set out

24   24.76 grams, but on instruction 3 it simply says 5 grams

25   or more which is the way that the indictment reads.

423

```
 1            THE COURT:  Well, I follow the language of the
 2    indictment if that's what you're pointing out.
 3            MR. OAKLEY:  Well, I think that the
 4    indictment, Your Honor, says 5 grams or more and then in
 5    parenthesis has approximately 24.76 grams.
 6            THE COURT:  Well, Count 1 says 5 grams -- no,
 7    not Count 1, Count --
 8            MR. OAKLEY:  Three.
 9            THE COURT:  -- three says approximately 42
10    grams.  That's what Count 3 says.  And Count 9 says 5
11    grams or more approximately.  So I'll add here 5 grams
12    or more, approximately 24.764 grams, close parenthesis,
13    as charged.  Any objection?
14            MR. OAKLEY:  No, Your Honor.
15            MR. GRADERT:  No objection.
16            THE COURT:  Count 10.
17            MR. OAKLEY:  No objection.
18            MR. GRADERT:  Your Honor, once again, it has
19    that listing of substances regarding being a user of
20    controlled substances.
21            THE COURT:  I'll take it out.  Count 11?
22            MR. OAKLEY:  No objection.
23            MR. GRADERT:  No objection.
24            THE COURT:  And finally, Count 12.
25            MR. OAKLEY:  No objection.
```

1          MR. GRADERT:  No objection.

2          THE COURT:  Next is methamphetamine and

3     marijuana are controlled substances.

4          MR. OAKLEY:  No objection.

5          MR. GRADERT:  No objection.

6          THE COURT:  Here's the definitional

7     instruction on Counts 1, 5, 7 and 10.  Any objection?

8          MR. OAKLEY:  Your Honor, the last one is drug

9     addict; and since this was charged as a drug user, I

10    don't know if that's needed.

11         MR. GRADERT:  Your Honor, if that's the

12    situation, all of those instructions that we've dealt

13    with on the substantive counts related to user of

14    controlled substances, frankly, I don't think it makes

15    too much of a difference, but if the Government isn't

16    pursuing it from a drug addict perspective and only from

17    a user then perhaps that drug addict could even be

18    eliminated and we can eliminate our semi colon in all

19    those other instructions.

20         THE COURT:  I think we did.  Let's look back.

21    On Count 1 the semi colon comes after controlled

22    substance and the phrase that is marijuana or was a drug

23    addict is excised.

24         MR. GRADERT:  Okay.  I'm sorry.  I didn't

25    catch that we had excised the drug addict.

425

 1            THE COURT:  The same on Count 5.  The same on

 2    Count 7.  And the same -- those are the only ones, I

 3    think.

 4            MR. GRADERT:  Yes, that's fine.

 5            THE COURT:  So, no, we'll do that.  We'll take

 6    out drug addict.  Definition of possessed with intent to

 7    distribute.

 8            MR. OAKLEY:  No objection.

 9            MR. GRADERT:  No objection.

10            THE COURT:  Definition of knowingly and

11    intentionally.

12            MR. OAKLEY:  No objection.

13            MR. GRADERT:  No objection.

14            THE COURT:  The next one I'm going to take out

15    addict.  It seems to me that Steve cross-examined Wes

16    Williamson and got into evidence without objection, some

17    evidence about knowledge of drug user.

18            MR. GRADERT:  Whether he knew it was against

19    the law for a drug user to possess a firearm.

20            THE COURT:  Right.

21            MR. GRADERT:  And Mr. Oakley did, too, because

22    I think Mr. Oakley was trying to establish what this

23    statement of the law is, Your Honor.

24            THE COURT:  I'm going to leave this one in but

25    I'll take out or addict.

1          MR. GRADERT:  Just for the record on that one,

2     because even though I can't find any law to the

3     contrary, I'm going to object to this instruction.

4          THE COURT:  I'll show your objection then.

5          MR. GRADERT:  Thank you, Your Honor.

6          THE COURT:  Who knows, you may make it to the

7     Supreme Court on this.

8          MR. OAKLEY:  Your Honor, for the record, I

9     think Mr. Gradert may have mentioned it in his opening

10    statement as well.

11         THE COURT:  Well, that's not evidence.

12         MR. OAKLEY:  Sure.

13         THE COURT:  Yet.  The next one is actual and

14    constructive possession.  And I added the joint

15    possession because the evidence is that when the house

16    was searched Ms. -- I can't remember her name.

17         MR. GRADERT:  Ms. Elwell.

18         THE COURT:  Ms. Elwell was there.  Any

19    objection?

20         MR. OAKLEY:  No objection.

21         MR. GRADERT:  No objection, Your Honor.

22         THE COURT:  Next is not guilty.

23         MR. OAKLEY:  No objection.

24         MR. GRADERT:  No objection.

25         THE COURT:  Next is presumption of innocence.

1          MR. OAKLEY:  No objection.

2          MR. GRADERT:  No objection.

3          THE COURT:  Next is this union of or joint

4     operation of act and intent.

5          MR. OAKLEY:  No objection.

6          MR. GRADERT:  No objection.

7          THE COURT:  Next is proof beyond a reasonable

8     doubt.

9          MR. OAKLEY:  No objection.

10          MR. GRADERT:  No objection.

11          THE COURT:  Next is burden of proof.

12          MR. OAKLEY:  No objection.

13          MR. GRADERT:  No objection.

14          THE COURT:  Next is the credibility

15     instruction.

16          MR. OAKLEY:  No objection.

17          MR. GRADERT:  No objection.

18          THE COURT:  Next is the weight to be given the

19     evidence.

20          MR. OAKLEY:  No objection.

21          MR. GRADERT:  No objection.

22          THE COURT:  Next is direct and -- yeah, direct

23     and circumstantial evidence.

24          MR. OAKLEY:  No objection.

25          MR. GRADERT:  No objection.

1          THE COURT:  Next is the Defendant's intent.

2          MR. OAKLEY:  No objection.

3          MR. GRADERT:  No objection.

4          THE COURT:  Next is the Defendant testifies.

5          MR. OAKLEY:  No objection.

6          MR. GRADERT:  No objection.

7          THE COURT:  And then the next one is the

8  Defendant is on trial only for the acts alleged.

9          MR. OAKLEY:  No objection.

10          MR. GRADERT:  No objection.

11          THE COURT:  Next is the one relating to his

12  statement.

13          MR. OAKLEY:  No objection.

14          MR. GRADERT:  No objection.

15          THE COURT:  Next is the law enforcement

16  methods.

17          MR. OAKLEY:  No objection.

18          MR. GRADERT:  Judge, I'm not going to object

19  to the instruction; but I probably will argue a little

20  bit about their methods of enforcement in this case.

21          THE COURT:  Well, no, I think that's okay.  I

22  think that, you know, there's plenty of evidence they

23  didn't find fingerprints and all that, and there was no

24  objection made to the evidence so -- and there was

25  examination of the witnesses by the Government that you

429

1    don't often find fingerprints.

2         MR. GRADERT:  But I have no objection to the

3    instruction.

4         THE COURT:  All right.  Next is the good sense

5    instruction.

6         MR. OAKLEY:  No objection.

7         MR. GRADERT:  Your Honor, this is one that

8    I've mentioned to the Court the other day just casually

9    that this instruction has always been given in my

10   experience here for many many years, but I've recently

11   heard and seen that there is a little bit of a movement

12   or some consideration of the old concept that juries

13   have an inherent power to determine whatever they want

14   to.

15        THE COURT:  What do they call that?  The --

16        MR. GRADERT:  They call it nullification, jury

17   nullification, Your Honor.

18        THE COURT:  Yes.

19        MR. GRADERT:  Ironically, I found a case --

20   and the Court may want to take a look at this at some

21   point in time -- and I haven't been able to read the

22   whole case.  I've only been able to read the headnotes.

23   It was an April 1st, 2008, case out of the Eastern

24   District of New York.  So I know what the Court probably

25   thinks about that but it's --

430

1                THE COURT:  No.

2                MR. GRADERT:  2008 WESTLAW 1886006 and --

3                THE COURT:  Who was the judge?

4                MR. GRADERT:  Let me see if I can find out.

5    By the way, this was a receipt of child pornography case

6    and, by the way, I have copies of these cases but I

7    couldn't get my printer to work at home last night so I

8    had to come in this morning and print them off at the

9    office and I have --

10               THE COURT:  We'll find it.  Don't worry about

11   it.  It doesn't make any difference who the judge was.

12               MR. GRADERT:  Jack Wienstien.

13               THE COURT:  Oh, Wienstien.  Yeah, he's kind of

14   famous.  I'll have to read that case closely.  And he

15   says that you should give a -- you shouldn't give this

16   instruction because --

17               MR. GRADERT:  Well, it actually goes more

18   to -- this instruction is more generic, and my objection

19   to it is just to say that what I think this instruction

20   does is misinforms the jury of their actual right to

21   decide a case on anything that they choose.  But what

22   this opinion basically deals with is what's coming up

23   with regard to the question of punishment and it also

24   goes to some of these same nullification issues.  This

25   particular opinion of Coleeze found that the jury

431

1    should -- that it was error for the jury not to be

2    instructed on the mandatory minimum punishment that

3    would be required upon their conviction.

4                THE COURT:  Is there a mandatory minimum in

5    this case?

6                MR. GRADERT:  There are some mandatory

7    minimums in this case, Your Honor, on counts -- well, I

8    can't tell you which counts, but the counts related to

9    the possession with intent to distribute and at least

10   two of those and then, of course, we have a 924(c) count

11   here which is a mandatory minimum five years.  And I

12   know -- I used to argue about this a long time ago with

13   absolutely no authority but just suggested that I

14   thought that it should be.  But I think where the

15   movement has come, Your Honor, is that Justice Scalia,

16   being sort of the traditionalist that he is, has looked

17   back to the common law and how juries -- what their

18   traditional function was.  And I don't know if the

19   Court's moving in that direction or not on the Supreme

20   Court; but it's been suggested, and, of course,

21   obviously, I'm not smart enough to think of this on my

22   own.  I got this from somebody way smarter than me.

23               THE COURT:  This the law professor at your

24   seminar that says that juries ought to determine the

25   punishment?

1           MR. GRADERT:  Not that they should determine

2    the punishment, but they should at least be informed

3    because, you know, at common law, all crimes were

4    capital offenses so they knew the consequences of their

5    verdict and they can take that into consideration.  And

6    a lot of our traditional instructions that deal with,

7    you know, sympathy and those types of things are not

8    inconsistent with that original make up of our juries.

9    And so in addition to objecting to this instruction, I

10   would also request that the Court consider instructing

11   the jury that although the sentencing is entirely up to

12   the court with regard to most of these charges, that if

13   they find the Defendant guilty of certain counts that

14   they would be -- that the Defendant is required to serve

15   at least a minimum of five years in prison.  And even

16   thought on the 924(c) it may be appropriate to tell them

17   that it has to run consecutively to the other charges.

18   I think I know what the Court's probably going to do on

19   this, but at least it's my belief that it's something

20   that they need to take into consideration in their

21   overall weight of what they decide to do in this case.

22           THE COURT:  Well, I don't know.  I'll read

23   your case and I'll show your objection and your proposed

24   instruction; but there's no law in any Court of Appeals

25   cases that says this.

1          MR. GRADERT:  That's my understanding, too,

2     Your Honor.  I haven't seen anything in the Court of

3     Appeals yet that indicates that.  And like I said, I

4     haven't read the entire facts of this case.  I found a

5     headnote that basically said the district court

6     committed constitutional error by denying defendant's

7     request to inform the jury of the statutory five year

8     mandatory minimum sentence and that's all I saw.  And

9     then I think that there's some -- some of that

10    discussion about this historical perspective in this

11    case.  I was surprised to see there was one so quick

12    after I just learned this at this seminar last week.

13         THE COURT:  Well, you know, this is probably

14    and should be an issue, and you've raised it and made a

15    record on it and it should be an issue that the Court of

16    Appeals looks at and decides.  There are probably some

17    judges up there now who might be more receptive to that

18    sort of thing than there were a few years ago; but this

19    is one of those things where I thought you told me that

20    this law professor was advocating that juries sentence

21    people, not just that they are aware of the sentence.

22         MR. GRADERT:  Just that they be aware of the

23    sentence, Your Honor, is all he's advocating.

24         THE COURT:  I see.

25         MR. GRADERT:  You know, juries in essence do

1    sentence when they, in some instances, when they make a

2    finding and did so traditionally in the past and I think

3    there's still some state jurisdictions where the jury

4    does impose the sentence.

5         THE COURT:  Well, of course they do in the

6    death penalty case.  I'm not aware of any noncapital

7    case where juries are made aware of -- are given the

8    option to do anything.

9         MR. GRADERT:  Right.  I think it's only in

10   capital cases where sometimes the jury's verdict is the

11   death sentence but that's the only time I can think of

12   that.  But, no, he wasn't advocating that they actually

13   impose the sentence but just that they be informed of

14   the potential punishment, or at least the mandatory

15   punishment, not so much the potential punishment.  I

16   don't think we need to tell the court that this court

17   could give the defendant life without parole for a

18   conviction for a 924(c) but I do think they need to know

19   that their decision will at least require a five year

20   sentence on that charge.

21        THE COURT:  Well, I think I'll let you make

22   that argument to the people who are -- well, at least

23   arguably, in a better position -- the problem,

24   obviously, with that would be that I would be doing that

25   without any authority from the Court of Appeals, number

1    one.  I'd be doing it on the basis of a decision outside

2    the Tenth Circuit, even though Jack Weinstein is highly

3    regarded.  And under the circumstances, I don't think it

4    would particularly help you.  No, I'll just let it go at

5    that.  It's interesting though.

6         MR. GRADERT:  Your Honor, I agree with the

7    Court that I think our Circuit has upheld the denial of

8    those types of requests.  I think I've maybe raised it

9    once on appeal a long time ago without having any real

10   good basis for it, and I think they've rejected it, or

11   at least I've seen some other cases where they've

12   rejected requests for that and so I don't fault the

13   Court for not doing it this time but I did want to raise

14   it as an issue.

15        THE COURT:  Well, I remember in some case

16   years ago that I did allow evidence in of sentencing but

17   I don't remember why.  It may be because there was

18   evidence that a defendant was told by a government agent

19   that he was facing a certain -- something.  It's been so

20   long ago and I don't remember but it wasn't on this

21   theory and I don't remember that the Court of Appeals

22   ever even addressed it.

23        All right.  Next one, statements, arguments of

24   counsel, et cetera.

25        MR. OAKLEY:  No objection.

```
1           MR. GRADERT:  No objection.

2           THE COURT:  Have we got -- I think we need to

3   add -- we need to modify this one to put in the

4   stipulation, you know, the standard language where it

5   says when the parties have stipulated.

6           MR. GRADERT:  Oh, yes, that would be fine.  A

7   good place to put that.

8           THE COURT:  Yeah.  It's in this instruction

9   but if there's no stipulation, I just take it out.

10      Next one is objections, et cetera.

11          MR. OAKLEY:  No objection.

12          MR. GRADERT:  No objection, Your Honor.

13          THE COURT:  Next is punishment.  And I'll show

14  your request and your objection to this one.

15          MR. GRADERT:  Thank you, Your Honor.

16          THE COURT:  Next is the notes instruction.

17          MR. OAKLEY:  No objection.

18          MR. GRADERT:  No objection.

19          THE COURT:  Next is the final suggestion.

20          MR. OAKLEY:  No objection.

21          MR. GRADERT:  No objection.

22          THE COURT:  I'm going to take out the next

23  one, the deliberations, because I think that they'll get

24  the case probably at a little after noon.  I don't know

25  how long it will take them to reach their verdict; but
```

437

1    if for some reason they couldn't reach a verdict today
2    and they had to go home over the weekend then I would
3    give them this instruction before they went home.
4         Next is the unanimous verdict instruction.  No, I'm
5    sorry -- yeah, this is the unanimous verdict
6    instruction.  Any objection?
7              MR. OAKLEY:  No objection.
8              MR. GRADERT:  No objection, Your Honor.
9              THE COURT:  And, finally, the concluding
10   instruction.
11             MR. OAKLEY:  No objection.
12             MR. GRADERT:  No objection, Your Honor.
13             THE COURT:  And the verdict form.
14             MR. OAKLEY:  No objection.
15             MR. GRADERT:  No objection, Your Honor.
16             THE COURT:  All right.  Now, how long would
17   you all like to argue?
18             MR. OAKLEY:  20 minutes, Your Honor.
19             MR. GRADERT:  That sounds okay to me, Judge.
20   I've never heard the Government only request 20 minutes
21   but -- 20 minutes is fine.
22             THE COURT:  Well, I think this is basically a
23   20 minute case.  There's some facts and issues, but not
24   that many.  Okay.  When the jury comes, we'll start up.
25   Mr. Gehringer can testify.  Does the Government plan any

438

1    rebuttal at this point?

2              MR. OAKLEY:  Not at this point, Your Honor.

3              THE COURT:  So at the end of Mr. Gehringer's

4    testimony, I will excuse the jury, let Mr. Gradert renew

5    his Rule 29 motion.  And that will give us an

6    opportunity then to distribute the instructions and

7    we'll get them back in here and have closing argument

8    and should be able to get this thing to the jury by noon

9    or thereabouts.

10       Let me change topics entirely here.  This can be on

11   the record.  Do you all have any idea, are we still

12   going to trial next week with five defendants or four?

13             MR. OAKLEY:  Your Honor, I don't know.  I know

14   that Ms. Barnett has been talking to Mr. Lonegran's

15   attorney but I don't know if they have resolved

16   anything.

17             THE COURT:  So that would be five then.

18             MR. OAKLEY:  At this point, that's my

19   understanding, yes.

20             THE COURT:  And how long do you think --

21   assuming five, how long do you think the Government's

22   evidence is going to take?

23             MR. OAKLEY:  Judge, I'm horrible at estimating

24   these things, but I would think that we would take all

25   of next week and maybe even into, a day or two into the

1    following week.

2              THE COURT:  Is that what you think?

3              MR. GRADERT:  Your Honor, I don't really --

4    that's probably about right.  I have no idea who all I'm

5    going to be in trial with.  Most of the evidence is

6    against all the other guys, not my client so --

7              THE COURT:  Well, all of your clients are

8    innocent.

9              MR. GRADERT:  It can probably take about an

10   hour to put in the evidence that they have against my

11   client I think, Your Honor.

12             THE COURT:  Well, you're going to get an order

13   this morning on Bigelow sustaining the motion to

14   suppress, if that makes any difference.  But I don't

15   know what the other evidence is against him, if any.

16             MR. OAKLEY:  I think we -- I don't know, Your

17   Honor.

18             THE COURT:  I don't either.  I'm just trying

19   to think ahead in terms of -- I guess we'll know more

20   next week but --

21             MR. GRADERT:  Judge, do you have any idea how

22   you were going to -- some of the other lawyers have

23   asked me since I've been here so many times, but I

24   haven't tried very many multi-defendant cases, certainly

25   not in your court, and I think you mentioned at our last

440

1    status hearing that you haven't had too many with that

2    many defendants.  I'm just curious, do you know how

3    you're going to divide up the peremptory challenges

4    between, say, five lawyers.

5            THE COURT:  Well, there's a total of ten and

6    you can each have two or you can get together and

7    cooperate.  I really don't care.

8            MR. GRADERT:  Just divide up the ten.

9            THE COURT:  I mean, I know so little about

10   this case.  I don't know whether we've got inconsistent

11   defenses, whether we're going to have defendants

12   pointing their fingers at each other.  I just don't

13   know.  Nobody's ever told me and so --

14           MR. GRADERT:  But the plan for now is ten

15   divided amongst us?

16           THE COURT:  However you want to do it.

17           MR. GRADERT:  All right.

18           THE COURT:  I think I said that in that

19   letter.

20           MR. GRADERT:  You may have and I may have

21   missed that, Your Honor.  I'm still trying to figure out

22   what a James hearing is.

23           THE COURT:  You know what a James hearing is.

24           MR. GRADERT:  I know.  I'm just kidding.

25           THE COURT:  I'm a little concerned about that,

1   too.  Whether, you know, I'll be able to make a totally

2   definitive ruling at the James hearing.  I'll make a

3   stab at it; but sometimes you have to listen to a little

4   bit of the evidence in the case also.  All right.  I'll

5   see you at 10:00.

6                    (Recess.)

7                    (Following proceedings continued

8                     IN THE PRESENCE of the jury.)

9        THE COURT:  Well, I hope none of you suffered

10  any storm damage last night.  All right.  Mr. Gradert.

11  You may call Mr. Gehringer.

12       MR. GRADERT:  Yes, Your Honor.  Defense is

13  going to call Todd Gehringer.

14                    **TODD GEHRINGER**

15  Having been first duly sworn to tell the truth, the

16  whole truth and nothing but the truth, testified as

17  follows on:

18                 **DIRECT EXAMINATION**

19  BY MR. GRADERT:

20  Q   Can you tell the judge and jury your name please.

21  A   Todd Russell Gehringer.

22  Q   How old are you, Mr. Gehringer?

23  A   43.

24  Q   Okay.  Where are you currently residing?

25  A   Sedgwick County jail.

1    Q    And how long have you been in jail now?

2    A    Since December 3rd.

3    Q    Of last year?

4    A    Yes.

5    Q    Have you had anything to drink or used any drugs

6    since you've been in custody?

7    A    Nope.  I don't even -- they, they have psychotics or

8    other medications you can take to keep you calm and

9    stuff and I've managed to take the course in my life

10   with God and decided that I wasn't going to do what

11   everybody else in jail is doing and medicate themselves.

12   I said I needed a higher power.

13   Q    Now, you've heard a lot of testimony here about

14   your -- the suspicion that you're a drug user.  Have you

15   used drugs?

16   A    Yes.

17   Q    What kind of drugs have you used?

18   A    Marijuana, pharmaceutical pills, meth, Valium,

19   Xanax.

20   Q    What was your primary -- do you need to have him

21   speak up?

22            THE COURT:  I think you need to have him move

23   up.  Mr. Gehringer -- there you go.

24   BY MR. GRADERT:

25   Q    What was the drug that you used primarily?

1    A    Meth and marijuana.

2    Q    Okay.  And how -- when you started using meth, did

3    you use less than you did later on in your life?

4    A    Yeah.  Just like anything.  Start out drinkin' a

5    little and by the time, you know, you're drinkin' a

6    gallon a day.

7    Q    I'm sorry.  You need to speak up just a little bit,

8    Todd.

9    A    It's just like drinkin' alcohol, you know.  One day

10    you're drinkin' a six pack and the next day you're

11    drinkin' a gallon.

12    Q    Have you ever been involved in the sale of drugs?

13    A    Yeah, purchasing.

14    Q    I'm sorry?

15    A    Yes, purchasing.

16    Q    But you haven't sold it yourself?

17    A    No.  I've had people ask me to and I wouldn't

18    because I, I obtained it for myself, nobody else.

19    Q    Have you shared drugs with other people in your

20    past?

21    A    Yeah, more or less.

22    Q    Sittin' around using drugs and sharing what you had

23    with other people?

24    A    Yes.

25    Q    Okay.  Of course, possessing drugs is an expensive

1   proposition, isn't it?

2   A   Yes.

3   Q   Okay.  Where do you go to get drugs?

4   A   Anywhere, a bar, any drug known area, south

5   Broadway.  There's all kinds of places that are heavy

6   drug areas or, I don't know how to word that properly

7   but, you know, crime areas or, you know, different parts

8   of town, bars.

9   Q   All right.  Besides having been somebody who used

10  drugs, Todd, did you have a regular job ever in your

11  life?

12  A   Yes.

13  Q   Where did you work?

14  A   Carpet Value.  Bauer Floor Cover, Quality Floor

15  Covering, Fortney Tile, Colonial Floors, Bob Smith Tile.

16  Q   When you worked for all those companies, were you

17  actually an employee of the company or have you always

18  been like a subcontractor?

19  A   Both.

20  Q   And --

21  A   Last, I don't know, probably last about seven, since

22  2000, I started subcontracting.

23  Q   Okay.  The last company that you actually did

24  subcontracting for was the Carpet Value that the lady

25  came in here and told us about that?

1    A    Yes.

2    Q    And do you ever do any of that kind of work just on

3    the side for friends or anybody?

4    A    All the time.

5    Q    Did you get paid for it?

6    A    Yes.

7    Q    What kind of money were you making, Todd?

8    A    Well, I quit workin' by the hour when I was making

9    $20 an hour, started subcontracting by the square foot

10   which is probably three or four times that.

11   Q    So what's the most money maybe you've made in a

12   year?

13   A    $80,000 on the record through Carpet Value and then

14   50,000, and then it teetered off from there because

15   that's -- I was single and having problems and just like

16   anything else, you know, you start to become an

17   alcoholic or addict, whatever, you fall back in a rut

18   sometimes and you can't get out of it.

19   Q    So did it effect your ability to go to work and do

20   your job?

21   A    Yeah.

22   Q    I mean, I think they said that you were pretty --

23   we've heard a couple people testify that you're good at

24   what you do in that regard?

25   A    I'm very good.

1    Q   But did it effect your ability to sometimes even

2    just get up and go in and work?

3    A   Yeah.

4    Q   Okay.  Is that because you were using so much

5    methamphetamine or so much in the way of drugs?

6    A   That and denial.  You know, nobody wants to, I mean,

7    I had a high, it was a high -- what would you call it?

8    Q   Tolerance?

9    A   High skill hard labor job.  And it's a trade.  It's

10   a profession.  You have on-the-job training, you know,

11   it's, it's, you know, you can't go, well, I guess you

12   might be able to go to school or read a book, but it's,

13   it's physical labor and very technical work.  I mean,

14   you come to a building like this and it's like if you

15   all walked through the floors where marble floors are

16   and stuff, that's the kind of work I do.

17   Q   Okay.  Besides that kind of work, do you have any

18   other -- did you have any other hobbies or sources of

19   income?

20   A   Yes.  I've been trying to get off my knees for a

21   while.  I've been on my knees for twenty some years.

22   Scrappin' metal.  There's, I mean --

23   Q   Well, hang on just a minute.  You say you scrapped

24   metal?

25   A   Yeah.

1    Q    What do you do when you scrap metal?

2    A    Well, there's, there's farm fields out that have

3    excess junk metal sittin' there where people take their

4    trash and have it, you know, illegal dumps or combines

5    and trucks and farm equipment that's sittin' out there

6    just rustin' out in the middle of the field that's trash

7    and you go talk to the owner of the property and say,

8    hey, would you like to have that stuff removed.  You go

9    out there and, you know, free of charge, you know, you

10   cut it up and you take it to the scrap yard and make

11   money, you know, and it's just money that they don't

12   care and then it cleans up their property and --

13   Q    Where would you then sell that stuff?

14   A    Wichita Iron Metal.  I can't think of all the rest

15   of 'em.  There's all kinds of scrap yards in town where

16   you separate your metals, your copper, your aluminum,

17   your brass, your titanium, you know.  It pays very well.

18   Q    Okay.  Any --

19   A    And then I was able to, I was able to hide my

20   addiction by doing that because I wasn't coming into a

21   job where I had to deal with contractors and architects

22   and things like that.  You know, it was easier to hide

23   my addiction.

24   Q    Any other kinds of jobs, sources of income?

25   A    Well, I, I'm an antique collector and it's a hobby

448

1    of mine.  I, in fact, one of them pictures of the

2    kitchen, there's a historical treasure map on the wall.

3    And I like to, you know, basically doing treasure hunt,

4    you know, and I collected antiques and had garage sales

5    and attended auctions and, you know, always trying to,

6    you know, I got a pretty good eye for things like that.

7    Q    Were there some specific items that you kind of

8    focussed on collecting?

9    A    Old guns, coins, stamps.  Anything unique.

10   Arrowheads.  I'd go out and look for my own arrowheads.

11   I had quite an extensive collection of them but I don't

12   know what I have left any more from what I hear.

13   Q    Okay.  Since you've been in custody, has anything

14   happened to your personal property that you know of?

15   A    Everything -- it's been robbed, stolen, broke.  The

16   house has been broke into.  We no longer have the house.

17   There was a home invasion where somebody actually went

18   in with a gun and forcefully took things from my woman

19   and with my two year old baby there.

20   Q    And you're talking about Ms. Elwell; correct?  Dana

21   Elwell?

22   A    Yes.

23   Q    Did you -- I think it's been suggested or people

24   have thought that maybe you're involved in buying and

25   selling or trading in stolen property?

1    A    No.  I, if I knew it was stolen, I wouldn't take it.

2    I mean, I didn't want it.  It's taboo to me.  I work for

3    a livin' and I know what it's like to have things

4    robbed, stolen from you, and it was strictly taboo.  It

5    was just, you know, you steal a man's tools, he can't

6    work.  And that was just something that I prided myself

7    in, you know.

8    Q    So the guns that we've heard testified about, all

9    the rifles, the long rifles and the shotgun and those

10   kinds of things in your house, were any of those stolen

11   that you knew of?

12   A    No, not, not to my knowledge none of 'em were.

13   Q    Okay.  And once again, were guns a thing that you

14   collected?

15   A    Yes.  They're very valuable.  I mean, especially the

16   ones that I collected, you know.  They're very rare.  If

17   you all noticed any of 'em, you know, I mean, ones

18   without serial numbers, those are early 1800s, you know.

19   And they haven't even brought in any of the older ones

20   that are muzzle loaders and Hawkins and flint locks and

21   anything like that.  Let alone my coin collections that

22   they collected.  I can't see why they took them.  My

23   stamp collections.  You know, I feel like I was robbed

24   by the police, too.

25   Q    Okay.  Did -- you know, we've heard that the guns

450

1    that were in your house, I don't think any of them were

2    loaded.  Did you keep loaded guns in your house?

3    A    No.

4    Q    Were the guns there for protection?

5    A    No.  I collected 'em to, to sell.  Whenever they

6    have a gun, you know, the gun shows and stuff, you know,

7    I had, you know, I'd take 'em up there and buy, sell or

8    trade, you know.

9    Q    Okay.  Now, we've heard some testimony about the

10   fact that back in July of 2006 agents from the Bureau of

11   Alcohol, Tobacco and Firearms came to talk to you.  Do

12   you remember that, Todd, in July?

13   A    2006?

14   Q    Yes.

15   A    About Bear?

16   Q    Yeah.  That was about Mr. Fillman.  What do they

17   call him?  Bear?

18   A    Yeah.  That was his nickname.

19   Q    And what they wanted to know from you -- well, what

20   was it that they were asking you about him?

21   A    Bear came to my house.  They was askin' if I had

22   purchased any firearms from him because he had

23   apparently broke into one of his friend's house and

24   stole a bunch of guns and all kinds of other things,

25   trucks, cars, motorcycles, cleaned his buddy out.  And

1    him and some girl came over and they tried to sell them

2    to me and I -- just something told me that it's like all

3    of a sudden he has these things that he's never had

4    before and I just knew, you know, in my heart, you know,

5    because he had gotten into some trouble and he told me

6    that he had his truck and his boat in this person's name

7    just in case he ever got arrested for sellin' drugs or

8    whatever so that his friends could get 'em out of

9    impound and he could get his truck back.  And the guy

10   apparently didn't want to give him his truck back.  He

11   wanted the $600 for the impound fee.  And Bear was

12   pretty upset about it and I -- and that's what I assumed

13   he got 'em from.

14   Q    That's what was going on in your mind about when he

15   came to you then; correct?

16   A    Yeah.  I was pretty, pretty positive of that because

17   he all the sudden come up with these things and drivin'

18   a brand new motorcycle that he didn't have and it's

19   like, Bear, what did you do, you know.  So I told him to

20   leave.  I didn't want 'em.  I didn't want any of 'em.

21   Q    And that's what you told the agents when they came

22   to you, that you didn't have any stolen guns in your

23   house.  Right?

24   A    No, I didn't.  I even let 'em look.

25   Q    Okay.  And so they did go in and look in your house;

452

```
 1    right?

 2    A    Yes.

 3    Q    And back in July, where were you living?  Was that

 4    when you were living on Tracy street?

 5    A    No.  I was living on Mt. Vernon.  Mt. Vernon and

 6    Washington, 920 -- 910 East Mt. Vernon.

 7    Q    Okay.  And do you remember them finding any drugs in

 8    your house on that occasion?

 9    A    Yes.  I wasn't gonna let 'em search the house

10    because I knew I had drugs in the house because at that

11    time I don't think I was workin'.  And I refused to let

12    'em in.  And they made a comment that they didn't care

13    about any drugs that was in the house, that if I consent

14    to searching, you know, that they would just confiscate

15    the drugs if they could look for the guns.  And I said,

16    well, sure.

17    Q    So you let 'em go?

18    A    Yeah.

19    Q    And they didn't arrest you?

20    A    No.

21    Q    And you weren't ever charged with anything related

22    to that incident, were you?

23    A    No.

24    Q    Okay.

25    A    No.  They didn't find any stolen guns.
```

453

1    Q    They do -- later you give 'em permission to look in

2    your storage shed.  They're looking for more guns.

3    Right?

4    A    They came to my house on December 3rd looking for

5    from what I read on the search warrant it was AR 15s

6    semiautomatic handguns and things like that.

7    Q    And --

8    A    And I had never possessed the seven AR 15s or the 14

9    or 15 semiautomatic handguns, Glocks and things like

10   that that the search warrant claimed.

11   Q    Okay.  So --

12   A    And they never found anything like that.

13   Q    You let 'em search your storage unit then; correct?

14   A    Yes.  I, I offered for them to search the storage

15   unit because they didn't have a search warrant for it.

16   And I didn't want the guns that I had.  I didn't, I

17   didn't want those guns because of the February 27th

18   incident or 26th, whatever it was, they told me some

19   things and I had forgotten about 'em and when they came

20   lookin' for AR 15s and rocket launchers and I can't

21   remember what else but I said please go get these

22   things.

23   Q    So when they came in February, I think Agent Jones

24   or one of the agents testified that they told you that

25   because you're a drug addict that you can't --

1          MR. OAKLEY:  Objection, Your Honor.  Hearsay.

2          THE COURT:  Overruled.

3    BY MR. GRADERT:

4    Q    That you can't possess firearms.  Is that right?

5    A    He, on February 26th or 27, whatever it was, they, I

6    was outside workin' in the yard and Mr. Jones happened

7    to be drivin' by while I was workin' on a car and

8    decided to stop and talk to me, him and Detective

9    Barrier.  And they were looking -- they was asking me

10   again about the July 14th incident, about guns that

11   Bear, Mr. Fillman, tried to bring and sell to me.  And I

12   told 'em I didn't know where they was at.  And he

13   claimed that he had sources that claimed that I had two

14   of 'em, the two guns that were missing from that

15   burglary.  And I told 'em that I did not have any guns

16   from that incident and in fact I think I directed him

17   to -- towards the person that may have had 'em and --

18   Q    Did you tell him you do have guns but they're not

19   the stolen guns?

20   A    After he described 'em, yeah.

21   Q    Okay.  And once again, did you know that it was

22   against the law for somebody who used drugs to --

23          MR. OAKLEY:  Objection; relevance.

24          THE COURT:  Sustained.

25

455

BY MR. GRADERT:

Q   Were you told by Agent Jones then that -- because I
don't think you've answered that yet -- that it was
against the law for somebody who possessed guns --

A   Yes.

        MR. OAKLEY:  Objection; hearsay.

        THE COURT:  I'll allow it.

A   Mr. Jones, they didn't have a search warrant when
they came over that day and was talkin' to me lookin'
for the other two firearms, I can't remember what they
were, that I knew for a fact I didn't have 'em because I
know quite a bit about old guns, but all the guns they
were lookin' for were a lot newer.  I didn't have 'em.
I'm not into them gang type guns.  And -- because I'm a
hunter, you know.  And they didn't have a warrant and he
was still lookin' for them two guns and he told me, he
says, well, do you mind if we search.  And I said, yes,
I do.  And he says why.  I says, because I don't want
you to search the house.  And he asked me why and I said
because you don't have a search warrant.  And he says,
well, we're lookin' for these two guns and we'll go
get -- we can sit here and go get a warrant or whatever,
we've got witnesses that claims that you have them two.
Or if you consent to search, we know you're an addict,
that if we find any drugs, we won't charge you with the

1    drugs.  And with 'em sayin' that, I said, yeah, okay, if

2    you're not going to charge me for no drugs, just like

3    the last time, that they could search the house.

4    Q    Okay.

5    A    And so I showed him my guns, you know, just, you

6    know while he's searching the house.  I said here's

7    where the guns are, you know, and he said, well, we're

8    gonna confiscate the drugs, you know, because he asked

9    me where the drugs were.  I told him where the weed was

10   at and he -- then I showed 'em the guns and he said,

11   well, we're confiscatin' the drugs, we won't charge you

12   with it.  And he said that, you know, being an addict,

13   you know, if you want to keep these guns, because you're

14   an addict and you was possessing drugs, we'll have to

15   charge you with these guns for being an addict in

16   possession.  Or if you abandon them to us, we will -- it

17   will keep you from being charged, you know, because you

18   won't be possessing them and surrendering them to us.

19   Q    So that's what you did, you surrendered them to

20   them?

21   A    Yes.

22   Q    Now, Todd, just at that moment in time did you have

23   the guns that were in the storage unit or did you get

24   them later?

25   A    I had -- I think I had them.  I'm not sure.

457

1   Q   Did you think to -- when they told you that, did you

2   think to give him permission to go get those guns?

3   A   No.  There was still guns there at the house that I

4   had missed.

5   Q   Okay.

6   A   That, I mean, I couldn't remember where they was all

7   at because they weren't in plain sight.  I didn't have a

8   gun cabinet or a safe or anything like that.  I had 'em

9   behind cabinets, under this, under that, you know,

10  trying to, you know, keep 'em out of sight from people

11  because I did have break in's and things like that and I

12  didn't want people to see 'em, you know, give 'em any

13  more money for somebody to break in.

14  Q   Okay.  All right.  So any drugs that they did find

15  in your house, you're not denying that you had those;

16  correct?

17  A   No.

18  Q   Okay.  Now, I think that the most methamphetamine

19  that they found in your house at any one time was when

20  they searched when you weren't home when Ms. Elwell was

21  there and I think they found about three grams of meth.

22  Is that right?

23  A   I think they only found .17.

24  Q   That might have been on the 3rd.  I'm sorry.  About

25  .17 grams of methamphetamine on that occasion; correct?

458

```
 1    A    I believe so.

 2    Q    When Ms. Elwell was there?

 3    A    Yeah.  I'm not sure but --

 4    Q    You don't deny that's yours or that you might have

 5    possessed it?  If you know?

 6    A    I don't remember if -- I mean, I don't know.  I

 7    don't think it was mine.  I don't remember if it was

 8    mine or if it was hers.

 9    Q    But it could have been yours?

10    A    Highly possible.  I'm not going to deny it.

11    Q    And then on the 3rd of December when they came with

12    the last search and when they arrested you and put you

13    in custody this time, what was the most methamphetamine

14    that they found in your house that day?  Do you recall?

15    A    No, I don't.

16    Q    Was it about three grams maybe?

17    A    That's what I threw down when they were chasin' me.

18    Q    Okay.  And --

19    A    I believe, if I'm not mistaken.

20    Q    And we heard Agent Williamson talk about eightballs.

21    How many grams are in an eightball?

22    A    That would be three, three and a half grams.

23    Q    An eightball is --

24    A    An eightball is like broke down.  And an ounce is 28

25    grams.  A half ounce is two parts of a whole, which
```

1    would be 14 grams, you know.  You break, like, eight

2    into 28 and you got three and a half.  That's what an

3    eightball is called -- that's why it's --

4    Q    It's called an eightball?

5    A    Yeah.  Because it's one part of all that makes a

6    whole.

7    Q    Is an eightball a single dosage?  Three grams?

8    A    I wouldn't say a single dosage; but possibly a day.

9    Q    You could use that in a day?

10   A    Easily.

11   Q    Would you use that much?

12   A    Easily.

13   Q    We heard Agent Williamson say that some people might

14   use an eightball a day but that they couldn't do it

15   seven straight days.  How about you, could you do that?

16   A    I think I could.

17   Q    Okay.

18   A    I think I did at one point in time until I started

19   asking for help and, you know, needin' -- realizing that

20   I had a problem.  And that's why every time I had

21   contact with the police I said, hey, I'm an addict, you

22   know.  I was -- at one time several years ago I got

23   caught at a wildlife refuge with two marijuana cigars

24   and it was a federal misdemeanor and I was put on

25   probation for six months and went and had a drug

 1    evaluation and they concluded that I needed drug

 2    therapy.  And it was two hours every two weeks.  And in

 3    that six months time, I was on a code-a-phone and I had

 4    to call daily between certain hours and then report, you

 5    know.  It straight up said your name if you had to do a

 6    UA.  And I failed five UA's, no show seven times, and

 7    quit reporting because I was scared.  And it come the

 8    middle of December and it was almost Christmas and I

 9    knew I had barely two months left of my probation period

10    and got a letter in the mail from my probation officer,

11    so I called 'em.  And I knew that if they caught me that

12    I was gonna go to jail for violation and I called 'em

13    and I said what's it gonna take for me to stay out of

14    jail.  I'm an addict and I'm an alcoholic, I don't want

15    to go to jail.  And he told me to be in his office in an

16    hour.  So, I mean, I could have ran.  I don't know what

17    would have happened.  I'm sure sooner or later I'd be

18    right here where I'm at but --

19    Q    Did you have some treatment then?

20    A    Yes.  When I went in to his office he told me, he

21    told me, he said, what's it gonna take for you to stay

22    clean.  I said I don't know, Phil, I'm an addict and

23    alcoholic.  I get group therapy every two weeks.  It's

24    not enough.  And it was virtually the only time I've

25    ever been in drug treatment.  And he asked me, he said,

1    have you ever been in inpatient.  And I said no.  He

2    asked me if I'd ever considered it and I said, no, I

3    can't, I don't have insurance.  And going to treatment

4    is much more if you do a half a day treatment, cost you

5    more than that, but he said that because it's -- because

6    I told him I was an addict and alcoholic, needed more

7    help, he said that it's the federal rules that they had

8    to pay for my drug treatment.  And I subsequently went

9    into a place called Options on Douglas and it was

10   inpatient.  I couldn't leave.  The doors were unlocked.

11   I could have walked out of there any given time but that

12   would have been -- that would have been stupid on my

13   part because then I would be refusing any kind of

14   treatment.  And, you know --

15   Q   Todd, all of that was before all of these things

16   occurred?

17   A   Yes.  This is long time ago.  Probably 2002.

18   Q   So you did treatment?

19   A   2001.

20   Q   Was that helpful to you?

21   A   Very.  I mean, like I said, it was in the middle of

22   December and because it was the end of the year, the

23   federal government, the treatment facility kicked me out

24   at the new year.  They said it was the end of the

25   financial fiscal budget year and they're not financing

1    me no more.  My PO didn't even know it.  And when they

2    kicked me out, you know, I didn't, I didn't do nothing

3    wrong.  I didn't violate, you know.  I was cooperative.

4    I did everything I was supposed to.  They just said that

5    it was the end of the fiscal budget year and that they

6    can't keep me in treatment no longer and --

7    Q   But so then sometime after that you started using

8    again then?

9    A   Quite a while.  I got out the first of the year when

10   they released me and I believe that's the year that I

11   went out and I made $80,000, or I made 50,000.  I think

12   I made 80,000 that year with Carpet Value and then

13   50,000 the following year, which would take me to about

14   '84, and that's when I started using because I had saved

15   up all that money and thought, well, you know, I can get

16   off my knees.  And started investing my money elsewhere.

17   Q   Well, now, Todd, I want to talk to you here in a

18   minute specifically about the things that happened in

19   October and in December.  But just in both of these

20   cases, we know that there's approximately -- well, I

21   guess it's like 90 grams of methamphetamine but forty

22   some odd grams of pure methamphetamine on the December

23   19th incident.  And then there's about I think I want to

24   say 24 grams approximately on the October incident.

25   Have you ever had that much methamphetamine at any one

463

1    time?

2    A    No.  I've never even seen that much, not even

3    purchasing it.  I think the most he ever bought at a

4    time was probably a quarter ounce.

5    Q    And certainly in all these arrests that you've had,

6    did they ever find any more than three grams of

7    methamphetamine on you or in your house?

8    A    No.

9    Q    Well, let's talk about the October 10th incident.

10   You were stopped by Officer Cooper.  Tell us what

11   happened.  Why you were where you were and what you were

12   doing.

13   A    He didn't stop us.  He -- I was out trying to

14   purchase some drugs.

15   Q    Where had you gone to purchase drugs?

16   A    I was down off south Broadway and I ran into Ricki

17   Starks and she said that she knew somebody, she had been

18   hangin' out at her friend, and that we could go back

19   over there.  And that's where we was headed.  Then when

20   I seen the police behind us, I figured they probably

21   seen us over there, seen me over there in the drug

22   trafficking area of town and subsequently followed me.

23   Q    So when you drove --

24   A    That's why I pulled over because, because I was

25   drivin' under suspension and I had a meth pipe with me

464

1    and I knew he was comin' after me.  So I was trying to

2    get rid of the meth pipe and be out of the driver's seat

3    because I was driving under suspension.

4    Q    Did you know there was a pouch with a sizable

5    quantity of methamphetamine in the car?

6    A    No.  I'd have took that with me and threw that.  If

7    I knew that was there, I'd have been grabbing that

8    instead of in the glove box just to get a pipe out and

9    get rid of a pipe.

10   Q    So where was your meth pipe?

11   A    In the glove box.

12   Q    Ms. Starks I think testified that she thought that

13   you reached for the glove box.  Is that what you heard

14   her say?

15   A    Yeah.

16   Q    And that's what you were doing was getting your meth

17   pipe?

18   A    Yes.

19   Q    And when you ran up by the tree, is that what --

20   were you trying to get away or were you just trying to

21   hide the drugs?

22   A    Just trying to hide the pipe.  I didn't have any

23   drugs, just a pipe.

24   Q    And --

25   A    Lighter just happened to be in my hand and just, you

465

```
 1   know, I let 'em both go.
 2   Q   Whatever happened to that vehicle or the -- we heard
 3   both these vehicles had the license tag WYK 991.
 4   Whatever happened after the arrest on October 10 to the
 5   vehicle and the tag?
 6   A   I have no idea about the tag.  I had Dana pick up
 7   the truck.
 8   Q   Okay.  Did you even know what the tag was on the
 9   October 10th incident?
10   A   No.
11   Q   Was that your vehicle?
12   A   No.
13   Q   All right.  Well, let's talk about December 19,
14   2006, because it's just a couple months later.  The
15   Homeland store that we've talked about and we've seen
16   all the pictures of, where is that in relation to your
17   house?
18   A   About four blocks away.
19   Q   And what were you doing that night that caused you
20   to want to go to the Homeland store?
21   A   I needed propane.  My gas was turned off and I had a
22   garage heater, like a little barrel heater thing, and
23   that's how I was heating the house at the time.
24   Q   So what were you going to do then?
25   A   I was going to purchase -- get some propane.  It was
```

```
 1    cold out and I was walkin' and --
 2    Q   Did you have a vehicle at that time?
 3    A   No, not that I was driving.  I was walkin' down
 4    Central and it's just -- there's a Braum's like right at
 5    Central just two blocks, or right there behind that main
 6    shopping center, and I cut -- there's a little field
 7    right there.  That's the field that Officer Gravatt and
 8    what's his name chased me through.  But I cut that
 9    corner and was walkin' down Central to head over to Food
10    4 Less to get propane because it was the closest place,
11    there or Walgreen's, and I had the propane bottle on my
12    shoulder and somebody stopped and picked me up.
13    Q   Do you know the person?
14    A   No.
15    Q   Well, I mean, what do you remember that was said to
16    you by that individual?
17    A   He asked me -- says looks like -- looks like you
18    need a ride.  I said, yeah, I'm just going a couple
19    blocks this way to get some propane.  He said, well, hop
20    in, I'm headin' that direction.  And we pulled off into
21    the parkin' lot, you know.  He, he resembled me quite a
22    bit.  He had long hair.  Except for he had facial hair
23    where I didn't.  I think I had stubble, stubble all the
24    way around, but he had a moustache and goatee kind of
25    like the undercover agent, but it wasn't him.  But he
```

1   pulled in the parking lot, pulled up to the stop sign.

2   I got out at the stop sign.  And he backed up and went

3   to pull in the stall.  He did scrape the sign.  And I

4   wasn't driving.  It wasn't me.

5   Q   Had you gotten out of the car before he hit the stop

6   sign?

7   A   Yeah.  I got out, when he pulled up past the stop

8   sign, I stopped and got out and that's when he backed up

9   a little bit and just took a sharp left right next to it

10  and that's what made him catch the sign.

11  Q   Did you see the police officers in the area when all

12  this was going on?

13  A   Yeah.

14  Q   Okay.  Where were they in relation to you?

15  A   They were straight southwest.

16  Q   How far away were they?

17  A   I'm going to say at least 100 yards.

18  Q   And did they holler out to you or anything right off

19  the bat or --

20  A   The police?

21  Q   Yes.

22  A   No.  They, they pulled over.  I went to the door and

23  was trying to go in.  There was a guy standing inside

24  the door and he had just closed and I was trying to get

25  his attention, you know, say, hey, man, let me pay for

```
1    propane real quick.  Because the propane tank is out on
2    the north side of the building.  And he wouldn't open
3    the door.  And when I turned around and started walkin'
4    back towards the truck, that's when one of the police
5    officers pulled up between me and the truck and then the
6    other one pulled up a few minutes later on the other
7    side of him so they was between me and the truck and
8    they came over and talked to me.
9    Q   Did you tell them that you weren't the driver of
10   that truck?
11   A   Yes, I did.  I even tried pointing him out.  I said:
12   That's -- the driver's leaving the parking lot.  They
13   wouldn't turn around or nothing.  They said, no, we
14   got -- we're busy talkin' to you.  I said, man, I wasn't
15   drivin'.  I was -- my license is revoked and I'm -- I
16   wasn't drivin'.  It's not my truck.  I said, he's
17   leavin' right there.
18   Q   Could you see him?
19   A   Yes.
20   Q   The person leaving?
21   A   Yes.  It was very well lit.
22   Q   Was he running or just walking away?
23   A   He, he kind of walked fast.
24   Q   Which direction was he headed?
25   A   Straight north.
```

469

```
 1    Q   And when you got in that truck, did you see a gun?
 2    A   No.
 3    Q   Did you see drugs?
 4    A   No.
 5    Q   In the picture we see a lighter and a key to the
 6    vehicle laying on the seat of the truck.  Did you have
 7    keys in the truck?
 8    A   I had a lot of keys.  I don't know if they was in my
 9    pocket or if they was in the truck.  I think they might
10    have been on the dashboard.
11    Q   Did you --
12    A   -- on the passenger side.
13    Q   Did you ever collect any property after you were --
14    well, you were arrested that night; right?
15    A   Yes.
16    Q   Okay.  And did they question you at all about the
17    drugs or the guns that they found in there, those
18    officers, McVay or Wolfram?
19    A   I don't really recall.  All I know they, they was
20    arrestin' me for driving under suspension and I was
21    trying to argue that I didn't drive -- that I wasn't
22    driving and that they weren't looking at the driver
23    before he got out of the parking lot.
24    Q   Okay.  Were you there when they took those pictures
25    of the stuff they found in the truck?
```

470

1    A    No.

2    Q    Did you see, ever see those things other than when I

3    gave you the pictures to look at?

4    A    I seen the Sprite can in the seat; but the, the dope

5    or whatever it was, the container of the dope wasn't

6    there.

7    Q    Okay.  Do you have any explanation at all, Todd,

8    about how the same tag would be on the truck that you

9    got this ride in on December 19, was on the vehicle that

10   you had on October 10th?

11   A    Don't have a clue.  It had to have been stolen.  I

12   mean, the -- one of the officers straight up said that

13   it was a high crime rate area in my neighborhood, too.

14   Q    In fact, I think did they not say that the tag had

15   been not assigned to that vehicle and they did seize it

16   then?

17   A    I don't recall.

18   Q    You don't know if they seized it, seized that tag on

19   October 10th of 2006?

20   A    I don't have a clue.  I was taken to jail.

21   Q    Because you never saw it again or never really ever

22   knew what the tag was?

23   A    No.

24   Q    Even in October, did you?

25   A    No.  It was pure coincident.  I mean, I lived on the

471

1    west side and, you know --

2    Q    Okay.  Let's go to February --

3    A    Besides, if I had that much dope, I wouldn't be

4    runni' around town with it, that's for sure, because

5    I --

6    Q    How about that gun.  This gun was a semi automatic

7    loaded gun.  Did you have any semi automatic loaded guns

8    around?

9    A    No.  I never kept any kind of loaded gun.  I never

10   ran around town with a gun.  The way I see it, if I need

11   to go someplace with a gun, I don't need to go there.

12   Q    Okay.  Let's go to the February incident.

13   A    That's why my guns ain't even loaded at the house.

14   Q    Let's go to the February incident.  That was when

15   you gave the guns.  We've talked about that already.

16   A    Uh-huh.

17   Q    And you told 'em again you were a drug addict;

18   right?

19   A    Yep.

20   Q    And then --

21   A    Not because I'm proud of it.

22   Q    -- then again in March, the police came to search

23   your house but you weren't there.  Is that right?

24   A    March?

25   Q    Or -- excuse me -- May, May of 2007?

472

1    A    Oh, yeah.

2    Q    When did you find out about that?

3    A    Three or four days later.  Me and Dana hadn't been

4    together long and I hadn't been gettin' long and I

5    hadn't been there.  I was out doing my own thing actin'

6    stupid.

7    Q    Did you find out that Dana had been arrested?

8    A    Yes.

9    Q    And was she charged with --

10   A    Yes.

11   Q    -- crimes associated with that search?

12   A    Yes.  She's pending -- those charges are still

13   pending against her.

14   A    Yes.

15   Q    Not here in federal court, though?

16   A    No.

17   Q    Is that right?  Okay.  Did -- well, so nothing

18   happens to you based on that charge?

19   A    Not on that one.

20   Q    You weren't arrested until you were charged with

21   this later; right?

22   A    Correct.

23   Q    And, in fact, when you were first charged in

24   December with these crimes, that charge and the October

25   incident weren't even charged, were they?

1    A    No.

2    Q    They added those later?

3    A    Right.

4    Q    Okay.

5    A    Added them March 5th.

6    Q    So then we go clear up until December of '07.  And

7    what happened on that day?  Do you remember?

8    A    I got up in the mornin' and I went to Braums because

9    I was gettin' some milk for Autumn and --

10   Q    I'm sorry.  For who?

11   A    Autumn, the baby.

12   Q    Okay.

13   A    And when I was walkin' back from Braum's, I was

14   behind the music store, the piano store, wherever,

15   that's right there between the Braum's and the bar.

16   Q    Over on Central?

17   A    Yeah.  Just north of my house.  And I can't even

18   remember his name but --

19   Q    Agent Gravatt?

20   A    Gravatt.  He called my name and I was ever bit the

21   length of this courtroom away from him.  And he called

22   my name and I turned around and looked at him and he

23   said come here.  And I kind of started walking towards

24   him until he did like this and stuck his hand in his

25   coat and I thought oh, crap, and I turned around and ran

474

1    because I wanted to get the milk home first for some

2    reason.  I knew it was the police or suspected it was

3    the police and I wanted to get the milk home and get the

4    dope out of my pocket because I'm an addict and I didn't

5    wanna be arrested with it.

6    Q    You even tried to jump the fence with the milk,

7    didn't you?

8    A    I tried to make it home so the baby could have milk,

9    yes.

10   Q    Milk went everywhere; right?

11   A    I tried to hurdle the neighbor's fence and landed

12   straight on my face.  Broke both gallons.

13   Q    Okay.

14   A    Then I got up and tried to run again to get rid of

15   the dope that I had in my pocket.

16   Q    After the milk was broken, that's when you threw the

17   dope down?

18   A    Yes.

19   Q    Do you remember what you had on you that day, Todd?

20   A    I think it was eighth ounce or quarter ounce,

21   something like that.

22   Q    Okay.  Was that drugs that you planned to sell?

23   A    No.

24   Q    Or give to anybody?

25   A    No.

1    Q    What were you gonna do with that?

2    A    I was gonna get high.

3    Q    Eightball?

4    A    I was gonna get high.  I'm an addict, you know, and

5    what I learned in what little bit of treatment I did

6    get, the first step to recovery is admitting you're an

7    addict.  But they say that relapse is a part of

8    recovery, unfortunately, and that's why I'm here today.

9    Q    That step you're talking about is like the twelve

10   step program of Narcotics Anonymous?

11   A    Yes.

12   Q    And Alcoholics Anonymous?

13   A    Yes.

14   Q    Okay.  Is that why every time you encountered cops

15   you told them you were a drug addict?

16   A    Yeah.  I was hoping that I might be able to get some

17   sort of financial help like when I was on federal

18   probation where I could have got some sort of inpatient

19   treatment or something because that's what I needed was

20   a dry out time because being an addict, you know, every

21   time that I was arrested, it just -- they got what they

22   call a wop now, it's without prejudice or without

23   prosecution or something like that.  They take you to

24   jail and they let you out a few hours later, you know.

25   They just keep the drugs and don't do nothing with you.

1    And, I mean, I figured they might be able to give me

2    some sort of pamphlets or idea where to go to get help.

3    But now that I been in jail for the last six and a half

4    months, I know where to go.  Go to a church and they'll

5    direct you or find someplace, you know, to direct you to

6    a treatment place or, you know, where you can get some

7    help.  In jail --

8    Q    Todd, you --

9    A    I even asked in this courtroom in December and

10   January if I could get some help and Mr. Belot denied me

11   any kind of treatment.

12            MR. OAKLEY:  Objection, Your Honor.

13   Irrelevant.

14            THE COURT:  Sustained.

15   BY MR. GRADERT:

16   Q    That was when we were trying to get you out on bond;

17   right?  And the judge wouldn't allow you to get out, to

18   be released on bond?

19   A    I asked for electronic surveillance, any kind of

20   monitoring, and treatment.  And he refused.

21   Q    So you stayed in custody?

22   A    Yes.

23   Q    You've talked about being on federal probation.

24   You've never been convicted of a felony offense, though,

25   have you?

1    A    No.

2    Q    That was just a misdemeanor?

3    A    Right.

4           MR. GRADERT:  I don't think I have any further

5    questions.  Thank you, Todd.

6           THE COURT:  All right.  Mr. Oakley.

7                      **CROSS EXAMINATION**

8    BY MR. OAKLEY:

9    Q    Mr. Gehringer, I'd like to start off by just going

10   through each of these incidents you've been charged

11   with.  Okay.  Let's talk first of all about the October

12   10th, 2006, incident.  This is the one where you were

13   with Ricki Starks.  Correct?

14   A    Yes.

15   Q    And you've heard Ms. Starks testify from the same

16   witness seat that you're sitting in; correct?

17   A    Yep.

18   Q    And she told what happened, didn't she?

19   A    Basically.

20   Q    You agree with everything she said, don't you?

21   A    Not everything.

22   Q    What do you not agree with?

23   A    I don't recall exactly what she said.  I'd have

24   to -- what did she say?

25   Q    Well, I tell you what, we'll get to that in a

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

478

1    second.  You'll agree with me that this was late at

2    night, wouldn't you?

3    A    Yes.

4    Q    You would agree with me that before October 10th,

5    2006, you'd never met Ricki Starks, had you?

6    A    Correct.

7    Q    Ricki Starks had never been in that truck you were

8    driving, had she?

9    A    No.

10   Q    Was this your truck?

11   A    No.

12   Q    But you were driving this truck?

13   A    Right.

14   Q    Where did you get the truck?

15   A    I borrowed it.

16   Q    From who?

17   A    Somebody at the storage unit.

18   Q    What's this person's name?

19   A    I don't recall his name.

20   Q    Okay.  Well, that's not the same person that picked

21   you up in December; right?

22   A    No.  Wasn't the same truck either.

23   Q    Okay.  Exactly.  Not the same truck, not the same

24   person that picked you up, but it was the same license

25   tag.  Right?

479

```
 1    A    Pure coincidence.

 2    Q    We'll get to that.  So you didn't know Ricki Starks.

 3    You picked her up.  You were driving that truck, weren't

 4    you?

 5    A    Yeah.

 6    Q    You said that you picked Ricki Starks up on south

 7    Broadway; correct?

 8    A    Yes.

 9    Q    And you were just gonna give her a ride?

10    A    Yes.

11    Q    Correct?  You were out looking for drugs to buy;

12    right?

13    A    Probably, yeah.

14    Q    Well, you just testified on direct examination when

15    Mr. Gradert asked you what you were doing --

16    A    I just said it, yeah.

17    Q    You said you were looking for drugs; correct?

18    A    Yep.

19    Q    At some point you see a police officer behind you;

20    correct?

21    A    Right.

22    Q    And you reached into the glove compartment, grab

23    your pipe and you run; correct?

24    A    No.  I got out and walked.

25    Q    You got out and walked?
```

1    A    If I was gonna run, I'd have kept going.

2    Q    You got out and walked to that tree; correct?

3    A    Right.

4    Q    That's where you dropped the pipe and the lighter;

5    correct?

6    A    Right.

7    Q    And, in fact, this is the lighter that you dropped?

8    A    Yeah.

9    Q    And this is the pipe that you dropped, isn't it?

10   A    I guess so.

11   Q    Do you want to see it?

12   A    No, I'll take your word for it.

13   Q    Well, we need you to testify, not me.

14            MR. OAKLEY:  Your Honor, may I approach?

15   Q    Let me show you this pipe.  Was this the pipe that

16   you dropped by the tree?

17   A    Yeah.  I wasn't denying that.

18   Q    You talked to the officer, didn't you, that night?

19   A    Yeah.

20   Q    The officer came up to you, asked you to step away

21   from the tree and you had a conversation with him,

22   didn't you?

23   A    I don't recall what about.

24   Q    Okay.  Do you remember the officer asking you if you

25   had any drugs on you?

1    A    Yeah.

2    Q    Do you remember saying I don't think so?

3    A    No.  I told him, no, I didn't have any.

4    Q    You told the officer you didn't have any?

5    A    No.

6    Q    Okay.  Do you remember the officer saying why you

7    said you didn't think you had any drugs?

8    A    I don't understand the question.

9    Q    Do you remember the officer asking you why do you

10   say you don't think you have any drugs?

11   A    I said I don't have any.

12   Q    Okay.  So I guess the answer to my question is the

13   officer didn't ask you, quote, why do you say you don't

14   have any drugs?

15   A    I'm not following you.

16   Q    You don't remember the officer saying that to you?

17   You don't remember the officer saying to you, quote,

18   "Why Are you telling me you don't think you have any

19   drugs?  "?

20   A    I never said that I said I don't have any.

21   Q    And so, obviously, the officer wouldn't have said

22   that to you if what you had said is I don't have any

23   drugs.  Right?

24   A    You're losing me.

25   Q    You don't remember the officer saying to you why are

482

```
 1    you telling me you don't think you have any drugs?
 2    A   I didn't tell him that.
 3    Q   Okay.
 4    A   I said I don't have any.
 5    Q   Okay.  We'll move on.  You told the officer that
 6    you'd used drugs earlier though; right?
 7    A   Right.
 8    Q   The officer searched the truck that you were
 9    driving, didn't he?
10    A   Yes.
11    Q   And the officer found during the search of the truck
12    that you were driving this black bag underneath the
13    driver's seat of the truck; correct?
14    A   I don't know.  You'll have to ask him.  I didn't see
15    him.
16    Q   The officer told you that he found this black bag in
17    the truck that you had been driving; correct?
18    A   No, he never showed it to me.
19    Q   The officer told --
20    A   I was arrested for driving under suspension --
21    Q   The officer found --
22    A   -- and paraphernalia.
23    Q   Okay.  The officer found in that bag in the truck
24    underneath the driver's seat, four baggies of
25    methamphetamine, didn't he?  Yes?  Four baggies of
```

483

```
 1   methamphetamine, didn't he?
 2   A   I don't know.  That's what -- that's what I'm told.
 3   Q   Well, you heard the officer testify he found four
 4   baggies of methamphetamine underneath the driver's seat
 5   of that truck; right?
 6   A   That would be hearsay if I agreed, wouldn't it?
 7   Q   Well, my question to you is you were in the
 8   courtroom when the officer testified to that, weren't
 9   you?
10   A   Right.
11   Q   Do you have any reason to disagree with the officer
12   that he found those four baggies of meth in this black
13   bag underneath the driver's seat of the truck?
14   A   It wasn't in the truck when I got in it to my
15   knowledge.
16   Q   My question to you isn't what was in the truck when
17   you got in.  My question to you is what the officer
18   found in the truck.  Do you have any reason to disagree
19   that the officer found these four baggies of
20   methamphetamine?
21   A   Yeah.  I didn't see 'em.
22   Q   In the truck?
23   A   I didn't see him find it.
24   Q   Okay.  You would agree that this is a lot of
25   methamphetamine, wouldn't you?  I'll approach and show
```

484

1    'em to you.  You would agree that that is a lot of

2    methamphetamine, wouldn't you?

3    A    Don't look like that much to me.  I mean, it looks

4    like a little bit, but I don't have any idea what it,

5    you know --

6    Q    Okay.

7    A    I mean, that's a handful.

8    Q    Okay.  You would agree -- in fact, that

9    methamphetamine is packaged in four separate bags, isn't

10   it?

11   A    That's the way I count it.

12   Q    On October 10th, you were a drug user, weren't you?

13   On October 10th, 2006, you were a user of drugs, weren't

14   you?

15   A    Occasionally, yes.

16   Q    You were out that night looking for drugs, weren't

17   you?

18   A    Yes.

19   Q    You were looking for drugs to use them?

20   A    Yes.

21   Q    That makes you a drug user, doesn't it?

22   A    Yes.

23   Q    On October 10th, 2006, you were a drug user, weren't

24   you?

25   A    Yes.

485

1    Q   You testified on direct examination that 90 grams of

2    methamphetamine is a lot of meth.  Isn't that true?

3    A   Sure would seem like it.

4    Q   Well, you're a drug user; right?  You testified --

5            THE COURT:  Mr. Oakley, I think we've

6    established here that the Defendant is a drug user.

7    A   That's not the question.

8            THE COURT:  Let's move on to something else.

9    BY MR. OAKLEY:

10   Q   You would agree that 90 grams of methamphetamine is

11   a lot of meth, wouldn't you?

12   A   Yeah.

13   Q   You would agree that someone who possessed that much

14   meth probably possessed it with the intent to sell it,

15   not for their own personal use, wouldn't you?

16           MR. GRADERT:  Objection.  Calls for

17   speculation.

18           THE COURT:  Overruled.

19   BY MR. OAKLEY:

20   Q   Wouldn't you agree to that?

21   A   Probably.  I don't know.  I don't sell.

22   Q   I want to talk to you about December -- well, let me

23   back up.  On October 10th, 2006, you were unemployed,

24   weren't you?

25   A   Kind of.  I mean, I wasn't workin' at Carpet Value

486

```
 1    or someplace where I was gettin' a steady paycheck.  I
 2    did work on the side and I was scrappin' metal and had
 3    garage sales.
 4    Q   Okay.  But you weren't working at Carpet Value at
 5    that time; correct?
 6    A   No.
 7    Q   The 4812 (sic) that you had in your pocket.  There
 8    were 97 $20 bills, weren't there?
 9    A   I don't recall exactly, but probably.  I mean,
10    that's what the report says I'm sure.
11    Q   There were 13 $100 bills?
12    A   Yeah.
13    Q   There were 29 $50 bills; correct?
14    A   If that's what it says.
15    Q   Let me talk to you about the December 19th, 2006,
16    incident.  This is the one at the Homeland grocery;
17    right?
18    A   Uh-huh.
19    Q   On that date you were unemployed; correct?
20    A   Correct.
21    Q   You had $334.80 in your pocket on that day, didn't
22    you?
23    A   Yeah.
24    Q   You --
25    A   I didn't have a garage sale that weekend.
```

487

1    Q    You were picked up by a person who you didn't know;

2    correct?

3    A    Right.   I didn't know Ricki Starks when I picked her

4    up.

5    Q    My question to you isn't about Ricki Starks.   It's

6    about the gentleman that picked you up on December 19,

7    2006.   You didn't know him; correct?

8    A    No.

9    Q    This was a pickup truck with a cab; correct?

10   A    Yeah.

11   Q    Would you please show Government Exhibit 208-B on

12   the screen.

13        I'm going to show you what's been admitted into

14   evidence as Government Exhibit 208-B.   Mr. Gehringer,

15   you would agree that this is a photograph of the

16   interior of the pickup truck that you were in on

17   December 19th, 2006, wouldn't you?

18   A    Yeah, but it didn't look like that.

19   Q    Well, let me ask you this.   That pickup truck has

20   only one seat, it's the long seat, for both driver and

21   the passenger; correct?

22   A    Correct.

23   Q    And according to your direct, your testimony on

24   direct examination, you were the passenger in that

25   pickup truck; right?

1    A    Right.

2    Q    So I would assume -- and tell me if I'm wrong --

3    that that means that you were seated in the passenger

4    side of that pickup truck over here; correct?

5    A    Yeah.

6    Q    You weren't in the back of the truck in the back end

7    or anything, were you?

8    A    No.  I set my propane tank in the back.

9    Q    I'm not asking about your propane tank.  I'm asking

10   about you.  You were physically seated in the cab of the

11   truck; correct?

12   A    At one time.

13   Q    This blue cell phone was your phone, wasn't it?

14   A    I don't know if it was that one or the one that was

15   on the dashboard.

16   Q    Well, you picked up a blue cell phone from the

17   Wichita Police Department evidence, didn't you?

18   A    Yes, I did.

19   Q    You also picked up a lighter.  Is this the

20   photograph of the lighter that you picked up from the

21   Wichita Police Department?

22   A    If that was with my -- what they gave me, yeah.

23   Q    Okay.

24   A    I mean, I wasn't --

25   Q    You were -- thank you.  You've answered my question.

489

1    You were approached by law enforcement officers on that

2    day, weren't you?

3    A    Yes.

4    Q    And they put you through some tests to determine

5    whether or not you were under the influence; correct?

6    A    Yeah.

7    Q    And eventually they arrested you for driving under

8    the influence; correct?

9    A    Yeah.  Allegedly.

10   Q    Well, we know that's what they arrested you for;

11   correct?

12   A    Yeah.

13   Q    And they asked you to take a blood test; correct?

14   A    Correct.

15   Q    And you told them that you wouldn't take a blood

16   test because you were a drug user; correct?

17   A    Right.  It doesn't leave your system immediately.

18   Q    And so on that day as well, December 19, 2006, you

19   were a drug user?

20   A    You're an addict as long as you live.  If you

21   don't -- if I never touch another drug, in your twelve

22   step method, in AA, in any AA, it tells you you are an

23   addict for the rest of your life.  If you never take

24   another drink, if you never touch another drug, you're

25   an addict for the rest of your life, regardless.

1    Q    Well, thank you.  But my question to you was you

2    told the officers that you wouldn't take a blood test

3    because you had used and you were afraid the blood test

4    would be positive for drugs; correct?

5    A    Correct.  I'm not denying being an addict.

6    Q    Thank you.  You've answered my question.  Let me

7    talk to you about May 25th, 2007.  That was the Wichita

8    police search warrant at your house; correct?

9    A    Yes.

10   Q    And on that date you were a drug user, on May 25,

11   2007, weren't you?

12   A    I don't know if I used that day or not.

13   Q    During that period of time in May of 2007, you were

14   a drug user; right?

15   A    I don't recall exactly.  I wasn't -- I didn't mark

16   the calendar.

17   Q    Okay.  Well, Mr. Gradert -- on direct examination

18   Mr. Gradert asked you about the methamphetamine that was

19   found in your house on May 25th, 2007.  You said that

20   that methamphetamine could either have been yours or

21   Dana's; correct?

22   A    Correct.

23   Q    And so on May 25th when they found the drugs, it

24   could have been yours?

25   A    It could have been.

1    Q    It could have also been Dana's; correct?

2    A    Right.

3    Q    Dana was a drug user, wasn't she?

4    A    Occasionally.

5    Q    Occasionally you would give Dana drugs, wouldn't

6    you?

7    A    No.

8    Q    You were living with Dana; right?

9    A    Right.

10   Q    Dana is the mother of your child; correct?

11   A    Yes.

12   Q    You and Dana had been living together for quite a

13   long time, hadn't you?

14   A    Right.

15   Q    You were the breadwinner of the house; correct?

16   A    Right.

17   Q    Dana didn't have a job, did she?

18   A    No.

19   Q    Dana looked to you to provide for her needs, didn't

20   she?

21   A    I guess, yes.

22   Q    Would you please put up 410-A.  You would agree that

23   this is a photograph that was taken during the Wichita

24   police department search warrant of your house on May

25   25, 2007, wouldn't you?

1    A    After they trashed the place, yeah.

2    Q    Well, you would agree that this is your kitchen;

3    right?

4    A    Yes.  There's the map up on the wall I was talking

5    about, the historical treasure map.

6    Q    That historical treasure map right there?

7    A    Yeah.

8    Q    Okay.  So we know because you've seen that map that

9    this is your kitchen?

10   A    Yes.

11   Q    Would you please show 410-B.  This is that same

12   house, isn't it, 422 Tracy?

13   A    Well, after the police trashed it.

14   Q    Okay.  I understand, but what I'm asking you is this

15   is your house?

16   A    Yes.

17   Q    And this is your bedroom; correct?

18   A    It was.

19   Q    Well, you would agree with me that this is a

20   photograph of a bedroom; correct?

21   A    Pardon.

22   Q    You would agree with me that this is a photograph of

23   a bedroom; correct?

24   A    Yes.

25   Q    And we can see the bed right there; right?

493

1    A    Yeah.

2    Q    And you would agree with me, wouldn't you, that this

3    is a photograph of your bed?

4    A    It was.  But I don't have the house no more.

5    Q    Well, I'm asking you on May 25th, 2007, this was a

6    photograph of your bedroom; right?

7    A    Yes.

8    Q    Would you please show 410-C.  This is a photograph

9    of your living room, isn't it?

10   A    After they trashed the place.

11   Q    Well, you heard the officers testify that they were

12   unable to enter into that door when they executed the

13   search warrant on May 25; right?

14   A    Yeah.

15   Q    So you would agree that there was a lot of stuff

16   that was blocking that door on May 25, 2007; correct?

17   A    No.  If you had a better picture, there's an

18   antique, it's called a seatee, that's got a box sittin'

19   on it that's been shoved up against the -- towards the

20   center of the room.  The door is -- you can see it -- is

21   opened.  You see the black line vertically, that is the

22   door where it's opened and down low is the hole in the

23   door where -- that's the hole in the door.

24   Q    That's the hole in the door that the officers caused

25   when they tried to get into your house; correct?

494

```
 1    A    Right.  We didn't use the front door.  We used the
 2    side door.  As Mr. Jones established already when they
 3    came in.
 4    Q    Okay.  Great.  Thank you.  But my question to you is
 5    this stuff was in front of that door when they tried to
 6    get in; right?
 7    A    Pardon.  Which stuff?
 8    Q    There was stuff in front of the door when they tried
 9    to get into your house on May 25th; correct?
10    A    Yes.  We used the side door.  I mean --
11    Q    You've answered my question.  Thank you.  Your
12    firearms were in that house, weren't they?
13    A    I think I had surrendered them to Mr. Jones by then.
14    Q    Well, let me show you what's been admitted into
15    evidence --
16    A    Except for what they missed, what we missed.  I
17    tried to surrender them to 'em.
18    Q    This is a photograph of your shotgun in your house?
19    A    Correct.
20    Q    May 25th?
21    A    Yeah.
22    Q    Correct?
23    A    It's one I missed.  Like I said, I had 'em hidden
24    out of sight and couldn't remember 'em all.  I'm an
25    antique collector.  I kept 'em out of sight trying to
```

495

```
 1    hide 'em to keep people from breaking in and getting
 2    them.
 3    Q   Well, I appreciate that, but you would agree with me
 4    that this is your shotgun at your house on --
 5    A   Again, yes.
 6    Q   Can we see 410-H please.  I'm assuming then that you
 7    would agree with me that this is your rifle in your
 8    house on May 25th, 2006; correct?
 9    A   Yes.
10    Q   I'm sorry.  If you answered, I didn't hear.
11    A   Yes.
12    Q   Let me talk to you about February 26, 2007.  That's
13    the time when you spoke with Agent Jones at your house
14    and showed him your guns and your drugs; right?
15    A   Yes.
16    Q   And just so we're clear, you would agree that that
17    happened prior to the May 25th, 2007, search warrant;
18    right?
19    A   Yes.
20    Q   And that happened prior to the December 3rd, 2007,
21    search warrant; right?
22    A   Yes.
23    Q   Okay.
24    A   Those were the guns that was picked up on
25    November -- like I said, I'm a collector.  It's been
```

496

1    established I'm a collector.  A bunch of coins, bunch of

2    old guns, couldn't find 'em.

3    Q   The only thing that I'm asking you now is if you

4    would agree with me that February 26, 2007, occurred

5    prior to May 25th, 2007.  Right?

6    A   Mathematically, yeah.

7    Q   And it's also before December 3rd, 2007; right?

8    A   Yeah.

9    Q   Let's talk about February 26, 2007.  ATF agents came

10   over to your house; correct?

11   A   Pardon.

12   Q   ATF agents came over to your house; correct?

13   A   When?

14   Q   On February 26, 2007.

15   A   Yeah.

16   Q   ATF agents talked to you about guns; correct?

17   A   Yes.

18   Q   You showed ATF agents your guns; correct?

19   A   On a condition.

20   Q   Okay.  My question to you is whether or not you

21   showed them guns?

22   A   We've already established this.

23   Q   So I take it your answer is yes, you showed them

24   guns?

25   A   Yes.

497

1    Q    You showed ATF agent your drugs?

2    A    Yes.

3    Q    You were a drug user on February 26, 2007?

4    A    And yes.  I'm not denying that.

5    Q    Okay.  Well, now let's talk about December 3rd,

6    2007.  On that day you were walking to Braums to by

7    milk; correct?

8    A    Yes.

9    Q    You were coming from your house on Tracy; correct?

10   A    Yes.

11   Q    The only purpose that morning was to buy a couple

12   gallons of milk for your child; correct?

13   A    Yes.

14   Q    When you -- let me back up.  Before you went to go

15   buy milk, somebody pulled into your drive, didn't they?

16   A    I don't know.  I wasn't outside.

17   Q    Somebody pulled into your drive and called you on

18   the telephone, didn't they?

19   A    Yeah.  I don't know if they was in the drive.  A

20   friend called me.

21   Q    And you say you don't remember whether or not they

22   were in the drive?

23   A    Yeah, I didn't go outside.  I went outside to go get

24   milk, go around the corner and walk to Braum's.

25   Q    Mr. Gehringer, let me talk to you a little bit about

1    now.  This isn't your first time that you've testified

2    in this case, is it?  You testified before in this case,

3    haven't you?

4    A    No.  This is the first time we're trying the case.

5    Q    Well, I'm not talking about trial.  On April 28th,

6    2008, we had some matters in front of the court and you

7    testified on that day, didn't you?

8    A    Yes.

9    Q    And, in fact, you sat in the same chair that you're

10   sitting in right now, didn't you?

11   A    Yes.

12   Q    And before you testified, the judge had you raise

13   your hand like you did today and take an oath; correct?

14   A    Yes.

15   Q    And you promised to tell the truth like you did

16   today?

17   A    Yes.

18   Q    Correct?  And then you testified; right?

19   A    Right.

20   Q    And Mr. Gradert asked you questions; correct?

21   A    Correct.

22   Q    And I asked you questions; correct?

23   A    Yes.

24   Q    And wasn't one of the things that Mr. Gradert asked

25   you about was your friends pulling up your driveway?

1   A   I don't recall.

2   Q   I'm going to hand you a transcript from that hearing

3   and I'm going to have you read to yourself on Page 125,

4   Lines 18 to 21, and then when you're done with that, on

5   Page 126 from Lines 5 to 7.  I'll have you read those to

6   yourself and if you would let me know when you're done.

7   A   Yeah.

8   Q   Does that refresh your recollection?

9   A   Yeah.

10  Q   So friends came over to your house in a red truck;

11  right?

12  A   I don't remember what color it was but -- yes -- was

13  it red?

14  Q   Let me have you read the first paragraph there on

15  Page 126, the first sentence.

16  A   Yeah.

17  Q   It was a red truck; right?

18  A   Right.

19  Q   They pulled in in the front of the driveway and they

20  gave you a call on the telephone; correct?

21  A   Right.

22  Q   And you said that it would be a few minutes, that

23  you weren't ready to come out, that you needed to go get

24  some milk and for them to come back in a few minutes;

25  correct?

1    A    Uh-huh.

2    Q    And then you went and walked over to Braum's;

3    correct?

4    A    Right.

5    Q    And you got the two gallons of milk; correct?

6    A    Yes.

7    Q    And you had contact with the ATF agents; right?

8    A    Yes.

9    Q    And you testified on direct that when you had

10   contact with these guys, even though they weren't in

11   uniform, you believed they were probably cops; correct?

12   A    I assumed it.

13   Q    And you knew that in your possession you had four

14   baggies of methamphetamine; correct?

15   A    I don't know how many.  I didn't -- I don't know.

16   Q    You knew you had meth?

17   A    I knew I had dope in my pocket, yeah.

18   Q    And you knew they were in separate packages; right?

19   A    Right.

20   Q    And so you ran?

21   A    Yeah.

22   Q    And you threw down the baggies of methamphetamine;

23   correct?

24   A    Yeah.  I believe I had marijuana, too.

25   Q    And so the photographs that the jury saw with bags

1    of methamphetamine that were sitting by the fence, those

2    were your bags?

3    A    Yes, they were mine.  I didn't deny that.

4    Q    On that day you gave consent to search your storage

5    unit; correct?

6    A    I asked them to.

7    Q    So you gave them permission to go into your storage

8    unit; right?

9    A    I asked them to.

10   Q    Okay.  And they went into your storage unit; right?

11   A    Right.

12   Q    You gave them the key to the storage unit?

13   A    Right.

14   Q    You gave them the key code to get in; right?

15   A    Right.

16   Q    And they found guns, didn't they?

17   A    I told 'em they were there, that I didn't want them

18   in my possession because I found them after the February

19   incident and remembered that they were there at that

20   time and there was other ones that we had missed, you

21   know.

22   Q    Okay.  Well, thank you for that.  My question is you

23   let them search your storage unit.

24   A    Yes.

25   Q    Okay.  This is one of the guns that was in your

502

1    storage unit; right?

2    A    Yes.

3    Q    The handgun?

4    A    Yes.

5    Q    There were a lot of handguns like this in your

6    storage unit; right?

7    A    No.  That's the only one like that.

8    Q    Well, there were a lot of handguns in your storage

9    unit; right?  This is a Ruger Redhawk?

10   A    Super Redhawk, 44 mag.

11   Q    This isn't an antique; right?

12   A    No.  That's why I -- that's why I told them I didn't

13   want them.

14   Q    My question to you is this is not an antique; right?

15   A    No.

16   Q    Now, you heard Agent Jones testify that the guns

17   from your storage unit were stolen; right?

18   A    He thinks they were.

19   Q    Okay.  But you testified on direct examination that

20   you didn't steal them, and if they were stolen when you

21   received them, you didn't know about it.  Right?

22   A    Right.

23   Q    You heard Agent Jones testify that they were

24   reported stolen in October of 2007; correct?

25   A    That they were what?

503

1    Q    You heard Agent Jones testify that they were

2    reported stolen in October, 2007?

3    A    They were reported stolen, yeah.

4    Q    In October of 2007?

5    A    Right.

6    Q    You would agree with me --

7    A    I've got the record on the table right there.

8    Q    You would agree with me that October of 2007, when

9    you look at a calendar, occurs after February, 2007?

10   A    We've already established this.

11   Q    So the answer is yes?

12   A    What?

13   Q    October comes after February in 2007?

14   A    I think we all know that.

15   Q    Okay.  This was a gun that was found in your storage

16   unit; right?

17   A    Right.

18   Q    This is a gun that was found in your storage unit;

19   right?

20   A    Right.

21   Q    This is a gun that was found in your storage unit?

22   A    Yes.  We've already established that.

23   Q    Okay.  That is a gun that was found --

24   A    You're wasting the Court's time.  This was

25   established the other day.  We didn't deny the admission

1    of evidence.

2    Q    And this is a gun that was found in your storage

3    unit; right?

4    A    You're wasting these people's time and the Court's

5    time.  That's been established.

6    Q    Well, let's let the Judge decide if that's

7    happening.  If you would just answer my questions.  All

8    these guns were found in your storage unit; right?

9    A    Right.

10   Q    None of these guns are antiques, are they?

11   A    No.  That's why they weren't at my house.

12   Q    Okay.

13   A    I didn't want them in my possession.

14   Q    You've answered my question.  I appreciate it.

15   A    And that's why I asked Mr -- that's why I asked

16   Mr. Jones to take them out.

17   Q    Thank you, sir.  There's not a question before you.

18   A    I was just finishing the answer.

19   Q    Let me talk to you a little bit about the drug

20   trade.

21            THE COURT:  Is this a new area that you're

22   going into.

23            MR. OAKLEY:  It is, Your Honor.

24            THE COURT:  I think let's take a recess,

25   Ladies and Gentlemen.  About 10 or 15 minutes.  Remember

505

```
 1    and heed the admonition.
 2                 (Recess.)
 3           THE COURT:  Yes, sir.  Go ahead.
 4    Q    (By Mr. Oakley) Mr. Gehringer, let me go back and
 5    let me talk to you just for a second again about that
 6    December 3rd, 2007, ATF search warrant.  And I'm going
 7    to show you what's been admitted into evidence as
 8    Government Exhibit 509.  First of all, let me show you
 9    the plastic baggies.  And you would agree that those
10    baggies are yours; correct?
11    A    Yes.
12    Q    Okay.  I'm going to show you --
13    A    Yes and they resemble the baggy that I threw down
14    with dope in it, yes, they did.
15    Q    I'm going to show you, I guess, the Blue Cross/Blue
16    Shield pill.  This is your plastic pill; right?
17    A    That's evidence that's already been submitted.  We
18    haven't denied it.  We already accepted --
19    Q    When I open this up, there's going to be empty
20    baggies in them; right?
21    A    Correct.
22    Q    These baggies have never had anything in them, have
23    they?
24    A    They don't look like it from here.
25    Q    Do you want to see them?
```

506

```
 1    A    No.  We haven't disputed that evidence.
 2    Q    Let me show you now what's been admitted into
 3    evidence as Government Exhibit 202.  It's the
 4    methamphetamine that was taken out of the pickup truck
 5    at the Homeland on December 19th.  Let me show that to
 6    you.  If you need to see it closer, let me --
 7    A    Yeah.
 8    Q    You would agree that's a lot of methamphetamine?
 9    A    Certainly looks like it to me.
10    Q    And you would agree with me that the person who
11    possessed this methamphetamine would have done so with
12    the intent to sell it?  This is too much for somebody to
13    use for their own use; right?
14    A    I would imagine.
15    Q    Okay.  Now, as a drug user, I think you testified on
16    direct examination that you've purchased drugs before;
17    right?
18    A    Yes.
19    Q    And I think you testified on direct examination that
20    you don't have one source for your drugs; correct?
21    A    I never testified to that, no.  But that's the
22    assumption, yes.
23    Q    Okay.  Well, we don't want you to assume.  Let me
24    ask you.  Do you have more than one source for your
25    drugs?
```

1   A   Yes.

2   Q   I think you testified on direct examination that

3   sometimes you get your drugs from bars?

4   A   Yes.

5   Q   You said that sometimes you go down to -- I can't

6   remember if you said south Broadway?

7   A   There's lots of high traffic, high drug traffic

8   areas.

9   Q   And as a drug user, you know where these areas are;

10   correct?

11   A   A few of 'em.

12   Q   Well, you know where a few of these areas are;

13   right?

14   A   Right.

15   Q   And when you go out and you're buying your drugs

16   from these areas, usually you don't know the person

17   who's selling you the drugs, do you?

18   A   No.

19   Q   And they don't know you?

20   A   No.

21   Q   Correct?

22   A   No.

23   Q   And you would agree with me that, well, drugs are

24   valuable, aren't they?

25   A   They're expensive.  They're not valuable.

508

1    Q    Well, for somebody who sells methamphetamine,

2    methamphetamine has some value to it, doesn't it?

3    A    It's expensive.  It has no value.

4    Q    And so when you would go out and you would buy

5    drugs, you would have to pay money for your drugs;

6    correct?

7    A    Right.

8    Q    Now let me talk to you about the fall of two

9    thousand and -- well, let's start with the fall of 2006.

10   How much drugs were you using back then?

11   A    I don't recall.

12   Q    You don't recall?

13   A    No.

14   Q    Well, when you would go buy your drugs, how much

15   would you buy?

16   A    Eighth ounce, quarter ounce.

17   Q    An eighth of an ounce or a quarter of an ounce.

18   Eighth of an ounce I think you testified is called an

19   eightball; right?

20   A    Yes.

21   Q    How much would you typically pay for an eightball?

22   A    Hundred, 150 bucks.

23   Q    I'm sorry.  $150 for an eightball?

24   A    Mostly, yeah.

25   Q    Who would you buy an eightball from that would only

1   charge you $150?

2   A    I'm not an informant.

3   Q    So you don't wanna tell me who would only charge you

4   150?

5   A    I'm not an informant.

6   Q    Well, did everybody only charge you that much?

7   A    Pardon.

8   Q    Was that the consistent price that you got for an

9   eightball?

10  A    What's that matter?

11  Q    Well, I think we'll let the Court and the jury

12  decide.  But my question is is that what you would

13  typically pay for an eightball?

14  A    Yes.

15  Q    Okay.  You said that you would buy a quarter of an

16  ounce.  Is that the most methamphetamine that you've

17  ever bought was a quarter of an ounce?

18  A    Yes.

19  Q    And how much would you typically pay for a quarter

20  of an ounce?

21  A    250.

22  Q    $250?

23  A    The most.

24  Q    Was the most.  So you never bought anything more

25  than a quarter of an ounce?

510

```
 1    A    No.
 2    Q    So you would agree with me that really anything more
 3    than a quarter of an ounce would be distribution
 4    quantities; right?
 5    A    Yeah.
 6    Q    Yes?
 7    A    Yes.
 8    Q    Now, when you would go out and buy drugs, would you
 9    agree with me that that's kind of a dangerous
10    transaction?
11    A    Say that again.
12    Q    Buying drugs is a dangerous transaction; correct?
13    A    It's risky.  I mean, I -- what do you mean by
14    dangerous?
15    Q    Well, have you ever had a gun pulled on you while
16    you were buying drugs?
17    A    No.
18    Q    Never had a gun pulled on you?
19    A    If I felt that nervous, I wouldn't, I wouldn't be
20    there.
21    Q    Okay.  Have you ever seen a drug dealer that had a
22    gun?
23    A    Yeah.
24    Q    Okay.  How many times have you seen drug dealers
25    with guns?
```

511

1    A    I never counted.

2    Q    More than once though?

3    A    I never counted.

4    Q    Okay.  But it would -- would it be more than one

5    time?

6    A    I've never counted.

7    Q    So would it be more than two times?

8    A    I don't recall.  I don't -- I don't -- I may have

9    seen a gun once or twice but that's probably it.  I

10   mean, I don't look for 'em.  If I felt that threatened,

11   I wouldn't be there.

12   Q    Okay.  Well, when you saw those guns, you know it

13   was because the drug dealer was concerned about getting

14   ripped off; right?

15   A    Or they thought they were cool.

16   Q    Or they thought that they were cool.  But the guns

17   were there to protect the drug dealer's drugs; right?

18          MR. GRADERT:  I'm going to object.  That calls

19   for speculation.  He wouldn't know what some drug dealer

20   thinks.

21          THE COURT:  Overruled.  But let's move on

22   here.

23   Q    I want to show you what has been admitted into

24   evidence as Government Exhibit 201.

25   A    I can see it from here.

512

1    Q   You can see it.  You would agree with me that this

2    is not an antique gun; correct?

3    A   Correct.

4    Q   This is a semi automatic handgun, isn't it?

5    A   Yes, it is.

6    Q   Some of the guns that you had in your storage unit

7    were semi automatic handguns; right?

8    A   There was one.

9    Q   One.  Did you ever fire it?

10   A   No.

11   Q   Have you ever fired a semi automatic handgun?

12   A   Yes.

13   Q   So you're familiar with the way that they work;

14   right?

15   A   Correct.

16   Q   And this is called a magazine; correct?

17   A   Yep.

18   Q   And this is where you put the bullets?

19   A   Yes.

20   Q   Correct?  And once you have the bullets in there,

21   you stick it into the -- I guess the butt of the

22   firearm, don't you?

23   A   Yes.

24   Q   And once you do that, all you have to do to fire it

25   is pull this back and it's ready to go; right?

1    A    Yeah.

2    Q    And so once the magazine is loaded and in there,

3    it's ready to fire once you jack a round into it;

4    correct?

5    A    Right.  Anyone that knows about guns, knows that.

6    They know how to handle guns, I mean.

7    Q    Okay.  Well, I don't think there's a question in

8    front of you, but let me see if I can come up -- see if

9    I have anything else to ask.  I don't know that -- if I

10   remember right, on December 19th, 2006, you testified

11   that the gas had been turned off at your house and

12   that's why you were gonna go to buy propane; right?

13   A    Right.

14   Q    I think you also testified that that area was very

15   well lit; right?

16   A    Right.

17   Q    In fact, the parking lot in the Homeland grocery

18   store is well lit?

19   A    Right.

20            MR. OAKLEY:  Your Honor, I don't have any

21   further questions.

22            THE COURT:  Mr. Gradert.

23            MR. GRADERT:  Just a few, Your Honor.

24                    **REDIRECT EXAMINATION**

25   BY MR. GRADERT:

514

1    Q    Todd, I actually forgot to ask you about this

2    earlier.  On I think it was in October they said that

3    you had about four thousand some odd dollars on you?

4    A    Right.

5    Q    You had had a garage sale that week, hadn't you?

6    A    Yes, I did.

7    Q    And --

8    A    I even pulled the permit from city hall that

9    weekend, too.

10   Q    Was the permit in your name or Dana's name?

11   A    I believe it was in Dana's.

12   Q    Okay.

13   A    I think I -- the week before was in mine.

14   Q    Did you have garage sales and sales at your house

15   very often?

16   A    Yes, we did.  About -- in the springtime and in the

17   summertime and in the fall.

18   Q    Okay.  So you had just had a garage sale prior to

19   your arrest on the 10th?

20   A    Yes.

21   Q    Was the money that you had on you the money from the

22   garage sale?

23   A    Most of it.  The other part was from scrappin' metal

24   at Wichita Iron and Metal.

25   Q    Did you have a bank account?

515

1   A   No.

2   Q   Have you ever had a bank account?

3   A   Once upon a time.

4   Q   Is there any reason why you didn't have a regular

5   bank account?

6   A   Because when I was paying child support, I used to

7   pay money orders and one time I just started

8   subcontracting and paid with one of my checks and I had

9   to pay directly to the courts and because I owed back

10  child support, the courts closed my bank account and all

11  my people that worked for me, all their payroll checks

12  bounced.  So I never got a bank account after that

13  again.

14  Q   Okay.  On December 19th when you got arrested I

15  think they said you had about $300.  Where'd that come

16  from?

17  A   Scrappin'.  Scrap iron, metal.

18  Q   How much would be the most money that you might

19  carry around with you at any given point in time?

20  A   It wasn't -- one time I was -- one time I cashed a

21  payroll check for a little over $16,000 and the bank

22  gave it to me all in 20s.  They didn't have any $100

23  bills.  They didn't have any 50s.  That's when I was

24  working for Carpet Value.  I couldn't believe it.  I was

25  like -- and I was trying to get a bank account then and

516

1    the bank wouldn't -- because the account that got

2    closed, they wouldn't, they wouldn't reopen it.  But I

3    had $16,000 in $20 bills.

4    Q   Okay.  The handguns that Mr. Oakley showed you, each

5    one of these -- he brought each one of these up

6    individually.  Most of these are revolvers, aren't they?

7    A   Yes.  They all are except for the one.

8    Q   I think except for this one right here; is that

9    correct?  This is Government Exhibit 505-F.  Is that an

10   automatic of some kind or semiautomatic?

11   A   Yeah.  That one and the other little chrome one.

12   Q   Then you had Derringers.  Those aren't automatics,

13   are they?

14   A   No.

15   Q   Revolvers are -- well, they're not antiques but --

16   A   They're western style.

17   Q   They're not designed to fire fast or rapid fire or

18   anything like that, are they?

19   A   No.

20   Q   Okay.  I suppose if you shot somebody with 'em,

21   they'd kill you just as dead as if it was a semi

22   automatic though; right?

23   A   Right.

24   Q   Okay.  You know there's that one big old gun over

25   there that has the scope on it.  Was that gun of any

517

1   special interest to you or anything like that?

2   A   No.  It was a target.  That's a target gun.

3   Q   Did you think it was kind of cool lookin'?

4   A   Yeah.

5   Q   By the way, most of these guns that are sitting over

6   here that were found in the -- well, actually, all these

7   guns are larger than this gun right here.  Is that a

8   fair statement?  Except for maybe those Derringers?

9   A   Right.

10  Q   This kind of gun might be something that somebody

11  could like conceal during a drug transaction or

12  something, couldn't they?

13  A   Yes, they could.

14  Q   Be kind of hard to conceal this big old thing in

15  your waistband or something like that, wouldn't it?  I

16  guess it's kind of intimidating looking, though, isn't

17  it?

18  A   Especially if you used it for a club.

19  Q   I just want to make sure it's clear.  You didn't

20  possess any of these drugs with an intent to sell them?

21  A   No, never.

22  Q   You weren't in the business of selling drugs?

23  A   No, never.

24        MR. GRADERT:  Thank you.  I have no further

25  questions.

1          THE COURT:  Very briefly, please.

2          MR. OAKLEY:  Yes.

3                    **RECROSS EXAMINATION**

4   BY MR. OAKLEY:

5   Q    You've given other people drugs before, though;

6   right?

7   A    No.

8   Q    Well, you testified on direct examination two times

9   ago to Mr. Gradert that you've given drugs to other

10  people before.

11  A    To other people?  No, I haven't.

12  Q    Okay.

13  A    I've shared with Dana.

14  Q    And sharing with Dana would require you to give her

15  some; correct?

16  A    No.  We smoked it together.  That's not --

17  Q    4812 came from a garage sale?

18  A    Most of it.

19  Q    I don't know that I understood this, but the payroll

20  check was for $16,000 in cash that you had on you?

21  A    No, it wasn't -- that I had on me?  No.  At one time

22  I cashed a payroll check for $16,000.

23  Q    But that wasn't during the time period of any of

24  these charges; right?  That was before October, 2007?

25  A    Yes.

519

```
1    Q    And you couldn't find a bank that would take $16,000
2    and open an account for you?
3    A    No, I couldn't, not the bank that I cashed it at.
4    Q    Mr. Gradert asked you a little bit about revolvers
5    and semi automatics.  And you're familiar with guns;
6    right?
7    A    Yes.
8    Q    You would agree with me that a semi automatic
9    handgun like this can sometimes jam; correct?
10   A    I guess.  I don't know.  I'm not that familiar with
11   automatics.
12   Q    Gets a stove pipe where the bullet's pointing up and
13   you have to stop and clear it?
14   A    I don't know.  I'm not that familiar with
15   automatics.
16   Q    You're familiar with revolvers; right?
17   A    Right.
18   Q    Revolvers don't jam; correct?
19   A    Right.
20   Q    They're more dependable?
21   A    Right.
22             MR. OAKLEY:  No further questions.
23             MR. GRADERT:  Nothing further, Your Honor.
24             THE COURT:  Mr. Gehringer, you may resume your
25   seat.
```

1            MR. GRADERT:  Your Honor, the defense would

2    rest.

3            THE COURT:  All right.  Well, let's see, it's

4    noon.  What time is your lunch supposed to be here?

5                    (Off-the-record.)

6            THE COURT:  I tell you what I think I'm going

7    to do.  If your lunch is going to be here a little after

8    12:15.  I want you to eat your lunch.  It's going to

9    take me probably 20 to 30 minutes to read you the

10   court's instructions, which is the next step in the

11   process.  So I don't see any point in starting to do

12   that now.  I think what I'm going to do is we're going

13   to recess until you've basically finished your lunch,

14   and I'm not sure when that's going to be, but somebody

15   can come tell Teresa or tell somebody else and then

16   we'll come back and I'll read you the instructions and

17   we'll have the closing arguments and then you can go

18   directly into your deliberations.  So remember and heed

19   the admonition.  Enjoy your lunch.  Don't eat too fast.

20   I don't want you to have an upset stomach.  And when you

21   finished your lunch -- I'm going to have the lawyers

22   stick around here -- and we'll come back and I'll read

23   you my instructions and we'll finish up this case.  So

24   you're excused.

25                    (Jury excused for noon recess at

1                        11:55 a.m.)

2              THE COURT:  Did you want to renew your motion?

3              MR. GRADERT:  Just -- I'll renew it, Judge,

4     and that's all I have to say about it.

5              THE COURT:  Well, the ruling will be the same.

6     They're going to be -- they're going to be out for at

7     least an hour so you guys can go get your lunch and

8     defendant can eat his lunch and then we'll probably

9     start again about 1.  But I, I didn't want to give them

10    an hour and a half for lunch.  They don't have anything

11    to do in there for that length of time.

12             MR. GRADERT:  An hour is fine.

13             THE COURT:  Okay.

14                        (Noon recess.)

15                        (Beginning at 1:08 p.m. Judge

16                        Belot reads instructions to

17                        jury.)

18                        (Closing Arguments NOT

19                        Transcribed.)

20

21                        (At 2:30 p.m. the jury retires

22                        to deliberate their verdict.)

23

24

25